Douglas D. Gerrard, Esq.
Nevada Bar No. 4613
dgerrard@gerrard-cox.com
Nathan R. Henderson, Esq.
Nevada Bar No. 13145
nhenderson@gerrard-cox.com
GERRARD COX LARSEN
2450 Saint Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000
*Attorneys for Creditor*,
WOODS & ERICKSON, LLP

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In Re: | Case No. BK-S-19-17282-btb |
| ANDREW BUNKER PLATT and RUTH ANN PLATT | Adversary Proceeding: 19-01125 |
| Debtor(s). | Chapter 7 |
| WOODS & ERICKSON, LLP, a Nevada Limited Liability Partnership, d/b/a WOODS ERICKSON & WHITAKER, LLP, | |
| Plaintiff, | |
| vs. | |
| ANDREW B. PLATT, an individual, | |
| Defendant. | |

**WOODS & ERICKSON, LLP d/b/a WOODS ERICKSON & WHITAKER, LLP'S RESPONSE TO AMENDED STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEBTOR'S AMENDED MOTION FOR SUMMARY JUDGMENT**

COMES NOW Creditor WOODS & ERICKSON, LLP d/b/a WOODS ERICKSON & WHITAKER, LLP ( "Firm") by and through its counsel of record, the law firm of GERRARD COX LARSEN, and hereby submits its Statement of Disputed Facts in Response to Debtor's Motion for Summary Judgment [ECF No. 26], pursuant to Federal Rule of Bankruptcy Procedure 7056 and Local Rules of Practice of the United States Bankruptcy Court for the District of Nevada.

/ /

/ /

/ /

| No. | Debtor's Statement of Undisputed Facts and Supporting Evidence | The Firm's Response and Supporting Evidence |
|---|---|---|
| 1 | Prior to becoming an attorney, Platt earned a degree in secondary education and obtained a teaching certificate.<br><br>*See*, Declaration of Andrew Platt. | Undisputed. |
| 2 | After becoming an attorney, Platt occasionally performed pro bono work for educational causes.<br><br>*See*, Declaration of Andrew Platt. | Undisputed. |
| 3 | Platt also served as a member of the board of a charter school, Renaissance Academy.<br><br>*See*, Declaration of Andrew Platt. | Undisputed. |
| 4 | As a member of the board, Platt got to know the founder of Renaissance Academy, and occasionally provided legal services to him for work separate from Renaissance Academy.<br><br>*See*, Declaration of Andrew Platt. | Undisputed. |
| 5 | Eventually, Renaissance Academy was forced by the Nevada Department of Education to shut down.<br><br>*See*, Declaration of Andrew Platt. | Undisputed. |
| 6 | Platt was appointed by the State of Nevada under NRS 388A.306(5) to oversee the shutdown of the school (the "**Shutdown Services**").<br><br>*See*, Declaration of Andrew Platt. | Undisputed. |
| 7 | All Renaissance amounts in dispute were paid as compensation for the Shutdown Services.<br><br>*See*, Declaration of Andrew Platt. | Undisputed. |

2

| 8 | The work consisted primarily of Platt overseeing the transfer of student education records and transcripts to new schools. Platt also oversaw the distribution of the school's physical assets, such as computers and desks, which were given to other charter schools. The Shutdown Services were not legal services; no legal degree or license was required. Generally, a school administrator would fulfill this role. Platt was put in charge of the process because of his teaching background and because of his familiarity with the school as a board member.<br><br>*See*, Declaration of Andrew Platt. | Disputed.<br><br>The Firm disputes that the "Shutdown Services" did not constitute legal services and that this distinction changes the fact that those amounts were properly owed to the Firm. When asked in deposition "How much money did you receive for legal services from Renaissance Academy?" the Debtor Andrew Platt ("Platt") answered "In total, it was probably around at least 10,000." *See*, April 9, 2019 Deposition of Andrew Platt attached hereto as **Exhibit "1"** at 77:14-17. Platt then went on to testify that he received no more than $15,000.00 from his work for the Renaissance Academy. *Id.* at 78:10-22. Thus, Platt's estimation of his own work was that the "Shutdown Services" consisted of legal services. When the checkbook for Renaissance Academy was subsequently obtained, it was discovered that the amount Platt actually received from the Academy for legal services was $31,815.00. *See*, Renaissance Academy Checkbook attached hereto as **Exhibit "2"**. Moreover, the Firm provides dissolution and wind-up services and has provided such services for over twenty-five years. *See*, Declaration of John Erickson attached hereto as **Exhibit "3"** at ¶ 17. As a result, all of the services for which Platt was paid by Renaissance Academy could have and should have been billed through the Firm. |

3

| | | |
|---|---|---|
| 9 | The only time that the Shutdown Services were even tangentially related to legal services was when Renaissance Academy needed to make a claim on an E&O policy to recover public funds. Platt approached the head of the litigation work at the Firm, Brian Whitaker because of his prior litigation experience in insurance and asked if Renaissance could engage WEW to provide legal services, but Whitaker declined and provided recommendations, including Royal Jones. Platt, on behalf of Renaissance Academy, retained Royal Jones to make the claim, and Platt himself did not undertake the legal services.<br><br>*See*, Declaration of Andrew Platt. | Disputed.<br><br>The Firm disputes that this was the only "time that the Shutdown Services were even tangentially related to legal services." *See*, **Exhibit "1"** (Platt Deposition) at 77:14-17. When asked in deposition "How much money did you receive for legal services from Renaissance Academy?" Platt answered "In total, it was probably around at least 10,000." *See*, April 9, 2019 Deposition of Andrew Platt attached hereto as **Exhibit "1"** at 77:14-17. Platt then went on to testify that he received no more than $15,000.00 from his work for the Renaissance Academy. *Id.* at 78:10-22. Thus, Platt has admitted that the "Shutdown Services" were legal services. When the checkbook for Renaissance Academy was subsequently obtained, it was discovered that the amount Platt actually received from the Academy for legal services was $31,815.00. *See*, **Exhibit "2"** (Renaissance Academy Checkbook). |
| 10 | Further, WEW was fully aware of Platt's work for Renaissance Academy. The matter was not hidden in any way, emblematic of this was the fact that Platt brought a large fireproof cabinet of school records to his office. The firm has not been engaged by the Department of Education before or since, nor has the firm sought to serve as a receiver in liquidation for other charter schools or, for that matter, any entities public or private.<br><br>*See,* Deposition of Allison Miller at 92:5-14; Declaration of Andrew Platt. | Disputed.<br><br>The Firm disputes that knowledge of volunteer work for a charter school constitutes knowledge of the provision of paid legal services to that charter school. The Firm further disputes that a non-partner firm employee, Allison Miller, being aware of the existence of a cabinet constitutes permission by the Firm's managing partners to divert legal income which should have been directed to the Firm. Platt's own testimony is that none of the Firm's managing partners approved *any* of his activities for Renaissance Academy much less his retention of the fees generated therefrom. *See*, **Exhibit "1"** (Platt Deposition) at 81:11-24. The managing partners of the Firm did not learn that Platt had been paid by Renaissance Academy until April of 2018. *See*, Deposition of Brian Whitaker attached hereto as **Exhibit "4"** at 123:18-124:7. At that time, Platt claimed he was only paid $2,500.00 by the Renaissance Academy. *See*, *id.* at 207:5-15. When the checkbook for Renaissance Academy was subsequently obtained, it was discovered that the amount Platt actually received from the Academy for legal services was $31,815.00. *See*, **Exhibit "2"**. Platt's proven deceit with regards to his payment by the Renaissance Academy makes clear that he did not truly believe he was authorized to personally receive payments. |

4

| | | |
|---|---|---|
| 11 | On September 28, 2017, Platt formed L&S after obtaining permission from Woods. Notwithstanding the fact that Platt had formed L&S, until Platt separated from WEW in April 2018, he continued to work for WEW, bill hours for WEW clients, generate revenue for WEW, bring new clients to WEW and run all clients through WEW except those referred by Don Joffe, Platt's business contact who was an accountant.<br><br>*See*, Declaration of Andrew Platt. | Disputed.<br><br>The Firm disputes that Glen Woods had authority to unilaterally authorize a firm employee to divert firm revenue to themselves. The Firm's Partnership Agreement requires all non-routine decisions to be made by the three Managing Partners (Glen Woods, John Erickson and Brian Whitaker) acting as a body and does not allow for unilateral decisions on non-routine matters by any one Managing Partner. *See*, Partnership Agreement attached hereto as **Exhibit "5"** at §§ 5.3 to 5.5. The Partnership Agreement further entitles each Managing Partner to "participate in the deliberations" of partnership decisions which Platt does not allege ever happened with regards to his supposed authorization by Glen Woods. *Id.* at § 5.4. Neither Erickson nor Whitaker knew of the existence of L&S until after Platt's departure from the firm. *See*, May 10, 2019 Deposition of Brian Whitaker attached hereto as **Exhibit "4"** at 104:15-18 and **Exhibit "18"** at 103:20-23.<br><br>Platt has failed to provide any evidence aside from his own self serving testimony that deceased managing partner Glen Woods ever authorized his diversion of firm revenue. Further, because Platt's diversion of fees was not intended to and was not completed within a year, pursuant to the statute of frauds (NRS 111.220(1)), any agreement authorizing such diversion must be reduced to writing which Platt has admitted never occurred. *See*, **Exhibit "1"** (Plat Deposition) at 81:11-18.<br><br>The Firm also disputes that Platt limited L&S Counselors, Ltd.'s ("L&S") scope of clients as alleged here. In Platt's final month of employment with the Firm he billed *all* legal services provided to *any* clients through L&S. *See*, Firm and L&S Billings for Identical Clients attached hereto as **Exhibit "6"**. |

| | | |
|---|---|---|
| 12 | WEW knew that Platt would handle Joffe's referrals outside of the Firm. They are aware that until Platt's ejection from the firm in April 2018, L&S had only three clients. All of them were established clients of Joffe, and as explored over multiple depositions, there were literally only three of them.<br><br>*See*, Declaration of Andrew Platt. | Disputed.<br><br>Platt has not provided any evidence that anyone at the Firm ever knew of the existence of L&S, his provision of legal services through L&S or his diversion of legal fees away from the Firm and to L&S. All Firm employees, including those who worked closely with Platt, testified that they had never heard of L&S and had no knowledge of Platt's activities. *See*, Deposition of Janet Baker attached hereto as **Exhibit "7"** at 53:3-25, 54:1-15; Deposition of Veronica McCormack attached hereto as **Exhibit "8"** at 30:13-22, 37:1-1-7; Deposition of Allison Miller attached hereto as **Exhibit "9"** at 91:18-25, 92:1; Deposition of Kent Woods attached hereto as **Exhibit "10"** at 41:23-25, 42:1-24; Declaration of John Bulloch attached hereto as **Exhibit "11"** at ¶ 7; and Deposition of Kathy Jones attached hereto as **Exhibit "12"** at 32:18-33:10.<br><br>It is disputed that L&S only had three clients and that all clients were referrals from Don Joffe. In Platt's last month with the Firm, Platt stopped billing through the Firm entirely and billed all pre-existing Firm employees through L&S. *See*, Firm and L&S Billings for Identical Clients, attached as **Exhibit "6"**; *see also*, **Exhibit "18"** (Erickson Deposition) at 150-152. Regardless of the number of individual clients, in response to the Firm's Interrogatory No. 10 Platt reported that he diverted a total of $134,920.00 in legal fees from the Firm to L&S. *See*, Andrew Platt's Response to Interrogatory No. 10, verified under oath, attached hereto as **Exhibit "13"**. |

| | | |
|---|---|---|
| 13 | Further, L&S documents were accessible to WEW and its staff. Far from a concealed secret, WEW's engagement letter was updated to reflect the existence of L&S and contemplated dual representation by both L&S and WEW. The most prominent example of this was that all three partners, Whitaker, Erickson, and Woods, each sent clients materials referencing L&S.<br><br>*See*, Tcholakian Engagement Letter at Section 8; Cates Engagement Letter at Section 8. | Disputed.<br><br>The normal course of sending out engagement letters by the Firm was to simply sign a single page letter describing the scope of services and then hand the letter to a legal assistant who would attach a standard General Terms Statement before sending it out. *See*, Declaration of Brian Whitaker attached hereto as **Exhibit "14"** at ¶¶ 7-9; Declaration of John Erickson attached hereto as **Exhibit "3"** at ¶¶ 7-9. Apparently, Platt inserted a reference to L&S into the General Terms Statement without telling anyone in an effort to protect himself. Platt made a two word insertion in the middle of the fifth paragraph on the second page of the General Terms Statement. *See*, Tcholakian Engagement Letter at Section 8 attached hereto as **Exhibit "15"**; Cates Engagement Letter at Section 8 attached hereto as **Exhibit "16"**. Prior to this litigation, neither Whitaker or Erickson had reviewed the General Terms Statement in many years and neither of them had ever seen a version of the General Terms Statement that included any reference to L&S. *See*, **Exhibit "14"** at ¶¶ 10-12; **Exhibit "3"** at ¶¶ 10-12. |
| 14 | The Firm claims that Platt was made a partner in January 2016. However, as demonstrated by archives of the Firm website, the Firm started referring to Platt as a junior or limited partner as early as the fall of 2014. Thus, it is clear that WEW's reference to an attorney as a "partner" or "limited partner" or "junior partner" cannot be construed as an indication that the attorney is a formal partner in the WEW entity, but rather, simply a reference to an attorney with a supervisory role in the firm structure according to the general vernacular common for law firms.<br><br>*See*, Declaration of Andrew Platt. | Disputed.<br><br>In January, 2016, the Firm offered Platt the opportunity to become a limited partner of the Firm. As a limited partner, Platt would be entitled to receive partnership distributions equal to fifty percent (50%) of the collections from his time billed to Firm clients but would have to pay his own self-employment taxes, among other things. *See*, **Exhibit "4"** (Whitaker Deposition) at 67:13-20. Platt elected to become a limited partner. *See*, July 11, 2019 Deposition of Andrew Platt attached hereto as **Exhibit "19"** at 305:14-21. Upon electing to become a limited partner, Platt's partnership distributions were reported at year end with a Form K-1 delivered to Platt. As a result, Platt's income was reported on a Form W-2 for the years 2007 through 2015, and Platt's partnership distributions were reported on a Form K-1 for the years 2016 through 2018. *See* **Exhibit "17"**. |
| 15 | In January 2016, the Firm stopped paying Platt a salary and started paying him strictly a commission equal to fifty percent (50%) of the fees he generated for the Firm.<br><br>*See*, Declaration of Andrew Platt. | Undisputed.<br><br>The referenced change in compensation structure resulted in Platt's income from the Firm nearly doubling. *See*, Tax Statements for years 2014-2017 attached hereto as **Exhibit "17"**. In deposition, Platt testified that he made this change in structure knowingly and willingly. *See*, **Exhibit "19"** at 305:14-21. |

7

| | | | |
|---|---|---|---|
| 16 | At the same time, WEW started classifying Platt as a partner for federal tax purposes. Platt started receiving K-1's instead of W-2's in 2016. By doing so, WEW avoided employment taxes, 401(k) matching, and other sums due to or with respect to employees which are not due to partners. Indeed, an audit performed in 2018 by the Nevada Department of Taxation found that the Firm had substantially misclassified and underreported wages from the time period of 2016 to 2018. *See*, Declaration of Andrew Platt. | Disputed. Platt was properly classified as a limited partner for purposes of federal taxation and was not entitled to the Firm's contribution towards employment taxes or 401(k) matching. In deposition Platt testified that he willfully agreed to this arrangement. *See*, **Exhibit "19"** at 305:14-21. As previously noted, this compensation structure resulted in a near doubling of Platt's income. *See*, **Exhibit "17"**. The Firm was never determined to have mis-classified Platt by the Nevada Department of Taxation, rather, the Firm was sent a letter from the Department of Employment Training and Rehabilitation stating that it had not paid $423.00 towards the Firm's unemployment bond in connection with Platt's employment. The Firm in turn paid this amount which does not have any bearing on Platt's employment classification or represent any amount which he was required to pay in the Firm's place. *See*, **Exhibit "4"** (Whitaker Deposition) at 73:7-75:10 | |
| 17 | As a result of the Firm classifying Platt as a partner rather than an employee, Platt was required to pay substantial self-employment taxes, was deprived of receiving 401(k) matching from the Firm, and was deprived of other benefits afforded to employees of the Firm. *See*, Declaration of Andrew Platt. | Disputed. Platt was properly classified as a limited partner for purposes of federal taxation and was not entitled to the Firm's contribution towards employment taxes or 401(k) matching. In deposition Platt testified that he willfully agreed to this arrangement. *See*, **Exhibit "19"** at 305:14-21. As previously noted, this compensation structure resulted in a near doubling of Platt's income. *See*, **Exhibit "17"**. The Firm was never determined to have mis-classified Platt by the Nevada Department of Taxation, rather, the Firm was sent a letter from the Department of Employment Training and Rehabilitation stating that it had not paid $423.00 towards the Firm's unemployment bond in connection with Platt's employment. *See*, **Exhibit "4"** (Deposition of Brian Whitaker) at 73:7-75:10 | |
| 18 | The Firm's Partnership Agreement, as required by Section 2.7 thereof, which states: "[a new partner] must execute a counterpart to this Agreement and agree to be bound by all the terms and provisions thereof." *See,* Partnership Agreement. | Undisputed. | |

8

| 19 | Platt cannot be characterized as a partner because he did not sign the Partnership Agreement. | Disputed.<br><br>Platt was properly characterized as a limited partner of the Firm, however, the characterization of Platt's relationship with the Firm as that of a limited partner or an employee is immaterial to any of the Firm's claims. |
|---|---|---|

DATED this 10th day of February, 2021.

**GERRARD COX LARSEN**

*/s/ Douglas D. Gerrard, Esq.*
Douglas D. Gerrard, Esq.
Nevada Bar No. 4613
Nathan R. Henderson, Esq.
Nevada Bar No. 13145
2450 Saint Rose Parkway, Suite 200
Henderson, Nevada 89074
*Attorneys for Creditor,*
*Woods & Erickson, LLP*