1  Matthew L. Johnson (6004)
2  Russell G. Gubler (10889)
   JOHNSON & GUBLER, P.C.
   Lakes Business Park
3  8831 West Sahara Avenue
   Las Vegas, Nevada 89117-5865
4  Phone: (702) 471-0065
   Fax: (702) 471-0075
5  mjohnson@mjohnsonlaw.com
   rgubler@mjohnsonlaw.com
   adhillon@mjohnsonlaw.com
6
   *Attorneys for Debtor/Defendant*
7  *Andrew Bunker Platt*

E-Filed: April 30, 2021

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

8                **UNITED STATES BANKRUPTCY COURT**

9                **FOR THE DISTRICT OF NEVADA**

10

11 In Re:                                    ) Case No.: 19-17282-btb
                                             ) Chapter 7
   ANDREW BUNKER PLATT and RUTH              )
12 ANN PLATT,                                )
                                             )
13        Debtors.                           )
                                             )
   _____         )
14 WOODS & ERICKSON, LLP, a Nevada           ) Adversary Proceeding 19-01125-btb
   limited liability partnership, d/b/a      )
15 WOODS ERICKSON & WHITAKER,                ) **DEFENDANT ANDREW B. PLATT'S**
   LLP,                                      ) **TRIAL STATEMENT**
                                             )
16        Plaintiff,                         )
                                             )
17 vs.                                       )
                                             )
18 ANDREW B. PLATT, an individual,           )
                                             )
19        Defendant.                         )
   _____         )

20        Andrew Bunker Platt ("Platt"), by and through his counsel of record, the law firm of

21 Johnson & Gubler, P.C. submits the following Trial Statement.

22
   **I.      WITNESSES**
23

24        1.   ANDREW B. PLATT
               C/O JOHNSON & GUBLER, P.C.
25             8831 W. Sahara Avenue
               Las Vegas, Nevada 89117

-1-

DM_US 52503472-3.094622.0011

(702) 471-0065

Andrew Platt will testify regarding his relationship with the Plaintiff, his status with the Plaintiff, the formation of L&S Counselors, and all other matters relevant to the issues raised by the Plaintiff's Complaint.

Plaintiff has not completed any disclosures in this case, nor has it disclosed any witnesses at all in this case as required by Fed. R. Bank. Proc. 7026, which incorporates Fed. R. Civ. Proc. 26. Therefore, Defendant objects to Plaintiff calling any witnesses at trial or producing any documents.

In the event that the Court allows witnesses to testify despite Plaintiff's failure to disclose witnesses as required, Defendant Platt reserves the right to call the following witnesses:

| Andrew Platt<br>c/o Johnson & Gubler PC<br>8831 W Sahara Ave,<br>Las Vegas, NV 89117 |
| PMK for Woods & Erickson, LLP<br>c/o GERRARD COX LARSEN<br>2450 Saint Rose Parkway, Suite #200<br>Henderson, NV 89074 |
| John Erickson<br>c/o GERRARD COX LARSEN<br>2450 Saint Rose Parkway, Suite #200<br>Henderson, NV 89074 |
| Brian Whitaker<br>c/o GERRARD COX LARSEN<br>2450 Saint Rose Parkway, Suite #200<br>Henderson, NV 89074 |

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

DM_US 52503472-3.094622.0011

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| Jay Larsen |
| C/O GERRARD COX LARSEN |
| 2450 Saint Rose Parkway, Suite #200 |
| Henderson, NV 89074 |

| Allison Miller |
| ERICKSON &WHITAKER, PC |
| 1349 Galleria Dr., Suite 200 |
| Henderson, NV 89014 |

| Kent Woods |
| LAW OFFICE OF KENT P.WOODS |
| 197 E. California Ave, Suite 300 |
| Las Vegas, Nevada 89104 |

| John Bulloch |
| ERICKSON &WHITAKER, PC |
| 1349 Galleria Dr., Suite 200 |
| Henderson, NV 89014 |

| Bryan Dixon |
| Fabian VanCott |
| 411 East Bonneville Ave, Suite 400 |
| Las Vegas, NV 89101 |

Defendant reserves the right to amend/supplement the disclosure of witnesses as additional witnesses become known.  Defendant reserves the right to call additional rebuttal witnesses.

## II.    DOCUMENTS

### DESCRIPTION:

Plaintiff has not completed any disclosures in this case, nor has it disclosed any documents at all in this case as required by Fed. R. Bank. Proc. 7026, which incorporates Fed. R. Civ. Proc. 26. Further, Defendant requested copies of documents used in the state court litigation, and Plaintiff stated that they would not produce any documents. *See* Email chain attached as **Exhibit "A"**.  The State Court case, which was removed to this Court, is a separate

-3-

case. Plaintiff has failed to produce a single document in this case even after several requests were made to produce documents in the State Court case. Platt's current counsel does not have those documents. He was not involved in the State Court case, and Platt's State Court counsel, who withdrew, has not provided those documents. Therefore, Defendant objects to Plaintiff calling any witnesses at trial or producing any documents as Plaintiff has not disclosed a single document or witness in this case.

In the event that the Plaintiff is allowed to utilize documents in this case despite not having produced any documents, having refused to produce documents, and not having made any disclosures over Defendant's objection, Plaintiff intends to rely on the following documents at trial:

1.      Partnership Agreement of WEW

2.      Rejected instruments for Platt's admission to WEW

3.      Ownership or formation documents for WWP, Bosque, and Gatehouse

4.      DETR correspondence and documents pertaining to misclassification of employees

5.      Evidence of payment of wages after separation.

6.      Images of WEW and Erickson & Whitaker PC websites showing designation of attorneys

7.      Correspondence relating to the John Bulloch's legal services in parallel to employment at WEW

8.      Contemporaneous correspondence discussing Woods' approval of work outside WEW.

9.      L&S Financial statement

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

-4-

10.     Pleadings in the State Court matter against the estate of Glen Woods

11.     Correspondence in 2016 from a referral from Joffe

12.     WEW Engagement letters signed by Erickson, Whitaker, and Woods

13.     WEW Engagement letters prepared after the formation of L&S

14.     Correspondence from the Nevada Charter School Authority

15.     Documents relating to the establishment of L&S

16.     Correspondence and audio conversations between parties after Platt's separation

17.     Documents relating to the transfer of bills and client information at Platt's separation

Defendants reserve the right to supplement the documents they intend to use at trial in this matter and to utilize other documents in rebuttal if this Court allows Plaintiff to introduce documents at trial over the continuing objection of Defendant.

III.    **NATURE OF THE ACTION AND CONTENTION OF THE PARTIES**

Because this Court has already granted partial summary judgment in this case in favor of Defendant, this matter consists of one cause of action to determine dischargeability of debt under 11 U.S.C. §523(a)(4). There are no causes of actions under 11 U.S.C. §523(a)(6) or (a)(2).

The trial will determine the dischargeability of Platt's debts under section 523(a)(4) of amounts claimed after Defendant Andrew Platt's ("***Platt***") separation from his former employer, Plaintiff, Woods & Erickson, LLP, d/b/a Woods Erickson & Whitaker, LLP ("***WEW***" or the "***Firm***"), and Platt's formation of a new law firm named L&S Counselors, Ltd ("***L&S***"). WEW has the burden of proving that Platt's moonlighting was not only unauthorized but that its claim against Platt arises from Platt's fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. This dispute arises because, following the death of the Firm's managing partner, R. Glen Woods ("**Woods**"), the remaining partners forced out, refused to pay compensation to, and then sued, the two attorneys who worked closest with Woods: Platt and

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

1  Woods' son, Kent Woods. During the same time, Plaintiff contacted Woods' clients to take over

2  his estate planning and tax practice. The Defendant's focus has been on whether, as an employee,

3  Platt was entitled to compensation after his separation from the firm.  The Plaintiff's focus has

4  been whether Platt was a partner in the sense that he owed the Firm and its non-managing

5  partners' fiduciary duties, and whether, by extension, Platt was prevented from providing legal

6  and non-legal services outside the firm.

7        a.   __The Formation of WEW and Glen Woods' Authority.__

8        In 1997, the original partners of Plaintiff Woods & Erickson, LLP, d/b/a Woods Erickson

9  & Whitaker, LLP") entered into a partnership agreement. On February 12, 2007, the partners of

10  the Firm entered into an amended and restated partnership agreement (the "***Amended and***

11  ***Restated Partnership Agreement***"). *See* ***Exhibit "B"***. Pursuant to the Amended and Restated

12  Partnership Agreement, "[e]xcept as specifically provided otherwise herein, the Managing

13  Partners shall make all decisions by majority vote, with each Managing Partner having one vote

14  for each Percentage Interest in the capital of the Partnership that is owned by such Managing

15  Partner." *See* Exhibit "B" at page 10, Section 5.1. Thus, unless the Amended and Restated

16  Partnership Agreement specifically requires something other than a majority vote, a majority vote

17  of the Managing Partners is sufficient to authorize an action. The Amended and Restated

18  Partnership Agreement did not require more than a majority vote to authorize "Routine

19  Decisions," "Partnership Decisions," or "Extraordinary Decisions." *See* Exhibit "B" at Sections

20  5.3, 5.4, and 5.5. Regarding the authority of WEW to approve of a partner pursuing outside

business opportunities, the Partnership Agreement states as follows:

21
22      Each Partner shall first offer to the Partnership an exclusive right of first refusal
    with respect to any opportunity within the scope of the Partnership's business . . . .

23      The Partnership shall have at least fifteen (15) days in which to accept such offer
    and, if not accepted, the offering Partner shall be free to pursue such opportunity

24      independent of the Partnership and the Partners.

*See* Exhibit "B" at page 12, Section 5.8.

25

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

On August 12, 2013, the partners of the Firm entered into an amendment to the Amended and Restated Partnership Agreement (the "***First Amendment***"). *See* **Exhibit "C"**. Pursuant to the First Amendment, Glen Woods ("**_Woods_**") held a fifty-nine percent (59%) interest in the Firm. The other two managing partners were John Erickson ("**_Erickson_**"), who owned four percent (4%), and Brian Whitaker ("**_Whitaker_**"), who owned thirty-seven percent (37%). *See* Exhibit "C" at 2.3. Thus, Woods held a sufficient ownership interest in WEW to constitute a majority vote all by himself. Pursuant to Article V of the Amended and Restated Partnership Agreement, as owner of fifty-nine percent (59%) of the capital of the Partnership, Woods had full authority to make all decisions on behalf of the Firm, including Routine Decisions, Partnership Decisions, Extraordinary Decisions, and decisions regarding the pursuit of outside business opportunities. *See* Exhibit "A" at Article V. And both sides have testified that that is exactly what happened in practice.

### b.  Platt's Employment With WEW

From 2007 to April 2018, Defendant Andrew Platt's ("**_Platt_**") worked for WEW. WEW claims that Platt became a partner of the Firm in January 2016, which Platt denies. WEW often used the term "partner" as a title, regardless of an attorney's financial stake in the Firm. Section 2.7 of the Amended and Restated Partnership Agreement states that a new partner "***must*** execute a counterpart to this Agreement and agree to be bound by all of the terms and provisions hereof." *See* Exhibit "B" at 2.7 (emphasis added). Platt never signed the Agreement. WEW has failed to explain how Platt can be a partner when he failed to sign the Partnership Agreement, ***as absolutely required by Section 2.7*** thereof.

In January 2016, the Firm stopped paying Platt a salary and started paying him strictly a commission equal to fifty percent (50%) of the fees he generated for the Firm. At the same time, WEW started classifying Platt as a partner for federal tax purposes. By doing so, WEW avoided employment taxes, 401(k) matching, and other sums due to or with respect to employees which are not due to partners. Indeed, an audit performed in 2018 by the Nevada Department of Taxation found that the Firm had substantially misclassified and underreported wages from the

**JOHNSON & GUBLER, P.C.**
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

time period of 2016 to 2018. As a result of the Firm classifying Platt as a partner rather than an employee, Platt was required to pay substantial self-employment taxes, was deprived of receiving 401(k) matching from the Firm, and was deprived of other benefits afforded to employees of the Firm.

### c. **WEW's Firm Culture.**

WEW has a long history of authorizing outside, and even competing work. In 2013, Woods, Platt, and Daniel Weintraub ("***Weintraub***"), a California attorney, created a Nevada limited liability partnership named Weintraub, Woods & Platt LLP ("***WWP***"). *See Exhibit "D"*. WWP was created specifically to receive all clients referred by Weintraub. The plan was that Weintraub would refer the client, Woods and Platt would perform the legal work, and all three partners would receive partnership distributions based on profits made through the legal services provided to these clients, with none of the profits being paid to WEW. Woods, Platt, and Weintraub were each listed as managing partners of WWP, and Woods was listed as the firm's registered agent. *See* Exhibit "D". WWP's principal office was listed at 1349 Galleria Drive, Suite 200, the same address as WEW. *See* Exhibit "D". WEW not only handled the creation of WWP, WEW also paid for a large portion of WWP's start-up expenses. *See* Exhibit "D"; *See also Exhibit "E"*.

Erickson and Whitaker deny knowing of WWP's existence until after Woods' death. *See Exhibit "F"*; Deposition of John Erickson at 59:8-60-8; *see also Exhibit "G"*, Deposition of Brian Whitaker at 154:19-155:12. However, evidence shows that the existence of WWP was well known among WEW employees, and WEW employees often did tasks for WWP's benefit. *See Exhibit "H"*, Employee Emails Regarding WWP. In fact, Whitaker himself signed for payments for WWP expenses. *See* Exhibit "E". Similarly, Woods and Erickson created Bosque Holdings, LLC in 2010, and Woods and Platt created Gatehouse Strategies, LLLP in 2014. *See Exhibit "I"*, Governing Documents of Bosque; *see also Exhibit "J"*, Governing Documents of Gatehouse. WWP, Bosque Holdings, LLC and Gatehouse Strategies all demonstrate that side projects—even competing projects—were a fact of life at WEW. And it did not stop there.  In 2016, Woods

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

approved of an arrangement where Platt would receive some compensation directly from one of the Firm's clients (outside of WEW). S*ee **Exhibit "K",*** Correspondence Regarding Fani. As the forgoing makes clear, there was an undeniable culture among the attorneys at WEW, where side projects were pursued openly but without participation or formal written approvals by all of the managing partners.

d.  **Renaissance Academy.**

In 2012, a charter school named Renaissance Academy was forced by the Nevada Department of Education to shut down. Platt was appointed by the State of Nevada under NRS 388A.306(5) to oversee the shutdown of the school (the "***Shutdown Services***"), which consisted primarily of Platt overseeing the transfer of student education records and transcripts to new schools. The Shutdown Services were not legal services; no legal degree or license was required. Generally, a school administrator would fulfill this role. Platt was put in charge of the process because of his teaching background and because of his familiarity with the school as a board member. Platt received some compensation for providing the Shutdown Services, and WEW is now seeking to recover that compensation, even though it was not received for doing legal services and even though the Shutdown Services were outside of the scope of WEW's business.

e.  **The Formation of L&S.**

WEW provided periodic corporate compliance services to clients on an hourly basis where paralegals billed substantial amounts to affirm the status quo or to provide substantially identical instruments year after year. Platt believed that the Firm should automate such services to save clients money. Platt and Woods discussed the issue for several years.

In the summer of 2017, Woods and Platt talked about Platt doing the work to develop the database system which would automate the work on Platt's own. Woods was not initially interested in the system as it would reduce the amount of revenue that he was generating with his current labor-intensive system.  However, Woods was recognized that there might be an opportunity that could be exploited and encourage Platt to pursue the idea.  If it worked well, Woods indicated that he would consider using it himself.

DM_US 52503472-3.094622.0011

**JOHNSON & GUBLER, P.C.**
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

Unfortunately, creating the system would take a substantial amount of Platt's time for which, because he was compensated on a commission basis, would not be paid. At Platt's suggestion, Woods agreed to use a similar business model that he and Woods had used in WWP, wherein clients referred by a specific source were handled by an entity other than WEW. Platt proposed that all clients referred by a business contact named Don Joffe ("***Joffe***") would be handled by Platt outside WEW in the same manner earlier contemplated by WWP. Woods authorized Platt to go forward with the project if Platt thought it was worthwhile to do so.

With Woods' blessing, Platt form L&S Counselors, Ltd ("***L&S***") on or about September 28, 2017. Notwithstanding the fact that Platt had formed L&S, Platt continued to work for WEW, bill hours for WEW clients, generate revenue for WEW, bring new clients to WEW and run all clients through WEW except those referred by Joffe, until Platt separated from WEW in April 2018. Platt had no intention of concealing his creation of L&S. L&S documents were saved to WEW's computer server, WEW's engagement letter was updated to reflect the existence of L&S and contemplated dual representation by both L&S and WEW, Platt worked with WEW to correct a bank error regarding the Firm's trust account and L&S's trust account, and Platt told several clients and members of the community about his creation of L&S. Most importantly, and very tellingly, Whitaker, Erickson, and Woods, each sent materials to clients specifically referencing WEW's working relationship with L&S. *See **Exhibits "L", "M" & "N"**,* at Section 8. Another notable corroboration of the fact that the Firm knew of L&S are the documents pertaining to the bank error on January 3, 2018 which drew a cashier's check in the amount of $29,446.10 from the WEW IOLTA. **Exhibit "O."** WEW's office manager, Allison Miller, brought the error to Andrew's attention whereupon Wells Fargo was directed on January 23, 2018 to transfer the funds from L&S' IOLTA to WEW's IOLTA to correct their error. The openness with which the two firms worked together in this instance illustrates that L&S was being operated with the same authority as WWP, Bosque, and Gatehouse. Moreover, inasmuch the transactions in the closely-audited IOLTA account were on the order of twenty-nine thousand

dollars, if the Firm found the operation of L&S unexpected or improper, there was ample opportunity for a discussion before Woods' illness in March and passing in April.

Unfortunately, Woods unexpectedly died on April 1, 2019, and Platt was forced to separate from WEW on April 19, 2019. Platt has never been paid the 50% of amounts due to him for collections that WEW received after April 2019 for work that was performed by Platt. Instead of negotiating over the amounts due Platt, the firm preemptively brought suit against Platt. Now, they have sued him under section 523(a)(4), claiming that he somehow took Plaintiff's clients and engaged in fraud or defalcation while acting in a fiduciary capacity.

**IV.    Statement as to Core or Non-Core Jurisdiction**

This is a core proceeding.

**V.    Stipulated Facts**

1.    Platt is an attorney that worked at the Firm from approximately August 2007 until April 20, 2018.

2.    During his time at the Firm Platt worked principally with Firm managing partner Glen Woods.

3.    Glen Woods died on April 1, 2018.

**VI.    Contested Issues of Law**

1.    Whether an employee's duty of loyalty or a limited partner's duty of loyalty rises to the fiduciary duty contemplated by 523(a)(4).

2.    Whether an attorney client relationship is personal property for purposes of the federal definition of larceny or embezzlement.

3.    Whether Woods had actual or apparent authority to authorize Platt to provide legal services outside of WEW.

4.    With respect to providing legal services apart from the firm, the nature of duties owed by Platt to WEW.

5.    Whether the Managing Partner, Glen Woods gave effective consent to Platt to provide legal services outside of WEW.

**JOHNSON & GUBLER, P.C.**
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

-11-

6.      Whether the state law duties Platt owed to WEW are of the type anticipated by 523(a)(4).

7.      If the Court permits argument and evidence regarding whether Platt committed larceny or embezzlement, whether attorney client relationships are personal property and whether Platt committed larceny or embezzlement providing legal services outside of WEW.

8.      To the extent of any finding of breach of fiduciary duty or commission of larceny or embezzlement, whether or to what extent WEW's debt corresponds to such act.

### A. Neither the status as a partner nor as an employee rises to the type of fiduciary duty capable of creating a denial of discharge.

The limits on the dischargeability of debts contained in Section 523 should be construed strictly against creditors and in favor of debtors. *See, e.g., Gleason v. Thaw*, 236 U.S. 558, 562 (1915); *In re Houtman*, 568 F.2d 651, 656 (9th Cir. 1978). Plaintiff's interpretation of 523(a)(4) would deny bankruptcy's fresh start to all manner of debts where the purpose of the denial of discharge is to protect society from a narrow range of fraud or defalcation through abuse of a trustee relationship. 11 U.S.C. 523(a)(4) denies discharge those acting in roles such as trustee or receiver where the abuse of their special status gives rise to the debt.  *See Mills v. Gergely (In re Gergely)*, 110 F.3d 1448, 1450 (9th Cir. 1997); see also Ragsdale v. Haller, 780 F .2d 794, 796 (9th Cir. 1986). Even in 1934, the Supreme Court asserted that the limitation on the fiduciary duty language "has been fixed by judicial construction for very nearly a century." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328 (1934). Accordingly, the Ninth Circuit has long held that the status of fiduciary is particular to federal law rather than state law. *E.g., Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125 (9th Cir. 2003). Specifically, the fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt. *Lewis v. Scott (In re Lewis),* 97 F.3d

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

1182, 1185 (9th Cir. 1996). Thus, while NRS 87.820 provides that partners are trustees as to

profits obtained without the consent of other partners, this is exactly what the *Davis* rule

relegates from federal to state law duties.  Because they do not have a trustee's duty before a

debt arises, they are not fiduciaries in the meaning of 11 U.S.C. §523 (a)(4). *See Chapman v.*

*Bond (In re Bond)*, 548 B.R. 570, 578 (Bankr. D. Or. 2016). Platt was not a limited partner, but,

even if he were, he was not a fiduciary of a type contemplated by Section 523 and discharge

must be granted.

> **B.**   **Because clients have a right to choose counsel, the attorney client relationship**
> **is not personal property in the definition of larceny (or embezzlement).**

Because Plaintiff did not raise the issue of larceny (or embezzlement) in the Complaint,

the court should not hear the new claim raised after the deadline for denial of discharge. *Willms*

*v. Sanderson,* 723 F.3d 1094 (9th Cir. 2013). Even if Plaintiff is permitted to argue the new

larceny/embezzlement theory, absent a fiduciary duty to direct clients to WEW, there was no

"personal property" involved in legal services through multiple firms. Where an employee

diverts tangible or intangible property from an employer and takes physical inventory from the

employer, that diversion can rise to larceny. *All In One Trading, Inc. v. Chaparala (In re*

*Chaparala)*, Nos. 2:16-bk-15692-RK, 2:16-ap-01332-RK, 2020 Bankr. LEXIS 2068 (Bankr.

C.D. Cal. Aug. 3, 2020). Unlike cases like *Chaparala*, WEW had no claim to clients referred by

Joffe. Joffe referred clients to professionals all over the world and clients were able to select

counsel as they saw fit. In the case of two of the three clients, referred to as "FF" and "TS," they

were introduced to WEW but months later, ultimately chose L&S. The third client was given

disclosure of Platt's dual affiliation, but engaged L&S. There are no decisions in Nevada on

whether the attorney-client relationship is personal property for purposes of the larceny

definition, but the general principle in the comments to the Model Rules of Professional Conduct

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

-13-

regarding Rule 1.17 bluntly asserts that "[c]lients are not commodities that can be purchased and sold at will."

### C. Woods repeatedly exercised the authority to allow competition with the Firm.

NRS 87.4316(1) provides that relations among partners are governed by the partnership agreement. In 87.4316(2)(c) it further provides that a partnership agreement may not eliminate the duty of loyalty, but may define categories of permitted activities that would otherwise be a violation of the duty of loyalty. Accordingly, Section 5.8 of the WEW Partnership Agreement provides for business opportunities to be pursued after waiver by the firm. By obtaining permission by the 59% owner of the Firm, if Platt were subject to the Partnership Agreement, Platt would have secured this waiver and satisfied any duty. Likewise, WEW claims that authorizing the formation of a competing firm would constitute an "Extraordinary Decision" Plaintiff's (State Court) Motion for Summary Judgment, at 23:16-18. Section 5.4 and 5.5 allow the managing partners to make decisions which are extraordinary and Glen Woods was the sole Managing Partner. Woods created entities separate from WEW including WWP, Bosque Holdings LLC, and Gatehouse Strategies LLLP. If WEW has any claim against Woods for his actions as Managing Partner, they were satisfied in their settlement agreement with his estate. They cannot seek recovery for issues they agreed are settled.

### VII.    Log of Exhibits that May Be Entered Into Evidence.
See above

### VIII.    Any Special Trial Issue Which Requires The Courts Attention.

JOHNSON & GUBLER, P.C.
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

-14-

Plaintiff initially attempted to consolidate this case with the State Court case that the Plaintiff removed to this case. The Court properly denied consolidation.  Then Plaintiff failed to obtain a discovery order, and failed to disclose a single document or a single witness as is required by Fed. R. Bankr. Proc. 26.  Thus, Defendant objects to any witnesses testifying and any documents being introduced by the Plaintiff in this case.

**IX.**     **List of Witnesses, with addresses, expected to be called.**

See above.

Dated to this 30th day of April, 2021.

JOHNSON & GUBLER, P.C.

/s/ Matthew L. Johnson
Matthew L. Johnson (6004)
Russell G. Gubler (10889)
Lakes Business Park
8831 West Sahara Avenue
Las Vegas, Nevada  89117-5865
Phone: (702) 471-0065
Fax: (702) 471-0075
mjohnson@mjohnsonlaw.com
rgubler@mjohnsonlaw.com

*Attorneys for Debtor/Defendant*

**JOHNSON & GUBLER, P.C.**
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

DM_US 52503472-3.094622.0011

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served a true and correct copy of the foregoing

TRIAL STAEMENT in the following manner:

[X]    **a.    Electronic Service on dates of filing**

Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced documents were electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

[  ]    **b.    United States Mail on**

By depositing a copy of the above-referenced documents for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the following parties, at their last known mailing addresses, on the date above written.

See attached service list.

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed on:  April 30, 2021          */s/ Annabelle Nudo*_____.
                                                An employee of Johnson & Gubler, PC

**JOHNSON & GUBLER, P.C.**
LAKES BUSINESS PARK
8831 WEST SAHARA AVENUE
LAS VEGAS, NEVADA 89117
(702) 471-0065
(702) 471-0075

-16-

# EXHIBIT "A"

# EXHIBIT "A"

# EXHIBIT "A"

**Matthew Johnson**

| | |
|---|---|
| **From:** | Matthew Johnson |
| **Sent:** | Wednesday, April 14, 2021 3:43 PM |
| **To:** | 'Nathan Henderson' |
| **Cc:** | Andrew Platt |
| **Subject:** | RE: Pratt/Woods & Erickson |

Hi Nathan:

I am not sure why it would be inappropriate for you to send the discovery files. It is as simple as hitting "copy" and "paste" on your disclosures and discovery and sending it over to me. I have none of that. My client has none of that. Jim does from the state court matter, but for some reason (probably because he hasn't been paid), he won't provide it. I suppose I could file a motion and ask Judge Beesley to order it to be produced. My guess is he would grant that and chew on us both for not resolving it amicably. Would you please reconsider? Otherwise I have no choice but to file a motion. Thank you.

Matthew L. Johnson
Johnson & Gubler, P.C.
Lakes Business Park
8831 West Sahara Avenue
Las Vegas, Nevada  89117
(702) 471-0065
(702) 471-0075 facsimile
mjohnson@mjohnsonlaw.com

www.johnsongubler.com

*Board Certified in Business Bankruptcy Law, American Board of Certification - Admitted in Nevada, Colorado, Arizona, and Utah. Recognized as a Specialist in Business Bankruptcy Law by the State Bar of Nevada.*

This communication may contain information that is privileged under the attorney-client privilege, or the work product doctrine, and should be read only by the person to whom it is addressed.  If you have received this communication in error, please delete it immediately.  Johnson & Gubler, P.C.





Board Certified in Business
Bankruptcy Law

---

**From:** Nathan Henderson [mailto:NHenderson@gerrard-cox.com]
**Sent:** Wednesday, April 14, 2021 3:37 PM
**To:** Matthew Johnson <mjohnson@mjohnsonlaw.com>
**Subject:** RE: Pratt/Woods & Erickson

Hi Matthew,

As noted, we have already disclosed everything to your client. It would be inappropriate for us to circumvent Mr. Shapiro's attorney's lien on your client's files. As such we will not be able to provide any documents to you.

-Nate

---

**From:** Matthew Johnson <mjohnson@mjohnsonlaw.com>
**Sent:** Tuesday, April 13, 2021 3:20 PM
**To:** Nathan Henderson <NHenderson@gerrard-cox.com>
**Subject:** RE: Pratt/Woods & Erickson

Hi Nathan:

My office called Jim Shapiro, and he apparently got upset and said that he won't provide them (he is a good guy and usually pretty even tempered so I am guessing he may be upset that he is owed a bunch of money on this case). Can you please get me the discovery files so that I have them? I will call you shortly re the order. Thank you.


Matthew L. Johnson
Johnson & Gubler, P.C.
Lakes Business Park
8831 West Sahara Avenue
Las Vegas, Nevada  89117
(702) 471-0065
(702) 471-0075 facsimile
mjohnson@mjohnsonlaw.com

www.johnsongubler.com

*Board Certified in Business Bankruptcy Law, American Board of Certification - Admitted in Nevada, Colorado, Arizona, and Utah. Recognized as a Specialist in Business Bankruptcy Law by the State Bar of Nevada.*

This communication may contain information that is privileged under the attorney-client privilege, or the work product doctrine, and should be read only by the person to whom it is addressed.  If you have received this communication in error, please delete it immediately.  Johnson & Gubler, P.C.





**Board Certified in Business**
**Bankruptcy Law**

---

**From:** Nathan Henderson [mailto:NHenderson@gerrard-cox.com]
**Sent:** Monday, April 12, 2021 5:22 PM
**To:** Matthew Johnson <mjohnson@mjohnsonlaw.com>
**Subject:** RE: Pratt/Woods & Erickson

Good Afternoon Mr. Johnson,

We have produced to your client all of the documents in our possession that are relevant to this litigation through your client's prior counsel, Jim Shapiro. You will need to get any documents from Mr. Shapiro.

Also, I emailed you last week about your proposed order. Would you mind giving me a call to discuss?

Thank you,

Nate

**From:** Matthew Johnson <mjohnson@mjohnsonlaw.com>
**Sent:** Monday, April 12, 2021 4:23 PM
**To:** Nathan Henderson <NHenderson@gerrard-cox.com>
**Subject:** Pratt/Woods & Erickson

Do you happen to have the discovery stuff from the state court litigation? I don't have any of that. Would you be willing to provide that to me so that I have access to it? I would greatly appreciate it. Thank you Nathan.


Matthew L. Johnson
Johnson & Gubler, P.C.
Lakes Business Park
8831 West Sahara Avenue
Las Vegas, Nevada  89117
(702) 471-0065
(702) 471-0075 facsimile
mjohnson@mjohnsonlaw.com

www.johnsongubler.com

*Board Certified in Business Bankruptcy Law, American Board of Certification - Admitted in Nevada, Colorado, Arizona, and Utah. Recognized as a Specialist in Business Bankruptcy Law by the State Bar of Nevada.*

This communication may contain information that is privileged under the attorney-client privilege, or the work product doctrine, and should be read only by the person to whom it is addressed.  If you have received this communication in error, please delete it immediately.  Johnson & Gubler, P.C.



Board Certified in Business
Bankruptcy Law





# EXHIBIT "B"

# EXHIBIT "B"

# EXHIBIT "B"

EXHIBIT B

# AMENDED AND RESTATED
## LIMITED LIABILITY PARTNERSHIP AGREEMENT
### of

## WOODS ERICKSON WHITAKER & MAURICE LLP,
### a Nevada limited liability partnership

This Limited Liability Partnership Agreement (this "Agreement") is made and entered into this 12th day of February, 2007, by and between R. Glen Woods, John R. Erickson, Brian C. Whitaker and Aaron R. Maurice, all of whom are individuals who reside in Clark County, Nevada, as managing limited partners (the "Managing Partners"); and those individuals or entities who execute the signature page to this Agreement, as additional limited partners (collectively, the "Limited Partners").

## PREAMBLE:

The predecessor entity to the Partnership was founded on January 1, 1995 by the Founding Partners. The Founding Partners made the decision to form the Partnership because they desired to practice law in a professional, yet collegial atmosphere, while avoiding mistakes that were made by their previous law firms. The Founding Partners share common values of hard work thrift, avoidance of debt, integrity and trust, and dedication and devotion to their clients. The Partnership's client base is stable, and has grown over the years. The Founding Partners made decisions to add other Partners, associates and employees as they became personally acquainted with other competent attorneys who shared their values. On January 1, 2005 the Founding Partners added Brian C. Whitaker to the Partnership as a Managing Partner. On January 1, 2007 the Founding Partners and Whitaker made the decision to admit Aaron R. Maurice to the Partnership as a Managing Partner. The Partners now desire to enter into this Partnership Agreement to set forth their mutual agreement respecting the management, operation and governance of the Partnership.

## ARTICLE I
### Basic Organization of Partnership

1.1    Formation. The Managing Partners and the Limited Partners (herein collectively referred to as the "Partners") hereby amend and restate in their entirety the provisions of the existing agreement of limited liability partnership of Woods & Erickson LLP (the "Partnership") pursuant to the provisions of the Nevada Revised Statutes Sections 87.440 et. seq., which law shall govern the rights and obligations of the parties hereto, except as may be set forth elsewhere herein to the contrary. From and after the Effective Date of this amended and restated Partnership Agreement, the terms of this document shall constitute the Partnership Agreement for the Partnership and shall replace and supersede all previous or existing partnership agreements. The Partners or their duly appointed attorneys-in-fact shall promptly execute all certificates and other documents, make all necessary filings or recordings thereof, and perform all other acts necessary to comply with the requirements for the formation and operation of a registered limited liability partnership under the laws of Nevada and the laws of any other state or local governmental jurisdiction In which the Partnership may own property or do business.

1.2    _Name_. The name of the Partnership shall be WOODS ERICKSON WHITAKER & MAURICE LLP; provided; however, that the Partnership may transact business under such other names as the Managing Partners may from time to time determine, in the manner set forth in Article V hereof.

1.3    _Definitions_. As used in this Agreement, the following terms shall have the meanings set forth:

(a) "Affiliate of a Partner" means:

(i) A partnership, limited liability company, corporation, trust or other entity at least fifty percent (50%) of the equity ownership interest in which is owned, directly or indirectly, by or for a Partner;

(ii) A spouse, ancestor or descendant of a Partner that is an individual; or

(iii) A partnership, corporation, trust or other entity at least fifty percent (50%) or more of the equity ownership interest in which is owned, in the aggregate, directly or indirectly, by or for, one or more individuals or entities described in paragraphs (i) and (ii), above.

(b) "Agreement" or "Partnership Agreement" means this Agreement of Limited Partnership, as hereafter amended, modified or supplemented from time to time.

(c) "Capital Account" means the separate Capital Account maintained for each Partner, in accordance with the provisions of Section 2.6 of this Agreement.

(d) "Code" means the Internal Revenue Code of 1986, as amended.

(e) "Effective Date" of the Partnership shall mean the date on which the predecessor entity to the Partnership was founded, which is January 1, 1995. "Effective Date" of this amended and restated Agreement shall mean January 1, 2007.

(f) "Founding Partners" means R. Glen Woods and John R. Erickson, who founded the Partnership and its predecessor entity on or about January 1, 1995. No transferee or other successor in interest to a Founding Partner shall thereby become a Founding Partner.

(g) "Limited Partners" means those individuals and/or entities whose signatures appear on the signature page to this Agreement beneath the caption "Limited Partners" collectively.

(h) "Managing Partners" or "Managing Limited Partners" means collectively, R. Glen Woods, John R. Erickson, Brian C. Whitaker and Aaron R. Maurice, all of whom are individuals who reside in Clark County, Nevada. No reference to a Managing Partner shall in any way alter or be construed as altering in any way the limitation on the personal liability of the Partners for the debts and obligations of the Partnership, as set forth in Article III and elsewhere in this Agreement.

(i) "Partners" means the Managing Partners and the Limited Partners, collectively, where no distinction is required by the context in which the term is used.

(j) "Partnership" or "Limited Liability Partnership" or "LLP" means the registered limited liability partnership established and governed hereby.

(k) "Percentage Interest" or "Partnership Interest" means each Partner's respective interest in the capital, profits, losses, and distributions of the Partnership.

1.4    Character of Business. The purpose of the Partnership and the character of its business shall be:

(a) To engage in the practice of law, including activities incident and ancillary thereto.

(b) To do each and everything necessary, suitable or proper for the accomplishment of the foregoing or that may at any time appear conducive to or expedient for the protection or benefit of the business of the Partnership, and to engage in all activities necessary, customary or incidental to the foregoing. The Partnership may pursue its business as a venture, as a partner or otherwise, either alone or in conjunction with any other person, partnership, association or corporation.

1.5    Principal Place of Business. The principal office and place of business of the Partnership shall be located at 1349 Galleria Drive, Suite 200, Henderson, Clark County, Nevada 89014. Subject to the provisions of this Agreement, the Managing Partners may, from time to time, change the Partnership's principal place of business and establish additional places of business for the Partnership. In such event, the Managing Partners shall promptly notify each Partner, and shall make any filings or amendments of previous filings required by applicable law.

1.6    Term. The term of the Partnership commenced on January 1, 1995. The term shall continue thereafter for a period of thirty (30) years from and after the Effective Date of the amendment and restatement of the Partnership Agreement, unless sooner terminated in accordance with the provisions of this Agreement or as otherwise provided by law.

## ARTICLE II
## Basic Organization of Limited Liability Partnership

2.1    Capital Contributions of the Founding Partners. On the Effective Date of this amended and restated Partnership Agreement, the Founding Partners shall contribute to the Partnership the money and/or property described in Exhibit A to this Agreement, to the extent that the same have not theretofore been contributed. Said money and/or property shall have the value ascribed thereto in Exhibit A. Upon contribution, each Founding Partner shall have the capital account balance set forth in Exhibit A. No other Managing Partner shall be required to make any capital contribution to the Partnership on or as of the Effective Date hereof. Except as may be specifically provided to the contrary in this Agreement, the Managing Partners shall not be obligated to make any additional contributions to the capital of the Partnership.

2.2    Capital Contributions of Limited Partners. As his or her initial contribution to the capital of the Partnership, each Limited Partner shall contribute to the Partnership his Pro Rata Share of the money and/or property described in Exhibit B to this Agreement, on or before the dates therein indicated. Each Limited Partner's Pro Rata Share of each such amount of money and/or property shall be determined by dividing such Limited Partner's Percentage Interest by the total of the Percentage Interests owned by all Limited Partners, as specified in Section 2.3 of this Agreement. Except as may be specifically provided to the contrary in this Agreement, no Limited Partner shall be obligated to make any additional contributions to the capital of the Partnership.

2.3    Percentage Interests. The Percentage Interests of the Partners shall be as follows:

| Partner | Percentage Interest |
|---|---|
| Managing Partners: | |
| R. Glen Woods | 34.0% |
| John R. Erickson | 29.5% |
| Brian C. Whitaker | 19.5% |
| Aaron R. Maurice | 17.0% |
| All Limited Partners | 0% |

The Percentage Interest of each Limited Partner shall be as set forth on the signature page to this Agreement. The Percentage Interests of the Partners may be modified, revised or adjusted by agreement of the Managing Partners.

2.4    Additional Capital Contributions. If Managing Partners determine that additional capital contributions from the Partners are necessary for the Partnership's best interests, the Managing Partners shall also determine the total amount to be contributed, and shall so notify each Partner. Within fifteen (15) days after notice of such a determination, each Partner shall contribute to the Partnership such Partner's pro rata share of the total amount to be contributed. Each Partner's pro rata share shall correspond to the Partner's Percentage Interest in the capital of the Partnership. Additional capital contributions shall be made only as specified in this Agreement or as otherwise determined by the Managing Partners.

2.5    Failure to Make Capital Contributions. If, within the time provided, any Partner fails to make a required additional capital contribution as specified pursuant to Section 2.3 above (a "Defaulting Partner"), the Percentage Interests of the Partners in the capital of the Partnership and in the Partnership's profits and losses shall be adjusted pursuant to Section 2.5 below on a pro rata basis. In addition, each Partner shall be notified in writing of the total amount of contributions not made, and, within fifteen (15) days after such notice, a non-Defaulting Partner may make an additional capital contribution in an amount equal to the contributions not made by the Defaulting Partner. If more than one non-Defaulting Partner elects to make such an

additional capital contribution, then the additional capital contribution shall be made by such Partners in proportion to their respective Percentage Interests in the capital of the Partnership. If any Partner makes such an additional capital contribution, such Partner's Percentage Interest in the capital and profits of the Partnership shall be adjusted as provided in Section 2.6, below. If a non-defaulting Partner is unable to make a capital contribution in excess of the amount originally called for under Section 2.2, above, Managing Partners may determine the terms and conditions upon which necessary funds shall be solicited from outside parties, and this Agreement shall be amended accordingly.

2.6    Adjustments of Percentage Interests and Capital Accounts for Additional Contributions. If the Partners make disproportionate additional capital contributions as described in Section 2.5 above, the Defaulting Partner's Percentage Interest and share of the capital and profits of the Partnership shall be decreased and the non-defaulting Partners' Percentage Interests and shares of the capital and profits shall be increased on a pro rata basis. If a non-defaulting Partner makes an additional contribution in an amount equal to the contributions not made by the Defaulting Partner as provided in Section 2.5, above, the Defaulting Partner's Percentage Interest and share of capital and profits shall be decreased and the non-Defaulting Partners' Percentage Interests and shares of the capital and profits of the Partnership shall be increased as appropriate to reflect the changes in cumulative capital contributions.

2.7    Admission of Additional Partners. New Partners may be admitted to the Partnership by the Managing Partners. The Managing Partners shall have the power, exercisable in their sole and absolute discretion, to determine the terms and conditions upon which additional Partners shall be admitted to the Partnership. New Partners must execute a counterpart to this Agreement and agree to be bound by all of the terms and provisions hereof. New Partners shall make such capital contribution and shall receive such Percentage Interests in the Partnership as may be determined by the Managing Partners. Upon the admission of an additional Partner, the Managing Partners shall assign a Percentage Interest to the newly admitted Partner, and shall correspondingly recalculate and adjust the Percentage Interests of all Partners.

2.8    Interest on Capital Contributions. The Partnership shall pay to each Founding Partner a dividend on the amount of such Founding Partner's capital contribution at the rate of one percent per calendar month. Except as may be specifically provided to the contrary in Section 6.3 or elsewhere herein, no Partner shall be entitled to receive interest on its capital contributions (whether initial or otherwise) to the Partnership.

2.9    Return of Contributions. Except as may be specifically provided to the contrary in this Agreement, or except as may be determined by the Managing Partners, with the consent of each Founding Partner: (a) No Partner shall be entitled to a return of its capital contributions to the Partnership (whether initial or otherwise) or to withdraw his capital contribution to the Partnership until the winding up and liquidation of the Partnership; and (b) Any return of capital contributions shall be made solely from Partnership assets and no Partner shall be personally liable to any other Partner for any such return.

2.10    Loans and Borrowing from Partners. Either in addition to or in lieu of additional capital contributions from the Partners, the Partnership may raise funds by borrowing from one

or more of the Partners or their Affiliates. The Managing Partners shall determine the terms of any such borrowing. If so determined by the Managing Partners, such borrowing may take the form of a short-term loan, either with or without interest. The terms of any such short-term loans may require that all such loans be paid in full before distributions of Available Cash Receipts are made to any Managing Partner. Alternatively, the terms of any loans may call for repayment either on demand or in installments, over longer periods of time and/or in installments, and may provide for repayment with interest at fixed or variable rates. Any loans shall, for all purposes, be deemed loans to the Partnership and shall not be deemed capital contributions to the Partnership. All such loans shall be repaid, in accordance with their terms, out of the gross revenues of the Partnership or out of the proceeds of any sale or refinancing of Partnership assets. To the extent of any such unpaid advances, upon the termination and dissolution of the Partnership, the same, together with accrued and unpaid interest, shall
become immediately due and payable.

2.11    Capital Accounts. Individual capital and income accounts shall be maintained for each Partner. The Capital Accounts shall be maintained in accordance with the applicable provisions of the Treasury Regulations. The Capital Account of each Partner shall be (a) credited with the dollar amount of any cash and the fair market value of any property (less any liabilities to which any such property is subject) contributed to the Partnership by the Partner; (b) credited with the amount of any income, gain or profit allocated to the Partner from the Partnership; (c) charged with the amount of any loss or other deduction allocated to the Partner from the Partnership; and (d) charged with the dollar amount of any cash and the fair market value of any property (less any liabilities to which any such property is subject) distributed to the Partner by the Partnership.

### ARTICLE III
### Status of Partners

3.1    Limited Liability. Except only to the extent provided in Nev. Rev. Stat. §87.150(3), no Managing Partner or Limited Partner shall be personally liable for any debts or obligations of the Partnership or for any of the liabilities of the Partnership, whether to the Partnership, to any Partner, or to creditors of the Partnership, beyond the amount contributed by him to the capital of the Partnership, plus his share of the accumulated but undistributed profits of the Partnership.

3.2    No Management Responsibility or Right. Except as may be specifically provided to the contrary in this Agreement, no Limited Partner shall participate in or interfere in any manner with the management of the business of the Partnership or transact any business for the Partnership, except as specifically provided in this Agreement. No Limited Partner shall have any right whatsoever to participate in the management of the Partnership or to vote or otherwise participate in any decision affecting the Partnership or its operations, business or properties.

3.3    No Authority to Bind Partnership. No Limited Partner shall have authority or power to act for, to bind, or to sign any writing for or on behalf of the Partnership or any of the Managing Partners.

3.4    Return of Capital Only From Partnership Assets. No Limited Partner shall be entitled to the return of any amount contributed by him to the capital of the Partnership out of any assets other than the assets of the Partnership, and then only strictly in accordance with the provisions of this Agreement. It is expressly understood and agreed that the Managing Partners shall not be personally liable for the return of any capital or other contributions of any Limited Partner. No Limited Partner shall have the right to demand or receive any property other than cash in return of his contributions to the Partnership. No Limited Partner shall receive any salary or other compensation from the Partnership for any service rendered on its behalf.

3.5    Relationship with Managing Partners. No Limited Partner shall have an interest in the individual assets of any Managing Partner or in any proceeds of any sales of the assets of any Managing Partner by virtue of acquiring or holding a Percentage Interest in the Partnership.

3.6    Expectations of Managing Partners. The Partnership has been formed, and the decision to admit Managing Partners has been made, with the expectation that each Managing Partner will engage in the full-time practice of law in Clark County, Nevada and will participate in the management of the Partnership, shouldering a portion of the responsibility of managing the Partnership's business, utilizing such Partner's best efforts to attract legal business for the Partnership and to supervise and direct others in the performance of their duties in the service or employ of the Partnership. Each Managing Partner, by executing this Agreement and becoming a Partner in the Partnership, undertakes to utilize such Partner's best efforts to cause this to occur.

### ARTICLE IV
### Allocation of Profit and Loss

4.1    Income and Losses. The Percentage Interest of one or more Partners may from time to time be governed by agreement (each such agreement is hereinafter referred to as an "Allocation Agreement") between such Partner and the Partnership. The establishment and amendment of any such Allocation Agreement shall require the approval of the Managing Partners, and shall in all events be subject to the provisions of this Partnership Agreement. During such times as an Allocation Agreement may be in effect, the Percentage Interest and share of Partnership profits and losses of the affected Partner shall be determined in accordance with the Allocation Agreement. Subject to the provisions of any such Allocation Agreements, the net profits and net losses of the Partnership in each taxable year, and each item of income, expense, gain, loss, deduction, credit and tax preference, that is not allocated in accordance with an Allocation Agreement shall be divided among and shall be credited and charged to and against the Partners in accordance with and in proportion to their respective Percentage Interests in the Partnership. In the event that any Partner's Percentage Interest is changed or altered, such Partner's distributive share of Partnership income, expense, gain, loss, deduction, credit and tax preference shall be determined by the Managing Partners by taking into account the varying Percentage Interests of the Partners during the taxable year. Such determination shall be made by the Managing Partners in accordance with the provisions of Code Section 706 and the Treasury Regulations issued thereunder.

4.2    Definitions of Profits and Losses. The "net profits" and "net losses" of the Partnership and each item of income, gain, loss, deduction, credit and tax preference shall be

determined in accordance with generally accepted principles of cash accounting customarily employed by partnerships or by limited liability partnerships for federal income tax purposes, consistently applied.

4.3    Allocation of Income Attributable to Principal Reductions in Nonrecourse Partnership Indebtedness. In the event that one or more Partners has a deficit Capital Account balance resulting in whole or part from allocations attributable to nonrecourse indebtedness of the Partnership, such Partner or Partners shall, to the extent possible, be allocated income or gain in an amount not less than the minimum gain (as defined in the applicable provisions of the Treasury Regulations), and at a time not later than the time the amount of such minimum gain is reduced to an amount that is less than the sum of all deficit Capital Account balances. Any allocation pursuant to this Section 4.3 shall be made by the Managing Partners after consulting with the Partnership's tax counsel, and in accordance with and to the extent required by Treasury Regulations governing partnership allocations attributable to nonrecourse indebtedness.

4.4    Allocation of Gains and Losses upon Disposition of Partnership Property. Notwithstanding the provisions of Sections 4.1 and 4.3, above, and after the allocations of Partnership operating income and deduction for the taxable year have been made, any gain or loss realized by the Partnership upon the sale, exchange, refinancing, foreclosure, involuntary conversion, abandonment or other disposition of the property or assets of the Partnership shall be allocated among the Partners in proportion to their respective Percentage Interests. In making such allocations the Managing Partners shall give effect to the provisions of Section 704(c) of the Code, or any successor provision to such Section, and to the Treasury Regulations from time to time in effect thereunder.

4.5    Tax Credits. Any items of tax credit to which the Partnership is entitled and any recaptures of tax credits previously claimed by the Partnership shall be allocated to the Partners in accordance with their respective Percentage Interests as of the time the item of tax credit or tax credit recapture arises, with the meaning of the applicable provisions of the Treasury Regulations. Any items of tax credit recapture that are not allocated pursuant to the preceding sentence shall be allocated as contemplated by the applicable provisions of the Treasury Regulations.

4.6    Limitation on Liability. Nothing in this Article IV regarding allocation of losses shall alter the limitation on the personal liability of the Partners for the debts or obligations of the Partnership, as set forth in Article III and elsewhere in this Agreement.

4.7    Treatment of Certain Items as Expenses.    Any and all compensation paid to a Partner pursuant to an Allocation Agreement or to the Managing Partners pursuant to Article V of this Agreement shall be treated for all purposes of this Agreement as an expense of the Partnership.

## ARTICLE V
### Authority, Power and Compensation of Managing Partners

5.1    Management of the Partnership; Votes. The Managing Partners, acting as a body, shall have full, exclusive and complete discretion in the management and control of the Partnership and its business for the purposes herein stated. Except as specifically provided otherwise herein, the Managing Partners shall make all decisions by majority vote, with each Managing Partner having one vote for each Percentage Interest in the capital of the Partnership that is owned by such Managing Partner.

5.2    General Statement of Authority to Manage the Partnership; Decision-Making. For purposes of managing the business and affairs of the Partnership, decisions that arise in the course of the business of the Partnership shall be divided into three categories, as follows:

(a)    Routine Decisions are those that arise as a matter of course in the conduct of the ordinary, day-to-day business of the Partnership. Examples include choosing suppliers of products and services used by the Partnership, managing the Partnership's cash flow, dealing with routine personnel matters, approving the issuance of checks to pay normal, recurring Partnership expenses, and the like. Each Managing Partner shall have the authority to make Routine Decisions on behalf of the Partnership, but the Partners expect that Routine Decisions will ordinarily be delegated to one or more designated Managing Partners or to employees of the Partnership, depending upon the decision in question.

(b) Partnership Decisions are those that arise in the course of the business of the Partnership, but that do not necessarily arise daily or even weekly, and that require the exercise of discretion or judgment by the management of the Partnership, and that are not Extraordinary Decisions. Examples of Partnership Decisions include, but are not limited to, the following: (i) expenditures of money or financial commitments that are not routine or recurring, and that do not rise to the level of Extraordinary Decisions; (ii) decisions to hire or terminate employees whose annual compensation from the Partnership exceeds $50,000; (iii) decisions to change the salaries or other compensation of Partnership employees; (iv) the amounts and timing of distributions to Limited Partners who are not Managing Partners; (v) the decision to pay discretionary bonuses to Partnership employees and the amounts of any such discretionary bonuses; (vi) entering into long-term agreements and financial commitments that can reasonably be expected to affect the Partnership's cash flow, such as equipment leases, loan agreements and the like; and (vii) establishing and changing employee benefit programs. Decisions arising in the course of the management of the Partnership that are not Routine Decisions or Extraordinary Decisions are Partnership Decisions.

(c) Extraordinary Decisions are those that affect in profound ways the relationship between the Managing Partners and the Partnership. The following decisions shall be Extraordinary Decisions: (i) the decision to change the Percentage Interest of a Managing Partner; (ii) the decision to redeem the Percentage Interest of a Managing Partner (unless due to the loss of such Managing Partner's privilege to practice law in the State of Nevada); (iii) the decision to liquidate or dissolve the Partnership; (iv) the decision to initiate litigation on behalf of the Partnership, other than the ordinary collection of accounts receivable; (v) the decision to

enter into an agreement, incur indebtedness or otherwise commit resources of the Partnership involving more than $100,000; (vi) the decision to relocate the Partnership's principal place of business or to establish additional places of business for the Partnership; (vii) the sale or other disposition of all or substantially all of the Partnership's assets or business; (viii) a change in the name of the Partnership; and (ix) the termination or modification of any agreement or transaction involving the Partnership if the approval of such agreement or transaction was an Extraordinary Decision.

5.3    <u>Authority to Make Routine Decisions</u>. Each Managing Partner shall have all specific rights and powers required for, appropriate to or incidental to the making and implementation of Routine Decisions, including but not limited to, the following rights and powers:

(a) To borrow money, and, if security is required therefore, to mortgage or subject to any other security device any or all of the assets of the Partnership.

(b) To negotiate, execute and enter into leases and other agreements in connection with the Partnership's assets, including leases and agreements the terms of which may extend beyond the term of this Partnership.

(c) To sell or exchange any or all of the assets of the Partnership upon such terms and conditions as the Managing Partners in their discretion may deem advisable, including a deferred payment sale or an exchange for other assets of any kind.

(d) To acquire and enter into any contract of insurance that the Managing Partners deem proper for the protection of the Partnership, the conservation of its assets, or for any other purpose convenient or beneficial to the Partnership.

(e) To execute and deliver on behalf of the Partnership such documents or instruments as the Managing Partners deem appropriate in their conduct of the business of the Partnership.

(f) To employ and to pay brokers, agents, consultants, attorneys, accountants and other individuals or entities deemed appropriate by the Managing Partners to the conduct of the Partnership's business, including without limitation any persons or entities related to a Managing Partner or in which a Managing Partner has an interest.

(g) To hold title to Partnership assets in the name of a nominee (which may be a Managing Partner so acting) designated by a Managing Partner.

(h) To make any decision or take any action on behalf of another partnership or other entity of which this Partnership is an officer, a manager or managing agent, if such decision or action would be permitted by this Section if made or taken by this Partnership.

5.4    <u>Partnership Decisions</u>. The Managing Partners, acting as a body, are empowered and authorized to make all decisions in the management and operation of the Partnership that are not Routine Decisions or Extraordinary Decisions. Except in an emergency, and unless approved

in advance pursuant to a resolution delegating authority or otherwise, each Managing Partner shall have the right to participate in the deliberations of the Managing Partners in respect of Partnership Decisions. The Managing Partners shall, acting as a body, have all specific rights and powers required for, appropriate to or incidental to the making and implementation of Partnership Decisions as are set forth above in respect of Routine Decisions.

    5.5    <u>Extraordinary Decisions</u>. The decisions identified above as constituting Extraordinary Decisions shall be made by the Managing Partners.

    5.6    <u>Execution of Documents and Agreements</u>. All leases, contracts, deed, encumbrances or other documents that purport on their face to bind the Partnership of the non-contracting Partners that are related to the purposes of the Partnership and that are specifically authorized by this Agreement or by separate written agreement, may be executed and delivered by any Managing Partner on behalf of the Partnership; provided, however, that if such document or agreement relates to a Partnership Decision or Extraordinary Decision, such document or agreement shall contain a representation by the Managing Partner that the necessary approval of the Partnership has been obtained.

    5.7    <u>Compensation of Partners</u>.

    (a) The Managing Partners shall perform their duties as Managing Partners without compensation for such service.

    (b) The Managing Partners shall be reimbursed by the Partnership for the reasonable, direct, out-of-pocket expenses incurred by the Managing Partners while acting on behalf of the Partnership.

    5.8    <u>Partnership Opportunities</u>. Each Partner shall first offer to the Partnership an exclusive right of first refusal with respect to any opportunity within the scope of the Partnership's business or that involves an investment opportunity that is not of a type or nature typically offered by full-service investment or brokerage firms. The Partnership shall have at least fifteen (15) days in which to accept such offer and, if not accepted, the offering Partner shall be free to pursue such opportunity independent of the Partnership and the Partners. The offering Partner shall not participate in the decision of the Partnership whether to accept such offer.

    5.9    <u>Dealings with Affiliates of the Managing Partners</u>. The validity of any transaction, agreement or payment involving the Partnership and any Affiliate of a Partner or Managing Partner that is otherwise permitted by the terms of this Agreement shall not be affected by reason of the relationship between the Partner or Managing Partner and the Affiliate, provided that full and complete disclosure of the nature of the transaction and the nature of the relationship between such Partner or Managing Partner and the Affiliate is made to the Partnership before consummation of the transaction in question.

    5.10    <u>Potential Liability of the Managing Partners</u>. No Managing Partner shall be liable, responsible or accountable in damages or otherwise to the Partnership or to any Partner for any

action taken or failure to act on behalf of the Partnership within the scope of the authority conferred upon the Managing Partners by this Agreement or by law unless such action or omission was intentional or was performed or omitted fraudulently, in bad faith, or amounted to gross negligence on the part of the Managing Partners.

5.11    Indemnification of Managing Partners. The Partnership shall defend, indemnify and hold harmless each Managing Partner and the respective partners, agents, heirs, executors, administrators, employees and Affiliates of each Managing Partner (collectively the "Indemnified Parties") from and against any cost, loss, expense, delay, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of its activities on behalf of the Partnership or in furtherance of the interests of the Partnership, including but not limited to any judgment, award, settlement, and reasonable attorneys' fees and other costs or expenses incurred in the defense of any actual or threatened action, proceeding or claim; provided that the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim is based were in good faith and were not performed or omitted fraudulently or in bad faith by the Indemnified Parties and did not amount to gross negligence on the part of the Indemnified Parties.

5.12    Section 754 Election under Internal Revenue Code. The Managing Partners may, in their sole discretion, make or revoke the election referred to in Section 754 of the Internal Revenue Code of 1986, as amended, or any successor provision hereafter enacted. Each Partner shall, upon request, supply the information necessary to give proper effect to such an election.

## ARTICLE VI
### Distributions to Partners

6.1    Definition of Available Cash Receipts. The term "Available Cash Receipts" is used herein to determine the amount of cash available for distribution to Partners as a result of Partnership operations, and shall mean all cash revenues and funds received by the Partnership (not including capital contributions to the Partnership or the proceeds of any sales, financing or refinancing of Partnership assets), less the sum of the following to the extent made from such cash revenues and funds received by the Partnership: (i) all principal and interest payments on mortgage and other indebtedness of the Partnership and all other sums paid to lenders; (ii) all cash expenditures (including expenditures for capital improvements) incurred incident to the normal operation of the Partnership's business, including compensation paid to the Managing Partners and expenses of the Managing Partners reimbursed by the Partnership to the Managing Partners; (iii) such amounts as the Managing Partners may elect to retain in the Partnership in order to enable the Partnership to make additional or further investments (whether or not such investments are similar to any other investments or property at any time held or owned by the Partnership); and (iv) such cash reserves as the Managing Partners in their discretion may deem to be necessary or desirable for the proper operation of the Partnership's business.

6.2    Timing of Distributions. Distributions of Available Cash Receipts shall be made when deemed appropriate by the Managing Partners, which decision shall be made in the sole and absolute discretion of the Managing Partners. The Partners agree that Available Cash Receipts may be used to purchase additional investment or business assets for the Partnership,

and understand and agree that accumulation and reinvestment of Available Cash Receipts may occur, in the sole discretion of the Managing Partners, at times when particular investment or business opportunities may not have been identified by the Managing Partners.

6.3     <u>Distributions to Partners</u>. The Managing Partners shall from time to time, whenever they consider appropriate, determine the amount of Available Cash Receipts and the amount or portion, if any, of such Available Cash Receipts that will be distributed to each Managing Partner. Distributions need not be made simultaneously to all Managing Partners. Once the amount of Available Cash Receipts has been determined by the Managing Partners, the amount shall be apportioned and distributed to the Managing Partners in the ratio that their respective Percentage Interests bear to one another.

6.4     <u>Final Authority</u>. The determination of the Managing Partners shall be final and binding with respect to all computations and determinations made pursuant to this Article VI and to Article IX of this Agreement.

## ARTICLE VII
## Books of Account, Records and Reports

7.1     <u>Books and Records</u>. The Managing Partners shall cause to be kept proper and complete records and books of account, in which shall be entered fully and accurately all transactions and other matters relating to the Partnership's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Partnership. Such books and records shall be maintained in accordance with generally accepted principles of cash accounting customarily employed by partnerships for federal income tax purposes, consistently applied. The books and records shall at all times be maintained at the principal office of the Partnership and shall be open to the reasonable inspection and examination by the Managing Partners at any time.

7.2     <u>Confidentiality of Partnership Books and Records</u>. In no event shall any Limited Partner have any right to inspect or review the books or records of the Partnership at any time or under any circumstance. Each Limited Partner covenants with the Partnership that neither he nor anyone claiming an interest in the Partnership through or on behalf of such Limited Partner shall ever seek any order of any court or governmental agency for the production or inspection of any books or records of the Partnership. Each Limited Partner agrees that, in the event that any inspection or production of any of the books and records of the Partnership shall ever be ordered by any court or governmental agency, or by virtue of any legal or administrative process whatsoever, as the result of any application sought by or on behalf of such Limited Partner, or by any person acting with reference to any interest whatsoever of such Limited Partner in the Partnership or otherwise, the person making the application or otherwise seeking the inspection or production shall pay to the Partnership the sum of Ten Thousand Dollars ($10,000) as a fee for the services of the Partnership in producing the records or other information so sought. If for any reason the fee is not paid by the person making the application or otherwise seeking the inspection, such fee shall be paid to the Partnership by the Limited Partner on behalf of, or in respect of whose Percentage Interest the inspection is requested or ordered. Said fee shall in all events be paid before the Partnership shall be required to produce or make available for

inspection any of its books or records. The right herein granted to the Partnership to collect said fee shall not be construed as a waiver by the Partnership of any objection otherwise available to it with respect to the production of any of its books or records.

7.3    Reports to Partners; Tax Information. Within a reasonable time after the close of each Partnership fiscal year, the Managing Partners shall cause to be sent to each Partner such tax information related to the Partnership as shall be necessary for the preparation by such Partner of his federal income tax return.

7.4    Fiscal Year. The fiscal year of the Partnership shall end on the thirty-first (31st) day of December of each year.

7.5    Bank Accounts. The funds of the Partnership shall be deposited in such bank account or accounts, or invested in such interest-bearing or non-interest-bearing investments, as shall be designated by the Managing Partners. All withdrawals from any of such bank accounts shall be made by anyone or more of the Managing Partners, or by the duly authorized agent or agents of the Managing Partners.

7.6    Taxable Year of Partners. The Managing Partners and any Limited Partner who acquires a Percentage Interest of five percent (5%) or more in the capital or profits of the Partnership hereby represent that they use the calendar year as their taxable year for federal income tax purposes.

7.7    Federal Tax Matters Partner. Solely for purposes of Section 6231(a)(7) of the Code, R. Glen Woods shall be the "Tax Matters Partner" of the Partnership. The Tax Matters Partner shall be authorized to carry out, on behalf of the Partnership and at the Partnership's expense, all acts appropriate to such designation, including, but not limited to:

(a)    Receiving and responding to any and all notices and requests from any federal taxing authority;

(b)    Informing all other Partners of any inquiry, examination or proceeding, as required by applicable federal law and, if not so required, as the Tax Matters Partner shall deem appropriate;

(c)    Meeting and negotiating with representatives of any federal taxing authority;

(d)    Entering into a binding settlement agreement with any federal taxing authority on behalf of all or some of the Partners regarding any tax deficiency, assessment, credit or refund; provided that all Partners be given adequate prior notice so that any Partner may, without prejudicing the validity of such a settlement agreement, elect not to be bound by the settlement agreement where permitted under applicable federal tax law;

(e)    Entering into any agreement with any federal taxing authority to extend the limitations period on assessment or collection of adjustments;

(f)     Commencing administrative or judicial proceedings regarding any federal tax matter;

(g)     Intervening in any judicial action or proceeding regarding any federal tax matter, the outcome of which could adversely affect a position taken by the Partnership;

(h)     Prosecute an appeal from a decision or judgment of any court that is wholly or partially adverse to a position taken by the Partnership; and

(i)     Retaining tax advisors, to whom the Tax Matters Partner may delegate such of its rights and duties as the Tax Matters Partner shall consider necessary and appropriate.

## ARTICLE VIII
## Default and Remedies

8.1     Events of Default. Each of the following events shall (upon the giving of the notice and/or passage of time, if any, set forth with respect to each event) constitute an "Event of Default," and the Partner as to whom the Event of Default has occurred shall be a "Defaulting Partner":

(a)     If any Partner shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent; or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for himself under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency or other relief for debtors; or shall acquiesce in the appointment of any trustee, receiver, conservator or liquidator of said Partner or of all or any substantial part of his properties or his interest in the Partnership. The term "acquiesce" includes, but is not limited to, the failure to file within thirty (30) days after any appointment a petition or motion to vacate or discharge any order, judgment or decree providing for such appointment.

(b)     If a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against any Partner seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act, or any other present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency or other relief for debtors, and the Partner shall acquiesce in the entry of such order, judgment or decree within thirty (30) days after the entry of the order, judgment or decree, or if such order, judgment or decree shall remain unvacated and unstayed for an aggregate of ninety (90) days (whether or not consecutive) from the date of entry thereof: or if any trustee, receiver, conservator or liquidator of said Partner or of all or any substantial part of his properties or his interest in the Partnership shall be appointed without the consent or acquiescence of said Partner and such appointment shall remain unvacated and unstayed before an aggregate of sixty (60) days (whether or not consecutive). The term "acquiesce" includes, but is not limited to, the failure to file a petition or motion to vacate or discharge such order, judgment or decree within thirty (30) days after the entry of the order, judgment or decree.

(c)     If any Partner shall admit in writing his inability to pay his debts as they mature.

(d)     If any Partner shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

(e)     If any Partner attempts to transfer or assign his interest in the Partnership in violation of the provisions of Article X, below.

(f)     If any Partner shall suffer the loss of such Partner's privilege to practice law in the State of Nevada.

8.2     Option to Purchase. Upon the occurrence of each Event of Default, the Defaulting Partner shall give to the Partnership written notice thereof and the Partnership shall have the right and option to purchase the Defaulting Partner's Percentage Interest in accordance with the provisions of Section 8.3 of this Agreement. If the Partnership does not exercise this option, or if the Partnership does not complete the buyout of the defaulting Partner's Percentage Interest within the time limit prescribed by Section 8.3, the term of the Partnership shall continue and the default and the option of the Partnership shall be deemed to have been waived. The Defaulting Partner shall not participate in the decision of the Partnership to exercise the option herein set forth.

8.3     Exercise of Option. If an Event of Default occurs, as defined in Section 8.1, the Partnership may exercise its option to buy the Percentage Interest of· the Defaulting Partner (the "Seller") by giving written notice of the election at any time after the occurrence of the Event of Default (whether or not the written notice required by Section 8.2, above, has been given), but in no event later than thirty (30) days after the date on which the Partnership receives written notice from the Seller of the occurrence of the Event of Default. The purchase price of the Defaulting Partner's Percentage Interest in the Partnership shall be determined in accordance with Section 8.4, below.

8.4     Determination of Purchase Price.

(a)     Percentage Interest of Limited Partner. The purchase price of the Percentage Interest of a Limited Partner shall in all events be the sum of One Hundred Dollars ($100.00). The foregoing purchase price shall apply regardless of the existence of any other agreement or understanding, unless such agreement is set forth in a writing that expressly provides that it amends this Section 8.4 of this Partnership Agreement.

(b) Percentage Interest of Managing Partner. The purchase price of the Percentage Interest of a Managing Partner shall be the sum of the Managing Partner's capital account balance, as set forth in Exhibit "A", attached hereto, and the amount of Available Cash Receipts that would otherwise have been distributed to the Managing Partner, if the Event of Default had not occurred, during the period of thirty (30) days after the exercise of the option herein set forth.

(c) Sole Consideration. The purchase price calculated pursuant to this Section 8.4 constitutes the total sum that the Partnership shall be obligated to pay in respect of the

Percentage Interest of a Partner whose Percentage Interest is purchased pursuant to this Article VIII. A Partner whose Percentage Interest is purchased pursuant to this Section shall have no other or further interest in or to the Partnership or any of its assets or properties.

8.5    Closing. The closing of the purchase of a Partner in the Partnership pursuant to Article VI of this Agreement shall be held at the time and place and in a manner mutually agreeable to the parties to the transaction. In the absence of unanimous agreement, the closing shall be held at the principal office of the Partnership thirty (30) days after the expiration of the option to purchase under the provisions of this Article VIII. At the closing the Seller, personal representative or other holder of the Percentage Interest being sold shall assign and deliver the Percentage Interest being sold to the purchaser or purchasers thereof.

8.6    Payment of Purchase Price. If the Percentage Interest being purchased is that of a Limited Partner, the Partnership shall pay the purchase price at the closing. If the Percentage Interest being purchased is that of a Managing Partner, the Partnership shall pay the purchase price in installments, at the times Available Cash Receipts would have been distributed to the Managing Partner if the Event of Default had not occurred.

8.7    Event of Default Involving Managing Partner. Upon the occurrence of an Event of Default (as defined in Section 8.1) occurs with respect to the Percentage Interest of a Managing Partner, then regardless of whether or not any option to purchase set forth herein shall be exercised, such Managing Partner shall thereupon and thereafter have no further right to participate in the management of the business of the Partnership. Such Managing Partner shall be deemed to have resigned such Managing Partner's office as Managing Partner of the Partnership, as provided in Section 9.3.

## ARTICLE IX
### Dissolution, Withdrawal

9.1    Dissolution. The Partnership shall be dissolved upon the first to occur of the following events:

(a)    The expiration of the term of the Partnership as established in Section 1.6 of this Agreement.

(b)    The sale or other disposition of all or substantially all of the assets of the Partnership and the receipt of all proceeds to be derived from such sale or disposition.

(c)    The withdrawal of a Managing Partner unless the Partnership is continued pursuant to the provisions of Section 9.7 of this Agreement.

(d)    The death of a Managing Partner, unless the Partnership is continued pursuant to the provisions of Section 9.7 of this Agreement.

(e)    The disability of a Managing Partner, unless the Partnership is continued pursuant to the provisions of Section 9.7 of this Agreement. For purposes of this Agreement, a Managing

Partner shall be deemed to be disabled if, in the opinion of an independent physician selected by the Partnership, such Managing Partner is likely to be unable to engage in the fulltime practice of law for a period of longer than one year.

(f)    The bankruptcy of a Managing Partner, unless the Partnership is continued pursuant to the provisions of Section 9.7 of this Agreement.

(g)    Sixty days after the Managing Partners give written notice of their decision to liquidate or dissolve the Partnership, as provided in Article V hereof, unless the Partnership continued pursuant to the provisions of Section 9.7 of this Agreement.

9.2    <u>Withdrawal of a Managing Partner</u>.

(a)    A Managing Partner may withdraw from the Partnership by giving written notice of such withdrawal to each other Managing Partner or, if no other Managing Partner remains, to each Partner. The notice shall also set forth the day upon which withdrawal is to become effective.

(b)    If a Managing Partner withdraws from the Partnership, the remaining Managing Partners shall cause an accounting to be prepared covering the transactions of the Partnership since the end of the previous calendar year.  Thereafter, the Partnership shall not sell or dispose of or allow to be sold or disposed any Partnership asset unless the sale or disposition was the subject of a contract entered into by and binding upon the Partnership prior to the date the notice of withdrawal was given, other than in the ordinary course of the business of the Partnership.

(c)    Upon the withdrawal of a Managing Partner, the Partnership shall purchase the Percentage Interest of the withdrawing Managing Partner in the manner and at the time provided in Section 8.6, as if the Partnership had been a "Buyer," and as if the withdrawing Managing Partner had been a "Seller," as those terms are used in Section 804, except that the purchase price shall be the amount of Available Cash Receipts that would otherwise have been distributed to the Managing Partner, if the Event of Default had not occurred, during the period of time that is one month for each full year that the withdrawing Managing Partner has been a Managing Partner of the Partnership. The periods of time set forth in the Preamble shall set forth the commencement of each Managing Partner's office as a Managing Partner. The Partnership shall pay the purchase price at the times set forth in Section 8.6.

(d)    The purchase price calculated pursuant to this Section 9.2 represents the total sum of money that the Partnership shall be obligated to pay in respect of the Percentage Interest of a Managing Partner who resigns or withdraws from the Partnership. A Managing Partner who resigns or withdraws from the Partnership shall have no other or further interest in or to the Partnership or any of its assets or properties.

9.3    <u>Death of Managing Partner</u>. A Managing Partner who dies while holding the office of Managing Partner shall be treated, and the Partnership shall purchase the Percentage Interest of such Managing Partner as if such Managing Partner had withdrawn from the Partnership.

9.4     <u>Disability of Managing Partner</u>. A Managing Partner who becomes Disabled while holding the office of Managing Partner shall be treated, and the Partnership shall purchase the Percentage Interest of Disabled Partner, as if such Disabled Partner had withdrawn from the Partnership.

9.5     <u>Resignation of Managing Partner</u>. A Managing Partner may resign such Managing Partner's office as a Managing Partner of the Partnership. Notice of resignation shall be given to each Managing Partner or, if no other Managing Partner remains, to all of the Limited Partners. Upon resignation, a resigning Managing Partner shall thereupon and thereafter have no further right to participate in the management of the business of the Partnership. Such a resigning Managing Partner shall thereafter have the same rights and responsibilities to the Partnership and under this Partnership Agreement as a Limited Partner, except that such a resigning Managing Partner (or a Managing Partner who is deemed to have resigned as a Managing Partner) shall not participate in a decision to continue the Partnership under any of the circumstances set forth in Section 9.4.

9.6     <u>Leaves of Absence</u>. A Managing Partner who has been a Managing Partner for at least five years may elect to take a leave of absence from the Partnership for missionary service, for medical purposes or for other reasons approved by the Managing Partners, and for periods of time approved by the Managing Partners. Unless otherwise determined by the Managing Partners, a leave of absence for reasons other than missionary service or medical reasons (a so-called "sabbatical leave") may not exceed six months in length. A Managing Partner who is on a leave of absence may continue to hold office as a Managing Partner, if able to do so due to health and otherwise. Unless otherwise determined by the Managing Partners, a Managing Partner who is on a leave of absence shall not share in other distributions of Available Cash Receipts during the period of a leave of absence, but may be paid a salary or other fixed monthly draw during the period of the leave of absence, as determined by the Managing Partners.

9.7     <u>Continuation of the Partnership</u>. Notwithstanding, the provisions of Section 9.1, the death, disability, bankruptcy, or withdrawal of a Managing Partner shall not dissolve the Partnership if within sixty (60) days after the occurrence of such event any remaining Managing Partner or, if no Managing Partner remains, Limited Partners owing a majority of the Percentage Interests owned by all Limited Partners (not taking into account a Percentage Interest held by a Managing Partner who has resigned or is determined to have resigned as a Managing Partner of the Partnership) elect to continue the Partnership and elect one or more Managing Partners to act as the Managing Partner of the Partnership. In the event the Partnership is continued, the Partnership shall purchase the Percentage Interest of the affected Managing Partner as if such Managing Partner had withdrawn from the Partnership with the consent of all other Managing Partners.

9.8     <u>Bankruptcy, Etc. of Limited Partners</u>. The Partnership shall not be dissolved or terminated in the event of the death, disability, bankruptcy, or withdrawal of any Limited Partner.

9.9    Dissolution Procedure. Upon the occurrence of any of the events set forth in forth in Section 9.1, above, and unless the Partnership is continued pursuant to Section 9.7, the Partnership shall be dissolved and the Managing Partners shall immediately commence to wind up and liquidate the Partnership's business. In liquidating the Partnership's business, the Managing Partners may either sell all or part of the Partnership's assets and distribute the proceeds, and/or may make distributions completely or partially in kind. The Capital Accounts of the Partners shall be adjusted to account for the operating income and deductions of the Partnership for the taxable year of the liquidation or dissolution and to account for any sales of Partnership assets, in the manner provided in Sections 4.1 and 4.4 of this Agreement. In the event that some or all of the Partnership's assets are not sold, the Managing Partners shall determine the fair market value of the unsold assets, and the gain or loss that would have been realized if the assets had then been sold shall be determined, and the Capital Accounts of the Partners shall be adjusted accordingly. Following the adjustment of Capital Accounts as provided in this Section 9.9, the assets or proceeds derived therefrom, to the extent sufficient shall be applied and distributed in the following order:

(a)    To the payment of creditors, in order of priority provided by law, except for any claim of any Partner or for compensation or reimbursement of costs or expenses advanced by the Partners, any claim of a Partner on account of loans made to the Partnership or an interest in the Partnership, and any claim of a secured creditor that will be assumed or otherwise transferred upon the liquidation or distribution of the Partnership's assets.

(b) To the repayment, pro rata in proportion to balances owing, of any amounts loaned to the Partnership by any Partner pursuant to the provisions of this Agreement, plus any accrued and unpaid interest thereon.

(c) To the Partners, pro rata in proportion to their Percentage Interests, in repayment of the positive balances, if any, in their Capital Accounts, until the positive balance, if any, in the capital account of each Partner has been reduced to zero.

(d) To the Partners, pro rata in proportion to amounts owed, in reimbursement of costs and expenses incurred and advanced and in payment of compensation earned or accrued, as provided in Section 5.3.

(e) To the Partners in proportion to their respective Percentage Interests.

Distributions described in this Section 9.9 shall be made not later than the end of the taxable year during which the liquidation occurs or, if later, within ninety (90) days after the date of the liquidation.

9.10    Negative Capital Account Restoration. If, following the distributions provided in Section 9.9, any Partner has a deficit Capital Account balance, such Partner shall be required to contribute cash to the Partnership in the amount of the deficit. Any cash so contributed to the Partnership shall be applied to pay Partnership creditors, or shall be distributed to the other Partners, pro rata, in proportion to their positive Capital Account balances. Any contribution that is required to be made by reason of this Section 9.10 shall be made not later than the end of the

taxable year during which the Partnership is liquidated or, if later, within ninety (90) days after the date of the liquidation.

## ARTICLE X
## Transfer of Partnership Interests; Involuntary Redemption

10.1    Transfer of Interest of Managing Partners. The Partnership Interest of a Managing Partner, as such, may not be assigned or transferred without the prior written consent of each other Managing Partner, which consent may be granted or withheld by a Managing Partner in such Managing Partner's sole and absolute discretion.

10.2    Transfer of Interest of Limited Partners. The Partnership Interest of a Limited Partner may not be assigned or transferred, in whole or in part, without the prior written consent of all Managing Partners, which consent may be granted or withheld by a Managing Partner in such Managing Partner's sole and absolute discretion.

10.3    Substituted Limited Partner. No assignee of the whole or any portion of a partner's Percentage Interest shall become a substituted Partner in the place of the assignor unless the following additional conditions are satisfied:

(a)    The duly executed assignment setting forth the intention of the assignor that the assignee becomes a substituted Limited Partner shall have been filed with the Managing Partners.

(b)    The assignee shall have executed and delivered to the Managing Partners such instruments and other documents as the Managing Partners may deem necessary or desirable to effect such substitution, including a power of attorney similar in form and substance to that contained in Article XII of this Agreement and a written acceptance and adoption by the assignee of all of the other provisions of this Agreement.

(c)    Each Managing Partner consents in writing to the assignee becoming a substitute Partner, such consent to be within the sole and absolute discretion of each Managing Partner.

10.4    Status of Assignee or Substituted Limited Partner. Any person who acquires a Percentage Interest or is admitted to the Partnership as a substituted ,Partner shall be subject to and shall be bound by all provisions of this Agreement as if originally a party to this Agreement.

10.5    Economic Allocation on Assignment. In the event of an assignment of a Partner's Percentage Interest in the Partnership, the Partnership's net profits or net losses allocable to the interest assigned for the taxable year in which the assignment occurs shall be apportioned between the assignor and the assignee on the basis of the number of days in such year that fall before and including the effective date of the assignment and the number of days in such year that fall after the effective date of the assignment, without regard to the receipt of any distribution that may have been made with respect to such Percentage Interest.

10.6    No Termination of Partnership. Notwithstanding the provisions of this Article X, no assignment or transfer of a Percentage Interest shall be permitted hereunder without the express written consent of each Managing Partner if the proposed assignment or transfer, when aggregated with all other transfers or assignments of Percentage Interests during the twelve-month period ending on the date of the proposed assignment or transfer, would result in a transfer or assignment of more than forty-nine percent (49%) of the Percentage Interests in the Partnership. Any purported transfer or assignment made in violation of this Section shall be void and of no effect.

10.7    Purported Assignments and Transfers. Any purported transfer or assignment of a Percentage Interest made in violation of the provisions of this Article X shall be void and of no effect whatsoever.

10.8    Redemption of Percentage Interest of Partner. Notwithstanding any other provision hereof, or any Allocation Agreement or other agreement heretofore or hereafter entered into by the parties, the Partnership by action of Managing Partners owning at least a majority of the Percentage Interests shall have the right and option to redeem the Percentage Interest of a Managing Partner who is not a Founding Partner or of a Limited Partner at any time. Said redemption may be accomplished by notice to the Partner stating that the Partner's Percentage Interest is redeemed, accompanied by payment of the redemption price herein set forth. The redemption price shall be calculated in the manner set forth in Article VIII or Article IX, as if the subject Partner had elected to resign or withdraw from the Partnership. Upon the giving of said notice as aforesaid, the Limited Partner shall be treated for all purposes hereof as having sold such Partner's Percentage Interest to the Partnership on the date of the aforementioned notice.

## ARTICLE XI
### Amendments; Meetings

11.1 Amendment of Limited Partnership Agreement.

(a)    This Agreement may be amended only by written consent of Managing Partners who own a majority of the Percentage Interests owned by all Managing Partners and, in addition, with the approval of each Founding Partner.

(b)    Notwithstanding the provisions of subsection (a), above, no amendment shall change the Partnership to any form of business other than a registered limited liability partnership, change the term of the Partnership, change the limited liability of the Partners, or deprive the Managing Partners of compensation or reimbursement of expenses to which they are otherwise entitled, without the prior written consent of all Managing Partners and of Limited Partners owning a majority of the Percentage Interests owned by all Limited Partners.

(c)    In the event that this Agreement is amended, the Managing Partners shall amend any and all registrations of the Partnership previously filed by the Partnership to reflect such change if they determine that such amendment is necessary under the laws of the State of Nevada.

11.2   Meetings. Meetings of the Partnership may be called at any time by any Managing Partner. No Limited Partner shall have any right or authority to call any meeting of the Partnership for any purpose.

## ARTICLE XII
## Power of Attorney

12.1   Creation of Power. Each Limited Partner, by his execution of this Agreement or a counterpart hereof, hereby constitutes and appoints each of the Managing Partners as his attorney-in-fact with full power and authority to act on such Limited Partner's behalf and in his name for the purpose of executing, acknowledging, swearing to, filing and recording.

(a)   A certificate of limited partnership, a certificate of doing business under an assumed name, and any other certificates or instruments the filing of which by the Partnership or the Partners may be necessary or appropriate under the laws of the State of Nevada or any other jurisdiction the laws of which may apply to the Partnership.

(b)   A certificate of cancellation of the partnership and such other instruments or documents as may be deemed necessary or desirable by the Managing Partners upon termination of the Partnership;

(c) Any and all amendments to the instruments described in subsections (a) and (b), above, to be filed, or that are consistent with this Agreement (including, without limitation, any amendments admitting or substituting owners of Percentage Interests as Limited Partners), or have been approved by the Partners or any of them pursuant to Section 11.1, or have been otherwise authorized by the Partner or Partners to whom the amendment relates;

(d) Any documents that may be required to effect the continuation of the term of the Partnership, the admission of an additional or substituted Limited Partner, or the dissolution and termination of the Partnership, provided that such continuation, admission, or dissolution and termination are consistent with the terms of this Agreement;

(e) Any and all other instruments as may be deemed necessary or desirable by the Managing Partners to carry out fully the provisions of this Agreement in accordance with its terms;

(f) Any and all such purchase agreements, deeds, mortgages, assignments, transfer documents, trust agreements, affidavits, or other documents or instruments that may be deemed necessary or desirable by the Managing Partners to effect the acquisition, construction, ownership, operation, leasing, sale or disposition of any Property in which the Partnership has or may have an interest; and

(g) Any and all such other documents and instruments as may be deemed necessary or desirable by the Managing Partners to carry out the transactions contemplated by this Agreement

that are of an inconsequential nature and do not adversely affect the rights of the Partners in any material respect.

12.2     Nature of Power of Attorney. The power of attorney created hereby:

(a)     Shall be deemed to be coupled with an interest, shall be irrevocable, and shall survive the death, disability, bankruptcy, dissolution, or insanity of the Limited Partners;

(b)     Shall survive the delivery of an assignment by a Limited Partner of the whole or any portion of his Percentage Interest; except where the assignee has been approved by the Managing Partners for admission to the Partnership as a substituted Limited Partner, and in any event, this power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Managing Partners to execute, acknowledge, swear to, file, and record any instruments necessary to effect such substitution; and

(c)     May be exercised for each Limited Partner by listing all of the Limited Partners executing any document or instrument with a single signature of a Managing Partner as attorney-in-fact for all of such Limited Partners; provided that this method of exercising the power shall not preclude the use of other methods.

## ARTICLE XIII
## Miscellaneous

13.1 Notices

(a)     All notices, demands or requests provided for or permitted to be given pursuant to this Agreement must be in writing. All notices, demands and requests to be sent to any Partner or any permitted assignee of the Percentage Interest of any Partner hereunder shall be deemed to have been properly given or served when deposited in the United States mail, addressed to the Partner, postage prepaid and registered or certified with return receipt requested, at the address indicated below the name of each Partner on the signature page of this Agreement.

(b)     Notwithstanding the fact that all notices, demands and requests shall be effective upon being deposited in the United States mail, the time period in which a response to any such notice, demand or request must be given shall commence to run from the date of receipt by the addressee, as indicated on the return receipt of the notice, demand or request.

(c)     By giving to each other Partner at least fifteen (15) days prior written notice, the Partners and their respective successors and assigns shall have the right from time to time and at any time during the term of this Agreement to change their addresses and to specify any other address within the United States of America.

(d)     No transferee of any Percentage Interest (regardless of whether the transfer was permitted by this Agreement) shall be entitled to receive a notice independently of the notice sent to the Partner making the transfer. A notice sent or given to a Partner shall be deemed to have been sent and given to all transferees of the Partner.

(e)    All payments to be made to any Partner pursuant to this Agreement shall be made at the Partner's address indicated below the name of the Partner or the signature page of this Agreement.

13.2    Titles and Captions. All Article and Section titles and captions in this Agreement are for convenience or reference only, and shall not be deemed part of this Agreement, and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

13.3    Pronouns and Plurals. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms and the singular form of nouns, pronouns and verbs shall include the plural, and vice versa.

13.4    Further Action. The Partners shall execute and deliver all documents, provide all information, and take or forebear from all such action as may be necessary or appropriate to achieve the purposes of this Agreement.

13.5    Applicable Law. This Agreement shall be construed in accordance with and shall be governed by the laws of the State of Nevada.

13.6    Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the Partners and their respective heirs, executors, administrators, successors, legal representatives and assigns; provided that this provision shall not be construed as permitting assignment or substitution except strictly in accordance with the applicable provisions of this Agreement.

13.7    Integration. This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof, and supersedes all prior agreements and understandings pertaining thereto. No covenant, representation or condition not expressed in this Agreement shall affect or be deemed to interpret, change or restrict the express provisions hereof.

13.8    Creditors. None of the provisions of this Agreement shall be for the benefit of or shall be enforceable by any creditors of the Partnership or of any Partner.

13.9    Waiver. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or of such or any other covenant, agreement, term or condition. Any Partner by notice given pursuant to Section 13.1 may, but shall be under no obligation to, waive any of his rights or any conditions to his obligations hereunder, or any duty, obligation or covenant of any other Partner. No waiver shall affect or alter the remainder of this Agreement, but each and every other covenant, agreement, term and condition hereof shall continue in full force and effect with respect to any other then existing or subsequently occurring breach.

13.10    Rights and Remedies. The rights and remedies of the Partners hereunder shall not be mutually exclusive, and the exercise of one or more of the provisions of this Agreement shall

not preclude the exercise of any other provision. Each Partner confirms that damages at law may be an inadequate remedy for a breach or threatened breach of any provision hereof. The respective rights and obligations of the Partners hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to or shall limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other parties for a breach or threatened breach of any provision hereof, it being the intention of the Partners by this Section to make clear their agreement that the respective rights and obligations of the parties hereunder shall be enforceable in equity as well as at law or otherwise.

13.11    Severability. In the event that any condition, covenant or other provision herein contained is held to be invalid or void by any court of competent jurisdiction, the same shall be deemed severable from the remainder of this Agreement and shall in no way affect any other covenant or condition herein contained. If such condition, covenant or other provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope or breadth permitted by law.

13.12    Counterparts. This Agreement may be executed in counterparts, all of which taken together shall constitute one Agreement binding on all of the parties notwithstanding that all the parties are not signatories to the original or the same counterpart. Each party shall become bound by the Agreement immediately upon affixing his signature hereto, independently of the signature of any other party.

13.13    Waiver of Partition. Each Partner hereby waives any right to partition of the Partnership property.

13.14    Exhibits. All exhibits or other documents referred to in the text of this Agreement are hereby incorporated herein by this reference.

13.15    Attorneys' Fees. In the event that the Partnership or any Partner shall enforce or attempt to enforce any provision of this Agreement (including the terms of any loan made by a Partner to the Partnership), the prevailing party in any resulting action, suit or proceeding shall be entitled to recover attorneys' fees from the other parties.

[SIGNATURES ON THE FOLLOWING PAGE]

Page 27 of 30

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

"Managing Partners"

_____
R. Glen Woods

_____
John R. Erickson

_____
Brian C. Whitaker

_____
Aaron R. Maurice

"Limited Partners"

NONE

**EXHIBIT A**
**Capital Contributions of the Founding Partners**

On the Effective Date of the amendment and restatement of the Partnership Agreement hereby made, the Founding Partners shall contribute to the Partnership all of the assets and business of the Partnership, including cash, accounts receivable, inventory, prepaid expenses, furniture, fixtures and equipment and other fixed assets as the same may exist, subject to all of the liabilities of the Partnership, accrued or otherwise.

The Partners hereby agree that the value of the property referred to in the foregoing paragraph is Eight Hundred Thousand Dollars ($800,000). Accordingly, each Founding Partner shall have a capital account balance for purposes of the Partnership Agreement of Four Hundred Thousand Dollars ($400,000) as of the Effective Date hereof.

## EXHIBIT B
## Capital Contributions of the Limited Partners


None

G:\Aaron\W&E Agreement.doc

# EXHIBIT "C"

# EXHIBIT "C"

# EXHIBIT "C"

## STATE OF NEVADA

**ROSS MILLER**
*Secretary of State*

**SCOTT W. ANDERSON**
*Deputy Secretary*
*for Commercial Recordings*



***Commercial Recordings Division***
*202 N. Carson Street*
*Carson City, NV 89701-4069*
*Telephone (775) 684-5708*
*Fax (775) 684-7138*

**OFFICE OF THE**
## SECRETARY OF STATE

ALLISON MILLER
WOODS & ERICKSON
1349 GALLERIA DRIVE SUITE 200
HENDERSON, NV 89014

**Job:C20130409-3384**
April 9, 2013

**Special Handling Instructions:**

**Charges**

| Description | Document Number | Filing Date/Time | Qty | Price | Amount |
|---|---|---|---|---|---|
| Initial List | 20130236847-16 | 4/9/2013 3:23:33 PM | 1 | $125.00 | $125.00 |
| Business License 3/2013-3/2014 | 20130236847-16 | 4/9/2013 3:23:33 PM | 1 | $200.00 | $200.00 |
| Total | | | | | $325.00 |

**Payments**

| Type | Description | Amount |
|---|---|---|
| Billed | 750514 | $325.00 |
| Total | | $325.00 |

**Credit Balance:**  $0.00

**Job Contents:**
File Stamped Copy(s):                           1
Business License(s):                            1

ALLISON MILLER
WOODS & ERICKSON
1349 GALLERIA DRIVE SUITE 200
HENDERSON, NV 89014

**INITIAL LIST OF MANAGING PARTNERS AND REGISTERED AGENT AND STATE BUSINESS LICENSE APPLICATION OF:**

FILE NUMBER

| WEINTRAUB WOODS & PLATT LLP | E0169672013-0 |

NAME OF LIMITED-LIABILITY PARTNERSHIP

FOR THE FILING PERIOD OF    MAR, 2013    TO    MAR, 2014

**\*\*YOU MAY FILE THIS FORM ONLINE AT www.nvsos.gov\*\***

The entity's duly appointed registered agent in the State of Nevada upon whom process can be served is:

R. GLEN WOODS
1349 GALLERIA DRIVE STE 200
HENDERSON, NV 89014

A FORM TO CHANGE REGISTERED AGENT INFORMATION IS FOUND AT: www.nvsos.gov

\*100601\*

Filed in the office of

Ross Miller
Secretary of State
State of Nevada

| Document Number |
| 20130236847-16 |
| Filing Date and Time |
| 04/09/2013 3:23 PM |
| Entity Number |
| E0169672013-0 |

(This document was filed electronically.)
ABOVE SPACE IS FOR OFFICE USE ONLY

**USE BLACK INK ONLY - DO NOT HIGHLIGHT**

☐ Return one file stamped copy. (If filing not accompanied by order instructions, file stamped copy will be sent to registered agent.)

*IMPORTANT: Read instructions before completing and returning this form.*

1. Print or type names and addresses, either residence or business, for all managing partners. **A Managing Partner** must sign the form. *FORM WILL BE RETURNED IF UNSIGNED.*
2. If there are additional managing partners, attach a list of them to this form.
3. Initial list fee is $125.00. A $75.00 penalty must be added for failure to file this form by the last day of the first month following registration date.
4. State business license fee is $200.00. Effective 2/1/2010, $100.00 must be added for failure to file form by deadline.
5. Make your check payable to the Secretary of State.
6. **Ordering Copies:** If requested above, one file stamped copy will be returned at no additional charge. To receive a certified copy, enclose an additional $30.00 per certification. **A copy fee of $2.00 per page** is required for **each additional copy** generated when ordering 2 or more file stamped or certified copies. Appropriate instructions must accompany your order.
7. Return the completed form to: Secretary of State, 202 North Carson Street, Carson City, Nevada 89701-4201, (775) 684-5708.
8. Form must be in the possession of the Secretary of State on or before the last day of the first month following the initial registration date. (Postmark date is not accepted as receipt date.) Forms received after due date will be returned for additional fees and penalties. Failure to include initial list and business license fees will result in rejection of filing.

INITIAL LIST FILING FEE: $125.00    LATE PENALTY: $75.00    BUSINESS LICENSE FEE: $200.00    LATE PENALTY: $100.00

**Complete only if applicable**

☐ Pursuant to NRS, this corporation is exempt from the business license fee. Exemption code:

☐ Month and year your State Business License expires:    20

**Section 7(2) Exemption Codes**
001 - Governmental Entity
002 - 501(c) Nonprofit Entity
003 - Home-based Business
004 - Natural Person with 4 or less rental dwelling units
005 - Motion Picture Company
006 - NRS 680B.020 Insurance Co.

| NAME | TITLE(S) | | | |
|---|---|---|---|---|
| DANIEL J WEINTRAUB | MANAGING PARTNER | | | |
| ADDRESS | CITY | STATE | ZIP CODE | |
| 1349 GALLERIA DRIVE SUITE 200  , USA | HENDERSON | NV | 89014 | |

| NAME | TITLE(S) | | | |
|---|---|---|---|---|
| R. GLEN WOODS | MANAGING PARTNER | | | |
| ADDRESS | CITY | STATE | ZIP CODE | |
| 1349 GALLERIA DRIVE SUITE 200  , USA | HENDERSON | NV | 89014 | |

| NAME | TITLE(S) | | | |
|---|---|---|---|---|
| ANDREW B PLATT | MANAGING PARTNER | | | |
| ADDRESS | CITY | STATE | ZIP CODE | |
| 1349 GALLERIA DRIVE SUITE 200  , USA | HENDERSON | NV | 89014 | |

| NAME | TITLE(S) | | | |
|---|---|---|---|---|
|  | MANAGING PARTNER | | | |
| ADDRESS | CITY | STATE | ZIP CODE | |
|  | HENDERSON | | | |

I declare, to the best of my knowledge under penalty of perjury, that the above mentioned entity has complied with the provisions of sections 6 to 18 of AB 146 of the 2009 session of the Nevada Legislature and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

ANDREW B PLATT

X
**Signature of Managing Partner**

| Title | Date |
|---|---|
| MANAGING PARTNER | 4/9/2013 3:23:21 PM |

Nevada Secretary of State Initial List ManPart
Revised: 8-5-09



# NEVADA STATE BUSINESS LICENSE

## WEINTRAUB WOODS & PLATT LLP
### Nevada Business Identification # NV20131206937

## Expiration Date: March 31, 2014

In accordance with Title 7 of Nevada Revised Statutes, pursuant to proper application duly filed and payment of appropriate prescribed fees, the above named is hereby granted a Nevada State Business License for business activities conducted within the State of Nevada.

This license shall be considered valid until the expiration date listed above unless suspended or revoked in accordance with Title 7 of Nevada Revised Statutes.



IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on April 9, 2013

ROSS MILLER
Secretary of State

This document is not transferable and is not issued in lieu of any locally-required business license, permit or registration.

*Please Post in a Conspicuous Location*

**You may verify this Nevada State Business License online at www.nvsos.gov under the Nevada Business Search.**

# EXHIBIT "D"

# EXHIBIT "D"

# EXHIBIT "D"

R. Glen Woods
John R. Erickson
Brian C. Whitaker
Andrew B. Platt
Kent P. Woods
Justin M. Townsend



**WOODS ERICKSON & WHITAKER LLP**

ATTORNEYS AT LAW

1349 West Galleria Drive
Suite 200
Henderson, NV 89014-8624
P. 702.433.9696
F. 702.434.0615
Website:
www.woodserickson.com

*[handwritten: put this in the file for WWP? The write off.]*

**Glen Woods**
**1349 W. Galleria Drive #200**
**Henderson, NV 89014**

October 7, 2013

Invoice # 0
Matter ID: 11764-001

**Weintraub Woods & Platt LLP**

Professional Services Rendered

|  |  | Hours | Amount |
|---|---|---|---|
| Services Performed by Kathy L. Jones | | | |
| 07/15/2013 Review correspondence from Daniel regarding changes to Shaysam Assignments; office conferences with Andrew regarding same; make revisions to Assignment and Assumption Agreements; make further revisions to Assignment and Assumption Agreements; correspondence to Daniel Weintraub regarding revised assignments; remit same with assignments for signature to Daniel via e-mail. | | 0.60 | |
| SUBTOTAL: | [ | 0.60 | 90.00 ] |
| For professional services rendered | | 0.60 | $90.00 |

Additional Charges:

| Costs | | Amount |
|---|---|---|
| 03/21/2013 | Travel Expenses for Andrew Platt | 394.80 |
| 04/08/2013 | Filing fee to the Nevada Secretary of State | 75.00 |
| 04/15/2013 | Filing fee to the Nevada Secretary of State | 325.00 |
| 04/15/2013 | Filing fee to the Nevada Secretary of State | 50.00 |
| 04/19/2013 | Advertising Graphics | 25.00 |
| 04/19/2013 | Domain Name Registration | 7.99 |
| 09/26/2013 | Check #42345 issued to Wells Fargo Bank | 500.00 |
| | SUBTOTAL: | [ $1,377.79 ] |
| | Interest on overdue balance | $0.00 |
| | Total amount of this bill | $1,467.79 |
| | Previous balance | $0.00 |
| | Total payments and adjustments | $0.00 |

<span style="color:red">CONFIDENTIAL</span>

WEW005585

Woods, Glen
October 07, 2013
Page 2

Balance due                                                                            $1,467.79

| Current | 30 Days | 60 Days | 90 Days |
|---------|---------|---------|---------|
| $0.00   | $0.00   | $0.00   | $0.00   |

CONFIDENTIAL

WEW005586



**Woods Erickson Whitaker & Maurice LLP**
1349 West Galleria Drive Suite 200
Henderson NV 89014

BANK OF NEVADA
Henderson, NV 89014
94-177/1224

41462

3/21/2013

PAY TO THE ORDER OF    Platt, Andrew                                    $ **394.80

Three Hundred Ninety-Four and 80/100**********************************************************    DOLLARS

Andrew B. Platt
1021 White Glacier Avenue
Henderson NV 89002

MEMO    Expenses

⑆04146 2⑆ ⑆122401778⑆

Platt, Andrew                    WWP                                    3/21/2013
Travel & Ent

BankWest-Checking    Expenses

41462

394.80

394.80

CONFIDENTIAL

WEW005587

EXHIBIT "E"

EXHIBIT "E"

EXHIBIT "E"

John Erickson, Esq.  ~  May 9, 2019

| Page 58 | Page 60 |
|---|---|

**Page 58**

1  hearing it.  You know, I didn't do any research about
2  it or anything.  I just assumed it was something the
3  firm had set up to handle those functions that we
4  talked about.
5      Q.  Did you ever notify anyone at the firm that
6  you had any problems or concerns about it?
7      A.  Well, I talked to Brian about it after I
8  found out what the ownership structure was.
9      Q.  And that was after Glen's death?
10     A.  Yes.
11     Q.  So before Glen's death, between the time you
12  returned from your mission and Glen's death, did you
13  ever raise any concerns about Gatehouse Strategies?
14     A.  No.
15     Q.  Do you believe that anyone tried to conceal
16  its existence from you?
17     A.  I don't know that anyone tried to conceal its
18  existence because they -- as I said, they mentioned it
19  around the firm, but I --
20     Q.  Did you have any involvement with Gatehouse
21  Strategies?
22     A.  No.  Other than, I think that at the request
23  of clients, after I took over the trusteeship of the
24  Holeman Trust from Glen, they asked us to put some
25  stuff up on the portal, and I directed somebody to do

**Page 60**

1      A.  Well, I know nobody ever asked me what I
2  thought about forming another firm with members of the
3  firm becoming members of another firm.  I remember Glen
4  had talked to me about, Hey, I might have a referral
5  source, estate planning attorney, of Weintraub.
6          But he never discussed forming a firm where
7  he or Andrew or anybody else would become members of a
8  firm with that person.  Never discussed.
9      Q.  Okay.
10     A.  So I think, yes, it's possible they tried to
11  conceal it.  But, you know, I don't have words from
12  them saying, We tried to conceal it.  They never
13  consulted me, which, to me, was unusual.
14     Q.  What's the Kitestring Group?
15     A.  I'm not sure I know.  I heard that name.  I
16  think it was a DBA that was filed by Glen, but I don't
17  know anything more about it.
18     Q.  When was the first time you heard of the
19  Kitestring Group?
20     A.  I don't recall.
21     Q.  Was it before or after Glen's death?
22     A.  I don't recall.
23     Q.  Do you have any idea what it did or does?
24     A.  No.
25     Q.  Do you believe that anyone had tried to

| Page 59 | Page 61 |
|---|---|

**Page 59**

1  that, to upload some information.
2      Q.  Do you know if that portal was operated by
3  Gatehouse or Woods Erickson?  In other words, do you
4  know who actually operated that portal?
5      A.  I thought it was under the umbrella of
6  Gatehouse, but I didn't -- you know, I had nothing to
7  do with setting up the portal, so I don't know.
8      Q.  Okay.  Have you heard of an entity called
9  "Weintraub Woods & Platt"?
10     A.  Yes.
11     Q.  When was the first time you heard of this
12  entity?
13     A.  I found out about that entity, you know, also
14  after Glen's death.
15     Q.  So the first time you heard about it was
16  after Glen died?
17     A.  Yes.
18     Q.  Do you know if Brian was aware of that entity
19  prior to Glen's death?
20     A.  I don't know.
21     Q.  Do you -- was Weintraub Woods & Platt
22  operational at the time of Glen's death?
23     A.  I don't know.
24     Q.  Do you believe that anyone had tried to
25  conceal its existence from you?

**Page 61**

1  conceal its existence from you?
2      A.  I don't know, but it's possible because they
3  never talked to me about it.
4      Q.  What is Desert Trust Services?
5      A.  I don't know.
6      Q.  Do you know if that had anything to do with
7  Woods Erickson or Glen Woods?
8      A.  I don't.
9      Q.  What is Bosque Holdings, LLC?
10     A.  Bosque?
11     Q.  Bosque.  B-O-S-Q-U-E, Bosque.
12     A.  I believe that is a series LLC that was
13  formed -- I don't know who it was formed by, but I'm
14  assuming it was either Glen or Andrew.  And all I know
15  is that it was a series LLC that owned various real
16  estate assets on behalf of different clients.  Could
17  have been other assets, but assets.
18     Q.  When was the first time you heard of that
19  entity?
20     A.  It was sometime after my return from my
21  mission.  And I think it was probably during the
22  aftermath of Glen's death.
23     Q.  Did you have anything -- or any involvement
24  in that entity?
25     A.  Not in forming it, no.

# EXHIBIT "F"

# EXHIBIT "F"

# EXHIBIT "F"

Brian Whitaker, Esq.  ~  May 10, 2019

Page 154

1   shelf of the books.
2       Q.  So that was after Andrew left.
3       A.  He left, but I didn't allow him to take
4   anything out of the firm.  So if it was there, it was
5   there, unless he removed it and lied to me again.
6       Q.  I'll give you what has been marked as
7   Exhibit M.
8           Do you recognize this document?
9       A.  Yes.
10      Q.  Did you have anything to do with its
11  preparation?
12      A.  Not of its preparation, no, other than I may
13  have reviewed it and had input.
14      Q.  Did you review it prior to it being
15  finalized?
16      A.  Yes, probably.
17      Q.  Look at request for Admission No. 5.
18      A.  Okay.
19      Q.  This says, "Admit that at some point prior to
20  Glen Woods' death, John Erickson and/or Brian Whitaker
21  became aware of Glen Woods and Platt's involvement in
22  an entity called Weintraub, Woods & Platt, LLP."
23          And the response is denied.  Is that an
24  accurate response?
25      A.  I did not know about a partnership being

Page 155

1   formed between Weintraub, Woods & Platt, which would be
2   a multi jurisdiction entity, which has to be reported.
3   I don't know.  I think you have to do bar things.  I'm
4   not sure what else.  And you would have to report it to
5   the insurance carrier.  And none of that happened, to
6   my knowledge, not without me knowing.
7       Q.  So is that an accurate response?
8       A.  Yeah.
9       Q.  Okay.
10      A.  I knew he had a relationship with Weintraub.
11  Did I know that they formed a separate law firm?  I
12  don't recall that at all.
13      Q.  Let me give you what was previously marked as
14  Exhibit N.
15          Take a look at that and tell me if you
16  recognize it.
17      A.  Yes.  This is the first set of
18  interrogatories.
19      Q.  If you turn to page 17, is that your
20  signature?
21      A.  The verification?
22      Q.  Yes.
23      A.  I believe, yes, it is.
24      Q.  Did you review these responses before you
25  signed the verification?

Page 156

1       A.  Yes.
2       Q.  Are the responses true and accurate and
3   complete?
4       A.  To the best of my knowledge.
5       Q.  Okay.  If you turn to Interrogatory No. 1.
6   I'll direct your attention to page 4, line 5.  It says,
7   "WEW was not governed by any other operating or
8   ownership agreements during Platt's relationship with
9   WEW."
10          Do you see that?
11      A.  Yes.
12      Q.  And on the prior page, you reference the
13  amended and restated operating -- or limited liability
14  partnership agreement, which is Exhibit A, and the
15  first amendment, which is Exhibit B, correct?
16      A.  That's correct.
17      Q.  Is that answer a true and accurate answer?
18      A.  Yes, to my knowledge.
19      Q.  All right.  Then it continues and says, "No
20  written agreements were ever entered into to allow for
21  a different percentage interest in profit sharing and
22  in the percentage ownership interest of the managing
23  members."
24          Is that true?
25      A.  That is correct.  There was no written

Page 157

1   agreement.
2       Q.  The next one says, "However, there were oral
3   modifications to the distribution percentages in
4   various years as reflected in the partnership tax
5   returns based upon an understanding that distribution
6   percentages would be periodically adjusted to take into
7   account productivity and workload."
8       A.  That's correct.
9       Q.  Are those the oral modifications we
10  previously discussed today?
11      A.  That, and also every time -- if we added
12  limited partners, I don't know that Glen ever
13  formalized that with an amendment or having them
14  signed.
15      Q.  So just to follow up on that, to your
16  knowledge, did any limited partner ever sign any
17  document where they agreed to be a limited partner?
18      A.  I don't know if I can speak to the entire
19  life of the firm, but not to my knowledge.
20      Q.  If you could turn to Interrogatory No. 13.
21  This talks about some deleted billing entries and
22  discussions you had with clients about those billing
23  entries.
24          My question to you is, is that the April 2018
25  entries that we've already discussed or is this

All-American Court Reporters (702) 240-4393
www.aacrlv.com

# EXHIBIT "G"

# EXHIBIT "G"

# EXHIBIT "G"

## Glen Woods

**From:** Glen Woods
**Sent:** Saturday, February 22, 2014 7:06 PM
**To:** Andrew Platt
**Subject:** Re: Liability insurance

There has to be something short of getting a new policy.

R. Glen Woods
Woods Erickson Whitaker & Maurice LLP
1349 Galleria Dr., Suite 200
henderson, NV 89014
(702) 433-9696
rgwoods@woodserickson.com
Sent from my iPad

On Feb 22, 2014, at 7:03 PM, "Andrew Platt" <aplatt@woodserickson.com> wrote:

> Yes, Allison responded. I wonder if there is an endorsement for the existing policy instead of a
> whole new policy as if we were full time with WWP.
>
> Andrew
>
> Begin forwarded message:
>
> **From:** Allison Miller <amiller@woodserickson.com>
> **Date:** February 20, 2014 at 12:43:54 PM PST
> **To:** Andrew Platt <aplatt@woodserickson.com>
> **Subject: RE: Liability insurance**
>
> Our coverage is for $2 million. The annual premium is $21,015. It is through Mercer (was Marsh) –
> Liberty Insurance Underwriters, Inc.
>
> ---
>
> **From:** Andrew Platt
> **Sent:** Thursday, February 20, 2014 11:45 AM
> **To:** Allison Miller
> **Cc:** Glen Woods
> **Subject:** Liability insurance
>
> Allison: I just spoke with Dan about the California firm (WWP); as he goes about quoting the
> insurance, he was curious what we carry. Do you have that at hand?

**WOODS ERICKSON & WHITAKER I**
ATTORNEYS AT
Andrew B. Platt   aplatt@woodserickson
1349 Galleria Drive, Suite 200, Henderson, Nevada 8
702 433 9696 · Fax 702 434 0615 · WoodsErickson

1

CONFIDENTIAL

WEW005485

**Andrew Platt**

| | |
|---|---|
| **From:** | Glen Woods |
| **Sent:** | Thursday, March 28, 2013 5:12 PM |
| **To:** | Andrew Platt |
| **Cc:** | Daniel J. Weintraub; Glen Woods |
| **Subject:** | Re: Helping Sagar's people with interstate tax matters |

Lets do the dial-in, ok?

Sent from my iPhone

On Mar 28, 2013, at 5:08 PM, "Andrew Platt" <aplatt@woodserickson.com> wrote:

> I will be available then and will await your call when you can: 702-433-9696.
>
> Andrew
>
> WOODS ERICKSON WHITAKER & MAURICE l
> ATTORNEYS AT
> Andrew B. Platt · aplatt@woodserickson
> 1349 Galleria Drive, Suite 200, Henderson, Nevada 8
> 702 433 9696 · Fax 702 434 0615 · WoodsErickson
>
> From: Daniel J. Weintraub [mailto:dan@wsrlaw.net]
> Sent: Thursday, March 28, 2013 4:35 PM
> To: Andrew Platt
> Cc: Glen Woods
> Subject: Re: Helping Sagar's people with interstate tax matters
>
> Let's discuss tomorrow (Fri) at 10 if you are available
>
> Daniel J. Weintraub
>
> On Mar 27, 2013, at 5:34 PM, "Andrew Platt" <aplatt@woodserickson.com> wrote:
>
>> Hope the week has been good despite the pressure.
>>
>> Would 4:00 or 4:30 pacific work? I'd like to get some traction so we can take care
>> of this group. I think you have helped make them the gateway for future services.
>>
>>
>> Turning to details of administering WWP, our insurance company would actually
>> write the multistate coverage from California with Nevada as a rider. Should I
>> have Veronica talk with your staff about who they work with?
>>
>> Glen and I talked about the income sharing in general terms. I don't think that we
>> want to be aggressive about the initial formula, and expect that we will be right

1

CONFIDENTIAL

WEW005063

around those terms with the provision that at some point a year in the future or earlier we talk again about whether the division is appropriate and whether it keeps things interesting for both you and us.

WOODS ERICKSON WHITAKER & MA

ATTORNS

Andrew B. Platt · aplatt@woc
1349 Galleria Drive, Suite 200, Henderson
702 433 9696 · Fax 702 434 0615 · Woo

**From:** Daniel J. Weintraub [mailto:dan@wsrlaw.net]
**Sent:** Wednesday, March 27, 2013 2:50 PM
**To:** Andrew Platt
**Cc:** Glen Woods; Veronica McCormack
**Subject:** Re: Helping Sagar's people with interstate tax matters

I have some ideas of how we should move forward

Daniel J. Weintraub
Weintraub & Selth, APC
11766 Wilshire Blvd.
Suite 1170
Los Angeles, CA 90025

On Mar 27, 2013, at 12:01 PM, "Andrew Platt" <aplatt@woodserickson.com> wrote:

> Dan: We know that you are travelling and want to balance those demands with getting WW&P off the ground. Let me know if I should reach out to Erika for contact information so see what we can get started on.
> Failing that, I will stay in a holding pattern until you and Glen are able to strategize.
>
> Andrew

WOODS ERICKSON WHITAKE

Andrew B. Platt · g
1349 Galleria Drive, Suite 200
702 433 9696 · Fax 702 434 0

CONFIDENTIAL

WEW005064

**Andrew Platt**

**From:**      Sara Henderson
**Sent:**      Tuesday, May 28, 2013 10:47 AM
**To:**        Andrew Platt
**Subject:**   RE: WWP Billing file

This is your reminder for us to coordinate this billing file.  Let me know
what you would like me to do.  :)

-----Original Message-----
From: Andrew Platt
Sent: Thursday, May 23, 2013 10:45 PM
To: Sara Henderson
Cc: Veronica McCormack
Subject: WWP Billing file

Sara, can you remind me to coordinate setting up a billing file for WWP and
the first sub matter Sagar?

Andrew

1

CONFIDENTIAL

WEW005088

# Weintraub Woods & Platt LLP

| 11766  Wilshire Boulevard, Suite 1170 | 1349 Galleria Drive, Suite 200, |
|---|---|
| Los Angeles, California  90025 | Henderson, Nevada 89014 |
| (310) 207-1494 — Fax: (310) 442-0660 | (702) 433 9696 — Fax: (702) 434-0615 |

Sagar and Shareena Kumar
3235 Dos Palos Drive
Los Angeles, CA 90068
sagarkumar@aol.com

8/12/2013
Inv #WWP101

| DESCRIPTION | AMOUNT |
|---|---|
| Flat-fee for drafting Nevada Asset Protection trust and Nevada limited-liability limited partnership to protect the business interests and personal investments of Sagar and Shareena Kumar. | $12,500.00 |
| TOTAL | $12,500.00 |

Please remit payment to:

Weintraub Woods & Platt LLP
1349 Galleria Drive #200
Henderson, NV 89014

CONFIDENTIAL

WEW005047

# Weintraub Woods & Platt LLP

| 11766  Wilshire Boulevard, Suite 1170 | 1349 Galleria Drive, Suite 200, |
|---|---|
| Los Angeles, California  90025 | Henderson, Nevada 89014 |
| (310) 207-1494 – Fax: (310) 442-0660 | (702) 433 9696 – Fax: (702) 434-0615 |

Sagar and Shareena Kumar                                   8/12/2013
3235 Dos Palos Drive                                    Inv #WWP102
Los Angeles, CA 90068
sagarkumar@aol.com

| DESCRIPTION | AMOUNT |
|---|---|
| Flat-fee for drafting irrevocable life Insurance trust to hold insurance policies on the lives of Sagar and Shareena Kumar for the benefit of their descendants. | $2,500.00 |
| TOTAL | $2,500.00 |

Please remit payment to:

Weintraub Woods & Platt LLP
1349 Galleria Drive #200
Henderson, NV 89014

CONFIDENTIAL

WEW005048

# Weintraub Woods & Platt LLP

| 11766 Wilshire Boulevard, Suite 1170 | 1349 Galleria Drive, Suite 200, |
|---|---|
| Los Angeles, California 90025 | Henderson, Nevada 89014 |
| (310) 207-1494 – Fax: (310) 442-0660 | (702) 433 9696 – Fax: (702) 434-0615 |

Mahendra & Herma Patel
3235 Dos Palos Drive
Los Angeles, CA 90068
sagarkumar@aol.com

8/12/2013
Inv #WWP103

| DESCRIPTION | AMOUNT |
|---|---|
| Flat-fee for drafting Nevada Asset Protection trust and Nevada limited-liability limited partnership to protect the business interests and personal investments of Mahendra and Herma Patel. | $12,500.00 |
| TOTAL | $12,500.00 |

Please remit payment to:

Weintraub Woods & Platt LLP
1349 Galleria Drive #200
Henderson, NV 89014

CONFIDENTIAL

WEW005049

# Weintraub Woods & Platt LLP

11766 Wilshire Boulevard, Suite 1170
Los Angeles, California 90025
(310) 207-1494 – Fax: (310) 442-0660

1349 Galleria Drive, Suite 200,
Henderson, Nevada 89014
(702) 433 9696 – Fax: (702) 434-0615

Sagar Kumar
3235 Dos Palos Drive
Los Angeles, CA 90068
sagarkumar@aol.com

8/12/2013
Inv #WWP101

Invoice:

Flat-fee for drafting Nevada Asset Protection trust and Nevada limited-liability limited
partnership to protect the business interests and personal investments of Sagar and Shareena
Kumar.

Balance due:                                                                $12,500.00

Please remit payment to:

Weintraub Woods & Platt LLP
1349 Galleria Drive #200
Henderson, NV 89014

CONFIDENTIAL

WEW005050

# Weintraub Woods & Platt LLP

| | |
|---|---|
| 11766 Wilshire Boulevard, Suite 1170 | 1349 Galleria Drive, Suite 200, |
| Los Angeles, California 90025 | Henderson, Nevada 89014 |
| (310) 207-1494 – Fax: (310) 442-0660 | (702) 433 9696 – Fax: (702) 434-0615 |

Sagar Kumar                                                            8/12/2013
3235 Dos Palos Drive                                          Inv #WWP102
Los Angeles, CA 90068
sagarkumar@aol.com

Invoice:

Flat-fee for drafting irrevocable life insurance trust to hold insurance policies on the lives of
Sagar and Shareena Kumar for the benefit of their descendants.

Balance due:                                                                     $2,500.00

Please remit payment to:

Weintraub Woods & Platt LLP
1349 Galleria Drive #200
Henderson, NV 89014

CONFIDENTIAL

WEW005051

# Weintraub Woods & Platt LLP

| | |
|---|---|
| 11766 Wilshire Boulevard, Suite 1170 | 1349 Galleria Drive, Suite 200, |
| Los Angeles, California 90025 | Henderson, Nevada 89014 |
| (310) 207-1494 – Fax: (310) 442-0660 | (702) 433 9696 – Fax: (702) 434-0615 |

Mahendra & Herma Kumar                                        8/12/2013
3235 Dos Palos Drive                                          Inv #WWP103
Los Angeles, CA 90068
sagarkumar@aol.com

Invoice:

Flat-fee for drafting Nevada Asset Protection trust and Nevada limited-liability limited
partnership to protect the business interests and personal investments of Mahendra and Herma
Kumar.

Balance due:                                                 $12,500.00

Please remit payment to:

Weintraub Woods & Platt LLP
1349 Galleria Drive #200
Henderson, NV 89014

CONFIDENTIAL

WEW005052

EXHIBIT "H"

EXHIBIT "H"

EXHIBIT "H"





*060102*

**ROSS MILLER**
Secretary of State
204 North Carson Street, Suite 4
Carson City, Nevada 89701-4520
(775) 684-5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
|  Ross Miller Secretary of State State of Nevada | **20140098494-21** |
| | Filing Date and Time |
| | **02/07/2014 8:25 AM** |
| | Entity Number |
| | **E0075042014-3** |

# Certificate of Limited Partnership
(PURSUANT TO NRS CHAPTER 87A)

USE BLACK INK ONLY · DO NOT HIGHLIGHT                    ABOVE SPACE IS FOR OFFICE USE ONLY

| **1. Name of Limited Partnership:** (see instructions) | GATEHOUSE STRATEGIES LP | | | |
|---|---|---|---|---|

| **2. Street and Mailing Address of Designated Office:** | 1349 GALLERIA DRIVE, SUITE 200 | HENDERSON | Nevada | 89014 |
|---|---|---|---|---|
| | Street Address *(required)* | City | | Zip Code |
| | 1349 GALLERIA DRIVE, SUITE 200 | HENDERSON | NV | 89014 |
| | Mailing Address *(required)* | City | State | Zip Code |

**3. Registered Agent for Service of Process:** (check only one box)

[X] Commercial Registered Agent: R. GLEN WOODS
    Name

[ ] Noncommercial Registered Agent     **OR**     [ ] Office or Position with Entity
   (name and address below)           (name and address below)

Name of Noncommercial Registered Agent  OR  Name of Title of Office or Other Position with Entity

| | Nevada | |
|---|---|---|
| Street Address | City | Zip Code |
| | Nevada | |
| Mailing Address (if different from street address) | City | Zip Code |

| **4. Dissolution Date:** (optional) | A Limited Partnership governed by NRS Chapter 87A may have perpetual existence or state a dissolution date. |
|---|---|
| | The date of dissolution of this entity, if any, is: _____ (mm/dd/yyyy) |

**5. Name, Street Address, Mailing Address and Signature of Each General Partner:** (add additional page if more than 2)

I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

| 1) R. GLEN WOODS | X _____ | | |
|---|---|---|---|
| Name of General Partner | General Partner Signature | | |
| 1349 GALLERIA DRIVE, SUITE 200 | HENDERSON | NV | 89014 |
| Street Address *(required)* | City | State | Zip Code |
| 1349 GALLERIA DRIVE, SUITE 200 | HENDERSON | NV | 89014 |
| Mailing Address *(required)* | City | State | Zip Code |
| 2) ANDREW B. PLATT | X _____ | | |
| Name of General Partner | General Partner Signature | | |
| 1349 GALLERIA DRIVE, SUITE 200 | HENDERSON | NV | 89014 |
| Street Address *(required)* | City | State | Zip Code |
| 1349 GALLERIA DRIVE, SUITE 200 | HENDERSON | NV | 89014 |
| Mailing Address *(required)* | City | State | Zip Code |

| **6. Other Matters:** (see instructions) | [ ] Mark box to indicate additional matters have been added to the Certificate of Limited Partnership and attach pages. |
|---|---|

| **7. Formation Date:** (optional) | The formation date of this entity will be the *later* of the filing date of this certificate or: _____ (mm/dd/yyyy) |
|---|---|

| **8. Certificate of Acceptance of Appointment of Registered Agent:** | *I hereby accept appointment as Registered Agent for the above named Entity.* |
|---|---|
| | X _____       2/7/14 |
| | Authorized Signature of Registered Agent or On Behalf of Registered Agent Entity    Date |

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State NRS 87A LP Certificate
Revised: 7-26-13



# CERTIFICATE OF REGISTRATION OF
# LIMITED LIABILITY LIMITED PARTNERSHIP

I, ROSS MILLER, the duly qualified and elected Nevada Secretary of State, do hereby certify that **GATEHOUSE STRATEGIES LLLP** did on February 7, 2014 file in this office a Registration of Certificate of Limited Partnership, that said Certificate is now on file and of record in the office of the Nevada Secretary of State, and further, that said Certificate contains all the provisions required by the laws governing Limited Liability Limited Partnerships in the State of Nevada.



IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on February 12, 2014.

ROSS MILLER
Secretary of State

Certified By: A Frieser
Certificate Number: C20140210-0457
You may verify this certificate
online at **http://www.nvsos.gov/**



**ROSS MILLER**
**Secretary of State**
**204 North Carson Street, Suite 1**
**Carson City, Nevada 89701-4520**
**(775) 684-5708**
**Website: www.nvsos.gov**



*080102*



| | |
|---|---|
| Filed in the office of | Document Number |
| *signature* | **20140098495-32** |
| Ross Miller | Filing Date and Time |
| Secretary of State | **02/07/2014 8:25 AM** |
| State of Nevada | Entity Number |
| | **E0075042014-3** |

## Certificate of Registration of a Limited-Liability Limited Partnership
### (PURSUANT TO NRS CHAPTER 87A)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                           ABOVE SPACE IS FOR OFFICE USE ONLY

**Certificate of Registration of a Nevada Limited-Liability Limited Partnership**
**(Pursuant to NRS Chapter 87A)**

**1. Name of the Limited-Liability Limited Partnership:**

GATEHOUSE STRATEGIES LLLP

**2. Name of the Nevada Limited Partnership registering to become the Limited-Liability Limited Partnership:**

GATEHOUSE STRATEGIES LP

**3. Street address of the Principal Office:**

| 1349 GALLERIA DRIVE, SUITE 200 | HENDERSON | NV | 89014 |
|---|---|---|---|
| Street Address | City | State | Zip Code |

**4. Registered Agent for Service of Process:** (check one box only)

[X] Commercial Registered Agent: R. GLEN WOODS
                                                                                   Name

[ ] Noncommercial Registered Agent      **OR**      [ ] Office or Position with Entity
    (name and address below)                                     (name and address below)

| | |
|---|---|
| Name of Noncommercial Registered Agent   OR   Name of Title of Office or Other Position with Entity | |

| | | Nevada | |
|---|---|---|---|
| Street Address | City | | Zip Code |

| | | Nevada | |
|---|---|---|---|
| Mailing Address (if different from street address) | City | | Zip Code |

**5. Name and Business Address of each initial General Partner:***

| R. GLEN WOODS | 1349 GALLERIA DRIVE, STE. 200 | HENDERSON | NV | 89014 |
|---|---|---|---|---|
| Name | Business Address | City | State | Zip Code |
| ANDREW B. PLATT | 1349 GALLERIA DRIVE, STE. 200 | HENDERSON | NV | 89014 |
| Name | Business Address | City | State | Zip Code |

**6. Name, Business Address and Signature of each Organizer executing the certificate:***

I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

| R. GLEN WOODS | X *signature* |
|---|---|
| Name | Organizer Signature |

| 1349 GALLERIA DRIVE, SUITE 200 | HENDERSON | NV | 89014 |
|---|---|---|---|
| Business Address | City | State | Zip Code |

**7.** The registration is effective on the later of the filing of the certificate of registration or a date specified in the certificate of registration.  Specified effective date: _____ **(mm/dd/yyyy)**

**8.** The certificate has been executed by the vote necessary to amend the partnership agreement.  The limited partnership hereafter will be a registered limited-liability limited partnership.

**9.** I hereby accept appointment as Registered Agent for the above named Entity.

X *signature*                                                                   2/7/14
Authorized Signature of Registered Agent or On Behalf of Registered Agent Entity                      Date
*attach a plain 8 1/2" x 11" sheet to list additional names and addresses.
**Filing Fee: $100.00**

Nevada Secretary of State NRS 87A DLLLP Registration
Revised: 7-29-13

# INITIAL/ANNUAL LIST OF GENERAL PARTNERS AND STATE BUSINESS LICENSE APPLICATION OF:

ENTITY NUMBER

GATEHOUSE STRATEGIES LLLP

NAME OF LIMITED PARTNERSHIP   OR   LIMITED-LIABILITY LIMITED PARTNERSHIP

FOR THE FILING PERIOD OF   2014   TO   2015

**USE BLACK INK ONLY - DO NOT HIGHLIGHT**

[X]   Return one file stamped copy. (If filing not accompanied by order instructions, file stamped copy will be sent to registered agent.)

**\*\*YOU MAY FILE THIS FORM ONLINE AT www.nvsilverflume.gov\*\***

*IMPORTANT*:  Read instructions before completing and returning this form.

1. Print or type names and addresses, either residence or business, for all general partners. A General Partner must sign the form. *FORM WILL BE RETURNED IF UNSIGNED.*

2. If there are additional general partners, attach a list of them to this form.

3. Return the completed form with the filing fee of $125.00/$175.00. A $75.00 penalty must be added for failure to file this form by the deadline. An annual list received more than 90 days before its due date shall be deemed an amended list for the previous year.

4. State business license fee is $200.00. Effective 2-1-2010, $100.00 must be added for failure to file form by deadline.

5. Make your check payable to the Secretary of State.

6. Ordering Copies:  If requested above, one file stamped copy will be returned at no additional charge. To receive a certified copy, enclose an additional $30.00 per certification. A copy fee of $2.00 per page is required for each additional copy generated when ordering 2 or more file stamped or certified copies. Appropriate instructions must accompany your order.

7. Return the completed form to:  Secretary of State, 202 North Carson Street, Carson City, Nevada 89701-4201, (775) 684-5708.

8. Form must be in the possession of the Secretary of State on or before the last day of the month in which it is due. (Postmark date is not accepted as receipt date.) Forms received after due date will be returned for additional fees and penalties. Failure to include annual list and business license fees will result in rejection of filing.

**LIMITED PARTNERSHIP FILING FEE:** $125.00   **LATE PENALTY:** $75.00 (if filing late)       **BUSINESS LICENSE FEE:** $200.00   **LATE PENALTY:** $100.00 (if filing late)

**LIMITED-LIABILITY LIMITED PARTNERSHIP FILING FEE:** $125.00 (NRS 87A) or $175.00 (NRS 88)   **LATE PENALTY:** $75.00 (if filing late)

| | Filed in the office of | Document Number |
| --- | --- | --- |
| *\*100502\** | | 20140098496-43 |
| | Ross Miller | Filing Date and Time |
| | Secretary of State | 02/07/2014 8:25 AM |
| | State of Nevada | Entity Number |
| | | E0075042014-3 |

**ABOVE SPACE IS FOR OFFICE USE ONLY**

---

**CHECK ONLY IF APPLICABLE AND ENTER EXEMPTION CODE IN BOX BELOW**

**NRS 76.020 Exemption Codes**
001 - Governmental Entity
005 - Motion Picture Company
006 - NRS 680B.020 Insurance Co.

[ ]   Pursuant to NRS Chapter 76, this entity is exempt from the business license fee. Exemption code: [   ]

**NOTE: If claiming an exemption, a notarized Declaration of Eligibility form must be attached. Failure to attach the Declaration of Eligibility form will result in rejection, which could result in late fees.**

| NAME | TITLE(S) |
| --- | --- |
| R. GLEN WOODS | **GENERAL PARTNER** |

| ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |
| 1349 GALLERIA DRIVE, SUITE 200 | HENDERSON | NV | 89014 |

| NAME | TITLE(S) |
| --- | --- |
| ANDREW B. PLATT | **GENERAL PARTNER** |

| ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |
| 1349 GALLERIA DRIVE, SUITE 200 | HENDERSON | NV | 89014 |

| NAME | TITLE(S) |
| --- | --- |
| | **GENERAL PARTNER** |

| ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |
| | | | |

| NAME | TITLE(S) |
| --- | --- |
| | **GENERAL PARTNER** |

| ADDRESS | CITY | STATE | ZIP CODE |
| --- | --- | --- | --- |
| | | | |

None of the general partners identified in the list of general partners has been identified with the fraudulent intent of concealing the identity of any person or persons exercising the power or authority of a general partner in furtherance of any unlawful conduct.

I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.

X _____
**Signature of General Partner or Other Authorized Signature**

Title   GENERAL PARTNER

Date   2/7/14

Nevada Secretary of State List GenPart
Revised: 11-1-13



# NEVADA STATE BUSINESS LICENSE

## GATEHOUSE STRATEGIES LLLP
### Nevada Business Identification # NV20141099492

### Expiration Date: February 28, 2015

In accordance with Title 7 of Nevada Revised Statutes, pursuant to proper application duly filed and payment of appropriate prescribed fees, the above named is hereby granted a Nevada State Business License for business activities conducted within the State of Nevada.

This license shall be considered valid until the expiration date listed above unless suspended or revoked in accordance with Title 7 of Nevada Revised Statutes.



IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on February 12, 2014

ROSS MILLER
Secretary of State

This document is not transferable and is not issued in lieu of any locally-required business license, permit or registration.

*Please Post in a Conspicuous Location*

**You may verify this Nevada State Business License
online at www.nvsos.gov under the Nevada Business Search.**

Form **SS-4**
(Rev. January 2010)
Department of the Treasury
Internal Revenue Service

## Application for Employer Identification Number

(For use by employers, corporations, partnerships, trusts, estates, churches, government agencies, Indian tribal entities, certain individuals, and others.)

► See separate instructions for each line.   ► Keep a copy for your records.

OMB No. 1545-0003

EIN   **32-0433214**

| | |
|---|---|
| 1 | Legal name of entity (or individual) for whom the EIN is being requested<br>**GATEHOUSE STRATEGIES LLLP** |

| 2 | Trade name of business (if different from name on line 1)<br>**nevadaLLLP.com** | 3 | Executor, administrator, trustee, "care of" name |
|---|---|---|---|

| 4a | Mailing address (room, apt., suite no. and street, or P.O. box)<br>**1349 Galleria Drive Suite 250** | 5a | Street address (if different) (Do not enter a P.O. box.) |
|---|---|---|---|
| 4b | City, state, and ZIP code (if foreign, see instructions)<br>**Henderson, Nevada 89014** | 5b | City, state, and ZIP code (if foreign, see instructions) |

| 6 | County and state where principal business is located<br>**Clark County, Nevada** |
|---|---|

| 7a | Name of responsible party<br>**Andrew Platt** | 7b | SSN, ITIN, or EIN   **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** |
|---|---|---|---|

| 8a | Is this application for a limited liability company (LLC) (or a foreign equivalent)? ☐ Yes ☑ No | 8b | If 8a is "Yes," enter the number of LLC members ► |
|---|---|---|---|

8c   If 8a is "Yes," was the LLC organized in the United States?   ☐ Yes   ☐ No

9a   Type of entity (check only one box). **Caution.** If 8a is "Yes," see the instructions for the correct box to check.

☐ Sole proprietor (SSN) ___
☑ Partnership
☐ Corporation (enter form number to be filed) ► ___
☐ Personal service corporation
☐ Church or church-controlled organization
☐ Other nonprofit organization (specify) ► ___
☐ Other (specify) ►

☐ Estate (SSN of decedent) ___
☐ Plan administrator (TIN) ___
☐ Trust (TIN of grantor) ___
☐ National Guard   ☐ State/local government
☐ Farmers' cooperative   ☐ Federal government/military
☐ REMIC   ☐ Indian tribal governments/enterprises
Group Exemption Number (GEN) if any ►

| 9b | If a corporation, name the state or foreign country (if applicable) where incorporated | State | | Foreign country |
|---|---|---|---|---|

10   Reason for applying (check only one box)
☑ Started new business (specify type) ► **Business services and consulting**
☐ Hired employees (Check the box and see line 13.)
☐ Compliance with IRS withholding regulations
☐ Other (specify) ►

☐ Banking purpose (specify purpose) ► ___
☐ Changed type of organization (specify new type) ► ___
☐ Purchased going business
☐ Created a trust (specify type) ► ___
☐ Created a pension plan (specify type) ► ___

| 11 | Date business started or acquired (month, day, year). See instructions.<br>**February 1, 2014** | 12 | Closing month of accounting year   **12** |
|---|---|---|---|

13   Highest number of employees expected in the next 12 months (enter -0- if none).
If no employees expected, skip line 14.

| Agricultural | Household | Other |
|---|---|---|
| **0** | **0** | **0** |

14   If you expect your employment tax liability to be $1,000 or less in a full calendar year and want to file Form 944 annually instead of Forms 941 quarterly, check here. (Your employment tax liability generally will be $1,000 or less if you expect to pay $4,000 or less in total wages.) If you do not check this box, you must file Form 941 for every quarter. ☐

15   First date wages or annuities were paid (month, day, year). **Note.** If applicant is a withholding agent, enter date income will first be paid to nonresident alien (month, day, year) . . .   **N/A**

16   Check one box that best describes the principal activity of your business.
☐ Construction   ☐ Rental & leasing   ☐ Transportation & warehousing
☐ Real estate   ☐ Manufacturing   ☐ Finance & insurance
☐ Health care & social assistance   ☐ Wholesale-agent/broker
☐ Accommodation & food service   ☐ Wholesale-other   ☐ Retail
☑ Other (specify) **Business services and consulting**

17   Indicate principal line of merchandise sold, specific construction work done, products produced, or services provided.
**Advising businesses on mechanics of interstate business operations and related services**

18   Has the applicant entity shown on line 1 ever applied for and received an EIN?   ☐ Yes   ☑ No
If "Yes," write previous EIN here ►

---

Complete this section only if you want to authorize the named individual to receive the entity's EIN and answer questions about the completion of this form.

| **Third Party Designee** | Designee's name | Designee's telephone number (include area code)<br>( ) |
|---|---|---|
| | Address and ZIP code | Designee's fax number (include area code)<br>( ) |

Under penalties of perjury, I declare that I have examined this application, and to the best of my knowledge and belief, it is true, correct, and complete.

Name and title (type or print clearly) ►   **Andrew Platt, MLP   (Managing Limited Partner)**

Applicant's telephone number (include area code)
( **702** ) **433-9696**

Signature ► ___   Date ► **02-12-14**

Applicant's fax number (include area code)
( **702** ) **434-0815**

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.   Cat. No. 16055N   Form **SS-4** (Rev. 1-2010)

# FIRST AMENDED AND RESTATED

# AGREEMENT OF LIMITED LIABILITY LIMITED PARTNERSHIP

## of

# GATEHOUSE STRATEGIES LLLP

**a Nevada limited-liability limited partnership**

# SECTIONS

Article I. Basic Organization of Partnership...............................................................................1

   1.01    Formation..................................................................................................................1

   1.02    Name.........................................................................................................................1

   1.03    Definitions................................................................................................................1

   1.04    Character of Business ..............................................................................................3

   1.05    Principal Place of Business .....................................................................................3

   1.06    Term.........................................................................................................................3

Article II. Basic Organization of Partnership .............................................................................3

   2.01    Capital Contributions of Partners............................................................................3

   2.02    Partnership Units......................................................................................................3

   2.03    Partners ....................................................................................................................4

   2.04    Interest on Contributions and Compensation..........................................................4

   2.05    Admission of Additional Partners...........................................................................4

   2.06    Redemption of Partnership Units.............................................................................4

   2.07    Return of Contributions ..........................................................................................4

   2.08    Capital Accounts......................................................................................................5

Article III. Status of Equity and Special Limited Partners .........................................................5

   3.01    Limited Liability ......................................................................................................5

   3.02    No Management Responsibility or Right .................................................................5

   3.03    No Authority to Bind Partnership ............................................................................5

   3.04    Return of Capital Only From Partnership Assets ....................................................5

   3.05    Relationship With Managing Limited Partners .......................................................5

Article IV. Allocation of Profit and Loss....................................................................................6

   4.01    Income and Losses...................................................................................................6

   4.02    Definitions of Profits and Losses............................................................................6

   4.03    Allocation of Income Attributable to Principal Reductions in Nonrecourse
           Partnership Indebtedness .........................................................................................6

   4.04    Allocation of Gains and Losses Upon Disposition of Partnership Property.............6

   4.05    Tax Credits...............................................................................................................6

   4.06    Limitation on Liability.............................................................................................7

   4.07    Treatment of Certain Items as Expenses.................................................................7

Article V. Authority, Power and Compensation of Managing Limited Partners..........................7

   5.01    General Statement of Powers...................................................................................7

5.02     Voting ............................................................................................................8

5.03     Execution of Documents and Agreements.......................................................8

5.04     Elections of Managing Limited Partners ........................................................8

5.05     Compensation of Partners ..............................................................................9

5.06     No Exclusive Duty to Partnership....................................................................9

5.07     Dealings With Affiliates of the Managing Limited Partners ...........................9

5.08     Potential Liability of the Managing Limited Partners ....................................9

5.09     Indemnification of Managing Limited Partners...............................................9

5.10     Borrowing from Managing Limited Partners ...............................................10

5.11     Section 754 Election Under Internal Revenue Code .....................................10

Article VI. Distributions to Partners ............................................................................ 10

6.01     Definition of Net Cash Receipts ...................................................................10

6.02     Timing of Distributions.................................................................................11

6.03     Distributions to Partners ...............................................................................11

6.04     Final Authority ..............................................................................................11

Article VII. Books of Account, Records and Reports .................................................. 11

7.01     Books and Records ........................................................................................11

7.02     Reports to Partners........................................................................................11

7.03     Tax Information .............................................................................................12

7.04     Fiscal Year ....................................................................................................12

7.05     Bank Accounts ..............................................................................................12

7.06     Taxable Year of Partners ..............................................................................12

7.07     Federal Tax Matters Partner..........................................................................12

Article VIII. Default and Remedies ............................................................................. 13

8.01     Events of Default ..........................................................................................13

8.02     Option to Purchase .......................................................................................14

8.03     Option to Buy................................................................................................14

8.04     Payment of Purchase Price ...........................................................................15

8.05     Event of Default Involving Managing Limited Partner .................................15

Article IX. Dissolution................................................................................................. 15

9.01     Dissolution....................................................................................................15

9.02     Resignation of Managing Limited Partner....................................................15

9.03     Continuation of the Partnership ...................................................................16

9.04     Bankruptcy, Etc. of Limited Partners ..........................................................16

9.05      Dissolution Procedure ..................................................................................16

Article X. Transfer of Partnership Units ....................................................................... 17

10.01     Transfer of Partnership Units ..................................................................17

10.02     Substituted Limited Partner ....................................................................17

10.03     Status of Assignee or Substituted Limited Partner ................................18

10.04     Economic Allocation on Assignment ......................................................18

10.05     No Termination of Partnership ................................................................18

10.06     Purported Assignments and Transfers ....................................................18

Article XI. Amendments; Meetings .............................................................................. 19

11.01     Amendment of Limited Partnership Agreement ......................................19

11.02     Meetings ..................................................................................................19

Article XII. Limited Power of Attorney ....................................................................... 19

12.01     Creation of Power ...................................................................................19

12.02     Nature of Power of Attorney ...................................................................20

Article XIII. Miscellaneous .......................................................................................... 20

13.01     Notices ....................................................................................................20

13.02     Titles and Captions .................................................................................21

13.03     Pronouns and Plurals ..............................................................................21

13.04     Further Action .........................................................................................21

13.05     Applicable Law .......................................................................................21

13.06     Binding Effect .........................................................................................21

13.07     Integration ..............................................................................................21

13.08     Creditors .................................................................................................22

13.09     Waiver .....................................................................................................22

13.10     Rights and Remedies ...............................................................................22

13.11     Severability .............................................................................................22

13.12     Counterparts ...........................................................................................22

13.13     Waiver of Partition ..................................................................................22

13.14     Schedules ................................................................................................22

13.15     Attorney Fees ..........................................................................................22

Signature Page To Agreement of Limited-Liability Limited Partnership

Schedule A— Schedule of Partners

# FIRST AMENDED AND RESTATED

## AGREEMENT OF LIMITED LIABILITY LIMITED PARTNERSHIP
### of

## GATEHOUSE STRATEGIES LLLP
### a Nevada limited-liability limited partnership

This First Amended and Restated Agreement of Limited Liability Limited Partnership (this "Agreement") is made and entered into as of February 7, 2014, by and between R. Glen Woods and Andrew B. Platt (whether one or many the "Managing Limited Partner"), and those individuals or entities who execute the signature page to this Agreement as limited partners (collectively, the "Limited Partners").

## ARTICLE I. BASIC ORGANIZATION OF PARTNERSHIP

1.01    Formation.    The Founding Partners (defined below) entered into a general partnership on or about February 1, 2013. In order to formalize the operation of the business and the respective rights of the partners, the Managing Limited Partners and the Limited Partners (herein collectively referred to as the "Partners") have registered the partnership as a limited partnership (the "Partnership") pursuant to the provisions of the Uniform Limited Partnership Act (2001) as adopted and in effect in the State of Nevada, Nevada Revised Statutes Sections 87A.005 through 87A.700, which law shall govern the rights and obligations of the parties hereto, except as may be set forth elsewhere herein to the contrary. The Partners have registered the Partnership as a limited-liability limited partnership pursuant to the Uniform Limited Partnership Act (2001). The Partners or their duly appointed attorneys-in-fact shall promptly execute all certificates and other documents, make all necessary filings or recordings thereof, and perform all other acts necessary to comply with the requirements for the operation of a limited-liability limited partnership under the laws of Nevada and the laws of any other state or local governmental jurisdiction in which the Partnership may own property or do business.

1.02    Name.    The name of the Partnership shall be Gatehouse Strategies LLLP; provided that the Partnership may do business under such other name or names as the Managing Limited Partners may select from time to time.

1.03    Definitions.    As used in this Agreement, the following terms shall have the meanings set forth:

(a)    "Affiliate of a Partner" means:

(i)    A partnership, corporation, trust or other entity twenty percent or more of the equity ownership interest in which is owned, directly or indirectly, by or for a Partner;

(ii)    A spouse, ancestor, descendant or sibling of a Partner that is an individual; or

(iii)    A partnership, corporation, trust or other entity twenty percent (20%) or more of the equity ownership interest in which is owned, in the aggregate, directly or indirectly, by or for, one or more individuals or entities described in paragraphs (i) and (ii), above.

(b)    "Agreement" means this First Amended and Restated Agreement of Limited Liability Limited Partnership, as hereafter amended, modified or supplemented from time to time.

(c)    "Capital Account" means the separate Capital Account maintained for each Partner, in accordance with the provisions of Section 2.08 of this Agreement.

(d)    "Code" means the Internal Revenue Code of 1986, as amended.

(e)    "Equity Limited Partner" means a Limited Partner who has been assigned any Partnership Unit in the capital and profits of the Partnership. "Equity Limited Partners" means all Equity Limited Partners.

(f)    "Founder Affiliate." Shall mean a designated business entity or trust affiliate of a Founding Partner which is an Equity Limited Partners of the Partnership. At the date of the execution of the First Amended and Restate Agreement of Limited-Liability Limited Partnership, the Equity Limited Partners affiliated with the Founding Partners are The Belhaven Company Limited Partnership (affiliate of R. Glen Woods) and the 1099 Trust (affiliate of Andrew B. Platt).

(g)    "Founding Partner" shall mean the partners of the predecessor to the Partnership: R. Glen Woods and Andrew B. Platt.

(h)    "General Partner" shall mean a Managing Limited Partner for all purposes of NRS 87A for which NRS 87A.365(3) shall also apply. "General Partners" means all General Partners.

(i)    "Limited Partners" means those individuals and/or entities whose signatures appear on the signature page to this Agreement, as the same may be added to pursuant to this Agreement, beneath the caption "Limited Partners," collectively. Except as otherwise provided, references to "Limited Partners" include references to Equity Limited Partners.

(j)    "Managing Limited Partner" means each of those partners acting as General Partners or Managing Limited Partners according to this Agreement and their duly constituted successors. No reference to a Managing Limited Partner shall in any way alter or be construed as altering in any way the limitation on the personal liability of the Partners for the debts and obligations of the Partnership, as set forth in Article III and elsewhere in this Agreement. "Managing Limited Partners" means all Managing Limited Partners.

(k)    "Partners" means the Managing Limited Partners and the Limited Partners, collectively, where no distinction is required by the context in which the term is used.

(l)        "Partnership" means the Partnership established hereby, which is known as Gatehouse Strategies LLLP, a Nevada limited-liability limited partnership.

(m)       "Partnership Unit" or "Unit" means each unit of ownership interest in and to the capital, profits, losses, and distributions of the Partnership which has been issued to a Partner.

1.04    Character of Business.  The purpose of the Partnership and the character of its business shall be:

(a)        To operate a professional business services and consulting company including activities incident and ancillary thereto.

(b)        To engage in any business activity which shall be lawful to be conducted by a limited-liability limited partnership.

(c)        To do each and every thing necessary, suitable or proper for the accomplishment of the foregoing or that may at any time appear conducive to or expedient for the protection or benefit of the business of the Partnership, and to engage in all activities necessary, customary or incidental to the foregoing.  The Partnership may pursue its business as a venturer, as a partner (either general or limited), or otherwise, either alone or in conjunction with any other person, partnership, association or corporation.

1.05    Principal Place of Business.  The principal office and place of business of the Partnership shall be located at 1349 Galleria Drive, Suite 200, Henderson, Nevada.  The Managing Limited Partners may, from time to time, change the Partnership's principal place of business and, in such event, the Managing Limited Partners shall notify each Limited Partner in writing within twenty (20) days before the effective date of such change, and shall make any filings or amendments of previous filings required by applicable law.  The Managing Limited Partners may, in their discretion, establish additional places of business of the Partnership from time to time.

1.06    Term.  The term of the Partnership shall be perpetual unless terminated in accordance with the provisions of this Agreement or as otherwise provided by law.

## ARTICLE II. BASIC ORGANIZATION OF PARTNERSHIP

2.01    Capital Contributions of Partners.  The Partners have duly made their initial Capital Contributions in connection with the formation of the Partnership. Except as may be specifically provided to the contrary in this Agreement, no Partner shall be obligated to make any additional capital contributions to the Partnership.

2.02    Partnership Units.  The initial number of Partnership Units owned by each Partner shall be as set forth on the signature page to this Agreement. Except as may be specifically provided to the contrary in this Agreement or as a result of transfer or assignment permitted under the terms of Article X of this Agreement, the number of Partnership Units of the Partners shall not be reduced or the rights incident thereto modified, revised or adjusted during the term

of the Partnership. The Managing Limited Partners may revise the attached Schedule A to reflect the current ownership of Partnership Units from time to time.

2.03    Partners. The Partnership shall consist of the one or more persons admitted to the partnership as Equity Limited Partners, Special Limited Partners, or Managing Limited Partners pursuant to this Agreement. The fact that any Managing Limited Partner or Special Limited Partner does not hold any Partnership Units shall not prejudice any right or diminish any responsibility hereunder. A non-economic Partner holding no Partnership Units does not have any rights to ownership or any rights to receive any distributions from operations or the liquidation or winding-up of the Partnership. A Managing Limited Partner who ceases to hold any number of Partnership Units may continue to serve as Managing Limited Partner until otherwise removed by the Partners hereunder.

2.04    Interest on Contributions and Compensation.    Except as may be specifically provided to the contrary in Section 6.03 or elsewhere herein, or except as may be agreed upon in writing by all Managing Limited Partners together with Limited Partners owning a majority of the Partnership Units owned by all Limited Partners, no Partner shall be entitled to receive interest on its capital contributions (whether initial or otherwise) to the Partnership. As provided in Section 5.04, the Managing Limited Partners shall be entitled to receive reasonable compensation for services rendered to or on behalf of the Partnership.

2.05    Admission of Additional Partners.    New Partners may be admitted to the Partnership after notice to all Partners, with the written consent of all Managing Limited Partners.  The Managing Limited Partners shall have the power, exercisable in their sole and absolute discretion, to determine the terms and conditions upon which additional Partners shall be admitted to the Partnership.  New Partners must execute a counterpart to this Agreement and agree to be bound by all of the terms and provisions hereof.  New Partners shall make such capital contribution and shall receive such Partnership Units in the Partnership as may be determined by the Managing Partners, with the approval of Equity Limited Partners who own at least a majority of the Partnership Units in the capital of the Partnership.  Upon the admission of an additional Partner, a number of Partnership Units shall be assigned to the newly admitted Partner and the Partnership Units of all Partners may be recalculated and readjusted as agreed by the Equity Limited Partners.

2.06    Redemption of Partnership Units. Upon the unanimous vote of the Managing Limited Partners, the Partnership Units of a Partner may be redeemed pursuant to the valuation and payment mechanism of Section 8.03 and 8.04.

2.07    Return of Contributions. Except as may be specifically provided to the contrary in this Agreement, or except as may be agreed upon in writing by all Managing Limited Partners and by Limited Partners owning a majority of the Partnership Units owned by all Equity Limited Partners:  (a) No Partner shall be entitled to a return of its capital contributions to the Partnership (whether initial or otherwise) or to withdraw its capital contribution to the Partnership until the winding up and liquidation of the Partnership; and (b) Any return of capital contributions shall be made solely from Partnership assets and no Partner shall be personally liable to any other Partner for any such return.

2.08    Capital Accounts.  Individual capital and income accounts shall be maintained for each Partner.  The Capital Accounts shall be maintained in accordance with the applicable provisions of the Treasury Regulations.  The Capital Account of each Partner shall be (a) credited with the dollar amount of any cash and the fair market value of any property (less any liabilities to which any such property is subject) contributed to the Partnership by the Partner; (b) credited with the amount of any income, gain or profit allocated to the Partner from the Partnership; (c) charged with the amount of any loss or other deduction allocated to the Partner from the Partnership; and (d) charged with the dollar amount of any cash and the fair market value of any property (less any liabilities to which any such property is subject) distributed to the Partner by the Partnership.

## ARTICLE III. STATUS OF EQUITY AND SPECIAL LIMITED PARTNERS

3.01    Limited Liability.  No Limited Partner shall be personally liable for any debts or obligations of the Partnership or for any of the liabilities of the Partnership, whether to the Partnership, to any Partner, or to creditors of the Partnership, beyond the amount contributed by him to the capital of the Partnership, plus his share of the accumulated but undistributed profits of the Partnership.

3.02    No Management Responsibility or Right.  Except as may be specifically provided to the contrary in this Agreement, no Equity or Special Limited Partner shall participate in or interfere in any manner with the management of the business of the Partnership or transact any business for the Partnership, except as specifically provided in this Agreement.  Notwithstanding the foregoing, in the event that any right or favor granted to a Limited Partner under this Agreement is determined by a court of competent jurisdiction to constitute "participating in the control of the business" of the Partnership, within the meaning of Section 87A.330 of the Nevada Uniform Limited Partnership Act (2001), such power shall not be exercisable by the Equity or Special Limited Partners and shall be deemed to be modified and limited to the extent necessary to maintain the limited liability status of the Limited Partners.

3.03    No Authority to Bind Partnership.  No Equity or Special Limited Partner shall have authority or power to act for, to bind, or to sign any writing for or on behalf of the Partnership or the Managing Limited Partners.

3.04    Return of Capital Only From Partnership Assets.  No Equity or Special Limited Partner shall be entitled to the return of any amount contributed by him to the capital of the Partnership out of any assets other than the assets of the Partnership, and then only strictly in accordance with the provisions of this Agreement.  It is expressly understood and agreed that the Managing Limited Partners shall not be personally liable for the return of any capital or other contributions of any Partner.  No Partner shall have the right to demand or receive any property other than cash in return of his contributions to the Partnership.  No Limited Partner shall receive any salary or other compensation from the Partnership for any service rendered on its behalf.

3.05    Relationship With Managing Limited Partners.  No Limited Partner shall have an interest in the individual assets of any Managing Limited Partner or in any proceeds of any sales

of the assets of any Managing Limited Partner by virtue of acquiring or holding any Partnership Units in the Partnership.

## ARTICLE IV.  ALLOCATION OF PROFIT AND LOSS

4.01    <u>Income and Losses</u>.  The net profits and net losses of the Partnership in each taxable year, and each item of income, gain, loss, deduction, credit and tax preference, shall be divided between and shall be credited and charged against the Partners in accordance with their respective proportion Partnership Units.  In the event that any Partner's number of Partnership Unit is changed or altered, such Partner's distributive share of such items shall be determined by the Managing Limited Partners by taking into account the varying number of Partnership Units of the Partners during the taxable year.  Such determination shall be made by the Managing Limited Partners in accordance with the provisions of Code Section 706 and the Treasury Regulations issued thereunder.

4.02    <u>Definitions of Profits and Losses</u>.  The "net profits" and "net losses" of the Partnership and each item of income, gain, loss, deduction, credit and tax preference shall be determined in accordance with generally accepted principles of cash accounting customarily employed by partnerships for federal income tax purposes, consistently applied.

4.03    <u>Allocation of Income Attributable to Principal Reductions in Nonrecourse Partnership Indebtedness</u>.  In the event that one or more Partners has a deficit Capital Account balance resulting in whole or part from allocations attributable to nonrecourse indebtedness of the Partnership, such Partner or Partners shall, to the extent possible, be allocated income or gain in an amount not less than the minimum gain (as defined in the applicable provisions of the Treasury Regulations), and at a time not later than the time the amount of such minimum gain is reduced to an amount that is less than the sum of all deficit Capital Account balances.  Any allocation pursuant to this Section shall be made by the Managing Limited Partners after consulting with the Partnership's tax counsel, and in accordance with and to the extent required by Treasury Regulations governing partnership allocations attributable to nonrecourse indebtedness.

4.04    <u>Allocation of Gains and Losses Upon Disposition of Partnership Property</u>.  Notwithstanding the provisions of Sections 4.01 and 4.03, above, and after the allocations of Partnership operating income and deduction for the taxable year have been made, any gain or loss realized by the Partnership upon the sale, exchange, refinancing, foreclosure, involuntary conversion, abandonment or other disposition of the property or assets of the Partnership shall be allocated among the Partners in proportion to their respective number of Partnership Units.  In making such allocations the Managing Limited Partners shall give effect to the provisions of Section 704(c) of the Code, or any successor provision to such Section, and to the Treasury Regulations from time to time in effect thereunder.

4.05    <u>Tax Credits</u>.  Any items of tax credit to which the Partnership is entitled and any recaptures of tax credits previously claimed by the Partnership shall be allocated to the Partners in accordance with their respective number of Partnership Units as of the time the item of tax credit or tax credit recapture arises, with the meaning of the applicable provisions of the Treasury

Regulations.  Any items of tax credit recapture that are not allocated pursuant to the preceding sentence shall be allocated as contemplated by the applicable provisions of the Treasury Regulations.

      4.06    <u>Limitation on Liability</u>.  Nothing in this Article IV regarding allocation of losses shall alter the limitation on a Limited Partner's personal liability for the debts or obligations of the Partnership, as set forth in Article III.

      4.07    <u>Treatment of Certain Items as Expenses</u>.  Any and all compensation paid to the Managing Limited Partners pursuant to Article V of this Agreement shall be treated for all purposes of this Agreement as an expense of the Partnership.

## ARTICLE V. AUTHORITY, POWER AND COMPENSATION OF MANAGING LIMITED PARTNERS

      5.01    <u>General Statement of Powers</u>. Each Managing Limited Partner shall have full, exclusive and complete discretion in the management and control of the Partnership and its business for the purposes herein stated, and shall make all decisions affecting the Partnership's affairs and may take any action that the Managing Limited Partners deem necessary, advisable or incidental to the business of the Partnership.  In the management of the Partnership's business, the Managing Limited Partners may delegate duties to such persons or entities, including their Affiliates, as they deem appropriate. In addition to any other rights and powers that they may possess under the Nevada Uniform Limited Partnership Act (2001) or otherwise, the Managing Limited Partners and each Managing Limited Partner shall have all specific rights and powers required for, appropriate to or incidental to its management and control of the Partnership and its business, including but not limited to, the following rights and powers:

          (a)      To borrow money, and, if security is required therefor, to mortgage or subject to any other security device any or all of the assets of the Partnership, and the income therefrom, as security for repayment of such borrowings; to obtain replacements of any mortgage or other security device; and to prepay, in whole or in part, refinance, increase, modify, consolidate or extend any obligations or mortgage or other security device, all of the foregoing on such terms and in such amounts as a Managing Limited Partner in its discretion deems to be in the best interest of the Partnership.

          (b)      To negotiate, execute and enter into leases and other agreements in connection with the Partnership's assets, including leases and agreements the terms of which may extend beyond the term of this Partnership.

          (c)      To sell or exchange any or all of the assets of the Partnership upon such terms and conditions as a Managing Limited Partner in its discretion deems advisable, including a deferred payment sale or an exchange for other assets of any kind.

          (d)      To acquire and enter into any contract of insurance that a Managing Limited Partner deems proper for the protection of the Partnership, the conservation of its assets, or for any other purpose convenient or beneficial to the Partnership.

(e)        To execute and deliver on behalf of the Partnership such documents or instruments as a Managing Limited Partner deems appropriate in its conduct of the business of the Partnership. No person or entity dealing with the Partnership shall be required to inquire into the authority of a Managing Limited Partner to take any action or make any decision or execute and deliver any document or instrument. Any documents or instruments that are approved by a Managing Limited Partner may be signed by the Managing Limited Partner or by its authorized agents, with no other signature required.

(f)        To employ and to pay brokers, agents, consultants, attorneys, accountants and other individuals or entities deemed appropriate by a Managing Limited Partner to the conduct of the Partnership's business, including without limitation any persons or entities related in any way to a Managing Limited Partner or in which a Managing Limited Partner has an interest.

(g)        To employ from time to time persons, firms or corporations to operate and/or manage all or part of the assets of the Partnership.

(h)        To hold title to Partnership assets in the name of a nominee (which may be a Managing Limited Partner so acting) designated by a Managing Limited Partner.

(i)        To make, execute and deliver any assignment of the Partnership or its property for the benefit of creditors, or any bond, confession of judgment, guaranty, indemnity bond or surety bond.

(j)        To make any decision or take any action on behalf of another partnership of which this Partnership is a general partner if such decision or action would be permitted by this Section if made or taken by this Partnership.

5.02    Voting. Except as may be specifically provided to the contrary in this Agreement, any determination, agreement, designation, authorization, consent, vote or the like empowered to the Managing Limited Partners by this Agreement, shall be made by majority vote with each Managing Limited Partner having one vote on each such action, regardless of the Partnership Units in the capital of the Partnership that is owned or represented by any Managing Limited Partner.

5.03    Execution of Documents and Agreements.    All leases, contracts, deeds, encumbrances or other documents that purport on their face to bind the Partnership or the noncontracting Partners that are related to the purposes of the Partnership and that are specifically authorized by this Agreement or by separate written agreement may be executed by one or more Managing Limited Partners on behalf of the Partnership.

5.04    Elections of Managing Limited Partners. The power to elect or remove any Managing Limited Partner is exclusively and irrevocably vested through the Founding Partners to their respective Founder Affiliate. Each Founder Affiliates is entitled to appoint one Managing Limited Partner who shall serve at the pleasure of such affiliate. In addition, Founder Affiliates may elect or remove additional Managing Limited Partners as they may agree by unanimous vote of such affiliates.

5.05    Compensation of Partners.

(a)    The Managing Limited Partners shall be paid reasonable compensation for their services and personal efforts on behalf of the Partnership.

(b)    The Managing Limited Partners shall be reimbursed by the Partnership for the reasonable, direct, out-of-pocket expenses incurred by the Managing Limited Partners while acting on behalf of the Partnership, including but not limited to, legal, accounting, travel and other similar expenses reasonably incurred in connection with the formation of the Partnership and the operation of its business; provided that the Managing Limited Partners shall not be compensated for their general overhead or office expenses or salaries paid to their personnel.

5.06    No Exclusive Duty to Partnership.    Any Managing Limited Partner and the partners, agents, employees and affiliates of a Managing Limited Partner, and any Limited Partner, may engage in any business activity and/or acquire any asset or interest on their own behalf or on behalf of other partnerships, joint ventures, corporations or other business ventures formed by them or in which they may have an interest, including, without limitation, business ventures similar to, related to, or in direct or indirect competition with any business of the Partnership.    Neither the Partnership nor any Partner shall have any right by virtue of this Agreement or by virtue of the Partnership relationship created hereby in or to such other business ventures or the income or profits derived therefrom.    Neither the Managing Limited Partners nor their partners, agents, employees or affiliates shall be obligated to present any particular investment opportunity to the Partnership or to any Partner even if the opportunity is of a character that, if presented to the Partnership, could be taken by the Partnership.    Any Managing Limited Partner and the partners, agents, employees and affiliates, and any Limited Partner, shall have the right to take such investments for their own accounts, individually or as trustee, as the case may be, or to recommend to others any such opportunity.

5.07    Dealings With Affiliates of the Managing Limited Partners.    The validity of any transaction, agreement or payment involving the Partnership and any Affiliate of a Managing Limited Partner otherwise permitted by the terms of this Agreement shall not be affected by reason of the relationship between the Managing Limited Partner and the Affiliate, provided that full and complete disclosure of the nature of the transaction and the nature of the relationship between the Managing Limited Partner and the Affiliate is made to the Partnership before the consummation of the transaction in question.

5.08    Potential Liability of the Managing Limited Partners.    No Managing Limited Partner shall be liable, responsible or accountable in damages or otherwise to the Partnership or to any Partner for any action taken or failure to act on behalf of the Partnership within the scope of the authority conferred upon the Managing Limited Partners by this Agreement or by law unless such action or omission was intentional or was performed or omitted fraudulently, in bad faith, or amounted to gross negligence on the part of the Managing Limited Partners.

5.09    Indemnification of Managing Limited Partners.    No Managing Limited Partner shall be personally liable for any debts or obligations of the Partnership or for any of the liabilities of the Partnership beyond the amount contributed by him to the capital of the

Partnership, plus his share of the accumulated but undistributed profits of the Partnership. The Partnership shall defend, indemnify and hold harmless each Managing Limited Partner and the respective partners, agents, heirs, executors, administrators, employees and Affiliates of each Managing Limited Partner (collectively the "Indemnified Parties") from and against any cost, loss, expense, delay, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of its activities on behalf of the Partnership or in furtherance of the interests of the Partnership, including but not limited to any judgment, award, settlement, and reasonable attorneys' fees and other costs or expenses incurred in the defense of any actual or threatened action, proceeding or claim; provided that the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim is based were in good faith and were not performed or omitted fraudulently or in bad faith by the Indemnified Parties and did not amount to gross negligence on the part of the Indemnified Parties.

5.10    <u>Borrowing from Managing Limited Partners</u>.    Any borrowing referred to in Section 5.01(a) or elsewhere in this Agreement may, in the absolute discretion of the Managing Limited Partners, be from the Managing Limited Partners or from an Affiliate of a Managing Limited Partner.  In the event that any such borrowing is from a Managing Limited Partner or an Affiliate of a Managing Limited Partner, the aggregate amount of such advances shall become an obligation of the Partnership to the Managing Limited Partner to be paid out of the gross revenues of the Partnership, together with interest at two percent (2%) above the reference or base rate quoted or charged from time to time by Bank of America N.T. & S.A., Las Vegas, Nevada, but in no event to exceed the maximum legal rate of interest.  Such advances shall, for all purposes, be deemed a loan to the Partnership and shall not be deemed a capital contribution to the Partnership.  All such advances shall be repaid, in accordance with their terms, out of the gross revenues of the Partnership or out of the proceeds of any sale or refinancing of Partnership assets.  To the extent of any such unpaid advances, upon the termination and dissolution of the Partnership, the same, together with the accrued and unpaid interest, shall become immediately due and payable.

5.11    <u>Section 754 Election Under Internal Revenue Code</u>.    The Managing Limited Partners may, in their sole discretion, make or revoke the election referred to in Section 754 of the Internal Revenue Code of 1986, as amended, or any successor provision hereafter enacted. Each Partner shall, upon request, supply the information necessary to give proper effect to such an election.

## ARTICLE VI. DISTRIBUTIONS TO PARTNERS

6.01    <u>Definition of Net Cash Receipts</u>.    The term "Available Cash Receipts" is used herein to determine the amount of cash  available for distribution as a result of Partnership operations, and shall mean all cash revenues and funds received by the Partnership (not including capital contributions to the Partnership or the proceeds of any sales, financings or refinancings of Partnership assets), less the sum of the following to the extent made from such cash revenues and funds received by the Partnership: (i) all principal and interest payments on mortgage and other indebtedness of the Partnership and all other sums paid to lenders; (ii) all cash expenditures (including expenditures for capital improvements) incurred incident to the normal operation of

the Partnership's business, including compensation paid to the Managing Limited Partners and expenses of the Managing Limited Partners reimbursed by the Partnership to the Managing Limited Partners pursuant to Section 5.04 of this Agreement; (iii) such amounts as the Managing Limited Partners may elect to retain in the Partnership in order to enable the Partnership to make additional or further investments (whether or not such investments are similar to any other investments or property at any time held or owned by the Partnership); and (iv) such cash reserves as the Managing Limited Partners in their discretion may deem to be necessary or desirable for the proper operation of the Partnership's business.

6.02    Timing of Distributions.  Distributions of Available Cash Receipts shall be made when deemed appropriate by the Managing Limited Partners, which decision shall be made in the sole discretion of the Managing Limited Partners.  The Partners agree that Available Cash Receipts may be used to purchase additional investment or business assets for the Partnership, and understand and agree that accumulation and reinvestment of Available Cash Receipts may occur, in the sole discretion of the Managing Limited Partners, at times when particular investment or business opportunities may not have been identified by the Managing Limited Partners.

6.03    Distributions to Partners.  On or before December 15 of each taxable year of the Partnership, the Managing Limited Partners shall determine the amount of Available Cash Receipts and the amount or portion, if any, of such Available Cash Receipts that will be distributed to the Partners, and shall apportion and distribute such portion of Available Cash Receipts to the Partners in the ratio that their respective Partnership Units bear to one another.

6.04    Final Authority.  Except as to matters as to which the Managing Limited Partners are granted discretion hereunder, the opinion of the independent certified public accountants retained by the Partnership from time to time shall be final and binding with respect to all computations and determinations made pursuant to this Article VI and to Article IX of this Agreement.

## ARTICLE VII. BOOKS OF ACCOUNT, RECORDS AND REPORTS

7.01    Books and Records.  Proper and complete records and books of account shall be kept by the Managing Limited Partners, in which shall be entered fully and accurately all transactions and other matters relating to the Partnership's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Partnership. Such books and records shall be maintained in accordance with generally accepted principles of cash accounting customarily employed by partnerships for federal income tax purposes, consistently applied.  The books and records shall at all times be maintained at the principal office of the Partnership and shall be open to the reasonable inspection and examination of the Partners or their duly authorized representatives during reasonable business hours.

7.02    Reports to Partners.  Within a reasonable time and, in any event, within sixty (60) days after the end of each Partnership fiscal year, the Managing Limited Partners shall cause the following (none of which need be audited) to be sent to each person who was a Partner at any time during the year then ended: (i) a balance sheet as of the end of such year; (ii) a profit and

loss statement for such year; (iii) a cash flow statement for such year; (iv) a statement of cash distributions for such year; and (v) a statement describing the amount of all fees and other compensation and distributions paid by the Partnership for such year to the Managing Limited Partners and to Affiliates of the Managing Limited Partners.

7.03    <u>Tax Information</u>.  Within ninety (90) days after the close of each Partnership fiscal year, the Managing Limited Partners shall cause to be sent to each Partner such tax information related to the Partnership as shall be necessary for the preparation by such Partner of his federal income tax return, state income tax return and other applicable tax returns.

7.04    <u>Fiscal Year</u>.  The fiscal year of the Partnership shall end on the thirty-first (31st) day of December of each year.

7.05    <u>Bank Accounts</u>.  The funds of the Partnership shall be deposited in such bank account or accounts, or invested in such interest-bearing or non-interest-bearing investments, as shall be designated by the Managing Limited Partners.  All withdrawals from any of such bank accounts shall be made by the duly authorized agent or agents of the Managing Limited Partners.

7.06    <u>Taxable Year of Partners</u>.  The Managing Limited Partners and any Limited Partner who acquires an interest of five percent or more in the capital or profits of the Partnership hereby represent that they use the calendar year as their taxable year for federal income tax purposes.

7.07    <u>Federal Tax Matters Partner</u>.  Solely for purposes of Section 6231(a)(7) of the Code, the Managing Limited Partners shall be the "Tax Matters Partners" of the Partnership. The Tax Matters Partners shall be authorized to carry out, on behalf of the Partnership and at the Partnership's expense, all acts appropriate to such designation, including, but not limited to:

(a)    receiving and responding to any and all notices and requests from any federal taxing authority;

(b)    informing all other Partners of any inquiry, examination or proceeding, as required by applicable federal law and, if not so required, as the Tax Matters Partner shall deem appropriate;

(c)    meeting and negotiating with representatives of any federal taxing authority;

(d)    entering into a binding settlement agreement with any federal taxing authority on behalf of all or some of the Partners regarding any tax deficiency, assessment, credit or refund; provided that all Partners be given adequate prior notice so that any Partner may, without prejudicing the validity of such a settlement agreement, elect not to be bound by the settlement agreement where permitted under applicable federal tax law;

(e)    entering into any agreement with any federal taxing authority to extend the limitations period on assessment or collection of adjustments;

(f)        commencing administrative or judicial proceedings regarding any federal tax deficiency, assessment; credit or refund;

(g)        intervening in any judicial action or proceeding, the outcome of which could adversely affect a position taken by the Partnership;

(h)        prosecute an appeal from a decision or judgment of any court that is wholly or partially adverse to a position taken by the Partnership; and

(i)        retaining tax advisors, to whom the Tax Matters Partners may delegate such of its rights and duties as the Tax Matters Partners shall consider necessary and appropriate.

## ARTICLE VIII. DEFAULT AND REMEDIES

8.01    <u>Events of Default</u>.  Each of the following events shall (upon the giving of the notice and/or passage of time, if any, set forth with respect to each event) constitute an "Event of Default," and the Partner as to whom the Event of Default has occurred shall be a "Defaulting Partner":

(a)        If any Partner shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent; or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for himself under the present or any future federal bankruptcy act or any other present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency or other relief for debtors; or shall acquiesce in the appointment of any trustee, receiver, conservator or liquidator of said Partner or of all or any substantial part of his properties or his interest in the Partnership.  The term "acquiesce" includes, but is not limited to, the failure to file within thirty (30) days after any appointment a petition or motion to vacate or discharge any order, judgment or decree providing for such appointment.

(b)        If a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against any Partner seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act, or any other present or future applicable federal, state or other statute or law relating to bankruptcy, insolvency or other relief for debtors, and the Partner shall acquiesce in the entry of such order, judgment or decree within thirty (30) days after the entry of the order, judgment or decree, or if such order, judgment or decree shall remain unvacated and unstayed for an aggregate of ninety (90) days (whether or not consecutive) from the date of entry thereof, or if any trustee, receiver, conservator or liquidator of said Partner or of all or any substantial part of his properties or his interest in the Partnership shall be appointed without the consent or acquiescence of said Partner and such appointment shall remain unvacated and unstayed before an aggregate of sixty days (whether or not consecutive).  The term "acquiesce" includes, but is not limited to, the failure to file a petition or motion to vacate or discharge such order, judgment or decree within thirty (30) days after the entry of the order, judgment or decree.

(c)        If any Partner shall admit in writing his inability to pay his debts as they mature.

(d)        If any Partner shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

(e)        If the interest of any Partner in the Partnership is levied, executed upon, subjected to a charging order or similar order or process, or attached by a creditor or other person claiming a lien thereon or an interest therein and such lien or attachment is not released within thirty (30) days.

(f)        If any Partner attempts to transfer or assign his interest in the Partnership in violation of the provisions of Article X, below.

(g)        In the case of a Partner that is an entity, an Event of Default shall be deemed to have occurred with respect to such entity if a change occurs that, taking into account previous changes, results in a fifty percent (50%) or greater change in the ownership of such entity, or if a change occurs in the management or control of such entity. For purposes hereof, a change in the management of an entity shall be deemed to have occurred if the identity changes of any of the individuals who is entitled to control or direct the policies or business of such entity.

(h)        In the case of a Partner that is an entity, rather than an individual, if any of the events referred to in this Section 8.01 occurs with respect to an ownership interest in or right to manage, control or direct the affairs of such entity, an Event of Default shall be deemed to have occurred with respect to such entity.

8.02    <u>Option to Purchase</u>.    Upon the occurrence of each Event of Default, the Defaulting Partner shall give to the Partnership written notice thereof and the Partnership shall, upon the unanimous decision of the Managing Limited Partners, have the right and option to purchase the Defaulting Partner's Partnership Units in accordance with the provisions of Section 8.03 of this Agreement. If the Partnership does not exercise this option, or if the non-defaulting Partners do not complete the buyout of all or a part of the defaulting Partner's number of Partnership Units within the time limits prescribed by Section 8.03, the term of the Partnership shall continue and the default and the option of the non-defaulting Partners shall be deemed to have been waived.

8.03    <u>Option to Buy</u>. If an Event of Default occurs, as defined in Section 8.01, the non-defaulting Partners (the "Buyers") may exercise their options to buy the Partnership Units of the Defaulting Partner (the "Seller") by giving written notice of their election at any time after the occurrence of the Event of Default (whether or not the written notice required by Section 8.02, above, has been given), but in no event later than sixty (60) days after the date on which the Buyers receive written notice from the Seller of the occurrence of the Event of Default. The purchase price of the Seller's interest in the Partnership shall be determined as follows:

(a)        As agreed upon by the Seller and Buyers; or

(b)        In the absence of agreement by Seller and Buyers within sixty (60) days after the Buyers give notice to the Seller, the price shall be determined by three appraisers who are competent to appraise assets of the type held by the Partnership. The Seller shall select one appraiser, the Buyers shall select one appraiser and the two appraisers so selected shall agree

on a third appraiser. All fees and expenses of all appraisers shall be paid by the Seller or, if not paid by the Seller, by the proposed assignee or transferee of the Seller. The appraisers shall conduct their appraisals so as to determine as expeditiously as possible the fair market value of the Partnership Units to be sold. The median of the appraisals made by the three appraisers shall govern and shall be conclusive and binding upon the Partners.

8.04 <u>Payment of Purchase Price</u>. The purchase price shall be paid in cash at the closing, which shall take place within sixty (60) days after the date of determination of the purchase price; provided, however, that at the election of any Buyer, the purchase price paid by such Buyer may be paid ten percent (10%) in cash at the closing, and the balance, together with interest on the unpaid balance at a fluctuating rate equal to the reference or base rate charged from time to time by Bank of America, Las Vegas, Nevada, but in no event to exceed the maximum legal rate of interest, in twelve (12) equal monthly installments beginning one calendar month after the closing. The entire purchase price, together with interest, shall be paid on or before twelve (12) calendar months after the closing. The Buyers shall, within the first thirty (30) days of said sixty (60) day period, designate the time, date and place (within Clark County, Nevada) of the closing.

8.05 <u>Event of Default Involving Managing Limited Partner</u>. If an Event of Default (as defined in Section 8.01) occurs with respect to the Partnership Units of a Managing Limited Partner, then (whether or not) any option to purchase set forth herein shall be exercised, such Managing Limited Partner shall thereupon and thereafter have no further right to participate in the management of the business of the Partnership. Such Managing Limited Partner shall be deemed to have resigned such Managing Limited Partner's office as Managing Limited Partner of the Partnership, as provided in Section 9.02.

## ARTICLE IX. DISSOLUTION

9.01 <u>Dissolution</u>. The Partnership shall be dissolved upon the first to occur of the following events:

(a)     Consent of all Equity Limited Partners.

(b)     Ninety days after the withdrawal or resignation of all Managing Limited Partners unless the Partnership is continued pursuant to the provisions of Section 9.03 of this Agreement.

9.02 <u>Resignation of Managing Limited Partner</u>. A Managing Limited Partner may resign such Managing Limited Partner's office as Managing Limited Partner of the Partnership. Notice of resignation shall be given to each other Managing Limited Partner or, if no other Managing Limited Partner remains, to all of the Limited Partners. Upon resignation, a resigning Managing Limited Partner shall thereupon and thereafter have no further right to participate in the management of the business of the Partnership. Such a resigning Managing Limited Partner shall thereafter have the same rights and responsibilities to the Partnership and under this Partnership Agreement as a Limited Partner, except that such a resigning Managing Limited Partner (or a Managing Limited Partner who is deemed to have resigned as a Managing Limited

Partner) shall not participate in a decision to continue the Partnership under any of the circumstances set forth in Section 9.05 within sixty days of such resignation.

9.03    Continuation of the Partnership.  Notwithstanding the provisions of Section 9.01, the bankruptcy, insanity, withdrawal, dissolution, liquidation or deemed resignation (subject to Section 9.02) of a Managing Limited Partner shall not dissolve the Partnership if within ninety days after the occurrence of such event, the Equity Limited Partners owing a majority of the Partnership Units owned by all Limited Partners elect one or more Managing Limited Partners to act as the Managing Limited Partner of the Partnership and elect to continue the Partnership.

9.04    Bankruptcy, Etc. of Limited Partners.  The Partnership shall not be dissolved or terminated in the event of the death, insanity, incompetency, bankruptcy, insolvency, withdrawal, dissolution or liquidation of any Limited Partner.

9.05    Dissolution Procedure.  Upon the occurrence of any of the events set forth in Section 9.01, above, and unless the Partnership is continued pursuant to Section 9.03, the Partnership shall be dissolved and the Managing Limited Partners shall immediately commence to wind up and liquidate the Partnership's business.  In liquidating the Partnership's business, the Managing Limited Partners may either sell all or part of the Partnership's assets and distribute the proceeds, and/or may make distributions completely or partially in kind.  The Capital Accounts of the Partners shall be adjusted to account for the operating income and deductions of the Partnership for the taxable year of the liquidation or dissolution and to account for any sales of Partnership assets, in the manner provided in Sections 4.01 and 4.04 of this Agreement.  In the event that some or all of the Partnership's assets are not sold, the Managing Limited Partners shall determine the fair market value of the unsold assets, and the gain or loss that would have been realized if the assets had then been sold shall be determined, and the Capital Accounts of the Partners shall be adjusted accordingly.  Following the adjustment of Capital Accounts as provided in this Section 9.05, the assets or proceeds derived therefrom, to the extent sufficient, shall be applied and distributed in the following order:

(a)        To the payment of creditors, in order of priority provided by law, except for any claim of any Partner or for compensation or reimbursement of costs or expenses advanced by the Partners, any claim of a Partner on account of loans made to the Partnership or an interest in the Partnership, and any claim of a secured creditor that will be assumed or otherwise transferred upon the liquidation or distribution of the Partnership's assets.

(b)        To the repayment, pro rata in proportion to balances owing, of any amounts loaned to the Partnership by any Partner pursuant to the provisions of this Agreement, plus any accrued and unpaid interest thereon.

(c)        To the Partners, pro rata in proportion to amounts owed, in reimbursement of costs and expenses incurred and advanced and in payment of compensation earned or accrued, as provided in Section 5.04.

(d)        To the Partners, pro rata in proportion to their number of Partnership Units, in repayment of the positive balances, if any, in their Capital Accounts, until the positive balance, if any, in the capital account of each Partner has been reduced to zero.

(e)        To the Partners in proportion to their respective number of Partnership Units.

Distributions described in this Section 9.05 shall be made not later than the end of the taxable year during which the liquidation occurs or, if later, within ninety (90) days after the date of the liquidation.

## ARTICLE X. TRANSFER OF PARTNERSHIP UNITS

10.01   <u>Transfer of Partnership Units</u>.  Although the Partners recognize that, but for the provisions of this Article X, their Partnership Units in the Partnership would be assignable under the Nevada Uniform Limited Partnership Act (2001), the Partners agree that the partnership interest of a Limited Partner may not be assigned or transferred, in whole or in part, without the prior written consent of all Equity Limited Partners, which consent may be granted or withheld by an Equity Limited Partner in the sole and absolute discretion of such Equity Limited Partner. The Equity Limited Partners will withhold their consent if the assignment or transfer might violate the provisions of the Nevada Uniform Limited Partnership Act (2001) or of any applicable federal or state securities law, or might cause the termination of the Partnership as a partnership for federal income tax purposes.  Any assignment must be by a written instrument, the terms of which are not in contravention of any terms of this Agreement, and to be effective, must be received by the Managing Limited Partners.   The effective date of any transfer for purposes of this Article X shall be the beginning of the first day on which both of the following are accomplished:  The Managing Limited Partners consent to the transfer, and the assignee has executed a counterpart of this Agreement.

(a)        <u>Estate Planning Transfers</u>.  Notwithstanding the restrictions of this Article, an assignment for no more than nominal consideration of any portion of a Founder Affiliate's Partnership Units to a family member of a Founding Partner or a trust or limited partnership that is controlled by or for the benefit of such Partner's family shall not be deemed an "assignment" or "transfer" of a Partnership Unit for purposes of this Article provided that any such transferee agrees to be bound by all provisions of this Agreement. Any assignment described above shall nevertheless be characterized as a disposition in the meaning of this Agreement if (a) the assignment would be require the company to make a public disclosure or filing under State or Federal securities rules at such time as (b) the assignee ceases to qualify as a "Family Member" under 17 C.F.R. § 230.701(5)(c)(3) or, if applicable, any comparable State rules. The mere transfer of Units from a Founder Affiliate does not automatically constitute the transferee as a Founder Affiliate but an entity or trust which would satisfy the requirements this Section (a) shall succeed to the designation of Founder Affiliate if assignment document divests the Assignor of the designation and appoints one Assignee as the replacement Founder Affiliate.

10.02   <u>Substituted Limited Partner</u>.  No assignee of the whole or any portion of a Limited Partner's Partnership Units shall become a substituted Limited Partner in the place of the assignor unless the following additional conditions are satisfied:

(a)        The duly executed assignment setting forth the intention of the assignor that the assignee become a substituted Limited Partner shall have been filed with the Managing Limited Partners.

(b)        The intended assignee shall have paid to the Partnership a transfer fee in an amount determined by the Managing Limited Partners, which fee shall be in an amount not less than Ten Thousand Dollars ($10,000).

(c)        The assignee shall have executed and delivered to the Managing Limited Partners such instruments and other documents as the Managing Limited Partners may deem necessary or desirable to effect such substitution, including a power of attorney similar in form and substance to that contained in Article XII of this Agreement and a written acceptance and adoption by the assignee of all of the other provisions of this Agreement.

(d)        Each Managing Limited Partner consents in writing to the assignee becoming a substituted Limited Partner, such consent to be within the sole and absolute discretion of each Managing Limited Partner.

10.03    Status of Assignee or Substituted Limited Partner.  Any person who acquires a Partnership Units or is admitted to the Partnership as a substituted Limited Partner shall be subject to and shall be bound by all provisions of this Agreement as if originally a party to this Agreement.

10.04    Economic Allocation on Assignment.  In the event of an assignment of a Partner's Partnership Units in the Partnership, the Partnership's net profits or net losses allocable to the interest assigned for the taxable year in which the assignment occurs shall be apportioned between the assignor and the assignee on the basis of the number of days in such year that fall before and including the effective date of the assignment and the number of days in such year that fall after the effective date of the assignment, without regard to the receipt of any distribution that may have been made with respect to such Partnership Units.

10.05    No Termination of Partnership.  Notwithstanding the provisions of this Article X, no assignment or transfer of any Partnership Units shall be permitted hereunder without the express written consent of each Managing Limited Partner and of Limited Partners owning a majority of the Partnership Units owned by all Limited Partners if the proposed assignment or transfer, when aggregated with all other transfers or assignments of Partnership Units during the twelve-month period ending on the date of the proposed assignment or transfer, would result in a transfer or assignment of more than forty-nine percent (49%) of the Partnership Units in the Partnership.  Any purported transfer or assignment made in violation of this Section shall be void and of no effect.

10.06    Purported Assignments and Transfers.  Any purported transfer or assignment of any Partnership Unit made in violation of the provisions of this Article X shall be void and of no effect whatsoever.

## ARTICLE XI. AMENDMENTS; MEETINGS

11.01    Amendment of Limited Partnership Agreement.

(a)        This Agreement may be amended by written consent of all Managing Limited Partners.

(b)        Notwithstanding the provisions of subsection (a), above, no amendment shall change the Partnership to a general partnership, change the term of the Partnership, change the limited liability of the Limited Partners, or deprive the Managing Limited Partners of compensation or reimbursement of expenses to which they are otherwise entitled, without the prior written consent of all Managing Limited Partners and of Limited Partners owning a majority of the Partnership Units owned by all Equity Limited Partners.

(c)        In the event that this Agreement is amended, the Managing Limited Partners shall amend any certificates of limited partnership previously filed by the Partnership to reflect such change if they determine that such amendment is necessary under the Nevada Uniform Limited Partnership Act (2001).

11.02    Meetings.    Meetings of the Partnership may be called at any time by any Managing Limited Partner, and shall in all events be called by the Managing Limited Partners upon the written request of Limited Partners owning twenty percent (20%) or more of the Partnership Units owned by all Limited Partners.

## ARTICLE XII. LIMITED POWER OF ATTORNEY

12.01    Creation of Power.    Each Limited Partner, by his execution of this Agreement or a counterpart hereof, hereby constitutes and appoints each of the Managing Limited Partners as his attorney-in-fact with full power and authority to act on such Limited Partner's behalf and in his name for the purpose of executing, acknowledging, swearing to, filing and recording.

(a)        A certificate of limited partnership, a certificate of doing business under an assumed name, and any other certificates or instruments the filing of which by the Partnership or the Partners may be necessary or appropriate under the laws of the State of Nevada or any other jurisdiction the laws of which may apply to the Partnership;

(b)        A certificate of cancellation of the partnership and such other instruments or documents as may be deemed necessary or desirable by the Managing Limited Partners upon termination of the Partnership;

(c)        Any and all amendments to the instruments described in subsections (a) and (b), above, to be filed, or that are consistent with this Agreement (including, without limitation, any amendments admitting or substituting owners of Partnership Units as Limited Partners), or have been approved by the Partners or any of them pursuant to Section 11.01, or have been otherwise authorized by the Partner or Partners to whom the amendment relates;

(d)      Any documents that may be required to effect the continuation of the term of the Partnership, the admission of an additional or substituted Limited Partner, or the dissolution and termination of the Partnership, provided that such continuation, admission, or dissolution and termination are consistent with the terms of this Agreement;

(e)      Any and all other instruments as may be deemed necessary or desirable by the Managing Limited Partners to carry out fully the provisions of this Agreement in accordance with its terms;

(f)      Any and all such purchase agreements, deeds, mortgages, assignments, transfer documents, trust agreements, affidavits, or other documents or instruments that may be deemed necessary or desirable by the Managing Limited Partners to effect the acquisition, construction, ownership, operation, leasing, sale or disposition of any Property in which the Partnership has or may have an interest; and

(g)      Any and all such other documents and instruments as may be deemed necessary or desirable by the Managing Limited Partners to carry out the transactions contemplated by this Agreement that are of an inconsequential nature and do not adversely affect the rights of the Partners in any material respect.

12.02   <u>Nature of Power of Attorney</u>.  The power of attorney created hereby:

(a)      Shall be deemed to be coupled with an interest, shall be irrevocable, and shall survive the death, disability, bankruptcy, dissolution, or insanity of the Limited Partners;

(b)      Shall survive the delivery of an assignment by a Limited Partner of the whole or any portion of his Partnership Unit; except where the assignee has been approved by the Managing Limited Partners for admission to the Partnership as a substituted Limited Partner, and in any event, this power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the Managing Limited Partners to execute, acknowledge, swear to, file, and record any instruments necessary to effect such substitution; and

(c)      May be exercised for each Limited Partner by listing all of the Limited Partners executing any document or instrument with a single signature of a Managing Limited Partner as attorney-in-fact for all of such Limited Partners; provided that this method of exercising the power shall not preclude the use of other methods.

## ARTICLE XIII. MISCELLANEOUS

13.01   <u>Notices</u>.

(a)      All notices, demands or requests provided for or permitted to be given pursuant to this Agreement must be in writing.  All notices, demands and requests to be sent to any Partner or any permitted assignee of the Partnership Unit of any Partner hereunder shall be deemed to have been properly given or served when deposited in the United States mail,

addressed to the Partner, postage prepaid and registered or certified with return receipt requested, at the address indicated below the name of each Partner on the signature page of this Agreement.

(b)     Notwithstanding the fact that all notices, demands and requests shall be effective upon being deposited in the United States mail, the time period in which a response to any such notice, demand or request must be given shall commence to run from the date of receipt by the addressee, as indicated on the return receipt of the notice, demand or request.

(c)     By giving to each other Partner at least fifteen (15) days prior written notice, the Partners and their respective successors and assigns shall have the right from time to time and at any time during the term of this Agreement to change their addresses and to specify any other address within the United States of America.

(d)     No transferee of any Partnership Unit (regardless of whether the transfer was permitted by this Agreement) shall be entitled to receive a notice independently of the notice sent to the Partner making the transfer.  A notice sent or given to a Partner shall be deemed to have been sent and given to all transferees of the Partner.

(e)     All payments to be made to any Partner pursuant to this Agreement shall be made at the Partner's address indicated below the name of the Partner or the signature page of this Agreement.

13.02   <u>Titles and Captions</u>.  All Article and Section titles and captions in this Agreement are for convenience or reference only, and shall not be deemed part of this Agreement, and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

13.03   <u>Pronouns and Plurals</u>.  Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms and the singular form of nouns, pronouns and verbs shall include the plural, and vice versa.

13.04   <u>Further Action</u>.  The Partners shall execute and deliver all documents, provide all information, and take or forebear from all such action as may be necessary or appropriate to achieve the purposes of this Agreement.

13.05   <u>Applicable Law</u>.  This Agreement shall be construed in accordance with and shall be governed by the laws of the State of Nevada.

13.06   <u>Binding Effect</u>.  This Agreement shall be binding upon and shall inure to the benefit of the Partners and their respective heirs, executors, administrators, successors, legal representatives and assigns; provided that this provision shall not be construed as permitting assignment or substitution except strictly in accordance with the provisions of Article X of this Agreement.

13.07   <u>Integration</u>.  This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof, and supersedes all prior agreements and understandings pertaining thereto.  No covenant, representation or condition not expressed in this Agreement shall affect or be deemed to interpret, change or restrict the express provisions hereof.

13.08   Creditors.  None of the provisions of this Agreement shall be for the benefit of or shall be enforceable by any creditors of the Partnership or of any Partner.

13.09   Waiver.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or of such or any other covenant, agreement, term or condition.  Any Partner by notice given pursuant to Section 13.01 may, but shall be under no obligation to, waive any of his rights or any conditions to his obligations hereunder, or any duty, obligation or covenant of any other Partner.  No waiver shall affect or alter the remainder of this Agreement, but each and every other covenant, agreement, term and condition hereof shall continue in full force and effect with respect to any other then existing or subsequently occurring breach.

13.10   Rights and Remedies.  The rights and remedies of the Partners hereunder shall not be mutually exclusive, and the exercise of one or more of the provisions of this Agreement shall not preclude the exercise of any other provision.  Each Partner confirms that damages at law may be an inadequate remedy for a breach or threatened breach of any provision hereof.  The respective rights and obligations of the Partners hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to or shall limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other parties for a breach or threatened breach of any provision hereof, it being the intention of the Partners by this Section to make clear their agreement that the respective rights and obligations of the parties hereunder shall be enforceable in equity as well as at law or otherwise.

13.11   Severability.  In the event that any condition, covenant or other provision herein contained is held to be invalid or void by any court of competent jurisdiction, the same shall be deemed severable from the remainder of this Agreement and shall in no way affect any other covenant or condition herein contained.  If such condition, covenant or other provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope or breadth permitted by law.

13.12   Counterparts.  This Agreement may be executed in counterparts, all of which taken together shall constitute one Agreement binding on all of the parties notwithstanding that all the parties are not signatories to the original or the same counterpart.  Each party shall become bound by the Agreement immediately upon affixing his signature hereto, independently of the signature of any other party.

13.13   Waiver of Partition.  Each Partner hereby waives any right to partition of the Partnership property.

13.14   Schedules.  All exhibits or other documents referred to in the text of this Agreement are hereby incorporated herein by this reference.

13.15   Attorney Fees.  In the event that the Partnership or any Partner shall enforce or attempt to enforce any provision of this Agreement (including the terms of any loan made by a Partner to the Partnership), the prevailing party in any resulting action, suit or proceeding shall be entitled to recover attorney fees from the other parties.

[Signature page follows]

## SIGNATURE PAGE TO
## AGREEMENT OF LIMITED-LIABILITY LIMITED PARTNERSHIP

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

"MANAGING LIMITED PARTNERS"

_____
R. Glen Woods

_____
Andrew B. Platt

"LIMITED PARTNERS"

The Belhaven Company LP
*LP Partnership Units: 30.0*

By: _____
R. Glen Woods, Managing Partner

The 1099 Trust uad October 29, 2012
*LP Partnership Units: 30.0*

By: _____
Andrew B. Platt, Agent

Woods Erickson & Whitaker LLP
*LP Partnership Units: 20.0*

By: _____
R. Glen Woods, Managing Partner

## SCHEDULE A—
## SCHEDULE OF PARTNERS

### INITIAL PARTNERS

**MANAGING LIMITED PARTNERS**

| Partner | Business Address |
| --- | --- |
| R. Glen Woods | 1349 Galleria Drive, Suite 200, Henderson, Nevada, 89014 |
| Andrew B. Platt | 1349 Galleria Drive, Suite 200, Henderson, Nevada, 89014 |

**EQUITY LIMITED PARTNERS**

| Partner | Business Address | LP Partnership Units |
| --- | --- | --- |
| The Belhaven Company LP | 1349 Galleria Drive, Suite 200, Henderson, Nevada, 89014 | 30.0 |
| Trustees of the 1099 Trust uad October 29, 2012 | 1349 Galleria Drive, Suite 200, Henderson, Nevada, 89014 | 30.0 |
| Woods Erickson & Whitaker LLP | 1349 Galleria Drive, Suite 200, Henderson, Nevada, 89014 | 20.0 |

# EXHIBIT "I"

# EXHIBIT "I"

# EXHIBIT "I"


*090503*



**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

| Filed in the office of | Document Number |
|---|---|
| *Barbara K Cegavske* | **20170541360-89** |
| Barbara K. Cegavske | Filing Date and Time |
| Secretary of State | **12/21/2017 7:15 AM** |
| State of Nevada | Entity Number |
| | **E0506442010-9** |

# Certificate to Accompany
# Restated Articles or
# Amended and Restated Articles
(PURSUANT TO NRS)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                                      ABOVE SPACE IS FOR OFFICE USE ONLY

**This Form is to Accompany Restated Articles or Amended and Restated Articles of Incorporation**
**(Pursuant to NRS 78.403, 82.371, 86.221, 87A, 88.355 or 88A.250)**
**(This form is also to be used to accompany Restated Articles or Amended and Restated Articles for Limited-Liability Companies, Certificates of Limited Partnership, Limited-Liability Limited Partnerships and Business Trusts)**

1. Name of Nevada entity as last recorded in this office:

BOSQUE HOLDINGS LLC

2. The articles are: (mark only one box)   ☐ Restated   ☒ Amended and Restated
Please entitle your attached articles "Restated" or "Amended and Restated," accordingly.

3. Indicate what changes have been made by checking the appropriate box:*

☐ No amendments; articles are restated only and are signed by an officer of the corporation who has been authorized to execute the certificate by resolution of the board of directors adopted on:
The certificate correctly sets forth the text of the articles or certificate as amended to the date of the certificate.

☐ The entity name has been amended.

☐ The registered agent has been changed. (attach Certificate of Acceptance from new registered agent)

☐ The purpose of the entity has been amended.

☐ The authorized shares have been amended.

☐ The directors, managers or general partners have been amended.

☐ IRS tax language has been added.

☒ Articles have been added.

☒ Articles have been deleted.

☒ Other. The articles or certificate have been amended as follows: (provide article numbers, if available)

The Articles are being amended and restated in their entirety as shown on the attached.

4. Effective date and time of filing: (optional)   Date:   10/01/2017   Time:   8:00 am
(must not be later than 90 days after the certificate is filed)

* This form is to accompany Restated Articles or Amended and Restated Articles which contain newly altered or amended articles. The Restated Articles must contain all of the requirements as set forth in the statutes for amending or altering the articles for certificates.
**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*                    Nevada Secretary of State Restated Articles
Revised: 1-5-15



*091203*



**BARBARA K. CEGAVSKE**
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

# Amendment to
# Articles of Organization

(PURSUANT TO NRS 86.221)

USE BLACK INK ONLY - DO NOT HIGHLIGHT                    ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Amendment to Articles of Organization
### For a Nevada Limited-Liability Company
### (Pursuant to NRS 86.221)

1. Name of limited-liability company:

BOSQUE HOLDINGS LLC

2. The company is managed by:   ☒ Managers   **OR**   ☐ Members
*(check only one box)*

3. The articles have been amended as follows: (provide article numbers, if available)*

The Articles of Organization for the Company are being amended and restated in their entirety as follows:

Article 1: Name of Limited Liability Company.  Bosque Holdings LLC.

Article 2:  Management.  The Company shall be managed by Managers.

-see next page-

4. Effective date and time of filing: (optional)  Date: 10/01/2017     Time: 8:00 am

(must not be later than 90 days after the certificate is filed)

5. Signature (must be signed by at least one manager or by a managing member):

**X** _____

**Signature**

* 1) If amending company name, it must contain the words **"Limited-Liability Company," "Limited Company," or "Limited,"** or the abbreviations **"Ltd.," "L.L.C.," or "L.C.," "LLC" or "LC."**  The word **"Company"** may be abbreviated as **"Co."**

  2) If adding managers, provide names and addresses.

**FILING FEE: $175.00**

**IMPORTANT:** Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State 86.221 DLLC Amendment
Revised: 1-5-15

## AMENDED AND RESTATED ARTICLES OF ORGANIZATION
### BOSQUE HOLDINGS LLC

1.     <u>Name of Limited Liability Company</u>. Bosque Holdings LLC.

2.     <u>Management</u>. The Company shall be managed by Managers.

3.     <u>Nature of Company</u>. The Company is a series limited liability company. The Company shall have perpetual existence unless sooner terminated in accordance with Nevada law.

4.     <u>Separation of Series</u>. The Company may have one or more series each having separate rights, powers, or duties with respect to property, obligations, or profits and losses associated with property or obligations. Any series may be created as provided in an operating agreement of the Company and may from time to time have separate business purposes or investment objectives.

   a.     The Company or any series may indirectly associate and hold assets and otherwise conduct business in the manner established by their respective records through nominees, including other agent or nominee series, as provided in Chapter 86 of the Nevada Revised Statutes.

   b.     Where notice is given to the counterparties to contracts or loan agreements that a performance obligation is associated with any series, neither the Company nor any other series shall become associated thereto without notice to such counterparties.

5.     <u>Admission of Additional Members</u>. Additional members may be admitted to the Company or associated with any series only according to the terms of the applicable governing instruments.

6.     <u>Management Responsibilities</u>. The management of the Company and each series is reserved to its managers and the officers appointed by the Managers. The role of Company or series manager may be vested in a board or committee or in specific persons. The election and qualification of managers shall be according to the applicable Company or series governing instruments.

7.     <u>No Plenary Benefit or Authority</u>. The Company together with its members, managers, and agents are and shall be separate from any series. Notwithstanding the application of any tax or accounting principle which consolidates financial reporting or any characterization of the Company using terms such as a "parent" or "umbrella" entity, the Company neither has any implicit right to exercise control with respect to any series nor any implicit beneficial right (or sequent obligation) with respect to any asset or activity of any series. Specifically, absent an agreement with a series:

   a.     The fact that any asset or obligation shall be acquired by the Company in its capacity as an agent or nominee for any series shall not establish that the Company or any other series has ongoing rights or obligations after the conclusion of such agency or nominee role.

   b.     The Company managers are not automatically series managers and have no residual management right or duty.

   c.     The Company members are not automatically series members and have no claim to beneficial interests in any series.

   d.     The fulfillment of a clerical role in reporting ownership and control of or inventorying assets, rights, liabilities, and obligations of the Company or any series does not imply the power to determine or alter the same.

**Company Manager**

_____                    Dated: October 1, 2017
R. Glen Woods, Manager

**OPERATING AGREEMENT**
for

**BOSQUE HOLDINGS LLC,**
**a Nevada limited liability company**

WOODS ERICKSON WHITAKER & MAURICE LLP
www.WoodsErickson.com · (702) 433-9696

W:\Glen's Team\Bosque Holdings LLC\Docs\Op Agmt - Series LLC-Final.doc

# OPERATING AGREEMENT
### for

## BOSQUE HOLDINGS LLC,
### a Nevada limited liability company

THIS OPERATING AGREEMENT (this "Agreement") is made and entered into as of the ___ day of October, 2010, by John R. Erickson, a resident of Clark County, Nevada; R. Glen Woods, a resident of Clark County, Nevada; and each other person who may hereafter be admitted to the Nevada limited liability company known as Bosque Holdings LLC as a Member (said persons are hereinafter referred to collectively as the "Members" and individually as a "Member").

The Members desire to form a limited liability company pursuant to the laws of the State of Nevada and to propagate one or more Series, as provided herein. Accordingly, in consideration of the mutual covenants contained herein, the Members agree and certify as follows:

## ARTICLE I – THE LIMITED LIABILITY COMPANY

1.1　　_Formation_.  The Members hereby form a limited liability company pursuant to the provisions of Chapter 86, Nevada Revised Statutes, Section 86.010 et seq. as currently in effect (the "Act").

1.2　　_Filings_.  Upon the execution of this Operating Agreement, the Members shall cause Articles of Organization that meet the requirements of the Act to be properly filed with the Secretary of State of the State of Nevada, and shall execute and file for record such other and further documents (including amendments to the Articles of Organization) and shall take such other and further action as may be appropriate to comply with the requirements of law for the formation or operation of a limited liability company in all states and counties in which the Company may conduct its business.

1.3　　_Name_.  The name of the limited liability company shall be Bosque Holdings LLC, a Nevada limited liability company.

1.4　　_Separation of Series_.  The Company may propagate such Series as shall be created as described in this Agreement. The Managers shall cause the Company to maintain separate records of the assets and liabilities of each Series. Unless inappropriate from the context, references to the Company shall be references to any or all of the Series of the Company.

(a)　　The Company, with the approval of the Company Managers, may establish separate Series, as contemplated by Section 296.3 of the Act. Each Series may have separate Members, and each Series (i) will own separate assets, (ii) will have the separate rights and powers as herein provided, and (iii) may have separate investment or business purposes. The debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing from

time to time with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of any other Series or of the Company generally, and, unless the Company Managers agree otherwise, none of the debts, liabilities, obligations and expenses incurred, contracted for, or otherwise existing with respect to the Company generally or any other Series shall be enforceable against the assets of such Series.

(b)     Upon admission to the Company, each Member may be designated as a Series Member of a particular Series. A Member may be a member of more than one Series. Each Member shall have the rights, duties and powers as herein provided with respect to each Series of which it is a member. Members of a Series will be designated by the Company Managers. No Member shall have any right to vote on any matter pertaining to a particular Series, or with respect to the Company generally, except as herein expressly provided.

(c)     The Company shall be generally managed by the Company Manager and each Series shall be managed by the Series Manager thereof, who shall have, with respect to the particular Series in question, the powers herein provided. Each Series Manager shall at all times, however, be subject to the powers of the Company Manager.

1.5     Term.  The term of existence of the Company and of each Series of the Company shall commence on the date on which Articles of Organization for the Company are filed in the office of the Secretary of State of Nevada or on the date of such Series as are created pursuant to this Agreement shall be designated, and shall have a perpetual existence unless sooner terminated by law or by action of the Members as hereinafter provided.

1.6     Registered Office; Registered Agent.  The address of the principal place of business of the Company shall be 1349 Galleria Drive, Suite 200, Henderson, Nevada  89014, and thereafter at such other location as the Members may designate.  The Company's initial registered agent for the service of legal process in Nevada at such address shall be R. Glen Woods.

1.7     Purpose and Business.  The purpose and business of the Company and each Series of the Company shall be:

(a)     To transact any and all other businesses for which limited liability companies may be formed under Nevada law.

(b)     To accomplish any of the foregoing purposes for its own account or as a nominee, agent or trustee for others.

1.8     Principal Place of Business.  The location of the principal place of business of the Company shall be 1349 Galleria Drive, Henderson, Nevada  89014, or at such other place as the Members may from time to time determine.

2

1.9    <u>Managers</u>.  The name and business address of each Manager of the Company are as follows:

|  |  |
|---|---|
| John R. Erickson | 1349 Galleria Drive, Suite 200<br>Henderson, NV  89014 |
| Andrew Platt | 1349 Galleria Drive, Suite 200<br>Henderson, NV  89014 |
| R. Glen Woods | 1349 Galleria Drive, Suite 200<br>Henderson, NV  89014 |

1.10    <u>Members</u>.  The names and business addresses of each Member of the Company are as follows:

|  |  |
|---|---|
| John R. Erickson | 1349 Galleria Drive, Suite 200<br>Henderson, NV  89014 |
| R. Glen Woods | 1349 Galleria Drive, Suite 200<br>Henderson, NV  89014 |

## ARTICLE II – CAPITAL CONTRIBUTIONS

2.1    <u>Initial Contributions</u>.  The initial capital of the Company shall be Properties and cash with a value of at least One Thousand Dollars ($1,000). The Members shall make their initial capital contributions to each Series within thirty (30) days after the date on which this Agreement has been executed by all Members or after the date on which the applicable Series shall be designated by the Company Manager.  The initial capital contributions of the Members shall be as follows:

|  | Agreed Value of<br>Capital Contributions |
|---|---|
| John R. Erickson | $500.00 |
| R. Glen Woods | $500.00 |

2.2    <u>Percentage Interests</u>.  The Percentage Interests of the Members in and to the capital, profits and losses of the Company ("Percentage Interests") may be evidenced by certificates, and shall initially be in the following ratios:

|  | Percentage Interest |
|---|---|
| John R. Erickson | 50 % |
| R. Glen Woods | 50 % |

2.3    <u>Additional Capital Contributions</u>.

(a)    <u>Pursuant to Annual Operating Budget</u>.  Beginning with the Annual Operating Budget of the Company to be submitted for the calendar year 2010 (as provided hereinafter), the Members shall contribute to the capital of each Series of the Company each year in the amount, if any, set forth in the Annual Operating Budget for each Series.  Each Member shall make such contribution as may be required of such Member pursuant to the Annual Operating Budget for each Series, as and when required by the Annual Operating Budget for each calendar year of the operations of such Series.

(b)    <u>Other than Pursuant to Annual Operating Budget</u>.  If the Managers determine that additional capital in excess of the initial capital contributions of the Members or the capital contributions made pursuant to the Annual Operating Budgets of the Company is necessary for the best interests of any Series of the Company, the Managers shall then determine the total amount to be contributed, and shall so notify each Member.  The notice shall state the amount of capital required, the means by which the additional capital shall be raised, and the date or dates by which the capital shall be required and the additional contributions shall be made by the Members.  Each Member shall then contribute to the Series of the Company such Member's pro rata share of the total amount to be contributed to each Series, as and when the same shall be required.  Each Member's pro rata share shall correspond to such Member's Percentage Interest in the capital of such Series of the Company.

(c)    <u>Additional Capital Contributions</u>.  Additional capital contributions to any Series of the Company shall be made only as specified in this Agreement or as otherwise determined by the Managers.

2.4    <u>Failure to Make Capital Contributions</u>.  If, within the time provided, any Member fails to make an additional capital contribution required of such Member pursuant to Section 2.3 above (a "Defaulting Member"), the Percentage Interests of the Members in the capital of the affected Series of the Company and in the profits and losses of such Series shall be adjusted pursuant to Section 2.5 below on a pro rata basis.  In addition, each Member shall be notified in writing of the total amount of contributions not made, and, within thirty (30) days of such notice, a non-Defaulting Member may make an additional capital contribution in an amount equal to the contributions not made by the Defaulting Member.  If more than one non-Defaulting Member elects to make such an additional capital contribution, then the additional capital contribution shall be made by such Members in proportion to their respective Percentage Interests in the capital of the affected Series of the Company.  If any Member makes such an additional capital contribution, such Member's Percentage Interest in the capital and profits of the affected Series of the Company shall be adjusted as provided in Section 2.5, below.  If a non-defaulting Member is unable to make a capital contribution in excess of the amount originally called for under Section 2.3, above, then Managers may determine the terms and conditions upon which necessary funds shall be solicited from outside parties, and this Agreement shall be amended accordingly.

2.5    <u>Adjustments of Percentage Interests and Capital Accounts for Disproportionate Additional Contributions</u>.  If the Members make disproportionate additional capital contributions

as described in Section 2.4 above, the Defaulting Member's Percentage Interest and share of the capital and profits of the affected Series of the Company shall be decreased and the non-defaulting Members' Percentage Interests and shares of the capital and profits of the affected Series shall be increased on a pro rata basis.  If a non-defaulting Member makes an additional contribution in an amount equal to the contributions not made by the Defaulting Member as provided in Section 2.4, above, the Defaulting Member's Percentage Interest and share of capital and profits of the affected Series shall be decreased and the non-Defaulting Members' Percentage Interests and shares of the capital and profits of the affected Series of the Company shall be increased as appropriate to reflect the changes in cumulative capital contributions.

      2.6    <u>Admission of Additional Members</u>.  New Members may be admitted to any Series of the Company by the determination of the Managers.  The Managers shall have the power to determine the terms and conditions upon which any such additional Members may be admitted to the Company.  New Members must execute a counterpart to this Agreement and agree to be bound by all of the terms and provisions hereof.

      2.7    <u>No Interest on Capital Accounts</u>.  No interest shall be paid by the Company on any capital accounts or capital contributions of the Members.

      2.8    <u>Return of Capital Contributions</u>.  The capital contributions of the Members will be returned to them to the extent provided in Section 7.4 at the end of the term of the Company or of the affected Series of the Company or upon earlier termination and dissolution of the Company or of the affected Series of the Company.  No Members shall have the right to demand the return of such Members' capital contributions other than at the time provided herein, and no Member shall have the right to demand and receive property other than cash in return for such Member's capital contributions.  Notwithstanding the foregoing, however, the Company may by determination of the Managers return to such Member all or part of any Member's capital contribution to such Series.

### ARTICLE III – PROFITS, LOSSES AND DISTRIBUTIONS

      3.1    <u>Allocation of Profits and Losses</u>.  Except as provided below, the net profits or net losses of each Series of the Company and each item of the net income, gain, loss, deduction, credit and tax preference of each Series of the Company shall be determined on an annual basis, and shall be allocated, for purposes of both book and tax accounting, in accordance with the Percentage Interests of the Members in the profits of such Series of the Company as set forth in Section 2.2.

      3.2    <u>Distributions</u>.  Cash available for distribution to the Members of each Series of the Company, if any, shall be distributed no less frequently than quarterly, and shall be distributed to all Members of such Series in accordance with their respective Percentage Interests in the capital of  such Series of the Company set forth in Section 2.2.

      3.3    <u>Distributions of Capital Proceeds</u>.  In the event of the sale, financing, refinancing, or other disposition of any of the assets of any Series of the Company and in the discretion of the Managers, the net proceeds of the sale, financing, refinancing, or other disposition (after

deducting any expenses incurred in connection therewith) (hereinafter "Capital Proceeds"), in the sole discretion of the Managers, may be applied to pay any indebtedness of such Series of the Company, to purchase or finance any improvements to any assets of such Series, to pay any other expenses or to establish or increase any reserves of such Series deemed reasonably necessary by the Managers.  Any balance remaining after the foregoing applications shall be distributed among the Members of such Series in the following manner:

(a)     First, to the Members, pro rata, in repayment of the positive (credit) balances in their capital accounts.

(b)     All remaining Capital Proceeds shall be distributed among the Members in accordance with their Percentage Interests in the capital of the Company set forth in Section 2.2.

3.4     <u>Net Profits and Net Losses</u>.  The terms "net profits" and "net losses" as used in this Agreement and for accounting purposes shall mean taxable income and taxable losses, respectively, as calculated for federal income tax purposes.

3.5     <u>Cash Available for Distribution</u>.  The term "cash available for distribution" shall mean gross cash operating receipts of each Series of the Company, less:

(a)     All cash charges and business expenses incurred in the establishment and operation of the business of such Series of the Company;

(b)     Principal and interest payments on indebtedness of such Series (including indebtedness, if any, to a Member or an affiliate or associate of a Member); and

(c)     All cash reserves determined by the Managers to be necessary or desirable for the reasonable needs of such Series of the Company or for future investment or business opportunities (regardless of whether any specific opportunities have then been identified for consideration), including, but not limited to, reserves for contingencies, taxes, insurance, debt reduction and working capital.

3.6     <u>Allocation of Tax Credits</u>.  Any tax credits arising out of the operation of any Series of the Company for a given year shall be allocated among the Members of such Series in the same manner as net profits and net losses are allocated for such year pursuant to Section 3.1.

3.7     <u>Recapture of Tax Credits</u>.  The Members agree that any amounts of tax credit that are required to be recaptured, as a result of the disposition of any of the properties of any Series of the Company with respect to which any tax credit was claimed, will be allocated and taken into account with respect to each Member of such Series in the same proportion as the amounts of such tax credit were allocated to each Member.

3.8     <u>Members' Accounts</u>.  The Company shall maintain separate capital and distribution accounts for each Member for each Series of the Company.  The capital accounts shall at all times be maintained in accordance with the applicable requirements of Section 704 of the Internal Revenue Code of 1986 and the Treasury Regulations issued thereunder.  Each

Member's capital account for each Series shall consist of the Member's initial capital contribution to such Series, increased by (i) any additional capital contributions made by such Member, and (ii) credit balances transferred from such Member's distribution account to such Member's capital account, and shall be decreased by (iii) distributions to such Member in reduction of Company capital by such Series, and (iv) such Member's share of losses of such Series, if charged to the Members' capital accounts. The Members shall (a) maintain their capital accounts for each Series at all times in proportion to their respective Percentage Interests for such Series; (b) charge all distributions to the Members' distribution accounts for such Series; (c) charge the Company's losses for such Series to the Members' distribution accounts, unless the Members determine to charge any such losses to the Members' capital accounts; and (d) credit the Company's net profits for such Series to the Members' distribution accounts. The Members may transfer to their capital accounts for any Series all or any portion of the credit balances in their distribution accounts for such Series. Any amounts transferred shall be in proportion to the Members' Percentage Interests. A credit balance in a Member's distribution account shall constitute a liability of the Series of the Company to that Member; it shall not constitute a part of that Member's interest in the capital of such Series. A debit balance in a Member's distribution account, whether occasioned by distribution in excess of the Member's share of profits of any Series or by charging the Member for such Member's share of loss of such Series, shall constitute an obligation of the Member to the Series; it shall not reduce the Member's interest in the capital of such Series of the Company. Payment of any amount owed to the Series shall be made at such time and in such manner as the Managers may determine.

## ARTICLE IV – MANAGEMENT BY MANAGERS

4.1     <u>Management</u>.

(a)     If the Series Supplement of a Series provides for Series Managers, the powers, responsibilities and appointment thereof shall be governed by the provisions of this article ceteris paribus except to the extent of contrary provisions in the Series Supplement.

(b)     The business of the Company shall be under the full and exclusive management of the Managers, who shall make all decisions by majority vote (except as otherwise provided herein) with each Manager having one vote on each such decision. In the management of the Company's business, a Manager may delegate duties to such persons as such Manager may deem appropriate.

(c)     Each Member who owns at least fifty percent (50%) of the Percentage Interests in the capital of the Company shall have the right to designate one individual to act as a Manager of the Company. A Manager so designated by a Member serve at the pleasure of the Member who designated such Manager, and may be removed and replaced by the Member who designated such Manager. A Manager who is from time to time designated as provided in this Section shall be deemed to have been elected a Manager of the Company as provided in Section 6.11 hereof (relating to the Managers of the Company). Each Member who has the right to appoint one or more Managers shall from time to time identify to the Company the Manager or Managers that represent such Member.

(d)     The provisions of this Section shall not be interpreted to allow any Member to elect or designate a Manager except as specifically provided in this Agreement.  For purposes of this Agreement, the Managers may, either acting alone or acting together, take such actions as are vested in them hereunder.

4.2     Votes by Members.     Whenever, whether pursuant to this Agreement or otherwise, a vote is taken by the Members of any Series of the Company or an action is required to be approved by the Members of any Series, such vote or action shall be taken or approved in accordance with the Members' respective Percentage Interests in the capital of such Series of the Company.

4.3     Limitation of Liability.  Notwithstanding any provision of this Agreement to the contrary, the liability of the Members shall be limited as provided in the Act.  Furthermore, the debts and obligations of each Series of the Company shall be enforceable only against the assets of that Series, and shall not be enforceable against the assets of the Company generally or against the assets of any other Series.

4.4     Responsibilities and Compensation of Managers.

(a)     Annual Operating Budget.  Within thirty (30) days after the commencement of the first fiscal year of operation of any Series, and on or before the first day of each succeeding fiscal year of the Company, the Managers shall prepare an annual business plan or operating budget (the "Annual Operating Budget") for each Series of the Company for such calendar year.  The Annual Operating Budget shall include such information as the Managers may determine, such as (i) a narrative description of the proposed business activities of such Series for such year; (ii) pro forma financial statements for such year; (iii) capital and operating budgets for such Series, including working capital and contingency reserves; and (iv) a schedule of projected operating cash flow.  The Annual Operating Budget shall also set forth any projected contributions to the capital of any Series of the Company that may be expected to be required of the Members of such Series, and the estimated amounts and dates by which such contributions are expected to be required.

(b)     Management of the Company.  Each Manager shall spend such time in the management of the business of the Company and each Series of the Company as is necessary to fulfill effectively the duties of the Manager under this Agreement and under the Act, but need not be full-time.

(c)     Compensation of Managers.     The Managers shall be entitled to such compensation for their services rendered to the Company or to any Series of the Company as may be determined by the Managers.  Each Series of the Company shall also reimburse the Managers for all direct out-of-pocket expenses incurred by them in managing the business of such Series.

4.5     Major Decisions.  In carrying out their responsibilities, as set forth in Section 4.3, no act shall be taken, sum expended, decision made or obligation incurred by any Manager with respect to a matter within the scope of any of the major decisions enumerated below (hereinafter

referred to as the "Major Decisions"), unless and until the same has been reviewed and agreed upon by a majority of the Managers.  The Major Decisions shall include the following:

(a)    The financing, refinancing or encumbering of the Company or any Series, any interest in the Company, the operations of any Series of the Company, or any of the assets of the Company or any Series;

(b)    Any borrowing made by a Series of the Company, except to the extent that the borrowing is necessary to preserve the assets of such Series from foreclosure, levy, repossession, attachment or judgment;

(c)    The termination or modification of any agreement involving the Company or any Series if such agreement was required to be approved by the Managers, or if such modification would result in a modified agreement that, if such agreement were a new agreement, would require approval by vote of the Managers;

(d)    The execution of any purchase and sale agreement or any financing agreement, on behalf of the Company or any Series of the Company that is not in the ordinary course of the business of the Company or any Series of the Company;

(e)    The approval of the annual operating budget of the Company or any Series of the Company (said budget is hereinafter referred to as the "Annual Operating Budget");

(f)    The making of any expenditure or the incurring of any obligation by or on behalf of the Company or any Series of the Company involving a sum in excess of $10,000 or involving a sum less than $10,000 where the same relates to a series of related expenditures, the combined total of which in the current calendar year exceeds $10,000, except for (i) expenditures made and obligations incurred pursuant to and specifically set forth in the Annual Operating Budget; (ii) expenditures for individual items of equipment not exceeding $10,000; and (iii) expenditures for routinely used or recurring labor, services or supplies;

(g)    The making of any expenditure or the incurring of any obligation that, when added to any other expenditure or obligation for the current calendar year, exceeds the Annual Operating Budget or materially exceeds any line item in the Annual Operating Budget;

(h)    The commencement of any legal action by the Company, on behalf of the Company or any Series of the Company except in the ordinary course of the collection of accounts receivable;

(i)    The entering into of any lease or other contract that may significantly impact the cash flow of the Company or any Series of the Company; and

(j)    The making of any other major decision or the taking of any other major action that materially and substantially affects in a major way not otherwise anticipated by this Section, the Company or the assets or operations of the Company or any Series of the Company.

4.6    <u>Company Opportunities</u>.  No Manager or Member need offer to the Company any opportunity that may come to such Manager or Member, whether or not the opportunity is within the scope of the business of the Company or of any Series.  Any Manager or Member shall be free to pursue any such opportunity independently of the Company and of the other Members.

4.7    <u>Powers of Managers</u>.  Subject to the limitations of Section 4.5, and except as otherwise provided in this Agreement, each Manager shall have the full authority to control the business and affairs of the Series or Company, to make and carry out all decisions affecting such Series or Company affairs, including, without limitation, the power to do the following in connection with and in furtherance of the business thereof;

(a)    Sell, transfer, lease, borrow against, mortgage, pledge or otherwise dispose of the assets of the Series or Company in the ordinary course of business, and upon such terms and conditions and for such consideration as may be reasonable and prudent.

(b)    Manage and operate the business of the Series or Company or any property or assets thereof, and enter into agreements with others with respect to the business and assets of the Company containing such terms, covenants and conditions as a Manager shall approve;

(c)    Borrow money from banks or financial institutions and other lenders for any Company purpose and in connection therewith, and issue notes, debentures and other debt securities;

(d)    Enter into agreements and contracts with other parties and give receipts, releases and discharges with respect to all of the foregoing and any matters incident thereto as a Manager may deem advisable or appropriate;

(e)    Maintain, at the expense of the Company, adequate records and books and accounts of all Series and Company operations and expenditures; and cause the obtaining of and furnishing to each Member of annual financial statements as of the end of and for each fiscal year of the Series or Company of which each is a Member, together with tax reporting information;

(f)    Make all elections available to the Company under the Internal Revenue Code;

(g)    Retain accountants, investment advisors, legal counsel, appraisers, brokers, and other professional advisors for the purpose of planning, operating and carrying out the affairs of the Company, and the payment of fees, commissions or other compensation of such persons, firms or corporations shall be made by the Company and shall constitute expenses of the Company;

(h)    Open, maintain and close bank accounts, make deposits therein, and draw checks and other orders for the payment of monies therefrom, all in the name and on behalf of the Series or Company;

(i)      Compile reports and be responsible for the preparation, signing and filing of federal and state information returns and other reports and documents required by law or this Operating Agreement;

(j)      Collect and account for all monies payable to or owned by the Company and disburse the same in accordance with the terms of this Agreement; Company funds other than cash distributions to the Members shall be paid solely for Company obligations.  No Member is authorized otherwise to withdraw or advance funds without unanimous written approval of the Members of the Series or Company;

(k)      Exchange on behalf of the Company all promissory notes, security agreements, deeds of trust, mortgages, loan documents, or other documents related to the purchase and sale, financing or refinancing of any Company Properties;

(l)      Perform all other functions necessary for the day-to-day operation of the Series or Company or the business or assets thereof;

(m)      Perform any and all other acts or activities customary or incident to the acquisition, ownership, management or occasional disposition of Series or Company assets.

4.8      <u>Additional Powers</u>.  As additional rights and powers, the Managers shall possess and may enjoy and exercise all of the rights and powers of a Manager as more particularly provided by the limited liability company laws of the State of Nevada, except to the extent any such rights may be limited or restricted by the express provisions of this Agreement.

4.9      <u>Limitation on Powers</u>.  Notwithstanding anything to the contrary herein, no Manager or Member shall have any authority to:

(a)      Take any action in contravention of this Agreement;

(b)      Do any act that would make it impossible to carry out the ordinary business of the Company;

(c)      Confess judgment against a Series or the Company;

(d)      Possess Series or Company properties or assign, increase, modify or consolidate or extend any mortgage, encumbrance, pledge or other rights of the Company in specific property for other than a Company purpose except as otherwise specifically provided herein; or

(e)      Commingle the funds of the Company with the funds of any Member or other person or entity.

4.10      <u>Transactions Between Managers and Affiliates</u>.  No contract or other transaction between the Company and one or more of the Managers or any person, firm or corporation in which any of the Managers is a partner, owner, shareholder, member, manager, officer or director, or is otherwise financially interested, shall be either void, voidable or unenforceable

because of such relationship or interest, or because any Manager approves or votes as a Manager to approve or ratify such contract or transaction, or because such Manager's vote or approval as a Manager is counted for such purpose, if the contract or transaction is upon terms and conditions that are competitive with those reasonably available to the Company from of unaffiliated persons rendering comparable services.

## ARTICLE V – ACCOUNTS

5.1    <u>Books and Accounts</u>.  The Company shall keep, at all times during the term of its existence, records of all transactions, assets and liabilities, profits and losses of the Company, together with all records required to be kept pursuant to Section 86.241 of the Act.  All such records shall be kept at the principal place of business of the Company and shall be open for inspection by any Member for any proper purpose at all reasonable times.  The Company shall keep such records separately for each Series of the Company.

5.2    <u>Taxable Year; Method of Accounting</u>.  The Company shall keep its accounting records and shall report for income tax purposes on a cash basis and with a fiscal year ending on December 31 of each year, and shall report all income tax items in the same manner as a partnership (subject to applicable provisions of the Internal Revenue Code of 1986, as amended, or any future United States internal revenue law).

5.3    <u>Income Tax Returns and Information</u>.  The Managers shall cause to be prepared and timely filed on behalf of the Company all necessary income tax returns, reports and elections of the Company.  The Company shall provide to each Member information on the Company's taxable income or loss and each class of income, gain, loss, deduction and credit that is relevant to reporting Company affairs.  The information shall also show each Member's distributive share of each class of income, gain, loss or deduction.  This information shall be furnished to the Members as soon as possible after the close of the Company's taxable year, but no later than the first day of March of each year.

5.4    <u>Section 754 Election</u>.  If requested by any Member, the Company shall file an election with the Internal Revenue Service pursuant to the provisions of Section 754 of the Internal Revenue Code.

5.5    <u>Tax Controversies</u>.  Subject to the provisions hereof, the Managers of the Company are designated the "Tax Matters Partner" or "Tax Matters Member" of the Company (as such term is defined in Section 6231 of the Code), and is authorized and required to represent the Company (at the expense of the Company) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  Each Member agrees to cooperate with the designated "Tax Matters Member" and to do or refrain from doing any or all things reasonably required by the designated "Tax Matters Member" to conduct such proceedings.  The Managers may at any time change the Tax Matters Member.

5.6     Transfers During Year.  To avoid an interim closing of the Company's books and records, the share of profits and losses under Article III of a Member who transferred all or part of his Percentage Interest in the Company during the calendar year shall be determined by taking his proportionate share of the amount of profits and losses for the year.  The proration shall be made based on the portion of the calendar year that has elapsed prior to the transfer.  The balance of the profits and losses attributable to the transferred interest shall be allocated to the transferee of such Percentage Interest.

## ARTICLE VI – TRANSFERS OF PERCENTAGE INTERESTS

6.1     Non-Assignability of Percentage Interests.

(a)     This Article shall govern the transfer of interest in a Series except as provided to the contrary in the Series Supplement.

(b)     No Member shall transfer or dispose of a Percentage Interest in the Company at any time during the term of this Agreement except strictly in accordance with the provisions of this Article VI.  Any transfer or attempted transfer of all or any portion of the Percentage Interest of any Member that is not made in accordance with the provisions of this Article VI shall be void.  As used herein, the term "transfer" shall include any sale, gift, pledge, assignment, bequest, trade, exchange, and any other transfer of any kind, whether voluntary or involuntary, and whether or not for consideration.

(c)     Notwithstanding the provisions of Section 6.1(a), the assignment of a portion of a Member's Percentage Interest to a revocable living trust or to a limited partnership that is controlled by the Member making the assignment shall not be deemed a "transfer" of a Percentage Interest, during such times that such assignee is and continues at all times to be controlled by the Member making such assignment, and provided, further, that any such assignee agrees to be bound by all provisions of this Agreement.  Any event that results in the foregoing conditions ceasing to be satisfied shall be deemed to constitute a "transfer," for purposes of this Article VI, which transfer shall be deemed to take place upon the occurrence of the event that results in the foregoing conditions ceasing to be satisfied.

6.2     No Encumbrance.  Except as provided in Section 6.10, no Member shall pledge, hypothecate, encumber or otherwise permit a security interest to attach to his Percentage Interest in the Company, as now owned or as may be hereafter acquired, or contract to pledge, hypothecate or encumber such Percentage Interest, without the prior written consent of the Company and of all of the other Members.  Whether or not such consent is given, the rights of any security holder shall be subordinate and subject to the rights and obligations created by this Agreement.

6.3     Option to Purchase Upon Certain Events.  Upon the occurrence of any of the following events, the Company or the remaining Members shall, pursuant to the procedures and upon the conditions set forth in Section 6.4, below, have the option to purchase the Percentage

13

Interest of the Member to which such event relates, at the price and upon the terms set forth in this Agreement.

(a)    <u>Bankruptcy, Levy, Execution</u>.  If the Percentage Interest of any Member is levied upon, sequestered, administered by a receiver or trustee in bankruptcy, or attached, sold or proposed to be sold in foreclosure or execution under any power of sale contained in a note or loan agreement, or by operation of law or court order.

(b)    <u>Proposed Transfer</u>.  At any time a Member proposes to sell, assign or otherwise dispose of all or any part of its Percentage Interest in the Company (except to the extent set forth in Section 6.1).

(c)    <u>Retirement, Resignation, Expulsion</u>.  The retirement or resignation of a Member from the Company.

6.4    <u>Exercise of Option to Purchase</u>.  Upon the occurrence of any event that, under the terms of this Agreement creates an option for a member of the immediate family of a Member, or the remaining Members or the Company to purchase the Percentage Interest of a Member to Section 6.3, above, such option shall be exercised in the following manner:

(a)    <u>Company's Option</u>.  Subject to the provisions of subsection 6.4(b), below, the Company shall have a period of thirty (30) days after receipt of the Offer in which to elect to purchase all or any portion of the Offering Member's Percentage Interest in the Company by delivering written notice of such election to the Offering Member and to the other Members specifying the Percentage Interest of the Offering Member that the Company elects to purchase. The Offering Member shall not participate in the decision of the Company whether to exercise the option to purchase a Percentage Interest of the Offering Member.

(b)    <u>Members' Option</u>.  If the Company elects not to purchase all of the Member's Percentage Interest pursuant to subsection 6.4(a), all Members (other than the Offering Member) shall each have the right, subject to subsection 6.4(c), to purchase, at the price as established pursuant to Section 6.8, if any, all or any portion of the Offering Member's Percentage Interest in the Company not purchased by the Company pursuant to subsection 6.4(a).  This right shall be exercisable for a period of thirty (30) days after the expiration of the Company's right to purchase, and may be exercised by giving written notice to the Offering Member, the other Members and to the Company specifying the amount or portion of the Offering Member's Percentage Interest the other Members desire to purchase.  In exercising their right to purchase, the other Members may divide the Offering Member's Percentage Interest to be purchased in any manner in which they all agree.  In the absence of a unanimous agreement, the Offering Member's Percentage Interest to be purchased shall be divided among the Members electing to purchase such Percentage Interest in accordance with this subsection in proportion to their Percentage Interests as of the date the Offer was first delivered to the Company and the other Members.

(c)    <u>Requirement to Purchase Entire Percentage Interest</u>.  The right of the Company and the other Members to purchase the Offering Member's Percentage Interest in the Company

under subsections 6.4(a) and (b) shall not be effective unless the entire Percentage Interest that the Member proposes to sell, or that is being sold or otherwise transferred or disposed of pursuant to law, is purchased by the Company and/or the other Members.

(d)    Transfer.  Any Percentage Interest that is not purchased pursuant to subsections 6.4 (a) and (b) may be transferred by the Offering Member to the proposed transferee named in the Offer pursuant to the terms and conditions specified therein; provided, however, that such transferee shall be bound by the terms of this Agreement.  If such transfer is not made within thirty (30) days following the expiration of the right to purchase herein granted to the Members, a new offer must be made pursuant to the provisions of this Section 6.4 before the Offering Member can transfer any portion of such Member's Percentage Interest, and the provisions of this Article VI shall again apply to such transfer.

6.5    [Reserved]

6.6    [Reserved]

6.7    Substitution of Transferee as Member.    No transferee, designee or legal representative of a Member who is not then a Member shall become a substitute Member unless the consent of each Manager is first obtained.  In the event that such a consent is not granted, the transferee shall have no right to participate in the management of the business and affairs of the Company, and shall be entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the Offering Member would otherwise be entitled.  As a condition to his admission as a substitute Member (a) any transferee, designee or legal representative of the Offering Member shall execute and deliver such instruments, in form and substance satisfactory to the Members, as the Members shall deem necessary or desirable to cause the transferee to become a substitute Member, and (b) such transferee, designee or legal representative shall pay all reasonable expenses in connection with the transferee's admission as a substitute Member, including but not limited to, the cost of preparation and filing of any amendment to the Agreement or the Articles of Organization that may be necessary or desirable in connection therewith.

6.8    Purchase Price.  The purchase price for a Percentage Interest being purchased or sold under Subsection 6.3 of this Article VI shall be determined by agreement between the selling and purchasing Members or, in the absence of agreement, by multiplying the Percentage Interest being sold by the value of each one percent (1%) Percentage Interest in the capital and profits of the Company, determined in accordance with the following provisions:

(i)    As of the date of this Agreement, the Members hereby agree that the value of each one percent (1%) Percentage Interest in the capital and profits of the Company is as set forth in Schedule A attached hereto.  This agreed value shall remain effective until the sooner of Eighteen Months from and after the date of this Agreement, or until a redetermination is made of the value of the Percentage Interests, in accordance with the following provisions.

(ii)   At the end of each of the Company's fiscal years or more frequently, if desired, the Members shall redetermine the value of each one percent (1%) Percentage Interest in the capital and profits of the Company, and shall indicate their redetermination by their execution of a document similar to the form attached to this Agreement as Schedule A.   Where the membership of any series shall not be identical as the membership of the Company, the members of such series shall indicate the value of each one percent (1%) Percentage Interest thereof on Schedule A to the Series Supplement. Each redetermination shall be valid and binding for a period of eighteen months from and after the effective date of such redetermination, as indicated on Schedule A pursuant to which such redetermination is made.

(iii)   In the event that no valid redetermination is effective, the value of the Company shall be (and the value of each one percent (1%) Percentage Interest in the capital and profits of the Company shall be equal to one percent of the value of the Company) determined as follows:   Three times the "annual pretax net income" of the Company for the most recent calendar year, plus Two times the "annual pretax net income" of the Company for the immediately preceding calendar year, plus One times the "annual pretax net income" of the Company for the second immediately preceding calendar year.   For this purpose, "pretax net income" shall mean net income, as determined by the Company's regularly employed accountants, using accounting principles and practices theretofore consistently applied by the Company, after subtracting operating expenses, but before deducting compensation for services paid to Managers and their affiliates, income taxes, and distributions to the Members and their affiliates.  The value so determined shall be valid, binding and conclusive upon all parties to this Agreement and upon their heirs and successors.

6.9     Closing.   The closing of the purchase or sale of a Percentage Interest in the Company pursuant to Article VI of this Agreement shall be held at the time and place and in a manner mutually agreeable to the parties to the transaction.   In the absence of unanimous agreement, the closing shall be held at the principal office of the Company thirty (30) days after the expiration of the last option to purchase under the provisions of this Article VI.   At the closing the Offering Member, personal representative or other holder of the Percentage Interest being sold shall assign and deliver the Percentage Interest being sold to the purchase or purchasers thereof.

6.10    Payment of Purchase Price.  Unless the parties to the transaction agree otherwise, or as described below in the case of certain purchases of a deceased or permanently disabled Member's Percentage Interest, the purchase price shall be paid by a cash payment in the amount of twenty percent (20%) of such purchase price and a simultaneous execution by the purchaser of a promissory note payable to the order of the seller for the balance of such price.   Such promissory note shall provide for four equal annual payments of principal, plus accrued interest payable at a fluctuating rate equal to the prime, reference or base rate quoted or charged from time to time by Bank of America, Las Vegas, Nevada, but in no event to exceed the maximum legal rate of interest.  Prepayment without penalty shall be allowed.  The promissory note shall be secured by a pledge of the Percentage Interest in the Company being purchased if purchased by Members. In the event that the purchase of a Member's Percentage Interest in the Company

upon the death or permanent disability of such a Member is to be paid by life or disability proceeds payable to the Company or the other Members, the purchase price shall be paid in a cash payment equal to the full amount of the life or disability insurance proceeds paid or payable to the remaining Members and/or the Company by reason of the death or disability of the deceased or disabled Member or the full purchase price, if the proceeds exceed the purchase price.  The balance of the purchase price, if any, shall be paid in the form of the promissory note as described above.

6.11    Managers of the Company.

(a)    A Member who for any reason ceases to own a Percentage Interest in the Company or in another entity that is a Member (to the extent permitted by Section 6.1 herein) shall thereupon cease to have the right to appoint a Manager of the Company, as provided in Section 4.1 hereof. No other purchaser or other assignee or successor in ownership to a Member shall, by acquiring the Percentage Interest of a Member, thereby acquire any right to appoint a Manager of the Company unless the requirements of Section 4.1(c) are thereby satisfied.

(b)    The Members may at any time elect additional Managers of the Company.  The election of an additional Manager shall require the vote of Members owning more than Fifty Percent (50%) of the Percentage Interests in the capital of the Company.

(c)    The Members may at any time remove a Manager from office.  The removal of a Manager shall require the vote of Members owning more than Fifty Percent (50%) of the Percentage Interests in the capital of the Company that are owned by Members.

## ARTICLE VII – DISSOLUTION AND TERMINATION

7.1    Events of Dissolution.  The Company and each Series of the Company shall continue to exist perpetually until the Company or any Series of the Company is dissolved by:

(a)    The affirmative vote of a majority of the Managers.

(b)    Any event that makes it unlawful for the business of the affected Series of the Company to be carried on by the Members; or

(c)    Any other event that causes a dissolution of a limited liability company under the Act.

7.2    Continuance of the Company.  Notwithstanding the foregoing provisions of Section 7.1, upon the occurrence of an event described in subsection 7.1(c), the remaining Members shall have the right to continue the business of the Company or of the affected Series of the Company.  Such right may be exercised only by the affirmative unanimous vote of the remaining Members of the Company or of such Series, as the case may be, and, if there is only one remaining Member, provided that an additional individual or entity becomes a Member within 90 days after the occurrence of an event described in Section 7.1(c) to continue the

business of the Company or of the affected Series.  If not so exercised, the right of the Members to continue the business of the Company or the affected Series shall expire and the affairs of the Company or the affected Series shall be wound up as provided in this Article VII.

7.3     Final Accounting.  In case of dissolution, the Members shall cause a proper accounting to be made from the date of the last previous accounting to the date of dissolution.

7.4     Liquidation.  Upon the dissolution of the Company or any of its Series and the failure of the remaining Members to continue the business as provided in Section 7.2, a person selected by Members owing a majority of the Percentage Interests voting on the question shall act as liquidator to wind up the Company or the affected Series.  The liquidator shall have full power and authority to sell, assign and encumber any or all of the assets and to wind up and liquidate the affairs of the Company or of any affected Series in an orderly and prudent manner. The Capital Accounts of the Members shall be adjusted to account for the operating income and deductions of the Company or any of its Series for the taxable year of the liquidation or dissolution and to account for any sales of assets, in the manner provided in Article III of this Agreement.  The liquidator shall distribute all proceeds of the liquidation to the Members first in repayment of the positive balances, if any, in their Capital Accounts; and thereafter in proportion to their respective Percentage Interests.

7.5     Distribution in Kind.  If the liquidator shall determine that a portion of the assets of the Company or any Series should be distributed in kind to the Members, it shall distribute such assets to the Members in undivided interests as tenants in common in proportion to their respective Percentage Interests.  In the event that some or all of the assets are not sold, the Members shall determine the fair market value of the unsold assets, and the gain or loss that would have been realized if the assets had then been sold shall be determined, and the Capital Accounts of the Members shall be adjusted accordingly.

7.6     Dissolution of Company.  Upon the completion of the distribution of the assets of the Company or of the affected Series, the Company shall be terminated and the Members shall cause the Company to execute appropriate instruments of dissolution and to take such other actions as may be necessary to terminate the Company or the affected Series.

## ARTICLE VIII – POWERS OF ATTORNEY

8.1     Appointment.  Each Member, by execution of this Agreement, irrevocably constitutes and appoints each Manager of the Company, acting separately with full power of substitution, as such Member's true and lawful attorney, in such Member's name, place and stead to file articles of organization with the appropriate depositories and to execute, acknowledge, swear to and file (a) all amendments and Series Supplements to this Agreement or to the articles of organization required by law of authorized or required by the provisions of this Agreement or the articles of organization; (b) all certificates and other instruments necessary to qualify or continue the Company as a limited liability company wherein the Members have limited liability in all states and jurisdictions in which the Company may transact business; and

(c) all conveyances and other instruments that may be necessary to effect the Company's dissolution and termination.

8.2 <u>Nature of Power of Attorney</u>. The power of attorney herein granted shall be deemed to be coupled with an interest and shall be irrevocable and survive the death or incompetency of the Members. In the event of any conflict between this Agreement and any instruments filed by such attorneys pursuant to the powers of attorney granted in this Section, this Agreement shall control.

## ARTICLE IX – AMENDMENT TO AGREEMENT

Amendments to this Agreement and to the Articles of Organization may be proposed by any Member. The Member shall submit to the other Members any such proposed amendment. A proposed amendment shall become effective at such time as it has been approved in writing by the Members owning more than fifty percent (50%) of the Percentage Interests in the capital of the Company.

## ARTICLE X – INDEMNIFICATION

10.1 <u>Definitions</u>. For purposes of this Article X, the following terms shall have the meanings set forth below:

(a) <u>Action</u>. Any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative.

(b) <u>Indemnified Party</u>. Any person who is or was a party or is threatened to be made a party to any Action by reason of the fact that he is or was a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, officer, employee or agent of another corporation, limited-liability company, partnership, joint venture, trust or other enterprise.

10.2 <u>Actions</u>. The Company shall indemnify any Indemnified Party against expenses (including attorneys' fees), judgments, fines, excise taxes, and amounts paid in settlement actually and reasonably incurred by him in connection with any Action if, as determined pursuant to 10.4 below, he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal Action, had no reasonable cause to believe his conduct was unlawful. The termination of any Action by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not of itself create either a presumption that the Indemnified Party did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, or with respect to any criminal Action, a presumption that the Indemnified Party had reasonable cause to believe that his conduct was unlawful.

10.3    <u>Success on Merits or Otherwise</u>.  If and to the extent that any Indemnified Party has been successful on the merits or otherwise in defense of any Action referred to in Section 10.2 of this Article X, or in defense of any claim, issue, or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith without the necessity of any determination that he has met the applicable standards of conduct set forth herein.

10.4    <u>Determination</u>.  Except as provided in Section 10.3, any indemnification under Section 10.2 (unless ordered by a court) shall be made by the Company only upon a determination that indemnification of the Indemnified Party is proper in the circumstances because he has met the applicable standards of conduct set forth in said Section 10.2.  Any such determination shall be made (a) by the Managers who are not parties to the subject Action; or (b) upon the request of a majority of the Managers who are not or were not parties to such Action, or if there be none, by independent legal counsel (which counsel shall not be the counsel generally employed by the Company in connection with its business affairs) in a written opinion; or (c) by Members who own a majority of the Percentage Interest in the capital of the Company.

10.5    <u>Payment in Advance</u>.  Expenses (including attorneys' fees) or some part thereof incurred by an Indemnified Party in defending any Action, shall be paid by the Company in advance of the final disposition of such Action if a determination to make such payment is made on behalf of the Company as provided in Section 10.4; of this Article X; provided, that no such payment may be made unless the Company shall have first received a written undertaking by or on behalf of the Indemnified Party to repay such amount unless it is ultimately determined that he is entitled to be indemnified by the Company as authorized in this Article X.

10.6    <u>Other Indemnification</u>.  The indemnification provided by this Article X shall not be deemed exclusive of any other rights to which any Indemnified Party or other person may be entitled under any other agreement (including without limitation any other provision of this Operating Agreement), vote of the Members or Managers or otherwise, and any procedure provided for by any of the foregoing, both as to action in his official capacity and as to action in another capacity while holding such office.

10.7    <u>Period of Indemnification</u>.  Any indemnification pursuant to this Article X shall continue as to any Indemnified Party who has ceased to be a Manager, officer, employee, or agent of the Company, or at the request of the Company, was serving as and has since ceased to be a Manager, officer, employee, or agent of another corporation, limited-liability company, partnership, joint venture, trust, or other enterprise, and shall inure to the benefit of the heirs and personal representatives of such Indemnified Party.  The repeal or amendment of this Article X or of any Section or provision thereof which would have the effect of limiting, qualifying, or restricting any of the powers or rights of indemnification provided or permitted in this Article X shall not, solely by reason of such repeal or amendment, eliminate, restrict, or otherwise affect the right or power of the Company to indemnify any person, or affect any right of indemnification of such person, with respect to any acts or omissions which occurred prior to such repeal or amendment.

10.8    <u>Insurance</u>.  By action of the Managers, notwithstanding any interest of any Member or Manager in such action, the Company may purchase and maintain insurance, in such amounts as the Managers may deem appropriate, on behalf of any Indemnified Party against any liability asserted against him and incurred by him in his capacity of or arising out of his status as an Indemnified Party, whether or not the Company would have the power to indemnify him against such liability under applicable provisions of law.

10.9    <u>Right to Impose Conditions to Indemnification</u>.  The Company may impose, as conditions to any indemnification provided or permitted in this Article X, such reasonable requirements and conditions as to the Managers or Members may appear appropriate in each specific case and circumstance, including but not limited to any one or more of the following: (a) that any counsel representing the person to be indemnified in connection with the defense or settlement of any Action shall be counsel mutually agreeable to the person to be indemnified and to the Company; (b) that the Company shall have the right, at its option, to assume and control the defense or settlement of any claim or proceeding made, initiated, or threatened against the person to be indemnified; and (c) that the Company shall be subrogated, to the extent of any payments made by way of indemnification, to all of the indemnified person's right of recovery, and that the person to be indemnified shall execute all writing and do everything necessary to assure such rights of subrogation to the Company.

## ARTICLE XI – GENERAL PROVISIONS

11.1    <u>Notices</u>

(a)    <u>Method for Notices</u>.  All notices required or permitted hereunder shall be sent by first class mail, postage prepaid, and addressed as set forth in Section 1.9, above, (except that any Member may from time to time give notice changing such Member's address for such purpose) and shall be effective on the date of receipt or on the fifth day after mailing, whichever is earlier.

(b)    <u>Computation of Time</u>.  In computing any period of time under this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday in the State of Nevada, in which event the period shall run until the end of the next day that is not a Saturday, Sunday or legal holiday in the State of Nevada.

(c)    <u>Notice to Transferees</u>.  No transferee of the Percentage Interest of any Member, regardless of whether the transfer was permitted by this Agreement, shall be entitled to receive a notice independently of the notice sent to the Member who made the transfer.  A notice sent or given to a Member shall be deemed to have been sent and given to all transferees of the Member.

11.2    <u>Titles and Captions</u>.  All Article and Section titles and captions in this Agreement are for convenience or reference only, and shall not be deemed part of this Agreement, and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

11.3    Pronouns and Plurals.  Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms and the singular form of nouns, pronouns and verbs shall include the plural, and vice versa.

11.4    Entire Agreement.  This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and, except as provided in Article IX, may not be amended nor may any rights hereunder be waived except by an instrument in writing signed by the party sought to be charged with such amendment or waiver. By way of clarification, the creation or dissolution of a Series by the operation of this Agreement shall not be considered an Amendment restricted by this Section.

11.5    Applicable Law.  This Agreement shall be construed in accordance with and shall be governed by the laws of the State of Nevada.

11.6    Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, executors, administrators, successors, legal representatives and assigns.

11.7    Rights and Remedies.  The rights and remedies of the Members hereunder shall not be mutually exclusive, and the exercise of one or more of the provisions of this Agreement shall not preclude the exercise of any other provision.  Each Member confirms that damages at law may be an inadequate remedy for a breach or threatened breach of any provision hereof.  The respective rights and obligations of the Members hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to or shall limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other parties for a breach or threatened breach of any provision hereof, it being the intention of the Members by this provision to make clear their agreement that the respective rights and obligations of the parties hereunder shall be enforceable in equity as well as at law or otherwise.

11.8    Severability.  In the event that any condition, covenant or other provision herein contained is held to be invalid or void by any court of competent jurisdiction, the same shall be deemed severable from the remainder of this Agreement and shall in no way affect any other covenant or condition herein contained.  If such condition, covenant or other provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope or breadth permitted by law.

11.9    Further Action.  The Members shall execute and deliver all documents, provide all information, and take or forebear from all such action as may be necessary or appropriate to achieve the purposes of this Agreement.

11.10    Counterparts.  This Agreement may be executed in counterparts, all of which taken together shall constitute one Agreement binding on all of the parties notwithstanding that all the parties are not signatories to the original or the same counterpart.  Each party shall become bound by the Agreement immediately upon affixing his signature hereto, independently of the signature of any other party.

11.11 <u>Waiver of Partition</u>.  Each Member hereby waives any right to partition of the property of the Company or of any Series of the Company.

IN WITNESS WHEREOF, the Members acknowledge under penalties of perjury that the matters and facts set forth in this Agreement are true, and that they have signed this Agreement on the respective dates set forth below to be effective as of the date first above written.

"MEMBERS"

John R. Erickson

R. Glen Woods

The undersigned each accepts the office of Manager of the Company and agrees to perform the same, as set forth in the aforementioned Operating Agreement of the Company.

"MANAGERS"

John R. Erickson

Andrew Platt

R. Glen Woods

23

Inventory and Allocation of Assets held by Series of
**BOSQUE HOLDINGS LLC**
As of November 3, 2017

Printed  2018-07-28

| | Name of Series | Asset Description | APN/VIN/Serial Number | Notes | Value | Date of Value | Date Series Created | Date Series Terminated | List of Members (if different from LLC) | Managers (if different from LLC) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 4 Mountain Series | 4 Mountain LLC, a Nevada limited liability company (100% ownership of LLC) | | RGW = Mngr of Series | | | 2011-01-01 | 2013-07-01 | Prime 2005 Trust | R. Glen Woods |
| 2 | HSP Series | Health Screening Plus of San Diego LLLP (Series has 10% GP ownership of LLLP) | | RGW = Mngr of Series | | | 2011-05-31 | LLLP revoked 6/1/2012 | | |
| 3 | Wilmark Series | The Wilmark Limited Partnership, a Nevada limited partnership (Series has 1% GP ownership of LP) | | RGW = Mngr of Series | | | 2011-08-24 | | Harmony Trust (fka Bullard 2005 Trust) | R. Glen Woods |
| 4 | Faggen Series | Faggen Enterprises LLLP, a Nevada limited liability limited partnership (Series has 1% GP ownership of Series) | | Series initial GP of Asset; GP replaced by Craig & Ivan Faggen 9/15/11 | | | 2011-09-13 | Series replaced as GP on 9/15/2011 | | |
| 5 | CP Series | An undivided 50% interest in the Pair Family Partnership, a Nevada general partnership | | Christopher Pair = Manager of Series | | | 2013-06-01 | | Christopher Pair | Christopher Pair |
| 6 | Antigua Series | 99% interest in Antigua Enterprises LLLP, a Nevada limited partnership | | Series initial LP of Asset; LP interest transferred to Granados 2013 Trust 7/22/13 | | | 2013-06-21 | Series replaced as LP on 7/22/13 | | |
| 7 | Corbin Series | 47750 Corbin Avenue, Tarzana, CA | | RGW = Mngr of Series | LA County Assessor 2016 Roll Value   $631,317 | 2016 | 2013-12-02 | 2017-01-01 | Harmony Trust (fka Bullard 2005 Trust) | R. Glen Woods |
| 8 | Skyline Capital Series | Skyline LLLP, a Nevada limited liability limited partnership (Series has 1% MLP ownership in LLLP) | | Series initial MLP of Asset; MLP replaced by Blue Forest Holdings on 4/15/14 | | | 2014-02-18 | Series replaced as MLP on 4/15/14 | Ivan 2014 Trust | Donovan Ivan |
| 9 | Cloud Partners Series | Into the Clouds Production LLLP, a Nevada limited liability limited partnership (Series has 1% MLP ownership in LLLP) | | Series initial MLP of Asset; MLP replaced by Blue Forest Holdings on 4/15/14 | | | 2014-02-19 | Series replaced as MLP on 4/15/14 | Ivan 2014 Trust | Donovan Ivan |
| 10 | SJB Management Series | Series is Sole Manager of SJB Ventures LLC, a Nevada limited liability company | | Samuel Jacob Fillmore and William L. Fillmore = Managers of Series | | | 2014-07-15 | Series replaced as Manger on 4/23/15 | Samuel Jacob Fillmore & William L. Fillmore | Samuel Jacob Fillmore & William L. Fillmore |
| 11 | Aspen I Series | Awe Holdings LLLP, (Series has 99% LP ownership in LLLP) | | Series initial LP of Asset; LP replaced by Spartan Trust on 12/4/14 | | | 2014-11-20 | 2014-12-04 | Rohnn M. Lampi | Rohnn M. Lampi |
| 12 | Aspen II Series | Wapiti Investments LLLP, (Series has 99% LP ownership in LLLP) | | Series initial LP of Asset; LP replaced by Spartan Trust on 12/4/14 | | | 2014-11-20 | 2014-12-04 | Rohnn M. Lampi | Rohnn M. Lampi |
| 13 | Hawk Series | Eagle Ventures LLLP, a Nevada limited liability limited partnership (Series has 1% MLP ownership in LLLP) | | | | | 2017-03-31 | | | Bruce D. Savett Susan M. Savett |
| 14 | LHS BDS Series | Series is sole Manager of LHS BDS Holdings LLC, a Nevada limited liability company | | | | | 2017-03-21 | | | Bruce D. Savett |
| 15 | 6M Series | Series is sole Manager of LHS BDS Holdings LLC, a Nevada limited liability company | | | | | 2017-05-22 | | | Matt MacKay |
| | Kerker Series | Series is sole Manager of Kerker Offices LLC, an Arizona limited liability company | | | | | 2017-08-14 | | Harmony Trust (fka Bullard 2005 Trust) | Kim Bullard |
| 16 | Tiger I Series | Series is sole Manager of Tiger Holdings I LLLP, an NV LLLP | | | | | 2017-11-03 | | Tiger 2017 Family Trust | Dave Hopkins with R. Glen Woods as an additional Manager |
| | Tiger II Series | Series is sole Manager of Tiger Holdings II LLLP, an NV LLLP | | | | | 2017-11-03 | | Tiger 2017 Family Trust | Dave Hopkins with R. Glen Woods as an additional Manager |
| | **Shaded entries are not in existence** | | | | | | | | | |

1

Approved: _____

# EXHIBIT "J"

# EXHIBIT "J"

# EXHIBIT "J"

Unable to provide

EXHIBIT "K" & "L"

EXHIBIT "K" & "L"

EXHIBIT "K" & "L"

CONFIDENTIAL



# WOODS ERICKSON & WHITAKER LLP

### ATTORNEYS AT LAW

1349 Galleria Drive, Suite 200, Henderson, Nevada 89014
702.433.9696 ♦ Fax: 702.434.0615 ♦ WoodsErickson.com

March 13, 2018

Red Ledges Land Development, Inc.
Red Ledges Construction LLC
Todd R. Cates
205 N Red Ledges Blvd.
Heber City, UT 84032

      Re:    Engagement of Woods Erickson & Whitaker LLP

Mr. Cates:

      Thank you for discussing your legal needs with us. This letter defines the initial scope of our representation and the terms of that representation.

      **Initial Representation**: We are being engaged to represent you and your business interests as you may direct.

      **Initial Scope**: The legal services we have agreed to provide are contract related work including advice on licensing of construction company.

      **Initial Engagement Deposit**: $3,000, replenishable during the engagement.

      **Incorporated Terms**: This cover letter contemplates and specifically incorporates your agreement to the Incorporated Terms of Representation as they are amended from time to time. The version of the Terms of Representation in effect at any time is published on the firm website. As provided in the Terms of Representation, if we agree to perform additional services, including services for other entities or persons at your request, the Terms of Representation will apply. When material changes to the Terms of Representation are made, you will be notified in your monthly invoice.

      After reviewing this cover letter and the terms of representation attached to and incorporated with it, please sign to indicate your acceptance.

                    Very truly yours,

                    John R. Erickson

Accepted and agreed:                                    3/13/18

                    Todd R. Cates, CFO/Vice President,    Date
                    authorized signatory for
                    Red Ledges Land Development, Inc.,
                    a Florida corporation, and
                    Red Ledges Construction LLC
                    a Florida limited liability company

PLATT004282

CONFIDENTIAL

**WOODS ERICKSON & WHITAKER LLP**

ATTORNEYS AT LAW

## INCORPORATED TERMS OF REPRESENTATION

1.      **Scope of Engagement; Subsequent Matters**. Upon execution of the engagement cover letter and the deposit of the specified engagement deposit, our representation will encompass all matters that may arise, and that are related to the matter defined therein. Unless we otherwise agree, the Terms of Representation then in effect will apply to all future matters for which you engage us as counsel. We are not required to pursue all objectives or employ means which we deem imprudent or unprofessional. We will discuss with you which matters or objectives we are willing and able to undertake. At the conclusion of a matter, even when we continue to work with you on one or more other matters, we will not monitor or apprise you of changes in law that affect a concluded matter unless otherwise agreed.

2.      **Client Responsibilities**. You agree to be truthful with us, cooperate with us in the preparation and presentation of legal matters, keep us informed of developments, and abide by these Terms of Representation. Specifically, you agree to inform us of all facts that you may reasonably expect are or become relevant to whether the actions we advise or undertake may be illegal or unethical in any jurisdiction.

3.      **Communication**. We shall make every reasonable effort to keep you informed as to the progress of all matters of representation. The file and its progress are open to your inspection at any reasonable time.  Unless you tell us to avoid electronic communication, we increasingly utilize electronic telecommunications including cloud-based or hosted platforms.

4.      **Periodic Review of Compliance and Implementation**. When the firm, its affiliates, or agents maintain trust or entity records for you and when the firm, its affiliates, or agents, serve as trustee, officer, or registered agent, you understand that we will perform and bill you for periodic reviews, governance, and implementation of planning advice. You understand that the subscription and maintenance fees will be charged in advance either by the firm or its affiliates or agents and that there is no obligation to continue with services if the subscription is cancelled or the fees are not otherwise paid.

5.      **Proper Purposes and Disclosures**. You agree that you will not use the firm's services or any trust, entity, agreement, or proceeding which we form, administer, or in which we participate to engage in any action prohibited by law including fraud, fraudulent conveyance, concealment, money laundering, violation of foreign exchange controls, or the evasion or tax or other legitimate obligations. The firm may condition services upon delivery of supporting documentation (redacted or unredacted) and/or representations to satisfy KYC standards or satisfactorily demonstrate the absence of prohibited transactions or purposes.

6.      **Team Approach**. Our entire firm will act on your behalf in this matter and any other matters for which we may be engaged.  We will assign those members and affiliates of the firm to each matter who we believe have the skills and abilities to meet the needs and resolve the issues presented in our engagement.

7.      **Legal Fees; Expenses**. Generally, our fees for services are calculated based upon the applicable hourly rates for the attorneys and legal assistants who do the work. Our personnel bill in tenth-hour increments with an automatic minimum of two-tenths hour for any task. Under some circumstances, it may be appropriate in establishing our fees to take into account additional factors, such as the complexity of the work, the extent to which we have foregone other opportunities in order to satisfy a client's objectives, and the nature of the results that we ultimately achieve for our client. Our rates are based on experience, training and level of professional attainment. Our rates are subject to periodic adjustment.

Revised October 2017

PLATT004283

CONFIDENTIAL

7.01     Current rates range from $125 for some paralegals and law clerks to $460 per hour for senior partners. Junior partners and CPAs bill at $270 per hour.

7.02     Engagement deposits. Unless otherwise agreed, any deposit or retainer will be held as security for the payment of any expenses and legal fees when due. You grant to us a lien on and security interest in such retainer, together with all replacements and proceeds thereof. If it becomes necessary for us to access the retainer, we will apply the retainer first to the payment of any expenses advanced by us on your account and then to legal fees. In the event of any such application, a billing statement will be generated and provided to you. At that time, you may be requested either to replenish or to increase the retainer account (sometimes called an "evergreen" retainer). At the conclusion of our legal representation, the unapplied portion of any retainer will be returned to you as you direct.

7.03     Other fee arrangements. On occasion, and by specific agreement, we may agree to a fee arrangement other than an hourly fee, such as a fixed fee for a specifically defined project or a contingent fee. In such a case, the fee and payment schedule will be set forth in our cover letter to you or in a separate agreement or addendum, but otherwise, these Terms of Representation will apply. Fixed-fee arrangements differ from retainer deposits in that no portion of the fee is refundable. You understand that the portion of legal fees divided with attorneys outside the firm is based on the services they provide to the representation.

7.04     Expenses. Our hourly rates do not include out-of-pocket expenses that we may need to incur, such as charges made by courts and governmental agencies or related expenses (such as filing fees, service of legal process, subpoena costs, witness fees, etc.), photocopying, long distance telephone, overnight courier services, fees, facsimile service, postage, out-of-town travel expenses, credit card and bank charges, deposition expenses (including costs of transcripts and court reporter's fees for attendance), and fees and charges made by title companies and escrow agents.

8.     **Associate Counsel, Affiliates, Experts, and Third Parties**. Either you or we may retain experts or other third parties.  These specifically include firm affiliates such as Gatehouse Strategies, L&S Counselors, and Desert Trust Services. We shall have the authority to disclose necessary information, execute service agreements, incur expenses, and make advances on your behalf for any items of the type described in this paragraph, in such amounts as we determine to be advisable best in connection with our engagement.  By this agreement, you have appointed us as your agent for these purposes of securing such services and incurring expenses of the type described in these Terms of Representation.  If we incur such expenses directly, you are responsible for and we shall have the authority to make payment on your behalf for all such items. We will add any such expenses incurred by us to our invoices.

9.     **Billing Statements**. Generally, the law firm's practice is to render invoices on a monthly basis for services performed during each month.  Invoices for a given month are typically sent in the first half of the month for services rendered during the preceding month. Invoices are due at the time they are received.  You agree to pay our invoices monthly.

9.01     You agree to read carefully all statements for services rendered and expenses incurred, and to notify this office, in writing, of any claimed errors or discrepancies in billing.  You agree to give us this notice within fifteen days after receipt of any statement.  Each statement will be deemed accepted by you in full fifteen days after it is received.

10.     **Late Payment**. Compound interest at the rate of one and one-half percent per month will accrue on any invoices that become more than thirty days past due. Should you remit a payment by check that is returned for insufficient funds or stop payment, a $35 returned check fee will be assessed to you.

PLATT004284

CONFIDENTIAL

11.   **Privacy Policy**.

11.01   To the extent our relationship with you may include the provision of personal financial services, we further inform you of additional policies pertaining to financial services. In the course of providing personal financial services, we collect nonpublic personal information about you that is either given to us by you or obtained by us with your authorization. In order to guard your nonpublic personal information, we maintain physical, electronic, and procedural safeguards that comply with our professional standards.

11.02   We do not disclose any nonpublic personal information obtained from current or former clients in the course of our practice except as permitted or required by law. Permitted disclosures include, for example, providing information to our employees or, where appropriate, to unrelated third-parties who need to receive such information to assist in providing services to you. In such circumstances, nonpublic personal information is transmitted with the instruction that its confidential nature be respected.

12.   **Waiver; Hold Harmless**. You acknowledge that we have made no guarantees.  All expressions by us that relate to the possible results of our engagement are based strictly upon our opinions and judgment. You acknowledge that this agreement may be fully disclosed in connection with our representation of you if necessary or required by any court, legal process or discovery procedure.

12.01   Sometimes, matters are resolved in less time than might be expected.  Other times, unforeseen events arise that increase the amount of time required.  It is impossible to determine in advance the amount of time that will be needed to complete any particular matter.  We will keep you informed through periodic statements of the time used for drafting and preparation of documents, conferences, telephone calls, legal research, court time, necessary travel time, and all other time spent on your behalf.

12.02   You agree to hold us (including the owners, employees, and agents) harmless to the maximum extent permitted by law for any and all liabilities, losses, costs, and expenses relating to this engagement, as well as losses or expenses incurred by reason of any action taken or committed to be taken by us in good faith. In any case, however, our total liability and that of our owners, employees, and agents for all claims of any kind arising out of, relating to or connected with this engagement shall be limited to the total fees paid to us under this engagement.

12.03   You waive any claim for breach of fiduciary duty (whether against the firm or any attorney or agent) based on the exercise of the rights granted in these Terms of Representation or relating to collection of amounts owed to us.

12.04   You waive any claim for breach of any duty of confidentiality which might otherwise extend to the fact of our representation of you and/or financial transactions with you or on your behalf in order that we may, to the extent necessary, (a) effectively participate in any fee dispute or malpractice process involving you, (b) comply with disclosures (other than subpoenas) to a government agency, or (c) effectively participate in an official inquiry by a financial institution.

13.   **Termination**.

13.01   You are free at any time to terminate our attorney-client relationship, subject to court approval when necessary.  If you terminate our relationship you agree to pay immediately any unpaid legal fees, expenses, or service fees due us.

13.02   We likewise reserve the right to terminate our attorney-client relationship for nonpayment of fees or expenses, or for any other reason deemed appropriate under applicable rules of professional conduct, including misrepresented material facts, failure to disclose material facts, or if you

PLATT004285

CONFIDENTIAL

fail to cooperate fully with us in the preparation and presentation of legal matters on your behalf. If we reach a point at which there is a serious difference of opinion between us as to how your matters should be handled, we will withdraw if we may legally and ethically do so, or you may terminate our representation, as described above.

13.03   In the event that our appearance is entered in any court proceeding, your failure to pay shall constitute your express consent to our withdrawal of our appearance as your counsel in such proceeding.

13.04   The firm and its affiliates prioritize digital records and may dispose of physical originals as we deem appropriate. Our practice is to retain files for a period of five years; some records are required to be retained for longer periods. We assume no obligation to retain any documents after that period of time. If you would like us to send you your files at that time, please make arrangements with us.

**14.**   **Enforcement**.

14.01   Lawyer's lien. We have a lien on all files, their contents, and all property in our possession until we have received payment in full of all amounts due. In litigation matters in which a money judgment is rendered in your favor, we will have a lien on all proceeds thereof to the extent of any unpaid fees or expenses. In the event that we (including firm affiliates or firm's personnel in whatever capacity) act as trustee, agent, or otherwise control funds or property, you consent and authorize us to apply such funds or property to your account or to otherwise use the authority given us to satisfy your obligations to the firm.

14.02   Cost of collection. If it is necessary for us to bring a legal or other collection action against you to collect any amount due us, you agree to pay all expenses and attorney fees incurred in that action. If we use our own attorneys or legal assistants to pursue such an action or proceeding, the attorney fees you will be responsible to pay shall be calculated on an hourly basis using the applicable hourly rates.

14.03   Choice of Law and Venue. Nevada law will apply to any questions relating to the meaning of any provision of these Terms of Representation. You agree that any court proceeding to enforce, or that arises out of, this Agreement may be commenced and maintained only in the district courts of the State of Nevada or in the United States District Court for the District of Nevada. In the event that it becomes necessary that we seek recovery of fees using the Fee Dispute Arbitration Committee of the Nevada State Bar, you consent to be bound by the procedures and decisions of that body.

**15.**   **General Provisions**.

15.01   Effective date. These Terms of Representation will take effect when you have performed the conditions stated in Section 1, but its effective date will be retroactive to the date we first provided services, if earlier. Even if this Agreement does not take effect, you will be obligated to pay Attorney the reasonable value of any services we may have performed for you.

15.02   Severability. The provisions of these Terms of Representation shall be construed so as to give them the maximum force and effect. Any provision which is found to be void, unenforceable, or not in accordance with the Nevada Rules of Professional Conduct for any reason as written shall be construed to the broadest permissible extent.

PLATT004286

CONFIDENTIAL



# WOODS ERICKSON & WHITAKER LLP

### ATTORNEYS AT LAW

1349 Galleria Drive, Suite 200, Henderson, Nevada 89014
702.433.9696 ◆ Fax: 702.434.0615 ◆ WoodsErickson.com

January 19, 2018

Ara Tcholakian
4120 W. Windmill Lane #101
Las Vegas, NV 89139

> Re:    Engagement of Woods Erickson & Whitaker LLP

Mr. Tcholakian

Thank you for discussing your legal needs with us. This letter defines the initial scope of our representation and the terms of that representation.

**Initial Representation**: We are being engaged to represent you individually together with your business interests as you may direct.

**Initial Scope**: The legal services we have agreed to provide are to coordinate the formation of business entities, maintain record books, bring/defend actions against, provide advice and provide representation in administrative proceedings.

**Initial Engagement Deposit**: $_____, replenishable during the engagement.

**Incorporated Terms**: This cover letter contemplates and specifically incorporates your agreement to the Incorporated Terms of Representation as they are amended from time to time. The version of the Terms of Representation in effect at any time is published on the firm website. As provided in the Terms of Representation, if we agree to perform additional services, including services for other entities or persons at your request, the Terms of Representation will apply. When material changes to the Terms of Representation are made, you will be notified in your monthly invoice.

After reviewing this cover letter and the terms of representation attached to and incorporated with it, please sign to indicate your acceptance.

Very truly yours,

Brian C. Whitaker

Accepted and agreed:

Ara Tcholakian, individually and on
behalf of AMW Precision LLC, Direct
Asset Holdings Inc., General Sales LLC
and Nevatronix L.L.C.

CONFIDENTIAL

PLATT002253



CONFIDENTIAL
**WOODS ERICKSON & WHITAKER LLP**

ATTORNEYS AT LAW

### INCORPORATED TERMS OF REPRESENTATION

1. **Scope of Engagement; Subsequent Matters**. Upon execution of the engagement cover letter and the deposit of the specified engagement deposit, our representation will encompass all matters that may arise, and that are related to the matter defined therein. Unless we otherwise agree, the Terms of Representation then in effect will apply to all future matters for which you engage us as counsel. We are not required to pursue all objectives or employ means which we deem imprudent or unprofessional. We will discuss with you which matters or objectives we are willing and able to undertake. At the conclusion of a matter, even when we continue to work with you on one or more other matters, we will not monitor or apprise you of changes in law that affect a concluded matter unless otherwise agreed.

2. **Client Responsibilities**. You agree to be truthful with us, cooperate with us in the preparation and presentation of legal matters, keep us informed of developments, and abide by these Terms of Representation. Specifically, you agree to inform us of all facts that you may reasonably expect are or become relevant to whether the actions we advise or undertake may be illegal or unethical in any jurisdiction.

3. **Communication**. We shall make every reasonable effort to keep you informed as to the progress of all matters of representation. The file and its progress are open to your inspection at any reasonable time. Unless you tell us to avoid electronic communication, we increasingly utilize electronic telecommunications including cloud-based or hosted platforms.

4. **Periodic Review of Compliance and Implementation**. When the firm, its affiliates, or agents maintain trust or entity records for you and when the firm, its affiliates, or agents, serve as trustee, officer, or registered agent, you understand that we will perform and bill you for periodic reviews, governance, and implementation of planning advice. You understand that the subscription and maintenance fees will be charged in advance either by the firm or its affiliates or agents and that there is no obligation to continue with services if the subscription is cancelled or the fees are not otherwise paid.

5. **Proper Purposes and Disclosures**. You agree that you will not use the firm's services or any trust, entity, agreement, or proceeding which we form, administer, or in which we participate to engage in any action prohibited by law including fraud, fraudulent conveyance, concealment, money laundering, violation of foreign exchange controls, or the evasion or tax or other legitimate obligations. The firm may condition services upon delivery of supporting documentation (redacted or unredacted) and/or representations to satisfy KYC standards or satisfactorily demonstrate the absence of prohibited transactions or purposes.

6. **Team Approach**. Our entire firm will act on your behalf in this matter and any other matters for which we may be engaged. We will assign those members and affiliates of the firm to each matter who we believe have the skills and abilities to meet the needs and resolve the issues presented in our engagement.

7. **Legal Fees; Expenses**. Generally, our fees for services are calculated based upon the applicable hourly rates for the attorneys and legal assistants who do the work. Our personnel bill in tenth-hour increments with an automatic minimum of two-tenths hour for any task. Under some circumstances, it may be appropriate in establishing our fees to take into account additional factors, such as the complexity of the work, the extent to which we have foregone other opportunities in order to satisfy a client's objectives, and the nature of the results that we ultimately achieve for our client. Our rates are based on experience, training and level of professional attainment. Our rates are subject to periodic adjustment.

Revised October 2017

PLATT002254

7.01    Current rates range from $125 for some paralegals and law clerks to $460 per hour for senior partners. Junior partners and CPAs bill at $270 per hour.

7.02    Engagement deposits. Unless otherwise agreed, any deposit or retainer will be held as security for the payment of any expenses and legal fees when due. You grant to us a lien on and security interest in such retainer, together with all replacements and proceeds thereof. If it becomes necessary for us to access the retainer, we will apply the retainer first to the payment of any expenses advanced by us on your account and then to legal fees. In the event of any such application, a billing statement will be generated and provided to you. At that time, you may be requested either to replenish or to increase the retainer account (sometimes called an "evergreen" retainer). At the conclusion of our legal representation, the unapplied portion of any retainer will be returned to you as you direct.

7.03    Other fee arrangements. On occasion, and by specific agreement, we may agree to a fee arrangement other than an hourly fee, such as a fixed fee for a specifically defined project or a contingent fee. In such a case, the fee and payment schedule will be set forth in our cover letter to you or in a separate agreement or addendum, but otherwise, these Terms of Representation will apply. Fixed-fee arrangements differ from retainer deposits in that no portion of the fee is refundable. You understand that the portion of legal fees divided with attorneys outside the firm is based on the services they provide to the representation.

7.04    Expenses. Our hourly rates do not include out-of-pocket expenses that we may need to incur, such as charges made by courts and governmental agencies or related expenses (such as filing fees, service of legal process, subpoena costs, witness fees, etc.), photocopying, long distance telephone, overnight courier services, fees, facsimile service, postage, out-of-town travel expenses, credit card and bank charges, deposition expenses (including costs of transcripts and court reporter's fees for attendance), and fees and charges made by title companies and escrow agents.

8.    **Associate Counsel, Affiliates, Experts, and Third Parties**. Either you or we may retain experts or other third parties.  These specifically include firm affiliates such as Gatehouse Strategies, L&S Counselors, and Desert Trust Services. We shall have the authority to disclose necessary information, execute service agreements, incur expenses, and make advances on your behalf for any items of the type described in this paragraph, in such amounts as we determine to be advisable best in connection with our engagement.  By this agreement, you have appointed us as your agent for these purposes of securing such services and incurring expenses of the type described in these Terms of Representation.  If we incur such expenses directly, you are responsible for and we shall have the authority to make payment on your behalf for all such items. We will add any such expenses incurred by us to our invoices.

9.    **Billing Statements**. Generally, the law firm's practice is to render invoices on a monthly basis for services performed during each month.  Invoices for a given month are typically sent in the first half of the month for services rendered during the preceding month. Invoices are due at the time they are received.  You agree to pay our invoices monthly.

9.01    You agree to read carefully all statements for services rendered and expenses incurred, and to notify this office, in writing, of any claimed errors or discrepancies in billing.  You agree to give us this notice within fifteen days after receipt of any statement.  Each statement will be deemed accepted by you in full fifteen days after it is received.

10.    **Late Payment**. Compound interest at the rate of one and one-half percent per month will accrue on any invoices that become more than thirty days past due. Should you remit a payment by check that is returned for insufficient funds or stop payment, a $35 returned check fee will be assessed to you.

PLATT002255

11.    **Privacy Policy**.

11.01    To the extent our relationship with you may include the provision of personal financial services, we further inform you of additional policies pertaining to financial services. In the course of providing personal financial services, we collect nonpublic personal information about you that is either given to us by you or obtained by us with your authorization. In order to guard your nonpublic personal information, we maintain physical, electronic, and procedural safeguards that comply with our professional standards.

11.02    We do not disclose any nonpublic personal information obtained from current or former clients in the course of our practice except as permitted or required by law. Permitted disclosures include, for example, providing information to our employees or, where appropriate, to unrelated third-parties who need to receive such information to assist in providing services to you. In such circumstances, nonpublic personal information is transmitted with the instruction that its confidential nature be respected.

12.    **Waiver; Hold Harmless**. You acknowledge that we have made no guarantees.  All expressions by us that relate to the possible results of our engagement are based strictly upon our opinions and judgment. You acknowledge that this agreement may be fully disclosed in connection with our representation of you if necessary or required by any court, legal process or discovery procedure.

12.01    Sometimes, matters are resolved in less time than might be expected.  Other times, unforeseen events arise that increase the amount of time required.  It is impossible to determine in advance the amount of time that will be needed to complete any particular matter.  We will keep you informed through periodic statements of the time used for drafting and preparation of documents, conferences, telephone calls, legal research, court time, necessary travel time, and all other time spent on your behalf.

12.02    You agree to hold us (including the owners, employees, and agents) harmless to the maximum extent permitted by law for any and all liabilities, losses, costs, and expenses relating to this engagement, as well as losses or expenses incurred by reason of any action taken or committed to be taken by us in good faith. In any case, however, our total liability and that of our owners, employees, and agents for all claims of any kind arising out of, relating to or connected with this engagement shall be limited to the total fees paid to us under this engagement.

12.03    You waive any claim for breach of fiduciary duty (whether against the firm or any attorney or agent) based on the exercise of the rights granted in these Terms of Representation or relating to collection of amounts owed to us.

12.04    You waive any claim for breach of any duty of confidentiality which might otherwise extend to the fact of our representation of you and/or financial transactions with you or on your behalf in order that we may, to the extent necessary, (a) effectively participate in any fee dispute or malpractice process involving you, (b) comply with disclosures (other than subpoenas) to a government agency, or (c) effectively participate in an official inquiry by a financial institution.

13.    **Termination**.

13.01    You are free at any time to terminate our attorney-client relationship, subject to court approval when necessary.  If you terminate our relationship you agree to pay immediately any unpaid legal fees, expenses, or service fees due us.

13.02    We likewise reserve the right to terminate our attorney-client relationship for nonpayment of fees or expenses, or for any other reason deemed appropriate under applicable rules of professional conduct, including misrepresented material facts, failure to disclose material facts, or if you

PLATT002256

CONFIDENTIAL

fail to cooperate fully with us in the preparation and presentation of legal matters on your behalf. If we reach a point at which there is a serious difference of opinion between us as to how your matters should be handled, we will withdraw if we may legally and ethically do so, or you may terminate our representation, as described above.

13.03   In the event that our appearance is entered in any court proceeding, your failure to pay shall constitute your express consent to our withdrawal of our appearance as your counsel in such proceeding.

13.04   The firm and its affiliates prioritize digital records and may dispose of physical originals as we deem appropriate. Our practice is to retain files for a period of five years; some records are required to be retained for longer periods. We assume no obligation to retain any documents after that period of time. If you would like us to send you your files at that time, please make arrangements with us.

### 14.    Enforcement.

14.01   Lawyer's lien. We have a lien on all files, their contents, and all property in our possession until we have received payment in full of all amounts due. In litigation matters in which a money judgment is rendered in your favor, we will have a lien on all proceeds thereof to the extent of any unpaid fees or expenses. In the event that we (including firm affiliates or firm's personnel in whatever capacity) act as trustee, agent, or otherwise control funds or property, you consent and authorize us to apply such funds or property to your account or to otherwise use the authority given us to satisfy your obligations to the firm.

14.02   Cost of collection. If it is necessary for us to bring a legal or other collection action against you to collect any amount due us, you agree to pay all expenses and attorney fees incurred in that action. If we use our own attorneys or legal assistants to pursue such an action or proceeding, the attorney fees you will be responsible to pay shall be calculated on an hourly basis using the applicable hourly rates.

14.03   Choice of Law and Venue. Nevada law will apply to any questions relating to the meaning of any provision of these Terms of Representation. You agree that any court proceeding to enforce, or that arises out of, this Agreement may be commenced and maintained only in the district courts of the State of Nevada or in the United States District Court for the District of Nevada. In the event that it becomes necessary that we seek recovery of fees using the Fee Dispute Arbitration Committee of the Nevada State Bar, you consent to be bound by the procedures and decisions of that body.

### 15.    General Provisions.

15.01   Effective date. These Terms of Representation will take effect when you have performed the conditions stated in Section 1, but its effective date will be retroactive to the date we first provided services, if earlier. Even if this Agreement does not take effect, you will be obligated to pay Attorney the reasonable value of any services we may have performed for you.

15.02   Severability. The provisions of these Terms of Representation shall be construed so as to give them the maximum force and effect. Any provision which is found to be void, unenforceable, or not in accordance with the Nevada Rules of Professional Conduct for any reason as written shall be construed to the broadest permissible extent.

PLATT002257

# EXHIBIT "M"

# EXHIBIT "M"

# EXHIBIT "M"

Unable to provide

# EXHIBIT "N"

# EXHIBIT "N"

# EXHIBIT "N"

# Analyzed Business Checking IOLTA

Account number: ████ 8433 ■ January 1, 2018 - January 31, 2018 ■ Page 1 of 3



WOODS & ERICKSON LLP
DBA WOODS ERICKSON & WHITAKER LLP
NV IOLTA ACCT
1349 GALLERIA DR STE 200
HENDERSON NV 89014-8624

**Questions?**

*Available by phone 24 hours a day, 7 days a week:*
**1-800-CALL-WELLS** (1-800-225-5935)

*Online:* wellsfargo.com

*Write:* Wells Fargo Bank, N.A. (825)
P.O. Box 6995
Portland, OR 97228-6995

## Account summary

### Analyzed Business Checking IOLTA

| Account number | Beginning balance | Total credits | Total debits | Ending balance |
|---|---|---|---|---|
| ████ 8433 | $167,245.32 | $34,794.12 | -$59,191.14 | $142,848.30 |

### Interest summary

| | |
|---|---|
| Annual percentage yield earned this period | 0.63% |
| Interest earned during this period | $67.99 |
| Year to date interest and bonuses paid | $67.99 |
| Total interest and bonuses earned in 2017 | $4,651.56 |

## Credits

### Deposits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 01/08 | 279.03 | Deposit |
| | 01/18 | 4,501.00 | Deposit |
| | 01/29 | 500.00 | Deposit |
| | | **$5,280.03** | **Total deposits** |

### Electronic deposits/bank credits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 01/23 | 29,446.10 | Deposit Made In A Branch/Store |
| | 01/31 | 67.99 | Interest Payment |
| | | **$29,514.09** | **Total electronic deposits/bank credits** |
| | | **$34,794.12** | **Total credits** |

CONFIDENTIAL

WEW006888

Case Number: A-18-774926-C

**WELLS FARGO**

## Debits

### Electronic debits/bank debits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 01/03 | 29,446.10 | Withdrawal Made In A Branch/Store |
| | 01/29 | 1,400.00 | WT Fed#00126 Umpqua Bank /Ftr/Bnf=Stephen Hamile Srf# Ow00000219473602 Trn#180129002467 Rfb# Ow00000219473602 |
| | 01/31 | 67.99 | Int Transferred to NV 000000050291002 |
| | | $30,914.09 | Total electronic debits/bank debits |

### Checks paid

| Number | Amount | Date | Number | Amount | Date | Number | Amount | Date |
|---|---|---|---|---|---|---|---|---|
| 5130 | 2,482.21 | 01/04 | 5162* | 2,500.00 | 01/04 | 5164 | 4,501.00 | 01/24 |
| 5158* | 16,128.00 | 01/02 | 5163 | 2,500.00 | 01/08 | 5166* | 165.84 | 01/30 |
| | | $28,277.05 | | Total checks paid | | | | |

* Gap in check sequence.

| | $59,191.14 | Total debits |
|---|---|---|

---

### Daily ledger balance summary

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 12/31 | 167,245.32 | 01/08 | 114,468.04 | 01/29 | 143,014.14 |
| 01/02 | 151,117.32 | 01/18 | 118,969.04 | 01/30 | 142,848.30 |
| 01/03 | 121,671.22 | 01/23 | 148,415.14 | 01/31 | 142,848.30 |
| 01/04 | 116,689.01 | 01/24 | 143,914.14 | | |

| Average daily ledger balance | $127,193.93 |
|---|---|

 IMPORTANT ACCOUNT INFORMATION

Effective April 2, 2018, this account will earn interest on the entire daily collected balance. This is a change from interest being earned on daily collected balances less the current reserve requirement.

All other terms and conditions of your account will remain the same. If you have questions, please contact your local banker or call the phone number listed at the top of your statement. We appreciate your business and look forward to continuing to serve your financial needs.

*For additional account details, refer to the Business Account Fee & Information Schedule and Account Agreement page located at wellsfargo.com/biz/fee-information.

#### Important information about legal process fees.

The fee for legal order processing, which includes handling levies, writs, garnishments, and any other legal documents that require funds to be attached, remains $125. However, effective 2/16/18, the bank will assess no more than two legal process fees per account, per calendar month. Please note, the calendar month may not coincide with your statement cycle.

CONFIDENTIAL

WEW006889

# Basic Business Checking® IOLTA
CONFIDENTIAL

Account number: ■■■■■■  ■ January 1, 2018 - January 31, 2018  ■ Page 1 of 3


WELLS FARGO

ANDREW B PLATT
DBA L&S COUNSELORS
NV IOLTA ACCT
1533 INDEPENDENCE WAY
BOULDER CITY NV 89005-4207

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS**  (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (825)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Visit wellsfargoworks.com to explore videos, articles, infographics, interactive tools, and other resources on the topics of business growth, credit, cash flow management, business planning, technology, marketing, and more.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ☑ |
| Online Statements | ☑ |
| Business Bill Pay | ☐ |
| Business Spending Report | ☑ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 1/1 | $8,860.00 |
| Deposits/Credits | 64,372.97 |
| Withdrawals/Debits | - 52,626.72 |
| **Ending balance on 1/31** | **$20,606.25** |
| Average ledger balance this period | $31,528.72 |

Account number:  **9898412151**

**ANDREW B PLATT**
**DBA L&S COUNSELORS**
**NV IOLTA ACCT**

*Nevada account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): ■■■■■■

For Wire Transfers use
Routing Number (RTN): ■■■■■■

## Interest summary

| | |
|---|---|
| Interest paid this statement | $16.87 |
| Average collected balance | $31,528.72 |
| Annual percentage yield earned | 0.63% |
| Interest earned this statement period | $16.87 |
| Interest paid this year | $16.87 |
| Total interest paid in 2017 | $9.03 |

(825)
Sheet Seq = 0067904
Sheet 00001 of 00002

PLATT002008
**WEW006890**



Account number: ▮▮▮▮▮▮▮

CONFIDENTIAL

■ January 1, 2018 - January 31, 2018 ■ Page 2 of 3



WELLS FARGO

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|------|------|------|------|------|------|
| 1/2 | | WT Seq173144 Farjad Fani /Org= Srf# 0006903002759089 Trn#180102173144 Rfb# | 29,446.10 | | |
| 1/2 | | Wire Trans Svc Charge - Sequence: 180102173144 Srf# 0006903002759089 Trn#180102173144 Rfb# | | 15.00 | 38,291.10 |
| 1/5 | | Online Transfer to Andrew B Platt Ref #Ib04542Phq Business Checking December Earned Receipts | | 8,835.00 | 29,456.10 |
| 1/16 | | WT Seq#11826 Saas Central LLC /Org= Srf# Ow00000215828376 Trn#180116011826 Rfb# Ow00000215828376 | 12,387.00 | | |
| 1/16 | | WT Seq#11856 Farjad Fani /Org= Srf# Ow00000215828265 Trn#180116011856 Rfb# Ow00000215828265 | 5,148.00 | | |
| 1/16 | | Wire Trans Svc Charge - Sequence: 180116011826 Srf# Ow00000215828376 Trn#180116011826 Rfb# Ow00000215828376 | | 15.00 | |
| 1/16 | | Wire Trans Svc Charge - Sequence: 180116011856 Srf# Ow00000215828265 Trn#180116011856 Rfb# Ow00000215828265 | | 15.00 | 46,961.10 |
| 1/18 | | WT Seq#01521 Farjad Fani /Org= Srf# Ow00000216648731 Trn#180118001521 Rfb# Ow00000216648731 | 17,375.00 | | |
| 1/18 | | Wire Trans Svc Charge - Sequence: 180118001521 Srf# Ow00000216648731 Trn#180118001521 Rfb# Ow00000216648731 | | 15.00 | |
| 1/18 | | Withdrawal Made In A Branch/Store | | 14,268.75 | 50,052.35 |
| 1/23 | | Withdrawal Made In A Branch/Store | | 29,446.10 | 20,606.25 |
| 1/31 | | Interest Payment | 16.87 | | |
| 1/31 | | Int Transferred to NV 000000050291002 | | 16.87 | 20,606.25 |
| Ending balance on 1/31 | | | | | 20,606.25 |
| **Totals** | | | **$64,372.97** | **$52,626.72** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

 IMPORTANT ACCOUNT INFORMATION

Effective April 2, 2018, this account will earn interest on the entire daily collected balance. This is a change from interest being earned on daily collected balances less the current reserve requirement.

All other terms and conditions of your account will remain the same. If you have questions, please contact your local banker or call the phone number listed at the top of your statement. We appreciate your business and look forward to continuing to serve your financial needs.

*For additional account details, refer to the Business Account Fee & Information Schedule and Account Agreement page located at wellsfargo.com/biz/fee-information.

**Important information about legal process fees.**

The fee for legal order processing, which includes handling levies, writs, garnishments, and any other legal documents that require funds to be attached, remains $125. However, effective 2/16/18, the bank will assess no more than two legal process fees per account, per calendar month.    Please note, the calendar month may not coincide with your statement cycle.



CONFIDENTIAL

PLATT002009

**WEW006891**



DEPOSIT
TO
NEW
TRUST

Wells Fargo Bank
Transaction Receipt

Store #0007418 24          Deposit

Account Number          XXXXXX8433
CHK 00025
Number of Checks                    1
Check Listing
                        $29,446.10

Total Checks Amount     $29,446.10
Total Deposit           $29,446.10

Deposit Availability
$2,500.00 of your deposit is
included in your available balance.

$26,946.10 will be available on
Wednesday, 01/24/18

Transaction # 034 0083
01:32PM   01/23/18
Deposit Credit Date: 01/23/18

Thank you for your business.

Enjoy the convenience of

scheduling appointments online at

wellsfargo.com/appointments

Thank you, KINO

---

0007418
Office AU #        11-24
              121C(8)

Remitter:
Purchaser:        ANDREW B PLATT
Purchaser Account:  ANDREW B PLATT
Operator I.D:      9153497483
Funding Source:    u273851
            Payer Name(s)
PAY TO THE ORDER OF    ***UNITED STATES TREASURY***
                   ***FARJAD FANI 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 FORM 14654***

***Twenty-nine thousand four hundred forty-six dollars and 10 cents***

Payee Address:
Memo:

WELLS FARGO BANK, N.A.
1411 W SUNSET RD
HENDERSON, NV 89014
FOR INQUIRIES CALL (480) 394-3122

FB004   MKB83 70060564

**Purchaser Copy**

NOTICE TO PURCHASER – IF THIS INSTRUMENT IS LOST,
STOLEN OR DESTROYED, YOU MAY REQUEST CANCELLATION
AND REISSUANCE AS A CONDITION TO CANCELLATION AND
REISSUANCE, WELLS FARGO BANK MAY IMPOSE A FEE AND
REQUIRE AN INDEMNITY AGREEMENT AND BOND.

**CASHIER'S CHECK**

SERIAL #:  074180334B
ACCOUNT#: ███1988

January 03, 2018

**$29,446.10**

VOID IF OVER US$   29,446.10

**NON-NEGOTIABLE**

CONFIDENTIAL

WEW006892

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | Ca |
|------|-----------|--------|---------|---------|-----|--------|------------|-----|
| VIEWPOINTE | 20180103 | 4186 | 32127074 | ████3433 | 000069 | 29,446.10 | 1185738053 | |

**Withdrawal / Retiro:**

4186

(Check One / Marque una)  ☐ Checking / Cuenta de Cheques   ☐ Savings / Ahorros   ☐ Money Market Access   ☐ Command

WELLS FARGO

Account Number / Número de cuenta

✱  ████████8433     Date/Fecha  1 - 3 - 18

Please print: Name - / Letra de Imprenta: Nombre

Andrew Platt

Please print: Street Address, City, State, Zip Code / Letra de Imprenta: Domicilio, Ciudad, Estado, Código Postal

I authorize this withdrawal from the account listed above. / Autorizo este retiro de la cuenta mencionada arriba. Please sign in teller's presence for cash back. / Firme en la presencia del cajero(a) para el retiro de dinero en efectivo. Two forms of ID may be required. / Se podrían requerir dos tipos de identificación.

$ 29446 10

Twenty nine thousand four hundred forty six 10/100          **Dollars**

Bank Use Only (When SVT is Not Available)          TLR9230 (04/15)   WF0116  70238847

| Customer Id: | Exp. date: | Token Verified (✓) ☐ | Approval: |
|---|---|---|---|

⑈4186⑈ ⑆500000694⑆

Wells Fargo Internal Use When Blank. Wells Fargo Confidential When Completed

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

CONFIDENTIAL

https://oibservices.wellsfargo.com/OIB/ControllerServlet

WEW006893
5/20/2019

| Routing | Sequence # | Paid Date | Amount | Account | Serial | Capture Source |
|---------|-----------|-----------|--------|---------|--------|----------------|
| 32127074 | 1185733887 | 01232018 | $29446.10 | ▮2151 | 1655 | 00010064 |

**Withdrawal / Retiro:**

(Check One/  
Marque una)

☐ Checking / Cuenta de Cheques    ☐ Savings / Ahorros    ☐ Money Market Access    ☐ Command

1655

WELLS FARGO

Account Number /  
Número de cuenta

✱ ▮▮▮▮2151

Date/Fecha  1-23-18

Please print: Name -/ Letra de imprenta: Nombre

Andrew    Platt

Please print: Street Address, City, State, Zip Code/ Letra de imprenta: Domicilio, Ciudad, Estado, Código Postal

I authorize this withdrawal from the account listed above./ Autorizo este retiro de la cuenta mencionada arriba. Please sign in teller's presence for cash back./ Firme en la presencia del (de la) cajero(a) para el retiro de dinero en efectivo. Two forms of ID may be required./ Se podrían requerir dos tipos de identificación.

X

twenty nine thousand few hundred forty 8 x    to/100    **Dollars**    $  29446.10

Bank Use Only (When SVT is Not Available)    TLR0230 (04/15) wf8118  70238847

| Customer Id: | Exp. date: | Token Verified (✓) ☐ | Approval: |

⑈1655⑈ ⑆500000694⑆

1185733885

CONFIDENTIAL

WEW006894  
5/20/2019

| Site | Paid Date | Serial | Routing | Account | PC | Amount | Sequence # | Ca |
|------|-----------|--------|---------|---------|-----|--------|-----------|----|
| VIEWPOINTE | 20180123 | 54626171 | 32127074 | ████3433 | 000037 | 29,446.10 | 1185733885 | |

**Deposit:**

(Check One)  ☐ Checking  ☐ Savings  ☐ Money Market Access  ☐ Command

WELLS FARGO

Account Number

✱ ████████3433

Date  1-23 —18

Cash

Total Checks  29446.10

Please print Name  Andrew Platt

Deposits may not be available for immediate withdrawal. See Delayed posting information on reverse.*

Subtotal •

Please print Street Address, City, State, Zip Code

Two forms of ID may be required.

Minus cash back •

Please sign in the teller's presence for cash back.

Total $  29446.10

X

Bank Use Only (When SVT is Not Available)   TLR6697 (04/16) WF0117 70314855

Customer ID: ___ Exp. date: ___ Token Verified (✓) ☐ Approval: ___

⑈054626171⑈ ⑆500000377⑆

TOTAL $
× 1
× 2
× 5
× 10
× 20
× 50
× 100

CASH COUNT  FOR BANK USE

ENTER THIS TOTAL ON FRONT

TOTAL CHECKS

1185733885

CHECKS
PLEASE LIST CHECKS SEPARATELY BY BANK NO

AMOUNT

"Incorrect use of this form could result in a delay of crediting your deposit or crediting your deposit to the wrong account. Please ask a teller for help in completing the form if you have questions.

Copyright © 2002-06 Wells Fargo & Company. All rights reserved.

CONFIDENTIAL

WEW006895
5/20/2019

# EXHIBIT "O"

# EXHIBIT "O"

# EXHIBIT "O"

Unable to provide