1  Douglas D. Gerrard, Esq.
   Nevada Bar No. 4613
2  dgerrard@gerrard-cox.com
   Nathan R. Henderson, Esq.
3  Nevada Bar No. 13145
   nhenderson@gerrard-cox.com
4  GERRARD COX LARSEN
   2450 Saint Rose Parkway, Suite 200
5  Henderson, Nevada  89074
   (702) 796-4000
6  *Attorneys for Creditor*,
   WOODS & ERICKSON, LLP

7

8                    **UNITED STATES BANKRUPTCY COURT**

                              **DISTRICT OF NEVADA**
9

10 In Re:                              | Case No. BK-S-19-17282-btb

11 ANDREW B. PLATT and RUTH ANN PLATT  | Adversary Proceeding: 19-01125

                        Debtor(s).     | Chapter 7
12
   ─────────────────────────────────────
13 WOODS & ERICKSON, LLP, a Nevada
   Limited Liability Partnership, d/b/a WOODS
14 ERICKSON & WHITAKER, LLP,

15                        Plaintiff,

   vs.
16
   ANDREW B. PLATT, an individual,
17
                        Defendant.
18 ─────────────────────────────────────

19                          **POST-TRIAL BRIEF**

20         COMES NOW Plaintiff WOODS & ERICKSON, LLP d/b/a WOODS ERICKSON &

21 WHITAKER, LLP in the above-referenced adversary case, by and through its counsel of record, the

22 law firm of GERRARD COX LARSEN, and hereby submits the following Post-Trial Brief at the

23 request of the Court.

24         Plaintiff Woods & Erickson, LLP d/b/a WOODS ERICKSON & WHITAKER, LLP

25 ("WEW" or the "Firm") holds claims against the Debtor, Andrew Platt ("Debtor" or "Mr. Platt"),

26 arising out of the Debtor's fraudulent conduct, conversion, embezzlement, larceny and willful and

27 malicious injury inflicted by the Debtor upon the Firm.  The Firm objects to the Debtor's discharge

28 as it relates to the Firm's claims, on the basis of 11 U.S.C. § 523(a)(4).

                                       i

# I.

## <u>SUMMARY OF EVIDENCE PRESENTED AT TRIAL</u>

## THE NATURE OF THE FIRM

1.      The Firm is a Nevada limited liability partnership ("Partnership") which was founded by Managing Partners John Erickson ("Mr. Erickson") and Glen Woods on January 1, 1995 and has been operating as a law firm in Clark County, Nevada since that time.  On January 1, 2005, the Firm added Brian Whitaker ("Mr. Whitaker") as a General Partner.  Aaron Maurice was added as a General Partner on January 1, 2007.  *See* Partnership Agreement at **Exhibit "1"** in the Preamble.[1]

2.      Prior to the departure of Mr. Maurice from the Firm, the Partnership was owned by each of the following Managing Partners, in the percentages listed below:

| | |
|---|---|
| Glen Woods | 34.0% |
| John Erickson | 29.5% |
| Brian Whitaker | 19.5% |
| Aaron Maurice | 17.0% |

*See* **Exhibit "1"** at § 2.3.

3.      Effective August 12, 2013, the Partnership Agreement was amended to reflect a change in the ownership interest of the Managing Partners of the Firm as a result of Mr. Erickson taking a leave of absence to serve a 3-year mission for the Church of Jesus Christ of Latter-Day Saints and Aaron Maurice departing from the Firm.  The amended Partnership Agreement reflected each of the following Managing Partners, in the percentages listed below:

| | |
|---|---|
| Glen Woods | 59.0% |
| John Erickson | 4.0% |
| Brian Whitaker | 37.0% |

*See* **Exhibit "2"**.  However, Mr. Erickson remained a Managing Partner with the right to participate in any management decisions during his missionary service.  *See* **Exhibit "2"** and Testimony of Mr. Erickson and Mr. Whitaker.

---

[1]All references to Exhibits in this Brief will be to the Trial Exhibits admitted into evidence by this Court during the Trial which occurred May 18-21, 24-25.  The Trial Exhibits will not be attached hereto as the Court is already in possession of them.

4.    Mr. Erickson returned home from his 3-year missionary service in July, 2016 and begin working again at the Firm.  *See* Testimony of Mr. Erickson and Mr. Whitaker.

5.    The Firm is engaged in the general practice of law but focused primarily on all aspects of business law, estate planning, succession planning, and asset protection planning, including the formation and maintenance of corporations, limited liability companies, all forms of partnerships and trusts.  *See* Testimony of Mr. Whitaker, Mr. Erickson and Mr. Platt.

6.    The Partnership Agreement requires that all non-routine decisions for the Firm to be made by the Managing Partners of the Firm, **acting as a body**, and does not allow for unilateral decision making by any one Managing Partner with respect to any non-routine decision affecting the Firm.  *See* **Exhibit "1"** at §§ 5.3 to 5.5.  The Partnership Agreement specifically provides that "each Managing Partner shall have the right to participate in the deliberations of the Managing Partners in respect of Partnership Decisions" and that "[t]he Managing Partners, acting as a body, are empowered and authorized to make all decisions in the management and operation of the Partnership . . . ."  *See* **Exhibit "1"** at § 5.4.

7.    All Managing Partners routinely participated in all Partnership Decisions, which are defined as "those [decisions] that arise in the course of the business of the Partnership, but that do not necessarily arise daily or even weekly, and that require the exercise of discretion and judgment by the management of the Partnership.."  The Managing Partners also participated in considering and deciding Extraordinary Decisions, which are defined as "those [decisions] that affect in profound ways the relationship between the Managing Partners and the Partnership."  *See* **Exhibit "1"** at §§ 5.2(b) & (c) and the Testimony of Mr. Whitaker and Mr. Erickson.

8.    The Partnership Agreement was contained in the corporate book for Woods & Erickson, LLP which was stored with all other corporate books for clients of the Firm, and was accessible for Mr. Platt to review and determine whose consent would be required to approve him diverting revenue and business opportunities to himself.  *See* Testimony of Mr. Whitaker and Mr. Platt.  Mr. Platt admitted that he was aware of the existence and location of the Firm's Partnership Agreement, and that he easily located the Partnership Agreement on the Firm's computer server when he provided a copy of the same to Kent Woods in April, 2018.   *See* Testimony of Mr. Platt.

## ANDREW PLATT'S EMPLOYMENT AND LIMITED PARTNERSHIP

9.      In 2007, the Firm hired Mr. Platt as a full-time associate attorney.  Mr. Platt worked as an associate attorney until January 1, 2016, at which time he became a Limited Partner of the Firm.  *See* Testimony of Mr. Whitaker.

10.      Mr. Platt worked primarily in the areas of corporate formation and planning, tax and estate planning.  *See* Testimony of Mr. Platt.

11.      Mr. Platt testified at trial and in his deposition that he had "extensive knowledge of corporate law and the way partnerships are governed."  *See* Mr. Platt's April 9, 2019 Deposition Transcript at 44:25 - 45:8.  Mr. Platt admitted in trial that he was well aware of NRS 87.090(1) & (2) which provides:

**NRS 87.090 Partner agent of partnership; restrictions on authority**.

1. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which the partner is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom the partner is dealing has knowledge of the fact that the partner has no such authority.

2. **An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners**.   (Emphasis added).

*See* Testimony of Mr. Platt.

12.      Mr. Platt admitted in trial that he was well aware of NRS 87.210(1) which provides:

**NRS 87.210 Partner accountable as fiduciary.**

1. Every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by the partner without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by the partner of its property.

13.      Mr. Platt's compensation for his work as an associate attorney from 2007 until 12/31/2015, and his share of the Firm profits as a Limited Partner at the Firm from 01/01/2016 until 12/31/2017, and the percentage increase for each year, is described in Mr. Platt's W-2 Forms and K-1 Forms, found at **Exhibit "8"**, and summarized as follows:

2007 - $34,708.32
2008 - $85,000.08
2009 – $95,449.92 (12.3% increase)
2010 - $105,535.92 (10.6% increase)

2011 - $109,138.72 (3.4% increase)
2012 - $118,399.92 (8.5% increase)
2013 - $124,324.92 (5% increase)
2014 - $134,458.33 (8.2% increase)
2015 - $134,900.00 (.3% increase)

**2016 – $209,913.00 (55.6% increase)**
**2017 - $260,331.00 (24% increase)**

**Exhibit "8"** shows that once Mr. Platt became a Limited Partner of the Firm and began to participate in Firm profits, his compensation doubled in just two years from his last year as an associate attorney.  Mr. Whitaker and Mr. Erickson both testified that Mr. Platt only received this profit participation because he became a Limited Partner of the Firm.  Mr. Platt cannot both <u>accept</u> the benefits of becoming a Limited Partner and <u>deny</u> that he was a Limited Partner to avoid the associated fiduciary duties.  Although Platt now claims that he was not a limited partner, Platt admitted he has never offered to return the $200,444.00 in Firm Profits he received because he was a Limited Partner, which he would not be entitled to if he was still an employee (associate attorney). *See* Testimony of Mr. Platt and Mr. Whitaker.

14.     In December, 2015, Mr. Platt sent a series of emails to one of the Managing Partners, Glen Woods, captioned "**Andrew's transition to LP**" that discussed the terms for Mr. Platt becoming a Limited Partner of the Firm starting January 1, 2016. *See* **Exhibit "4"**.  Attached to these emails is a document drafted by Mr. Platt titled **AGREEMENT OF ADMISSION OF LIMITED PARTNER** which states, in relevant part, the following terms:

> 1.     As of, January 1, 2016, Woods & Erickson LLP, a Nevada limited liability partnership (the "Firm") admits Andrew Platt ("Andrew" or "the Limited Partner") as a limited partner of the Firm.
>
> 2.     The Limited Partner receives no percentage interest in the profits, losses, or capital of the Firm **except for profits corresponding to the profit sharing rights as agreed in Schedule A** as the same may be amended by the Firm from time to time.
>
> 3.     The Limited Partner shall be treated for tax purposes as a partner or contractor rather than as an employee.  Limited Partner is not eligible for 401(k) matching by the Firm. .....
>
> 4.     The Limited Partner may withdraw as limited partner and may be expelled from the Firm at any time without cause.  Unless otherwise specifically agreed in writing, the Limited Partner is not entitled to Profit Share or Equity Share (as both are defined in Schedule A) for amounts received by the firm when such Limited Partner shall not be a partner.

*See* **Exhibit "4"** at WEW012121.  Schedule A to this Agreement of Admission of Limited Partner

4

stated that the term "Profit Share" meant:

> 1.     The Firm shall pay to Limited Partner fifty percent of amounts received by the firm for hours billed to clients by the Limited Partner as such partner's "Profit Share.
>
> 2.     Profit Share shall also include fifty percent of amounts received by the firm for flat fee products and services sold by the Limited Partner adjusted for (a) fee-splitting agreements with other firms and (b) time billed in delivery of such flat fee matters by other partners and employees.
>
> 3.     The Firm shall pay the Profit Share on or as close to the 10th of each months as the Firm shall determine practical.

*See* **Exhibit "4"** at WEW012122.  The remainder of Schedule A to the  Agreement of Admission of Limited Partner described how Mr. Platt would receive a draw of $5,833.33 on January 16, 2016, and a draw of $5,500 on February 1, February 16, March 1 and March 16, against which his share of profits would be offset, all of which occurred.  *See* **Exhibit "4"** at pg 90 and **Exhibit "7"**.

        15.     Mr. Platt claims that he was not a limited partner of the Firm because a signed copy of this Agreement of Admission of Limited Partner cannot be located.  However, Platt admitted at trial that each of the terms of this Agreement of Admission of Limited Partner was followed by both he and by the Firm.  *See* Testimony of Mr. Platt, Mr. Whitaker and Mr. Erickson.  The evidence demonstrated unequivocally that each of these terms was satisfied:

**Term No. 1.  Mr. Platt was admitted as a Limited Partner of WEW**.  *See* **Exhibit "4"** (pages 89-90).

> ➡Mr. Platt testified that he held himself out as a Limited Partner at the Firm and to clients.
>
> ➡Mr. Platt was given additional authority and added as signatory to Firm bank accounts. *See* **Exhibit "28"** and testimony of Mr. Whitaker, Mr. Erickson and Mr. Platt.
>
> ➡Mr. Platt received Schedule K-1s reflecting his limited partnership profit share for both 2016 and 2017 (*See* **Exhibit "8"** at pages 187-190) and filed his tax returns as a limited partner (*See* **Exhibit "9"**).

**Term No. 2.  Mr. Platt received profit sharing rights equal to 50% of collections**.  *See* **Exhibit "4"** (pages 89-90).

> ➡Mr. Platt was paid a Profit Share equal to 50% of his collections. (*See* **Exhibits "7" & "8"** and Testimony of Mr. Platt, Mr. Whitaker and Mr. Erickson).

**Term No. 3.  Mr. Platt was treated for tax purposes as a limited partner and did not receive 401K match.  *See* **Exhibit "4"** (pages 89-90).

5

1

2

➡Mr. Platt received a Schedule K-1s as a Limited Partner for 2016, 2017 and 2018 reflecting that he was a limited partner of the Firm. (*See* **Exhibit "8"** pages 187 to 190, Box G).

3

➡Mr. Platt filed his federal income tax returns representing himself as a Limited Partner to the federal government. (*See* **Exhibit "9"** pages 199 to 217).

4

**Term No. 4.  Mr. Platt could withdraw at any time from the Firm or be expelled from the**

5

6

**Firm, but was not entitled to any Profit Share once he ceased to be a partner.** *See* **Exhibit "4"**

(pages 89-90).

7

8

➡Mr. Platt resigned on April 20, 2018. (*See* **Exhibit "11"** at page 12).

9

➡Mr. Platt was paid his Profit Share (50% of his collections) that were received by the Firm through April 20, 2018, but nothing more.  (*See* Testimony of Mr. Platt and Mr. Whitaker).

10

16.    No signed copy of the Agreement of Admission of Limited Partner can be located.

11

Mr. Platt testified he never signed it.  However, the conduct of a partner can establish that he is a

12

partner.  NRS 87.070(4) provides, in relevant part, as follows:

13

   **NRS 87.070  Rules for determining existence of partnership**.  In determining whether a partnership exists, these rules apply:

14

. . .

15

16

   4. **The receipt by a person of a share of the profits of a business is prima facie evidence that the person is a partner in the business** . . . (Emphasis added).

17

17.    Both Mr. Platt and the Firm acted at all times as if the terms of the Agreement of

18

Admission of Limited Partner were in place, and Mr. Platt has admitted that he received a portion

19

of the Firm's profits (that share being equal to 50% of his collections).  Thus, according to the

20

conduct of Mr. Platt and the Firm, and pursuant to NRS 87.070(4), Mr. Platt was a Limited Partner

21

of the Firm.

22

18.    Mr. Whitaker also testified that the terms of Mr. Platt's limited partnership, were the

23

same terms that he, (when he was a Limited Partner), and every other Limited Partner that had

24

worked at the Firm, also agreed to and operated under.

25

19.    As a Limited Partner of the Firm, Mr. Platt was subject to the following fiduciary

26

duties and an express trust, established by Nevada statute, over any profit or benefit derived by the

27

Partner from a partnership opportunity:

28

6

**NRS 87.4336  Conduct of partner: General standards**.

 1.  The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections 2 and 3.

2.  A partner's duty of loyalty to the partnership and the other partners is limited to the following:

   (a)  To account to the partnership and **hold as trustee for it any property, profit or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity**;

   (b)  To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and

   (c)  **To refrain from competing with the partnership** in the conduct of the partnership business before the dissolution of the partnership.

20.     In 2017, the Nevada Department of Employment, Training and Rehabilitation ("DETR") conducted an audit of the unemployment insurance contributions made by the Firm. DETR's audit challenged the designations of Mr. Platt and Kent Woods as limited partners (which means the Firm is not required to pay a contribution for unemployment insurance because they are not employees). *See* **Exhibits "E-1"** and **"X"**.

21.     The Firm challenged the audit, but rather than go through an administrative hearing where a hearing officer would make findings of fact and law on these issues, the Firm simply paid the amount being claimed by DETR because it was such a small amount it did not warrant fighting over. *See* **Exhibits "E-1"** and **"X"** and Testimony of Mr. Whitaker**.**

22.     Mr. Platt argues that the DETR audit results constitute a final and appealable administrative determination, (that he was never a limited partner but only an employee), that would be subject to issue preclusion and be binding on this Court.  However, as shown by the evidence, there was never any hearing before an administrative hearing officer in order to arrive at any legal findings that would have any preclusive effect on this Court, and the basis of the audit was not looking at the factual evidence presented in this case. *See* **Exhibits "E-1"** and **"X"** and Testimony of Mr. Whitaker**.**

## PLATT ILLEGALLY DIVERTED $31,815.00 OF LEGAL FEES TO HIMSELF FROM RENAISSANCE ACADEMY AND HID HIS ACTIVITY FROM THE FIRM

23.     From 2012 to 2015, while still an associate at the Firm, Mr. Platt provided legal

services to a charter school known as Renaissance Academy (the "Academy"), on whose board he served. *See* Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 77:2-8.

24.    Mr. Platt was appointed as the wind-up trustee after the Academy was closed and legally dissolved, giving Platt the ability to write and sign Academy checks. *See* Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 77:9-78:3; 79:1-14.

25.    Mr. Platt informed the Managing Partners of the Firm that he was providing legal services to the Renaissance Academy on a pro bono basis (not receiving fees but instead providing free legal services as a public service). *See* Testimony of Mr. Whitaker and Mr. Erickson. Mr. Platt admitted he never received any authorization from the Firm to bill the Renaissance Academy, outside of the Firm, for his legal services and keep the money for himself. *See* Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 81:15-18.

26.    Providing wind-up services to dissolving entities is a legal service the Firm regularly provided to its clients, and Mr. Platt was aware of this. *See* Testimony of Mr. Whitaker.

27.    Mr. Platt has argued that acting as the wind-up trustee for the Renaissance Academy was not providing legal services. However, Mr. Platt himself repeatedly stated the work he performed for Renaissance Academy was providing "legal services". *See* (Platt's 04/09/2019 Deposition) at 76-77.

28.    Rather than bill his legal work for the Academy through the Firm, Mr. Platt collected fees for his legal services outside of the Firm by using his position on the Academy's board and as wind-up trustee to pay himself legal fees. *See* Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 79:1-4; *see also* Renaissance Academy Checkbook at **Exhibit "3"**. Mr. Platt then fraudulently concealed his conversion of Firm property from the Managing Partners. *See* Testimony of Mr. Whitaker and Mr. Erickson.

29.    In April of 2018, the Firm learned for the first time, (during a conversation between Managing Partner Mr. Whitaker and Kent Woods), that Mr. Platt had individually received and kept legal fees for providing legal services to the Academy. *See* Testimony of Mr. Whitaker (also found in Whitaker Deposition at 123:18-124:7). This led to Mr. Whitaker and Mr. Erickson immediately confronting Mr. Platt about whether he had collected money for legal fees outside the Firm and kept the money. *See* Testimony of Mr. Whitaker and Mr. Erickson (also Whitaker Depo at 206:3-14).

8

30.     At that time Mr. Platt told Mr. Erickson and Mr. Whitaker that he had only received $2,500.00 in legal fees from the Academy.  *See* Testimony of Mr. Whitaker and Mr. Erickson (also Whitaker Deposition at 206:3-14).  Mr. Erickson then asked Mr. Platt if he had ever received any other money outside of the Firm for legal services, to which Platt responded *he had never taken any other money outside of the firm other than the $2,500.00 from the Academy*.  *See* Testimony of Mr. Whitaker and Mr. Erickson (also found in Whitaker Deposition at 207:5-15).  This was a lie as Mr. Platt had formed a competing law firm and had been diverting clients and fees, totaling more than $134,000.00, away from the Firm to himself for nearly a year at the time of this conversation.  *See* **Exhibits "6"** and **"25".**

31.     Later, on April 9, 2019, in deposition and under oath, Mr. Platt changed his story by claiming that the amount he had received from the Academy was no more than $15,000.00.  *See* (Platt's 04/09/2019 Deposition) at 78:10-22.

32.     When the checkbook for Renaissance Academy was subsequently located it was discovered that the actual amount Mr. Platt received from the Academy for legal services was actually $31,815.00.  *See* **Exhibit "3"**.  Mr. Platt received additional money from the Academy for expenses, that actually belong to the Firm as well because Mr. Platt was using the Firm's phones, postage and internet to act as the wind-up Trustee for the Academy.  *See* Testimony of Mr. Platt and  **Exhibit "3"**.

33.     Platt not only fraudulently concealed and converted the money received from Renaissance Academy from the partners of the Firm, but he also fraudulently concealed this money from the Internal Revenue Service, failing to disclose any income aside from that received as wages from the Firm in the three years in which he was paid by Renaissance Academy, 2012, 2013 and 2015.  *See* W-2 Forms for Mr. Platt at **Exhibit "8"**, and Platt's tax transcripts and returns at **Exhibits "9"** and **"10"**.  As a result, Platt fraudulently concealed from the Internal Revenue Service $31,815.00 in compensation received from Renaissance Academy.

### WHILE WORKING AT THE FIRM, PLATT ESTABLISHED A COMPETING LAW FIRM AND DIVERTED CLIENTS AND FEES FROM THE FIRM

34.      On September 28, 2017, while working at the Firm as a limited partner, Platt formed L&S Counselors LTD ("L&S"), a full-service law firm.  *See* L&S Formation Filings at **Exhibit**

**"6",** Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 149:6-16.

35.     Each type of legal services in which L&S engaged from September 28, 2017, until April 20, 2018 (the date Platt resigned his position at the Firm), was a type of legal service also provided by the Firm.  *See* Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 64:9-13, 66:15-20.  As a result, L&S was in direct competition with the Firm.

36.     Most if not all of the initial L&S clients were existing clients of the Firm or referrals to the Firm which Platt convinced to move their business to L&S (while Platt was still working at the Firm), including Tina Sawatzky "Tina Su" (**Exhibits "19"** and **"20"**), Rose Cordova (**Exhibit "21"**), and Farjad Fani aka Matt Johnson (**Exhibits "30"** and **"31"**).  Before Mr. Platt convinced Farjad Fani to move as a client to his competing law firm, the Firm had collected more than $211,000.00 in legal fees from Mr. Fani.  *See* **Exhibit "31"**.  The remaining clients of L&S, prior to Platt's April 20, 2018 resignation from the Firm, were clients that Platt chose to sign up through L&S rather than through the Firm (most of which were new Farjad Fani owned entities).  *See* Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 139:8-25.

37.     No discussion or vote among the Firm's Managing Partners was ever held regarding allowing Platt to form and operate a separate law firm directly competing with the Firm to which Platt could divert legal fees and clients of his choosing.  *See* Testimony of Mr. Whitaker and Mr. Erickson.

38.     In fact, neither Mr. Erickson nor Mr. Whitaker knew of the existence of L&S until after Platt's departure from the firm.  *See* Testimony of Mr. Whitaker and Mr. Erickson.

39.     Furthermore, not a single employee or attorney at the Firm, including all those who worked closely every day with Platt, had any knowledge that L&S existed and was being used by Mr. Platt to divert fees and clients to enrich himself at the expense of the Firm, or that Mr. Platt was operating a separate and competing law firm while working at the Firm.  *See* Testimony of Mr. Whitaker, Mr. Erickson, Janet Baker, Allison Miller and Kathy Jones.

40.     Mr. Platt has offered completely uncorroborated, self-serving, hearsay testimony that Glen Woods was allegedly aware of the formation of L&S, and, incredibly, gave Mr. Platt permission during a telephone conversation in August 2017 to set up L&S and divert fees to Mr. Platt as compensation for Mr. Platt setting up an automated corporate governance program that

10

would automatically prepare and send the annual corporate formality documents to clients.  *See* Testimony of Mr. Platt.

41.    Mr. Platt has admitted that there is not a single email, memo or anything in writing evidencing this incredible and unbelievable "alleged" authorization of Glen Woods.  *See* Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 89:3-21 and 140:7-9.  Mr. Platt also admitted there is no writing that confirms Glen Woods was even aware of L&S.   *See* Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 91:24.  Conveniently for Mr. Platt, Glen Woods died on April 1, 2018 and is not available to challenge Platt's unbelievable testimony.

42.    Mr. Platt further testified that he was aware of NRS 87.090(2), which would not permit Glen Woods to approve Mr. Platt setting up a competing law firm, without the consent of the other Managing Partners because permitting a Firm attorney to set up a competing law firm while continuing to work at the Firm was certainly outside of the ordinary business of the Firm.   *See* Testimony of Mr. Platt.

43.    However, Mr. Platt admitted that he never sought or received the approval of the other Managing Partners, Mr. Erickson or Mr. Whitaker, and this was corroborated by the testimony of Mr. Erickson and Mr. Whitaker.

44.    In Mr. Platt's response to the Firm's Interrogatory No. 4, he stated that the alleged authorization by Woods was to pay him for the creation of a cost saving database for the Firm which would automate the creation of legal forms for clients.  *See* Platt's Responses to Plaintiff's First Set of Interrogatories at **Exhibit "37"**.  However, no such database or computerized corporate governance program exists.  *See* Testimony of Mr. Platt, Mr. Erickson and Mr. Whitaker.

45.    Between September 2017 and April 20, 2018 (the date Mr. Platt resigned from the Firm), Mr. Platt collected a total of $134,920.00 from clients of L&S for legal services, all of which revenue was fraudulently converted from the Firm or was derived from Partnership opportunities converted by Mr. Platt to his personal use and gain  *See* L&S Income Statement at **Exhibit "25"** and Response to Interrogatory No. 10 at **Exhibit "37"**.

## PLATT USED AND CONVERTED FIRM RESOURCES FOR HIS PERSONAL BENEFIT

46.    Mr. Platt used his computer, internet and phones located at the Firm and provided by the Firm to conduct the business of his competing firm, L&S.  *See* Testimony of Mr. Platt and

11

1
2
3
(Platt's 04/09/2019 Deposition) at 155:24-156:8.  Mr. Platt also used the printers at the Firm to provide services through L&S and used the Firm's legal forms to provide services through L&S. *See* Testimony of Mr. Platt.

4
5
6
7
47.    During the entirety of Mr. Platt's association with the Firm as an associate and as a Limited Partner, the Firm paid his malpractice insurance and Platt never obtained malpractice insurance for himself or his competing firm, L&S, while Platt was working at the Firm.  *See* Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 159:7-18.

8
9
48.    Additionally, the Firm paid the health insurance premiums for Platt and his entire family.  *See* Testimony of Mr. Platt and (Platt's 04/09/2019 Deposition) at 159:19-25; 160:1-9.

10
## THE DISCOVERY OF L&S, MR. PLATT'S DEPARTURE FROM THE FIRM AND HIS EFFORTS TO CONCEAL HIS FRAUDULENT ACTION

11
12
13
49.    In March of 2018, one of the Managing Partners, Glen Woods, became very ill and was hospitalized in Phoenix, Arizona.  It was discovered that Glen Woods was suffering from leukemia and had only weeks to live.  *See* Testimony of Mr. Whitaker and Mr. Erickson.

14
15
16
17
18
19
20
21
50.    Glen Woods served as the Trustee on a series of trusts for the Firm's largest client, the McDonald Family.  As the Trustee, Glen had also appointed himself as the Managing Partner on some partnerships owned by the McDonald Trusts, which held many commercial properties worth tens of millions of dollars and which generated significant monthly revenue.  Mr. Erickson was the successor trustee on one of the McDonald Trusts. Historically, Firm attorneys had provided trustee services to clients on a regular basis.  The fees generated from acting as a trustee for Firm clients was always billed through and collected by the Firm as a Firm business opportunity.  *See* Testimony of Mr. Whitaker and Mr. Erickson.

22
23
24
25
51.    Glen Woods was placed into a medically induced coma on March 17, 2018 and he died on April 1, 2018, without ever having come out of the coma.  Neither Mr. Erickson nor Mr. Whitaker were aware of the seriousness of Glen Woods' condition until after Glen Woods was placed into a coma.   *See* Testimony of Mr. Whitaker and Mr. Erickson.

26
27
28
52.    Upon learning of Glen Wood's serious condition and that he was in a coma, the remaining Managing Partners of the Firm (Mr. Whitaker and Mr. Erickson) asked Mr. Platt to provide them with the McDonald Family trust and entity documents which would show who the

successors to Glen Woods would be to manage the McDonald Family trusts and assets.  Mr. Platt initially refused to provide the Managing Partner with this information, and eventually was only willing to point the Managing Partners to a large file on the Firm's computer server containing hundreds of documents (requiring them to engage in a time-consuming search to find the requested information).   *See* Testimony of Mr. Whitaker, Mr. Erickson and Mr. Platt.

53.    The Managing Partners learned that Mr. Platt had prepared succession documents to be signed by Glen Woods for the McDonald Trusts and related entities to make Kent Woods (Glen Wood's son) the successor to Glen Woods.  *See* Testimony of Mr. Whitaker and Mr. Erickson.

54.    These succession documents were allegedly signed by Glen Woods the day before being placed into a coma, when his capacity was obviously impaired and questionable at best.  Incredibly, at Mr. Platt's direction these same succession documents were then electronically docu-signed with Glen Woods' signature *after he was in a coma* and were obviously invalid.  *See* Testimony of Mr. Whitaker, Mr. Erickson and Mr. Platt.

55.    These succession documents were then returned from Phoenix, AZ to Mr. Platt at the Firm.  These are the documents Mr. Platt refused to provide to the Firm's Managing Partners along with the actual trust and entity documents which detailed how the succession was to occur.   *See* Testimony of Mr. Whitaker and Mr. Erickson.  Mr. Platt then provided these suspect succession documents to third parties including Wells Fargo Bank to be relied upon as if they were valid.   *See* Testimony of Mr. Platt.

56.    Following Glen Woods' death on April 1, 2018, and as a result of the Managing Partners' investigation into the succession issues related to the McDonald Family trusts and entities, the Managing Partners discovered that for the three years leading up to Glen Woods' death, he had been taking trustee's fees equal to $25,000.00 per month from the McDonald Family trusts and entities, and collecting these fees under a separate taxpayer I.D. number in his own name and keeping the money rather than running it through the Firm (even though he billed these same amounts on the Firm's billing program and claimed that the trustee's fees had been collected by the Firm).   *See* Testimony of Mr. Whitaker and Mr. Erickson.

57.    Upon discovering this embezzlement by Glen Woods, the Managing Partners confronted Kent Woods (an attorney at the Firm who was Glen Woods' son and the executor of

Glen Woods' estate) about this conversion.  In attempting to justify his father's actions, Kent Woods informed the Managing Partners that Mr. Platt had taken money outside the Firm from Renaissance Academy and kept it.  *See* Testimony of Mr. Whitaker and Mr. Erickson.

58.    This led to the Managing Partners confronting Mr. Platt to determine if he had taken money outside of the Firm from Renaissance Academy, (described in Paragraphs 29 & 30), where Mr. Platt lied and told them he had never received any money outside the Firm except $2,500.00 from the Academy.  This meeting occurred approximately a week to ten days before Mr. Platt resigned from the Firm on April 20, 2018.

59.    If L&S, (Mr. Platt's competing law firm), had truly been authorized by the Firm, there would have been no reason for Mr. Platt to lie to the Managing Partners during this meeting.  Mr. Platt's actions demonstrate that he was lying to conceal his conversion of Firm clients, revenue and business opportunities which he knew had never been authorized by the Firm.  At this point, Mr. Platt knew he was at risk of having his conversions, embezzlements and larceny discovered, and he began plans to exit the Firm and conceal his actions.

60.    Following this meeting, Mr. Whitaker was uncomfortable with what he had learned about Glen Woods and Mr. Platt, and what the Managing Partners were learning about the succession activities engaged in by Mr. Platt and Kent Woods related to the McDonald Family trusts and entities.  Mr. Whitaker ordered the Firm's Information Technology vendor ("IT Vendor") to make a backup of the Firm's computer server and of the desktop computers in the offices of Mr. Platt, Kent Woods and Glen Woods.  *See* Testimony of Mr. Whitaker.

61.    On April 19, 2018, Mr. Platt stayed late at the Firm when nobody else was around to observe him.  At this time he prepared a resignation letter to leave the Firm and he copied the Firm's client lists and forms.  *See* Testimony of Mr. Platt.

62.    Early the next morning, on April 20, 2018, many Firm employees begin to panic when documents and files they had been working on could not be located or were disappearing while the work was in progress.  *See* Testimony of Mr. Whitaker, Janet Baker, Kathy Jones and Allison Miller.  Mr. Whitaker contacted the Firm's IT Vendor who gained remote access to the Firm's server and confirmed that files had been and were being deleted from the Firm's Server.  *See* Testimony of Mr. Whitaker.

63.     Mr. Whitaker confronted Mr. Platt, who admitted that he had deleted files from the Firm servers, but claimed they were just "personal" files. *See* **Exhibit "11"** at 14-15.  Without informing Mr. Whitaker, Mr. Platt recorded this conversation. *See id.*  Mr. Platt then gave his letter of resignation and was escorted from the building.    *See* Testimony of Mr. Whitaker and Mr. Platt.

64.     The Firm then spent $2,093.02 restoring the files and data deleted by Mr. Platt from the Firm's server. *See* **Exhibit "12"**.  As the Firm worked with its IT Vendor to recover files deleted by Platt, a process that took many hours over a period of many weeks, the Firm learned about Platt's illicit activities when it recovered deleted documents referencing an entity called "L&S Counselors" and showing that Platt had been billing and collecting legal fees outside the Firm.  Having never heard of L&S, Mr. Whitaker asked around the Firm to see if anyone knew what L&S was.  No employee of the Firm had ever heard of L&S or knew anything about Mr. Platt doing work on the side for clients.    *See* Testimony of Mr. Whitaker, Kathy Jones, Janet Baker, Allison Miller and Mr. Erickson.

65.     After pulling records from the Nevada Secretary of State for L&S, the Firm learned that Mr. Platt had set up a separate competing law firm while working at the Firm.    *See* Testimony of Mr. Whitaker.

66.     The Firm also learned that Mr. Platt had deleted all of his April, 2018 time entries from the Firm's billing program when he deleted files from the Firm server to cover-up his fraudulent activities.  Mr. Platt then billed these same clients through L&S, using the same time entries he had deleted from the Firm, but raised the hourly rate by $30.00 per hour.

67.     In addition, the Firm discovered a modification to the retainer agreement posted on its website, listing L&S as an affiliate of the Firm. *See* Testimony of Mr. Whitaker.  Platt was the only attorney at the Firm who had the administrative passwords to alter the Firm's website and apparently made this change to cover his illicit actions. *See* Testimony of Mr. Whitaker, Allison Miller and Mr. Platt.

68.     The Firm also learned that Mr. Platt had changed the Incorporated Terms of Representation Form to identify L&S as an affiliate of the Firm.  The Incorporated Terms of Representation Form is a five page document which contains the boilerplate terms of every engagement letter between the Firm and a client.  The specific terms of the engagement (including

15

the scope of the engagement and the rates the client will pay) are always set forth in a single-page letter signed by the originating partner or attorney.  That attorney's assistant then attaches the boilerplate "Incorporated Terms of Representation Form" to the engagement letter and it is sent out to the client.  *See* Testimony of Mr. Whitaker, Mr. Erickson, Janet Baker and Kathy Jones, and **Exhibits "A-1"** through **"A-5"**.  Mr. Platt added the words "L&S Counselors" to Section 8 of the Incorporated Terms of Representation (added two words to a five page, single-spaced document), but the testimony of Mr. Whitaker, Mr. Erickson, Janet Baker and Kathy Jones demonstrated that nobody at the Firm was aware of this change or had ever heard of L&S.

**RED HERRING ARGUMENTS RELATED TO WEINTRAUB WOODS & PLATT, GATEHOUSE STRATEGIES, BOSQUE HOLDINGS AND GLEN WOODS' CONVERSION**

69.     Mr. Platt has argued that it was common practice for the Firm to permit attorneys to take money outside of the Firm through other ventures and has argued that Weintraub Woods & Platt, Gatehouse Strategies and Bosque Holdings prove his argument.  However, these factual arguments are a red herring and they do not prove Platt's argument or justify his theft and conversion from the Firm.

*Weintraub Woods & Platt*

70.     In early 2013, Glen Woods had a discussion with the other Managing Partners about a potential referral source, an attorney from California named Daniel Weintraub, that wanted to refer work to the Firm but wanted to receive a referral fee based upon a percentage of the money collected in fees by the Firm on each of Weintraub's referrals.  The Managing Partners agreed that some arrangement would be needed to pay the referral fees without being in violation of the Rules of Professional Conduct (that requires the referral fee be paid for actual work).  Mr. Erickson and Mr. Whitaker agreed to the proposed arrangement as long as the money all ran through the Firm. *See* Testimony of Mr. Whitaker and Mr. Erickson.

71.     Glen Woods set up an entity known as Weintraub Woods & Platt, LLP ("WWP") to be used to funnel the referral fees to Weintraub.  The WWP entity showed the partners as Weintraub, Glen Woods and Mr. Platt.  *See* **Exhibit "G-2"**.  Neither Mr. Erickson nor Mr. Whitaker was aware of the WWP form used by Glen Woods to funnel referral fees to Mr. Weintraub.  *See* Testimony of Mr. Erickson and Mr. Whitaker.  However, consistent with what had

16

1  been agreed to by the Managing Partners, **all work done for Weintraub's referrals was**

2  **performed by the Firm, and all money billed to the clients referred by Weintraub were billed**

3  **through and collected by the Firm**.  There was never any work performed or money collected

4  outside the Firm related to WWP.  *See* Testimony of Mr. Erickson, Mr. Whitaker, Allison Miller

5  and Mr. Platt.  **Most importantly, the WWP concept for paying referral fees to Weintraub was**

6  **discussed and approved by the Managing Partners**.

7  *Gatehouse Strategies*

8       72.      Mr. Whitaker attended a CLE course in which he learned that it was not a good idea

9  to have the Firm, or its attorneys, act as the resident agent for Firm clients.  The better practice was

10  to set up a separate entity to act as the resident agent for Firm clients.  The Firm could continue to

11  bill its clients for preparing all documents necessary to comply with the annual corporate

12  formalities, but would not have a conflict of interest by acting directly as the resident agent.  Mr.

13  Whitaker discussed this concept with the other Managing Partners and it was agreed that the Firm

14  would cause a separate entity to be formed to act as the resident agent for firm clients.  *See*

15  Testimony of Mr. Whitaker and Mr. Platt.

16       73.      The other Managing Partners did not care what type of entity was formed to act as

17  the resident agent or how that entity would be owned, because all of the fees paid by Firm clients to

18  use that resident agent and to have the annual work done to comply with the corporate formalities,

19  was to always run through the Firm.  *See* Testimony of Mr. Erickson and Mr. Whitaker.

20       74.      Glen Woods and Mr. Platt set up Gatehouse Strategies, Ltd. ("Gatehouse") to act as

21  the resident agent for Firm clients.  Gatehouse was owned by Glen Woods, Mr. Platt and the Firm;

22  however, no money was ever run through Gatehouse.  All money billed and collected for acting as

23  resident agent and for preparing annual corporate governance documents, was run through the Firm.

24  *See* Testimony of Mr. Erickson, Mr. Whitaker, Allison Miller and Mr. Platt.

25  *Bosque Holdings, LLC*

26       75.      Bosque Holdings, LLC is a series limited liability company established by the

27  Firm's partners to provide a service to any clients that wished to have a limited liability company

28  without disclosing their own names as the manager of the Company.  There has never been any

17

money generated by Bosque Holdings, LLC that did not run through the Firm and it was clearly approved by the Managing Partners.  *See* Testimony of Mr. Erickson and Mr. Whitaker.

***Conversion By Glen Woods***

76.    On May 25, 2018, the Firm filed a Complaint against the Estate of Glen Woods and his family limited partnership to recover approximately $1,000,000.00 in trustee's fees paid to Glen Woods from the McDonald Family trusts, which Glen Woods had converted from the Firm.  This Complaint had nothing to do with money and business opportunities converted by Mr. Platt.  *See* **Exhibit "I"**.  This lawsuit was resolved with a settlement between the Firm and the Glen Woods Estate, through which the Firm recovered the money converted by Glen Woods, and none of the damages the Firm incurred as a result of Mr. Platt's actions were satisfied in any manner through this Settlement.  *See* Testimony of Mr. Erickson and Mr. Whitaker.

77.    Contrary to Mr. Platt's argument, Mr. Woods theft from the Firm does not justify Mr. Platt's illicit actions and his conversion of Firm money, property and business opportunities.

**II.**

**STATEMENT OF THE LAW AS APPLIED TO THE EVIDENCE**

**A.    MR. PLATT OWED A FIDUCIARY DUTY TO THE FIRM**

**1.    Platt Owed The Firm A Fiduciary Duty As An Employee**

"The elements of common-law agency are present in the relationships between employer and employee, corporation and officer, client and lawyer, and partnership and general partner."  *See* Restatement 3d of Agency, § 1.01 (emphasis added).  As the Supreme Court of Utah explained, "[b]ecause of the privilege granted to engage in the practice of law, we impose upon members of our bar a fiduciary duty that encompasses the obligation to not compete with their employer, which we define as any law firm or legal services provider who may employ them in a legal capacity, without the employer's prior knowledge and agreement."  *Prince, Yeates & Geldzahler v. Young*, 94 P.3d 179, 185 (Utah 2004).

**2.    Mr. Platt Owed The Firm A Fiduciary Duty As A Partner**

A partner "is liable to his partners for any breach of fiduciary obligation."  Restatement 2d of Agency, § 14A.  Partners in a law firm owe fiduciary duties to one another.  This

18

common law duty is codified in the Nevada Uniform Partnership Act at NRS 87.4336, which states:

**NRS 87.4336  Conduct of partner: General standards.**

1.   The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections 2 and 3.

2.   A partner's **duty of loyalty** to the partnership and the other partners is limited to the following:

   (a)  ***To account to the partnership and <u>hold as trustee</u> for it any*** property, ***profit or benefit derived by the partner in the conduct*** or winding up ***of the partnership business*** or derived from a use by the partner of partnership property, ***including the appropriation of a partnership opportunity***;

   (b)  ***To refrain from dealing with the partnership in the conduct*** or winding up ***of the partnership business as or on behalf of a party having an interest adverse to the partnership***; and

   (c)  To ***refrain from competing with the partnership in the conduct of the partnership business*** before the dissolution of the partnership.

Mr. Platt testified that he was aware of NRS 87.4336 and that he had extensive knowledge of partnership laws.  Mr. Platt is also deemed to have knowledge of this and all other laws which governed his conduct. *See Smith v. State*, 38 Nev. 477, 481, 151 P. 512, 513 (1915) (reaffirmed in *Sengel v. IGT*, 116 Nev. 565, 573, 2 P.3d 258, 262 (2000)) ("Every one is presumed to know the law, and this presumption is not even rebuttable.").

As set forth above, Mr. Platt was required to "account to the partnership and **hold as trustee for it** any property, profit or benefit derived by" him from the Firm's business "including the appropriation of a partnership opportunity." NRS 87.4336(2)(a).  This statute imposed an actual, express trust upon Mr. Platt for all money and business opportunities he converted from the Firm. This is not a constructive trust or a resulting trust arising as a result of fraud, but an express trust.

This statute also expressly forbids Mr. Platt from "competing with the partnership in the conduct of the partnership's business".  NRS 87.4336(2)(c).  Yet, this is precisely what Mr. Platt did, he directly competed against the Firm and diverted the Firm's clients to himself.  This is an absolute breach of Platt's fiduciary duties owed to the Firm.

**B.    <u>AUTHORIZATION OF MR. PLATT'S COMPETING LAW FIRM WOULD HAVE REQUIRED THE CONSENT OF ALL MANAGING PARTNERS - WHICH NEVER HAPPENED</u>**

Mr. Platt's sole defense for his fraudulent actions is his uncorroborated and unbelievable

19

testimony that Glen Woods approved his setting up a competing law firm and diverting Firm clients, revenue and business opportunities to the competing firm.  As, set forth in the summary of evidence above, Mr. Platt has admitted that there is nothing in writing demonstrating that Glen Woods ever authorized or even knew about his illicit actions.  This Court should make a finding of fact that no such authorization ever occurred.

However, even if evidence existed to support this wild assertion, Glen Woods had no ability to approve Mr. Platt setting up a competing law firm as a matter of Nevada law.

### 1.  Under the Terms of the Firm's Partnership Agreement, Woods Had No Authority to Grant Permission to Platt to Compete With the Firm

According to the Partnership Agreement, decisions within the firm were divided into three (3) categories: "Routine Decisions," "Partnership Decisions," and "Extraordinary Decisions." "Routine Decisions" are defined as "those that arise as a matter of course in the conduct of the ordinary, day-to-day business of the Partnership."  *See* **Exhibit "1"** at § 5.3.

"Partnership Decisions" are defined as "those that arise in the course of the business of the Partnership, but that do not necessarily arise daily or even weekly, and that require the exercise of discretion or judgment by the management of the Partnership . . .."  *Id.* at § 5.2(b).  "Extraordinary Decisions" are defined as "those that affect in profound ways the relationship between the Managing Partners and the Partnership."  *Id.* at § 5.2(c).

The Managing Partners, acting as a body, were to make all decisions in the management and operation of the Partnership that were Partnership or Extraordinary Decisions and all partners had "the right to participate in the deliberations of the Managing Partners" in making these decisions. *Id.* at § 5.4.

Any decision to authorize Mr. Platt's violation of his duty of loyalty to the Firm, permitting him to directly compete with the Firm while still working at the Firm, and permitting him to divert and convert revenue, business opportunities and clients away from the Firm, is certainly not a "Routine Decision" as defined by the Partnership Agreement.  Such a decision would certainly fall under the definition of either a "Partnership Decision" or an "Extraordinary Decision", requiring a decision deliberated upon by all Managing Partners.  However, not only were Mr. Platt's actions never disclosed to all of the Managing Partners, but there was never any vote by the Managing

Partners to allow Mr. Platt to compete with the Firm and divert revenue and clients of his choosing into his own pocket. The testimony of Mr. Whitaker and Mr. Erickson make it clear that this decision was never considered or voted upon by the Firm's Managing Partners and is thus invalid.

**2.    Nevada Law Requires The Consent Of All Firm Partners To Authorize Mr. Platt Competing Against The Firm**

Mr. Platt admitted in trial that he was well aware of the requirements of NRS 87.090(1) & (2) which provides:

> **NRS 87.090 Partner agent of partnership; restrictions on authority**.
>
> 1. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which the partner is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom the partner is dealing has knowledge of the fact that the partner has no such authority.
>
> 2. **An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners**.   (Emphasis added).

Authorizing a Firm attorney to directly compete against the Firm, while continuing to work at the Firm, is certainly not "carrying on of the business of the partnership in the usual way", and thus Glen Woods had no ability to approve Mr. Platt's illicit actions "unless authorized by the other partners", Mr. Whitaker and Mr. Erickson. *See* NRS 87.090(2). No such authorization was ever provided by Mr. Whitaker or Mr. Erickson, and thus, as a matter of law, the Firm never authorized Mr. Platt's conversion of funds, clients and business opportunities. Mr. Platt admitted he never asked either Mr. Erickson or Mr. Whitaker for authorization of his actions and never disclosed to them what he was doing (in fact the evidence demonstrates he did just the opposite in fraudulently concealing his actions from the Managing Partners).

**C.    ANDREW PLATT'S ACTIONS CONSTITUTE A CONVERSION UNDER NEVADA LAW**

The elements for a claim of conversion under Nevada law are the following:

> Defendant committed a distinct act of dominion wrongfully exerted over Plaintiff's personal property; and the act was in denial of, or inconsistent with, Plaintiff's title or rights therein, or the act was in derogation, exclusion, or defiance of Plaintiff's title or rights in the personal property.

*See Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 5 P.3d 1043 (2000). "An act constituting

21

conversion must be an intentional act, but it does not require wrongful intent and is not excused by care, good faith, or lack of knowledge." *Bader v. Cerri*, 96 Nev. 352, 357 n.1, 609 P.2d 314, 317 (1980); *see also Winchell v. Schiff*, 193 P.3d 946 (Nev. 2008). The Ninth Circuit Court of Appeals has stated that under Nevada law:

> Conversion is defined as "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights. Additionally, conversion is an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge." *M.C. Multi-Family Development, L.L.C. v. Crestdale Assocs., Ltd., 193 P.3d 536, 542-43 (Nev. 2008).*

*See Ormsby v. First American Title Co.*, 591 F.3d 1199, 1205-1206 (9th Cir. 2009). Quite clearly, when Mr. Platt took $31,815.00 in fees from Renaissance Academy (**Exhibit "3"**) and took $134,920.00 in fees through L&S (**Exhibits "25"** and **"37"**), he converted to his own benefit fees, clients and business opportunities belonging to the Firm. Mr. Platt's actions constitute a conversion under Nevada law resulting in actual damages to the Firm of $166,735.00.

## D.     MR. PLATT'S CONVERSION UNDER NEVADA LAW EQUALS LARCENY UNDER FEDERAL LAW, WHICH IS EXCEPTED FROM DISCHARGE BY 11 U.S.C. § 523(a)(4)

11 U.S.C. § 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The Ninth Circuit has explained that "[c]learly, a debt can be nondischargeable for embezzlement under 523(a)(4) without the existence of a fiduciary relationship." *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991). Similarly, larceny can be committed without the existence of a fiduciary relationship, as Collier on Bankruptcy explains:

> In section 523(a)(4), the term "while acting in a fiduciary capacity" does not qualify the words "embezzlement" or "larceny." Therefore, any debt resulting from embezzlement or larceny falls within the exception of clause (4).

4 Collier on Bankruptcy P 523.10 (16th ed.2020).

In *Ormsby v. First American Title Co.*, 591 F.3d 1199, 1205-1206 (9th Cir. 2009), the Ninth Circuit made it clear that a state law conversion claim (under Nevada law) constituted larceny under federal law for purposes of 11 U.S.C. § 523(a)(4). In the *Ormsby* case, Mr. Ormsby had been employed by First American Title Company and had access to their title plant records used to search titles. While working at First American Title, Ormsby copied the title plant records and then went to work for a competing title company where he used the title plant records he had stolen from

First American to generate fees for the competing business.  The Nevada state court had made

findings that Ormsby's actions constituted conversion of First American's property and business

opportunities.  First American then sought to make Ormsby's state law conversion non-

dischargeable under 11 U.S.C. § 523(a)(4) as a larceny.

Ormsby argued that state law conversion did not constitute larceny under the federal

definition and thus his conversion was dischargeable.  591 F.3d at 1205.  The Ninth Circuit held:

> For purposes of section 523(a)(4), a bankruptcy court is not bound by the state law
> definition of larceny but, rather, may follow federal common law, which defines
> larceny as a 'felonious taking of another's personal property with intent to convert it
> or deprive the owner of the same.'  4 Collier on Bankruptcy P 523.10[2]."

591 F.3d at 1205.  The Ninth Circuit then went on to explain that the conversion found under

Nevada law constituted larceny under the federal standard.

> Based on these facts found by the state court [conversion], Ormsby's conduct
> constituted larceny within the federal meaning of the terms; accordingly under
> section 523(a)(4), this debt cannot be discharged.

591 F.3d at 1206.  Under the controlling *Ormsby* standard, Mr. Platt's conversion of the Firm's

revenue, clients and business opportunities, constitutes a larceny that is non-dischargeable under 11

U.S.C. § 523(a)(4).

This Court is not the first to encounter the case of an employee forming a side business to

redirect income away from his employer and towards himself.  In the case of *All In One Trading,*

*Inc. v. Chaparala (In re Chaparala),* Nos. 2:16-bk-15692-RK, 2:16-ap-01332-RK, 2020 Bankr.

LEXIS 2068 (Bankr. C.D. Cal. Aug. 3, 2020), a bankruptcy court was confronted with a case where

a perfume salesman formed a plan similar to that devised and executed by Mr. Platt.  Like Mr. Platt,

the debtor, Chaparala, was employed by his company to provide the exact same services to

company customers that his side operation provided to potential customers of the company.  *Id.* at

*40-*41.  Like Mr. Platt, Chaparala used firm resources to generate revenue for his side operation.

*Id.*  Like Mr. Platt Chaparala retained all proceeds from his side business while at the same time

taking and accepting his normal salary and hiding his operations from his employer.  *Id.*

The *Chaparala* Court found that "during term of employment, an employer is entitled to its

employees' 'undivided loyalty'" (*Id.* at *37) and then went on to hold:.

The court in *Sequoia Vacuum Systems* further stated that "[e]very agent owes his principal the duty of undivided loyalty [and] [d]uring the course of his agency, he may not undertake or participate in activities adverse to the interests of his principal." *Sequoia Vacuum Systems*, 229 Cal. App. 2d at 287."

*Id*. at *37-*38.

Section 523(a)(4) of the Bankruptcy Code, 11 U.S.C., excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The term "while acting in a fiduciary capacity" does not qualify the words "embezzlement" or "larceny." 11 U.S.C. § 523(a)(4). Therefore, any debt resulting from embezzlement or larceny falls within the exception of subparagraph (a)(4).

*Id*. at *40.

The Ninth Circuit has held that "[f]or purposes of section 523(a)(4), a bankruptcy court is not bound by the state law definition of larceny but, rather, may follow federal common law, which defines larceny as a 'felonious taking of another's personal property with intent to convert it or deprive the owner of the same.'" *Ormsby v. First American Title Co of Nevada. (In re Ormsby)*, 591 F.3d 1199, 1205 (9th Cir. 2010).

*Id*. at *40.

Chaparala during his employment with All In One formed a competing company in the same line of business as All In One for the purpose of conducting business with All in One's customers and suppliers, which he concealed from All in One."

"This scheme was to divert business opportunities from All In One."

*Id*. at *40.

"Chaparala and Kim diverted sales from All In One…" . . . "[The] State Court … made a number of findings when it held Chaparala converted All In One's [property]."

*Id*. at *41-*42.

The court determines that these issues are relevant to and encompassed within those that a bankruptcy court would consider in determining if Chaparala's actions constituted larceny under 11 U.S.C. § 523(a)(4) as the jury's findings of intentional tortious misconduct establish felonious taking of another's personal property with intent to convert it or deprive the owner of the same."

*Id*. at *43.

Thus, after reviewing a state court judgment finding a conversion under California law (*Id*. at *31) , the *Chaparala* Court, citing *Ormsby*, determined that this state law conversion constituted a larceny under federal law and that the debt was accordingly nondischargeable under 11 U.S.C. § 523(a)(4).

24

Because Platt was at all relevant times either an employee or limited-partner of the Firm and was compensated for devoting all of his professional time to the Firm, the Firm had a right to all revenue generated through Platt providing legal services.  Platt has admitted that he was compensated by the Academy for legal services which he never remitted to the Firm. Likewise, the Firm had the exclusive right to the business opportunities and the compensation derived from such business opportunities and all legal services which Platt performed through L&S to prospective clients of the Firm.  Platt's retention and diversion of these business opportunities and funds constituted a "felonious taking of [the Firm]'s personal property with intent to convert it." *Ormsby*, 591 F.3d at 1205.  It is undisputed that Platt took these actions willfully and knowingly.  **Under the controlling Ninth Circuit law *in Ormsby*, Mr. Platt's state law conversion of these funds and business opportunities constitutes a larceny under federal law which is nondischargeable under 11 U.S.C. § 523(a)(4).**

In the alternative, Mr. Platt's debts are nondischargeable under 11 U.S.C. § 523(a)(4) as acts of embezzlement.  Colliers on Bankruptcy explains that:

> Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking.

4 Collier on Bankruptcy § 523.10 (16th 2020).  Ninth Circuit law makes clear that Platt's actions can also be characterized as arising from embezzlement:

> Under federal law, embezzlement in the context of nondischargeability has often been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269, 40 L. Ed. 422, 16 S. Ct. 294 (1885). Embezzlement, thus, requires three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." *In re Hoffman*, 70 Bankr. 155, 162 (Bankr. W.D. Ark. 1986); *In re Schultz*, 46 Bankr. 880, 889 (Bankr. D. Nev. 1985).

*In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991).  Mr. Platt's taking and conversion of business opportunities and funds derived therefrom is best characterized as a larceny because those funds always should have been paid directly to the Firm and the business opportunities belonged to the Firm.  However, even should the Court find that it was lawful for Mr. Platt to receive fees from

clients, his employment or partnership relationship with the Firm required those fees to be turned

over to the Firm.  Mr. Platt was entrusted with the Firm's clients, referral sources, legal forms,

internet, phones, staff and other resources, and the Firm's client list, and Mr. Platt used this Firm

Property to generate revenue, which was also entrusted to Mr. Platt assuming he would remit it to

the Firm.  Mr. Platt's retention and conversion of legal fees which were due to his employer, if not

an act of larceny for having inappropriately directed those fees to himself, certainly constitute an

act of embezzlement.  *See*, *id.*  Turning once more to Collier:

> In short, section 523(a)(4) excepts from discharge debts resulting from the
> fraudulent appropriation of another's property, whether the appropriation was
> unlawful at the outset, and therefore a larceny, or whether the appropriation took
> place unlawfully after the property was entrusted to the debtor's care, and therefore
> was an embezzlement.

4 Collier on Bankruptcy P 523.10 (16th Ed. 2020).  Mr. Platt knowingly diverted business

opportunities away from the Firm, he also diverted revenue away from the Firm and to himself, and

finally when he provided legal services to clients that rightfully belonged to the Firm and collected

money that therefore belonged to the Firm, he failed to remit this money to the Firm.  Even if the

jury accepts Mr. Platt's incredible assertion that he was authorized to perform work outside of the

Firm, the work he performed exceeded by leaps and bounds the type of work he testified he was

authorized to perform, so any money he collected for unauthorized work was still the subject of

embezzlement and the money would be fees which were the rightful property of the Firm.

**E.** **THE EXPRESS TRUST CREATED BY NRS 87.4336(2)(a) RENDERS THE
DAMAGES ARISING FROM MR. PLATT'S ACTIONS NON-DISCHARGEABLE
FOR A FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY
CAPACITY**

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in

a fiduciary capacity...".  "For purposes of section 523(a)(4), the definition of "fiduciary" is

narrowly construed, meaning that the applicable nonbankruptcy law that creates a fiduciary

relationship must clearly outline the fiduciary duties and identify the trust property." 4 Collier on

Bankruptcy P 523.10 (16th Ed. 2020).  The Ninth Circuit has explained the fiduciary relationship

that is non-dischargeable as follows:

> Because the broad general definition of fiduciary -- a relationship involving
> confidence, trust, and good faith -- is inapplicable in the dischargeability context,
> ordinary commercial relationships are excluded from the reach of section 523(a)(4).

*In re Schultz*, 46 Bankr. 880, 884 (Bankr. D. Nev. 1985). The trust must have been created before the act of wrongdoing. The debtor must have been a trustee before the wrong and not a trustee *ex maleficio*. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 79 L. Ed. 393, 55 S. Ct. 151 (1934); *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986). **Thus, constructive or implied trusts are excluded, but statutory trusts are not**. *In re Pedrazzini*, 644 F.2d 756, 758 n.2 (9th Cir. 1981). Although the concept of fiduciary capacity is a narrowly defined question of federal law, state law can be consulted to determine when a trust exists. Id. at 758; *Haller,* 780 F.2d at 795-96.
. . .

Furthermore, we reasoned that "if state law makes clear that a partner necessarily is a trustee over partnership assets for all purposes, then that partner is a fiduciary within the narrow meaning of § 523(a)(4)." *Haller*, 780 F.2d at 797. In this case, the Washington statute and case law make clear that Short was a fiduciary within the meaning of section 523(a)(4).

In language identical to the California statute in *Haller*, the Washington statute provides in pertinent part:

> Every partner must account to the partnership for any benefit, and
> hold as trustee for it any profits derived by him without the consent of
> the other partners from any transaction connected with the formation,
> conduct, or liquidation of the partnership or from any use by him of
> its property.

*In re Short*, 818 F.2d 693, 695 (9th Cir. 1987).

Compare the Washington statute (cited above), which the Ninth Circuit in *Short* determined created the requisite fiduciary capacity to create a nondischargeable debt, to the Nevada statute (NRS 87.4336) which creates Mr. Platt's fiduciary capacity:

> A partner's duty of loyalty to the partnership and the other partners is limited to the
> following: (a) **[t]o account to the partnership and hold as trustee for it any
> property**, profit or benefit derived by the partner in the conduct and winding up of
> the partnership business or derived from a use by the partner of partnership property,
> including the appropriation of a partnership opportunity.  (Emphasis added).

They both contain the exact same statutory language creating an express trust.  Mr. Platt accepted all benefits of, and operated for 2 ½ years as, a limited partner of the Firm by receiving a share of the profits of the Firm (equal to 50% of his collections).  NRS 87.070 provides that "the receipt by a person of a share of the profits of a business is prima facie evidence that the person is a partner in the business..."  Under the controlling Ninth Circuit law of  *In re Short*, Mr. Platt, as a partner, was required to hold as a trustee for the Firm, all benefits derived from all partnership opportunities.  Mr. Platt committed fraud while acting in a fiduciary capacity by taking $166,735.00

1    in Firm revenue derived from Firm business opportunities, and this debt (together with punitive and

2    consequential damages arising therefrom), is nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

3    **F.**    **THE FIRM'S COMPLAINT FOR NONDISCHARGEABILITY SATISFIES THE**
       **NINTH CIRCUIT'S PLEADING STANDARDS TO COVER THE SECTION**
4      **523(a)(4) LARCENY CLAIM**

5    "Notice pleading only requires a plaintiff to allege claims for relief, not causes of action,

6    statutes or legal theories…..[n]otice pleading anticipates that subsequent proceedings will refine the

7    disputed facts and issues, including the legal theories." *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th

8    Cir. 2008). Thus, the Firm's original complaint was not required to use the label of "larceny" to

9    have properly pled a claim for nondischargeability under Section 523(a)(4). All that controlling

10   law requires is that the original complaint allege what the claim is (non-dischargeability under

11   Section 523(a)(4)) and not the "legal theories" that support that claim. *Id.* at 1157.

12   Additionally, the complaint is to be liberally construed to determine if adequate notice "of

13   the claim" (not the legal theories supporting the claim) has been provided.

14   Federal Rule of Civil Procedure 8(a)(1)-(2) requires only that a complaint contain "a
     short and plain statement of the claim showing that the pleader is entitled to
15   relief…..Rule 8's concluding admonishment that "[a]ll pleadings shall be so
     construed as to do substantial justice" confirms the **liberality with which we should**
16   **judge whether a complaint gives the defendant sufficient notice**…".

17   *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 839 (9th Cir. 2007) (emphasis added).

18   The Debtor has argued that the original Complaint did not provide sufficient notice of the Section

19   523(a)(4) claim (which is obviously not true), but what the Debtor is really arguing is that the

20   Complaint did not describe the legal theory (larceny) underlying the Section 523(a)(4) claim.

21   However, Ninth Circuit law is clear in providing that only the claim must be pled, not the

22   underlying legal theory for the claim. *See Alvarez* at 1157 and *Skaff* at 839.

23   The Complaint [ECF No. 1] demonstrates the fallacy of the Debtor's argument. Page 8 of

24   the Complaint states the "SECOND CLAIM FOR RELIEF" as "Objection to Discharge - 11 U.S.C.

25   § 523(a)(4)." [ECF No. 1 at page 8]. Paragraph 40 of this Second Claim for Relief states: "The

26   Firm repeats and re-alleges the preceding paragraphs as though set forth fully herein and

27   incorporates the same by reference." *Id.* This means the Second Claim for Relief

28   (Nondischargeability Under Section 523(a)(4)) is based upon Paragraphs 1 to 39 of the Complaint

28

in addition to Paragraphs 41 to 49.  Paragraphs 8-15, 22-28, and 33-36 of the Complaint describe Mr. Platt's conversion of money and business opportunities from the Firm and his lies and deleting of Firm files to cover his fraudulent conversion of the Firm's money and business opportunities.  *Id.* All of these allegations are included in the Section 523(a)(4) claim, and they clearly satisfy the notice requirements under Ninth Circuit law.  *See Alvarez* at 1157 and *Skaff* at 839.  The controlling Ninth Circuit law of *Ormsby v. First American Title Co.*, 591 F.3d 1199 (9th Cir. 2009), makes it clear that a conversion under Nevada law clearly qualifies as larceny under the federal standard for purposes of Section 523(a)(4).  Accordingly, the Debtor certainly had adequate notice of the Section 523(a)(4) claim, and that conversion/larceny was one basis of the claim.

**G.   UNTRUSTWORTHINESS OF MR. PLATT**

The only way this Court could rule in favor of Mr. Platt is if this Court believes his incredible testimony about his partnership status and the alleged consent for his illicit actions (which never happened and could not happen without the consent of all Managing Partners), none of which is corroborated by anything other than his hearsay testimony.  However, the following obvious misrepresentations of Mr. Platt (all of which are in the evidence summary above) demonstrate his utter lack of credibility.

1.   Mr. Platt told Mr. Whitaker he was representing the Renaissance Academy on a pro bono basis.  (**This was a lie as Mr. Platt was being paid for this work**).

2.   Mr. Platt filed a false tax return for 2012.  (**This was a lie to the IRS because Mr. Platt failed to report $25,065 in income for legal services to Renaissance Academy**).

3.   Mr. Platt filed a false tax return for 2013.  (**This was a lie to the IRS because Mr. Platt failed to report $5,250.00 in income for legal services to Renaissance Academy**).

4.   Mr. Platt filed a false tax return for 2015.  (**This was a lie to the IRS because Mr. Platt failed to report $1,500 in income for legal services to Renaissance Academy**).

5.   In April 2018, Mr. Platt told Mr. Whitaker and Mr. Erickson that he only received $2,500 from the Renaissance Academy.  (**This was a lie as Mr. Platt knew he had received $31,815 for legal services to Renaissance Academy**).

6.   In April 2018, Mr. Platt told Mr. Whitaker and Mr. Erickson that the only money he had ever received outside of WEW was the $2,500 he received from Renaissance Academy.  (**This was a lie because Mr. Platt knew he had received an additional $134,920 in legal fees through his hidden competing law firm**).

7.   In his April 9, 2019 Deposition, Mr. Platt changed his earlier lie by testifying under oath that he had received "at least $10,000 but not much more" from Renaissance Academy.  (Platt

29

depo 78:7-18) **(This was a lie because Mr. Platt knew he had received three times this much, $31,815)**.

8.    In his April 9, 2015 Deposition, Mr. Platt testified under oath that the Renaissance Academy checkbook and check register had been turned over the State of Nevada. (Platt depo 79:15-20) (**This was a lie as the checkbook was never turned over to the State**).

9.    On April 20, 2018, after being caught deleting files from the Firm's server, Mr. Platt told Mr. Whitaker that he had only deleted personal records. (**This was a lie as Mr. Platt deleted client records, billing records and financial records belonging to the Firm and other records to conceal his fraud**).

10.    On April 28, 2018, Mr. Platt informed Firm clients that the Firm Partners had begun a dissolution of the Firm to convince them to move their work to him. **(Exhibit "32")** (**This was a lie as the Firm Partners had made no decision at this time regarding dissolution and did not decide until the end of May**).

Obviously, Mr. Platt was willing to offer lie after lie to conceal his fraud from the Firm, but he was also willing to commit tax fraud to cover up his actions and avoid his legal obligations.  If Mr. Platt is willing to lie to cover-up his actions, his testimony to this Court lacks any credibility and should be disregarded.

**III.**

**CONCLUSION**

The Complaint properly alleges a claim for nondischargeability under 11 U.S.C. § 523(a)(4).  The Firm presented overwhelming evidence that Mr. Platt's debt is nondischargeable under Section 523(a)(4) based upon (i) a state law conversion claim (which is larceny under the controlling Ninth Circuit law set forth in *Ormsby),* and (ii) fraud while acting in a fiduciary capacity created by a statutorily created express trust (under the controlling Ninth Circuit law of *Short*).  Mr. Platt clearly converted Firm fees, clients, business opportunities and other resources to his personal use, resulting in a debt of $166,735.00 in actual damages, $2,093.02 in consequential damages (restoring the deleted files) and at least $500,000.00 in punitive damages.  These total damages are nondischargeable under 11 U.S.C § 523(a)(4).  This conversion, larceny and fraud while acting in a fiduciary capacity, was never authorized by the Firm because NRS 87.090(2) required all the Managing Partners to approve Mr. Platt's fraudulent actions, and this never happened.  Mr. Platt then did everything in his power to fraudulently conceal his actions from the Managing Partners.

DATED this 21st day of June, 2021.

**GERRARD COX LARSEN**

*/s/ Douglas D. Gerrard, Esq.*
Douglas D. Gerrard, Esq.
Nathan R. Henderson, Esq.
2450 Saint Rose Parkway, Suite 200
Henderson, Nevada  89074
*Attorneys for Creditor,*
*Woods & Erickson, LLP*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of GERRARD COX LARSEN, and that on the 21st day of June, 2021,  I served a copy of the **PRE-TRIAL STATEMENT**, as follows:

a.      Electronically Mailed by ECF System:

DOUGLAS D. GERRARD on behalf of Plaintiff WOODS & ERICKSON, LLP
dgerrard@gerrard-cox.com; kMr.son@gerrard-cox.com; emedellin@gerrard-cox.com; kgonzales@gerrard-cox.com; nhenderson@gerrard-cox.com; fbiedermann@gerrard-cox.com; gmilne@gerrard-cox.com

MATTHEW L. JOHNSON on behalf of Defendant ANDREW B. PLATT
annabelle@mMr.sonlaw.com; mMr.son@mMr.sonlaw.com; maria@mMr.sonlaw.com

*/s/ Kaytlyn H. Johnson*
Kaytlyn H. Johnson, An Employee of
GERRARD COX LARSEN