1    Douglas D. Gerrard, Esq.
     Nevada Bar No. 4613
2    dgerrard@gerrard-cox.com
     Gary C. Milne, Esq.
3    Nevada Bar No. 3653
     gmilne@gerrard-cox.com
4    **GERRARD COX LARSEN**
     2450 Saint Rose Parkway, Suite 200
5    Henderson, Nevada  89074
     (702) 796-4000
6    *Attorneys for Creditor*,
     WOODS & ERICKSON, LLP

7

8                    **UNITED STATES BANKRUPTCY COURT**

                          **DISTRICT OF NEVADA**
9

10   In Re:                                    Case No. BK-S-19-17282-btb

11   ANDREW B. PLATT and RUTH ANN PLATT        Adversary Proceeding: 19-01125

                              Debtor(s).       Chapter 7
12

13   WOODS & ERICKSON, LLP, a Nevada
     Limited Liability Partnership, d/b/a WOODS
14   ERICKSON & WHITAKER, LLP,

15                              Plaintiff,

16   vs.

17   ANDREW B. PLATT, an individual,

18                              Defendant.

19              **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

20          This matter having come before the Court for a trial which occurred on May 18, 19, 20, 21,

21   24 and 25, 2021, the Plaintiff, WOODS & ERICKSON, LLP d/b/a WOODS ERICKSON &

22   WHITAKER, LLP, ("WEW" or "Firm"),  having appeared by and through its counsel, Douglas D.

23   Gerrard, Esq. and GERRARD COX LARSEN; the Defendant/Debtor, ANDREW B. PLATT,

24   having appeared through his counsel, Matthew L. Johnson, Esq. and JOHNSON & GUBLER, PC.;

25   the Court having entered Judgment in this matter on August 26, 2021 in favor of WEW, (Doc. 87),

26   which Judgment was subsequently appealed to the Bankruptcy Appellate Panel of the Ninth Circuit

27   ("BAP"); the BAP having issued its Memorandum and Judgment, (Doc. 198), vacating the

28   Judgment and remanding the matter to this Court for further action consistent with its

                                         1

Memorandum; this Court having reviewed the  Memorandum and the complete record of Adv. No. 2:19-bk-01125 and Adv. No. 2:19-bk-01122, including the complete trial transcript and all trial exhibits admitted therein, and having reviewed and considered the facts, testimony of witnesses, the supplemental briefs and oral argument of counsel and good cause appearing, the Court makes the following detailed Findings of Fact and Conclusions of Law.[1]

## I.

### **FINDINGS OF FACT** [2]

### **PROCEDURAL HISTORY**

1.      On May 23, 2018, the Firm filed a Complaint in the Eighth Judicial District Court for Clark County, Nevada, against Andrew B. Platt ("Mr. Platt") and others, alleging causes of action for Breach of Fiduciary Duty, Civil Conspiracy, Conversion, Fraudulent Misrepresentation, Injunctive Relief, Constructive Trust, and Punitive Damages ("State Court Action").[3]

2.      Extensive discovery followed in the State Court Action, where Mr. Platt had filed a demand for a jury trial, leading up to a November 18, 2019 trial date.  On November 13, 2019, Mr. Platt filed a Chapter 7 Voluntary Petition in the United States Bankruptcy Court for the District of Nevada, as Bk. No. 2:19-bk-17282-BTB.  (Doc. 1).

3.      On December 13, 2019, the Firm filed a Notice of Removal, removing the State Court Action to this Court (as Adv. No. 2:19-bk-01122) (the "Removed Action").  (Removed Action Doc. 1)

4.      On December 27, 2019, the Firm filed an adversary proceeding against Mr. Platt, objecting to his discharge (as Adv. No. 2:19-bk-01125) (the "ND Action") (ND Action Doc. 1), which included two claims for relief as follows:

---

[1]  Any finding of fact that is more appropriately a conclusion of law shall be so deemed.  Any conclusion of law that is more appropriately a finding of fact shall be so deemed.

[2]  Throughout, citation is made to "Transcripts" which includes: (a) the transcript of a May 5, 2021 hearing on the Firm's motion to for leave to amend its original complaint (Transcripts 0352 - 0396); (b) the transcript of a May 14, 2021 hearing on competing motions in limine (Transcripts 0397 - 0475); and (c) the transcript from six days of trial (Transcripts 0476 - 1700).  Reference herein is also made to "Exhibits" which are those exhibits admitted during trial.

[3]  An Amended Complaint was filed on May 13, 2019.

First Claim for Relief: (Objection to Discharge - 11.U.S.C. § 523(a)(2)(A)); and

Second Claim for Relief: (Objection to Discharge - 11 U.S.C. § 523 (a)(4)).

5.    On January 6, 2020, the Firm filed its Motion to Consolidate the Removed Action and the ND Action.  (Removed Action Doc. 4).  Mr. Platt filed his Opposition to this Motion on February 5, 2020, (Removed Action Doc. 8), and the Firm filed its Reply in support of the Motion on February 10, 2020. (Removed Action Doc. 9).[4]  At the April 10, 2020 hearing on the Motion to Consolidate (no Discovery Plan having yet been filed), it was asserted by Mr. Platt that because he had requested a jury trial in the Removed Action, (Removed Action Doc. 57 at Page 4, lines 9 - 10), the ND Action should not be consolidated with the Removed Action, as the ND Action is premised in equity and would be a bench trial before this Court. (*Id.*, at Page 10, lines 11 - 23).  This Court agreed with Mr. Platt's argument, and thus denied the Motion to Consolidate and scheduled two separate trials to occur, with the Removed Action proceeding to trial first and the ND Action proceeding closely thereafter. It was expected that the Court could make factual findings based upon the record of the Removed Action trial, which would greatly reduce the length of the trial in the ND Action.

6.    Accordingly, the Court scheduled the jury trial for the Removed Action to occur first (estimated to take 10 days) for April 5 - 16, 2021, and scheduled the bench trial for the ND Action to occur second (estimated to take 2 days) for May 20 - 21, 2021.  (*Id.* at Page 12, Line 18 - Page 18, Line 20).[5]  The Court's Order denying consolidation was then filed on April 14, 2020. (Removed Action Doc. 22).

7.    In denying the Motion to Consolidate, this Court did not waive its right to determine or establish damages against Mr. Platt in the ND Action, nor should any intention to waive this right be implied from the Court's denial of the Motion to Consolidate.  The Court was merely scheduling the two adversary proceedings in a manner which the Court believed would conserve judicial resources under the circumstances, given Mr. Platt's jury demand in the Removed Action.

---

[4]  An Errata was filed on February 12, 2020. (Removed Action Doc. 12).

[5]  A Scheduling Order was filed in the ND Action on April 16, 2020.  (ND Action Doc. 13)

1    However, because COVID-19 created obstacles to holding jury trials, this Court later reversed the

2    order of the two trials, as explained hereafter, which resulted in this Court hearing the evidence on

3    the underlying claims from the Removed Action as such was required for this Court to make

4    determinations in the ND Action which proceeded to trial first.  The evidence to determine the ND

5    Action is clearly sufficient for this Court to render a money judgment, as this Court is permitted to

6    do under controlling Ninth Circuit law.  *In re Kennedy*, 108 F.3d 1015, 1017 - 1018 (9th Cir. 1997).

7         8.    Given the COVID-19 problems with jury trials, this Court gave both parties notice,

8    (through a February 18, 2021 email from Illuminada Starzyk, Deputy Courtroom Clerk), that the

9    jury trial in the Removed Action would need to be rescheduled, and the Court addressed this issue

10   with the parties in a March 10, 2021 status hearing, at which time the Court gave the parties the

11   opportunity to waive the jury demand to permit the Removed Action to proceed first as a bench

12   trial.  Mr. Platt refused to waive his jury demand, as is his right, which resulted in this Court

13   rescheduling the ND Action to proceed to trial first on May 19, 2021.  Mr. Platt was well aware that

14   the ND Action would be proceeding to trial before the Removed Action, and this Court has never

15   indicated or implied that it would not be making decisions or awarding damages through the ND

16   Action on the underlying claims giving rise to the ND Action (which were also before this Court in

17   the Removed Action), particularly when the evidence needed to decide the ND Action is the same

18   evidence needed to decide the Removed Action.

19        9.    On April 6, 2021, the Court's Amended Scheduling Order was filed, (ND Action

20   Doc. 45), officially setting the non-jury trial of the ND Action to occur first via Zoom on May 17 -

21   21, 2021.  The trial of the Removed Action was taken completely off calendar, as jury trials were

22   not occurring by reason of COVID-19 protocols.

23        10.   On December 29, 2020, Mr. Platt's Amended Motion for Summary Judgment was

24   filed.  (ND Action Doc. 25).  The Firm's Opposition was filed on February 10, 2021 (ND Action

25   Doc. 35), and Mr. Platt's Reply was filed on March 3, 2021.  (ND Action Doc. 38).  A hearing was

26   held on April 1, 2021, and an Order was filed on May 13, 2021, granting Mr. Platt's motion as to

27   the Firm's claims brought under 11 U.S.C. § 523(a)(2)(A), but denying the motion with respect to

28   / /

the Firm's claims brought under 11 U.S.C. § 523(a)(4), as genuine issues of fact remained precluding summary judgment.  (ND Action Doc. 74).

11.    On March 9, 2021, before the hearing on Mr. Platt's motion for summary judgment, the Firm filed its Motion to Amend Complaint in the ND Action, seeking to add a claim to prevent the Debtor's discharge based upon 11 U.S.C. § 523(a)(6).  The proposed amended complaint also included additional language adding more specificity to the existing claim made under 11 U.S.C. § 523(a)(4), by adding the labels "larceny" and "embezzlement" to the existing 523(a)(4) claim based upon conversion.  The Firm did not seek to amend its claim under 11 U.S.C. § 523(a)(4), as it had already been sufficiently pled, but sought to refine the legal theories underlying the Section 523(a)(4) claims already pled.  (ND Action Doc. 39)  Mr. Platt's Opposition was filed on April 21, 2021 (ND Action Doc. 52) and the Firm's Reply was filed on April 28, 2021 (ND Action Doc. 56).

12.    A hearing was held on May 5, 2021 on the Motion to Amend.  (Transcripts 0352).
The Court denied the Firm's Motion to Amend as it related to the request to add a new claim under 11 U.S.C. § 523(a)(6).  The hearing was almost exclusively regarding whether a Section 523(a)(6) claim could be added.  At the conclusion of the hearing, the Court indicated it believed embezzlement and larceny under federal law were not the same as a state law conversion and as a result, neither larceny nor embezzlement had been pled as part of the Section 523(a)(4) claim and thus could not serve as a basis of the pending Section 523(a)(4) claim.  (Transcripts 0384-0387). This was an interlocutory order which was subject to being changed by the Court.  *United States v. Fernandez*, 772 F.2d 495, 503-04 (9th Cir. 1985) ("As in the case of any opinion, order, or other pronouncement which does not amount to a final judgment, the recitals and decretal provisions of the order . . . [are] subject to revision;" 7 Moore's Federal Practice P60.20 (1983 ed.).")  Counsel for Mr. Platt was to prepare a written order and pass it by the Firm's counsel for review. (Transcripts 0393 at lines 9 - 16).  However, a written order was never submitted to, nor entered by the Court.

13.    The Court had reason to reconsider its oral order when the Court reviewed the Firm's Pretrial Statement, which included Ninth Circuit legal authority indicating that a state law conversion can constitute larceny under federal common law, for purposes of Section 523(a)(4),

which was contrary to the Court's previous view on this issue and which the Court had not carefully examined. *See In re Ormsby*, 591 F.3d 1199, 1205 (9th Cir. 2010) (in which a conversion claim under Nevada law was determined to constitute larceny for purposes of Section 523(a)(4)). (ND Action Doc. 62). This authority persuaded the Court that the allegations of conversion of money, property and business opportunities, set forth in the original complaint, all of which were incorporated by reference into the Section 523(a)(4) claim, satisfied the Ninth Circuit's notice pleading requirements, as set forth in *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) and *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 839 (9th Cir. 2007), and that the Firm's original complaint was not required to use the label "larceny" to have properly pled a claim for non-dischargeability under Section 523(a)(4) when all the facts creating the larceny were pled. As the Firm was only required to plead what the claim is (non-dischargeability under Section 523(a)(4)) and not the legal theories that support the claim, and as all facts establishing the larceny are pled in the original complaint, the Court determined that it was appropriate to allow the Firm to proceed on a Section 523(a)(4) claim based upon larceny, embezzlement and fraud or defalcation while acting in a fiduciary capacity.

14.    From the outset of the ND Action, Mr. Platt has at all times been on notice that the basis of the Section 523(a)(4) claim was a fraudulent conversion of the Firm's property, money and business opportunities, as that was pled in the original complaint, and because the facts pled to establish the conversion (larceny) are the same facts that likewise supported the "fraud or defalcation while acting in a fiduciary capacity" basis for the Section 523(a)(4) claim (i.e. the fraudulent taking of the money, property and business opportunities was both the "fraud or defalcation" and the "larceny"). Thus, the ND Action trial was at all times going to be about the fraudulent misappropriation and conversion of the Firm's money, property and business opportunities, all of which was alleged in the original ND Action complaint.

/ /

/ /

/ /

/ /

15.     A bench trial commenced in the ND Action, with opening statements on May 18, 2021, and without objection from Mr. Platt, the Firm described its claim and the controlling law,[6] as follows:

> So, Your Honor, let's talk about what this case is actually about. We asserted at the beginning of this case a claim for a non-dischargeability under 523(a)(2), and a separate claim for non-dischargeability under 523 (a)(4). Mr. Johnson would like the Court to believe that we are limited in this action on our 523(a)(4) claim to simply whether Mr. Platt breached his fiduciary duties, entered into a defalcation in committing fraud against the partnership. And that certainly is one of the bases under 523(a)(4) that we've alleged. But we have also alleged throughout our complaint that Mr. Platt took money, business opportunities, firm clients, firm legal forms that have been developed over the course of 30 years by the firm's partners, and diverted all of these things to his personal use. And we have made clear from the beginning that those claims are included in our 523(a)(4) claim. They are certainly incorporated by reference from our original complaint in our 523(a)(4) claim. And we certainly expect to present evidence on those items.

(Transcripts 0499, line 20 - 0500, line 12).

> And we have alleged that from the very beginning of our complaint, and we intent (sic) to put on the evidence of that larceny and that embezzlement.

(Transcripts 0503, lines 11 - 13).

> So, in conclusion, Your Honor, you will see that not only has the conduct of Mr. Platt – that the conduct that is alleged in the non-dischargeability complaint, not only does it qualify as fraud and defalcation while acting in a fiduciary capacity, it also meets the definition of embezzlement and larceny under the federal common law, and those are the allegations that are contained in our original complaint. And you will see that Mr. Platt's actions constitute all of those at the conclusion of this case. But with that, Your Honor, we're prepared to call our first witness.

(Transcripts 0512, lines 7 - 17).

16.     Thereafter, six days of trial in the ND Action continued via Zoom, on May 18, 19, 20, 21, 24, and 25, 2021, throughout which evidence related to the fraudulent taking (conversion/larceny) of the Firm's property, money and business opportunities was presented. (Transcripts 0476 - 1700). At no time during the trial did Mr. Platt argue that there was additional

---

[6] *In re Ormsby,* 591 F.3d 1199 (9th Cir. 2010) (the Nevada state law definition of conversion constitutes a larceny or embezzlement under federal definitions).

7

evidence on these topics that he was unable to present because he believed the trial would not include evidence about larceny, indeed such an argument would be contrary to what all parties understood the trial would be about - Mr. Platt's conduct in fraudulently converting to his own use the money, property and business opportunities belonging to the Firm.

17.    At the conclusion of the trial, Post-Trial Briefs were requested by the Court and filed by the parties on June 21, 2021. (ND Action Doc. 81 and 83).[7]

18.    On July 29, 2021, this Court issued an oral ruling in favor of the Firm on its Section 523(a)(4) claim against Mr. Platt that had been alleged in the ND Action.  The Court quantified the Firm's actual damages (but not the punitive damages portion of the underlying claim) and determined it was not dischargeable, both on the basis that Mr. Platt had committed fraud while acting in a fiduciary capacity and because Mr. Platt's actions in converting money, property and business opportunities belonging to the Firm, constituted larceny for purposed of Section 523(a)(4). The Court then sent the Removed Action back to the State Court to determine the remainder of the damage claims that had not been decided in the ND Action.

19.    The Clerk's docket in the ND Action indicates that as of August 20, 2021, Chief Judge August B. Landis was added to the case, while Judge Bruce T. Beesley's involvement was terminated through his retirement.

20.    On August 26, 2021, the Court entered a final judgment in favor of the Firm on  its 11 U.S.C. § 523(a)(4) claim against Mr. Platt in the ND Action, denying him a discharge of his debt, quantifying the Firm's actual damages in the total amount of $166,735.00 ($31,815.00 in fees taken by Mr. Platt in connection with Renaissance Academy and $134,920.00 in fees taken by Mr. Platt in connection with L&S), all of which had been converted for Mr. Platt's own benefit ("Judgment").  (Doc. 87 at Page 2, Lines 14 - 23).

21.    On September 20, 2021, a Stipulation and Order to Remand to State Court was filed, in keeping with Judge Beesley's oral ruling, whereby the Removed Action was remanded back to State Court for a determination of other damages sustained by the Firm arising out of the

---

[7] The Firm's motion to strike certain exhibits and arguments from Mr. Platt's post-trial brief was filed on July 1, 2021.  (Doc. 84)

1  conversion/larceny, all of which damages had been determined by this Court to be non-

2  dischargeable.  (Removed Action Doc. 87).  If the State Court determines there are additional

3  damages arising out of the conversion claim (i.e. punitive damages and attorney's fees), such

4  damages will likewise be non-dischargeable under Section 523(a)(4), for the same reasons stated

5  herein.

6      22.    On April 25, 2022, an Order reassigning this matter to Judge Gary Spraker was filed.

7  (ND Action Doc. 197).

8                          **THE NATURE OF THE FIRM**

9      23.    The Firm is a Nevada limited liability partnership ("Partnership") which was

10  founded by Managing Partners John Erickson ("Mr. Erickson") and Glen Woods on January 1,

11  1995 and has been operating as a law firm in Clark County, Nevada since that time.  (*See* Exhibit

12  "1" at Preamble).  On January 1, 2005, the Firm added Brian Whitaker ("Mr. Whitaker") as a

13  General Partner.  Aaron Maurice was added as a General Partner on January 1, 2007.  (*Id.*)

14      24.    The Partnership Agreement was completely amended and restated effective February

15  12, 2007, with all the partners identified in the preceding paragraph.  (*Id.*)

16      25.    Prior to the departure of Mr. Maurice from the Firm, the Partnership was owned by

17  each of the following Managing Partners, in the percentages listed below:

18      Glen Woods        34.0%

19      John Erickson      29.5%

20      Brian Whitaker     19.5%

21      Aaron Maurice      17.0%

22  (*See* Exhibit "1" at § 2.3, Transcripts 0519, 0943-44).

23      26.    Effective August 12, 2013, the Partnership Agreement was amended to reflect a

24  change in the ownership interest of the Managing Partners of the Firm as a result of Mr. Erickson

25  taking a leave of absence to serve a 3-year mission for the Church of Jesus Christ of Latter-Day

26  / /

27  / /

28  / /

9

Saints and Aaron Maurice departing from the Firm.  The amended ownership percentages of the Firm were:

| | |
|---|---|
| Glen Woods | 59.0% |
| John Erickson | 4.0% |
| Brian Whitaker | 37.0% |

(Exhibit "2" at § 2.3);(Transcripts 0534).  However, Mr. Erickson remained a Managing Partner with the right to participate in any management decisions during his missionary service. (Transcripts 533-35; 0992-94).  Mr. Erickson returned home from his 3-year missionary service in July, 2016 and began working again at the Firm.  (Transcripts 0993).

27.    The Firm is engaged in the general practice of law but focused primarily on all aspects of business law, estate planning, succession planning, and asset protection planning, including the formation and maintenance of corporations, limited liability companies, all forms of partnerships and trusts.  (Transcripts 0945-47).

28.    The Partnership Agreement states that the "purpose of the Partnership and the character of its business shall be:

> (a) To engage in the practice of law, including activities incident and ancillary thereto.
>
> (b) To do each and everything necessary, suitable or proper for the accomplishment of the foregoing or that may at any time appear to be conducive to or expedient for the **protection or benefit** of the business of the Partnership, and to engage in all activities necessary, customary or incidental to the foregoing.

(*See* Exhibit "1" at § 1.4) (emphasis added).

29.    The Partnership Agreement, at Section 5.8, requires every partner to first offer to the Partnership any opportunity within the scope of the Partnership's business.  (*See* Exhibit "1" at § 5.8).

30.    The Partnership Agreement requires that all non-routine decisions for the Firm are to be made by the Managing Partners of the Firm, **<u>acting as a body</u>**, and does not allow for unilateral decision making by any one Managing Partner with respect to any non-routine decision affecting the Firm.  (*See* Exhibit "1" at §§ 5.1 to 5.5).  The Partnership Agreement specifically provides that "each Managing Partner shall have the right to participate in the deliberations of the Managing

9

Partners in respect of Partnership Decisions" and that "[t]he Managing Partners, acting as a body, are empowered and authorized to make all decisions in the management and operation of the Partnership . . . ." Non-routine decisions at the Firm were made by **all** partners discussing the decision and then arriving at a consensus. (*Id.* at § 5.4); (Transcripts 0529-31, 0974, 0983-84).

31.     All Managing Partners routinely participated in all Partnership Decisions, which are defined as "those [decisions] that arise in the course of the business of the Partnership, but that do not necessarily arise daily or even weekly, and that require the exercise of discretion and judgment by the management of the Partnership." The Managing Partners also participated in considering and deciding Extraordinary Decisions, which are defined as "those [decisions] that affect in profound ways the relationship between the Managing Partners and the Partnership." (*See* Exhibit "1" at §§ 5.2(b) & (c)); (Transcripts 0521-27, 0529-31, 0881-83, 0886-87).

32.     Allowing an attorney to set up a competing business to the law firm that the attorney works for is not carrying on the business of the law firm in the ordinary course. (Transcripts 1244 - 1245).

33.     The Firm provided dissolution or wind-up services to its entity clients. (Transcripts 0548-49, 0995-96). If an attorney employed full-time by the Firm provided legal or wind-up services to an entity in exchange for payment, that money and the business opportunity belonged to the Firm. (*Id.*)

34.     The Partnership Agreement was contained in the Firm's corporate book and on the Firm's data server, which was available to Mr. Platt at any time to review and determine whose consent would be required to approve him directly competing with the Firm. (Transcripts 1235-37).

35.     Approval for a Firm attorney to open and operate a competing law firm while continuing to work at the Firm, is something that the Partnership Agreement would require disclosure to, and a vote of, all Managing Partners. (Transcripts 0975-76, 0983-84, 1247).

### **THE UNIFORM PARTNERSHIP ACT GOVERNED THE PARTNERSHIP**

36.     There are two possible partnership acts that could govern the operations of the Partnership. NRS 87.010 to 87.430 is referred to as the "Uniform Partnership Act" and it applies to

1  partnerships formed before July 1, 2006 or partnerships which are formed after July 1, 2006 that

2  elect to be governed by the Uniform Partnership Act. *See* NRS 87.010 and 87.025. NRS 87.4301

3  to 87.4357 is referred to as the "Uniform Partnership Act (1997)" and it applies to partnerships

4  formed on or after July 1, 2006 or partnerships formed before July 1, 2006 that elect to be governed

5  by the Uniform Partnership Act (1997). *See* NRS 87.4301 and 87.4314. The Court finds that for

6  purposes of this action, the distinction between the Uniform Partnership Act and the Uniform

7  Partnership Act (1997) is without a meaning as both Acts have virtually identical provisions for

8  purposes of what is at issue herein.[8] However, because the Partnership was formed in 1995 and it

9  makes reference to the Uniform Partnership Act in at least one provision (Section 3.1 of the

10  Partnership Agreement adopts and applies NRS 87.150(3)), the Court will treat the Partnership

11  Agreement as being governed by the Uniform Partnership Act.

12  ## MR. PLATT'S EMPLOYMENT AND LIMITED PARTNERSHIP

13  37.    In 2007, the Firm hired Mr. Platt as a full-time associate attorney. Mr. Platt worked

14  as an associate attorney until January 1, 2016, at which time he became a Limited Partner of the

15  Firm. (Transcripts 0516, 0550-51).

16  38.    Mr. Platt worked primarily in the areas of corporate formation and planning, tax and

17  estate planning and Mr. Platt testified that he had "extensive knowledge of corporate law and the

18  way partnerships are governed." (Transcripts 1237). Mr. Platt admitted he was very familiar with

19  the requirements of NRS 87.090(1) & (2), which provides:

20  **NRS 87.090 Partner agent of partnership; restrictions on authority**.

21  1. Every partner is an agent of the partnership for the purpose of its business, and the
act of every partner, including the execution in the partnership name of any instrument,
22  for apparently carrying on in the usual way the business of the partnership of which the
partner is a member binds the partnership, unless the partner so acting has in fact no
23  authority to act for the partnership in the particular matter, and the person with whom
the partner is dealing has knowledge of the fact that the partner has no such authority.
24

25  / /

26

27  [8] *Compare* NRS 87.090(2) to NRS 87.4325(2) (both state that an act of a partner which is not apparently for
carrying on the business of the partnership in the ordinary way, must be approved by the other partners); *compare* NRS
28  87.210(1) to NRS 87.4336(2)(a) (both state that a partner is an express trustee over any property or profits derived by
the partner in the conduct of the partnership business).

**2. An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners**.   (Emphasis added).

(Transcripts 0947, 1237-38) (emphasis added).

39.      Mr. Platt's compensation for his work as an associate attorney from 2007 until 12/31/2015 was a fixed salary each year.  After becoming a limited partner, Mr. Platt received a share of the Firm profits from 01/01/2016 until 12/31/2017.  The compensation to Mr. Platt for these years, and the percentage his compensation increased year-to-year, is taken from Mr. Platt's W-2 Forms and K-1 Forms (Exhibit "8"), and is summarized as follows:

2007 - $34,708.32

2008 - $85,000.08 (no percentage increase is reflected for this year because 2007 compensation is for a part-year only)

2009 – $95,449.92 (12.3% increase)

2010 - $105,535.92 (10.6% increase)

2011 - $109,138.72 (3.4% increase)

2012 - $118,399.92 (8.5% increase)

2013 - $124,324.92 (5% increase)

2014 - $134,458.33 (8.2% increase)

2015 - $134,900.00 (.3% increase)

**2016 - $209,913.00 (55.6% increase because Mr. Platt became a limited partner)**

**2017 - $260,331.00 (24% increase because Mr. Platt was a limited partner)**

40.      Mr. Platt has argued that he was never a limited partner of the Firm and was just a commissioned employee, and thus owed no duties to the Firm as a partner.  The Court rejects Mr. Platt's argument and finds that Mr. Platt was an employee until December 31, 2015, and finds that from January 1, 2016 until April 20, 2018, Mr. Platt was a limited partner of the Firm, for the reasons stated hereafter.

41.      In December, 2015, Mr. Platt sent a series of emails to one of the Managing Partners, Glen Woods, captioned "**Andrew's transition to LP**" that discussed the terms for Mr. Platt becoming a Limited Partner of the Firm starting January 1, 2016.  (*See* Exhibit "4");

(Transcripts 1304-07, 0552-57).  Attached to these emails is a document drafted by Mr. Platt titled **AGREEMENT OF ADMISSION OF LIMITED PARTNER** which stated the following terms of his becoming a limited partner:

1.      As of January 1, 2016, Woods & Erickson LLP, a Nevada limited liability partnership (the "Firm") admits Andrew Platt ("Andrew" or "the Limited Partner") as a limited partner of the Firm.

2.      The Limited Partner receives no percentage interest in the profits, losses, or capital of the Firm **except for profits corresponding to the profit sharing rights as agreed in Schedule A** as the same may be amended by the Firm from time to time.

3.      The Limited Partner shall be treated for tax purposes as a partner or contractor rather than as an employee.  Limited Partner is not eligible for 401(k) matching by the Firm.  .....

4.      The Limited Partner may withdraw as limited partner and may be expelled from the Firm at any time without cause.  Unless otherwise specifically agreed in writing, the Limited Partner is not entitled to Profit Share or Equity Share (as both are defined in Schedule A) for amounts received by the firm when such Limited Partner shall not be a partner.

(*See* Exhibit "4"); (Transcripts 0557, 0891, 1306-07).

42.    Schedule A to this Agreement of Admission of Limited Partner described Mr. Platt's "Profit Share" as follows:

1.      The Firm shall pay to Limited Partner fifty percent of amounts received by the firm for hours billed to clients by the Limited Partner as such partner's "Profit Share.

2.      Profit Share shall also include fifty percent of amounts received by the firm for flat fee products and services sold by the Limited Partner adjusted for (a) fee-splitting agreements with other firms and (b) time billed in delivery of such flat fee matters by other partners and employees.

13

3.      The Firm shall pay the Profit Share on or as close to the 10th of each month as the Firm shall determine practical.

(*See* Exhibit "4").  The remainder of Schedule A to the  Agreement of Admission of Limited Partner described how Mr. Platt would receive certain draws against his "Profit Share" at the commencement of his limited partnership, all of which draws were paid by the Firm, exactly in accordance with Schedule A.  (*See* Exhibit "4"); (Transcripts 0502-557); (Exhibit "7").

43.      Mr. Platt claimed that he was not a limited partner of the Firm because a signed copy of this Agreement of Admission of Limited Partner cannot be located.  (Transcripts 0567).  However, the evidence demonstrates that each of the four terms of the Agreement of Admission of Limited Partner were accepted and performed by both Mr. Platt and the Firm (Transcripts 0567-68), creating an enforceable agreement between the Firm and Mr. Platt. *See Micheletti v. Fugitt*, 61 Nev. 478, 489, 134 P.2d 99, 104 ("Where a complete agreement was made orally, the fact that it was expected that a written contract would afterwards be signed, embodying the terms of the oral contract, does not prevent the oral contract from taking effect.").  The performance of the terms of this agreement and the reliance thereon by both the Firm and Mr. Platt, acts as an estoppel of Mr. Platt's argument that he never became a limited partner.  *See Zunino v. Paramore*, 83 Nev. 506, 509, 435 P.2d 196, 197 (1967) ("to constitute estoppel the party relying on it must be influenced by the acts or silence of the other and it must appear that the acts or conduct of the party estopped caused the party relying to act as he would not have acted or he cannot complain that he was deceived to his prejudice.").  The statute of frauds would not apply to this oral agreement because performance occurred by both parties in reliance thereon and the elements of equitable estoppel are present. *See Schreiber v. Schreiber*, 99 Nev. 453, 455, 663 P.2d 1189, 1190 (1983) ("the statute of frauds is intended for the protection of the respective parties to a parol agreement.  Whenever one party, confiding in the integrity and good faith of another, proceeds so far in the execution of a parol agreement that he can have no adequate remedy unless the whole contract is enforced, then equity requires such relief to be granted; because, if the rules were otherwise, the statue [of frauds] which is designed to prevent fraud, would become an instrument of fraud" *citing Evans v. Lee*, 12 Nev. 393 (1877)).  Thus, an enforceable agreement existed between Mr. Platt and the Firm, the

terms of which are set forth in Paragraph 41 above, pursuant to which Mr. Platt became and was a limited partner of the Firm from January 1, 2016 to April 20, 2018.

44.    The evidence demonstrating that the parties accepted the terms of the agreement of limited partnership and performed in reliance thereon is as follows:

 **Term No. 1.  Mr. Platt was admitted as a limited partner of WEW** on January 1, 2016.  (*See* Exhibit "4").

➜Mr. Platt testified that he held himself out as a limited partner at the Firm both within the Firm and to clients.  (Transcripts 0563-64, 1145, 1172-77).

➜Mr. Platt was given additional authority and added as signatory to Firm bank accounts starting January 1, 2016.  (Transcripts 0564-65, 0968-69, 1207); (*See* Exhibit "28").

➜Mr. Platt received Schedule K-1s from the Firm reflecting his limited partnership profit share for both 2016 and 2017 (*See* Exhibit "8"), and filed his tax returns as a limited partner (*See* Exhibit "9"); (Transcripts 1332).

**Term No. 2.  Mr. Platt received profit sharing rights equal to 50% of his collections**.  (Exhibit "4").

➜Mr. Platt was paid a Profit Share equal to 50% of his collections from January 1, 2016 until he resigned on April 20, 2018.  (Transcripts 1063-64, 1121, 1308-09, 1313-29, 1334-35); (*See* Exhibits "7" and "8").

**Term No. 3.  Mr. Platt was treated for tax purposes as a limited partner and did not receive a 401K match.**  (*See* Exhibit "4"); (Transcripts 0561-62, 1310).

➜Mr. Platt received a Schedule K-1 as a Limited Partner for 2016, 2017 and 2018 reflecting that he was a limited partner of the Firm. (*See* Exhibit "8", Box G); (Transcripts 0579-85).

➜Mr. Platt filed his federal income tax returns representing himself as a Limited Partner to the federal government. (*See* Exhibit "9").[9]

/ /

---

[9]After this dispute arose, Mr. Platt notified the IRS that he disputed being characterized as a partner and that he considered himself to be a commission employee.  (*See* Exhibit "9" at 218).  However, Mr. Platt did not assert this position in his 2016 tax return, filed under penalty of perjury before this dispute arose.  (*See* Exhibit 9 at 199-207).

**Term No. 4.  Mr. Platt could withdraw at any time from the Firm or be expelled from the Firm, but was not entitled to any Profit Share once he ceased to be a partner.**  (*See* Exhibit "4"); (Transcripts 0562, 0998).

➡Mr. Platt resigned on April 20, 2018. (*See* Exhibit "11" at page 12); (Transcripts 1311).

➡Mr. Platt was paid his Profit Share (50% of his collections) that were received by the Firm through April 20, 2018, but nothing more.  (Transcripts 0562-63, 0565-67, 1311-13).

45.     Although no signed copy of the Agreement of Admission of Limited Partner was introduced as an Exhibit at trial and Mr. Platt testified he never signed the agreement, the evidence overwhelmingly demonstrated that Mr. Platt received and accepted all of the benefits outlined therein.  (Transcripts 0971).  Furthermore, the conduct of a partner can establish that he is a partner.  NRS 87.070(4) provides, in relevant part, as follows:

> **NRS 87.070  Rules for determining existence of partnership**.  In determining whether a partnership exists, these rules apply:
>
> . . .
>
> 4.  **The receipt by a person of a share of the profits of a business is prima facie evidence that the person is a partner in the business** . . . (Emphasis added).

46.     Exhibit "8" shows that once Mr. Platt became a limited partner of the Firm he began to receive a share of the Firm profits.  As a direct result of his receiving a share of Firm profits, Mr. Platt's compensation doubled in just two years from his last year as an associate attorney.  Mr. Platt only received this profit participation because he became a limited partner of the Firm.  Mr. Platt cannot both accept the benefits of becoming a limited partner and deny that he was a limited partner to avoid the associated fiduciary duties.  At trial, Mr. Platt claimed that he was never a limited partner of the Firm because he had not signed any partnership agreement.  However, Mr. Platt admitted he received and accepted all benefits of being a limited partner and admitted he has never offered to return the $200,444.00 in Firm Profits he received as a limited partner, which he would not be entitled to if he was still an employee (associate attorney).  (Transcripts 0552-53).

47.     The evidence demonstrates that Mr. Platt received and accepted compensation as a limited partner in accordance with the Agreement of Admission of Limited Partner, which although

/ /

16

no signed copy has been located, was followed by both the Firm and Mr. Platt and became an enforceable contract between the Firm and Mr. Platt.

48.    Both Mr. Platt and the Firm acted at all times as if the terms of the Agreement of Admission of Limited Partner were in place, (Transcripts 0568, 0707), and Mr. Platt admitted that he received a portion of the Firm's profits (that share being equal to 50% of his collections). (Transcripts 0558-59).  Thus, according to the conduct of Mr. Platt and the Firm, and pursuant to NRS 87.070(4), this Court finds that Mr. Platt was a limited partner of the Firm.

49.    As a limited partner of the Firm, Mr. Platt was subject to the following fiduciary duties and an express trust, established by Nevada statute, over any profit or benefit derived by the Partner from a partnership opportunity:

**NRS 87.210    Partner accountable as fiduciary**.

1.  Every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by the partner without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by the partner of its property.

50.    Mr. Platt was also aware and understood that "[a]n act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners." *See* NRS 87.090(2); (Transcripts 0947, 1237-38).  Thus, Mr. Platt knew that without the consent of all the partners of the Firm, (i) he could not work outside the Firm while he was an employee of the Firm, and could not accept compensation for that work without it being run through the Firm; and (ii) he could not open a competing law firm and divert Firm money and business opportunities to the competing Firm while still working at the Firm.  Mr. Platt knew NRS 87.090(2) prohibited these actions from being approved by any single partner as these actions were clearly not carrying on the business of the Firm in the usual way, and that these actions would require the consent of all partners to comply with NRS 87.090(2).

51.    The terms of Mr. Platt's limited partnership, were also the same terms that Mr. Whitaker, (when he was a limited partner), and every other limited partner that had worked at the Firm, had agreed to and operated under for many years.  (Transcripts 0516, 0894-95, 0967, 0971).

/ /

52.     Accordingly, this Court finds that Mr. Platt was an employee of the Firm until 12/31/2015, and that he became a partner of the Firm on January 1, 2016 and remained a partner of the Firm until he resigned on April 20, 2018.  This Court further finds that Mr. Platt was entitled to be paid, and was fully paid, his "Profit Share" (equal to 50% of his collections) up to the date he resigned, and that in accordance with the Agreement of Admission of Limited Partner that both the Firm and Mr. Platt were operating under, Mr. Platt was not entitled to any "Profit Share" for fees collected by the Firm after April 20, 2018 (the date he resigned).  (*See* Term No. 4 in Agreement of Admission of Limited Partner at Exhibit "4").  The Court further finds that under the terms of the enforceable agreement between the Firm and Mr. Platt, after January 1, 2016, Mr. Platt was responsible for paying his own payroll taxes and he was no longer entitled to 401K matching by the Firm.  (*See* Term No. 3 in Agreement of Admission of Limited Partner at Exhibit "4").

53.     In 2017, the Nevada Department of Employment, Training and Rehabilitation ("DETR") conducted an audit of the unemployment insurance contributions made by the Firm. DETR's audit challenged the designations of Mr. Platt and Kent Woods as limited partners (because the Firm is not required to pay a contribution for unemployment insurance for individuals who are not employees).  (*See* Exhibits "E-1" and "X"); (Transcripts 0868-77).  The auditor concluded that Mr. Platt and Kent Woods should be treated as employees for purposes of the Firm's required unemployment insurance contributions.

54.     The Firm disputed the audit, but rather than go through an administrative hearing where a hearing officer would make findings of fact and conclusions of law on these issues, the Firm simply paid the nominal amount being claimed by DETR because the amount sought by DETR did not warrant fighting over.  (*See* Exhibits "E-1" and "X"); (Transcripts 0868-77).

55.     Mr. Platt argues that the DETR audit results constitute a final and appealable administrative determination, (that he was never a limited partner but only an employee), that would be subject to issue preclusion and be binding on this Court.  Generally, federal courts must give preclusive effect to the prior findings of state administrative bodies acting in a judicial capacity.  *See University of Tennessee v. Elliott,* 478 U.S. 788, 796-98, 2 L. Ed. 2d 635, 106 S. Ct. 3220 (1986). This rule of preclusion "extend[s] to state administrative adjudications of legal as well

1   as factual issues . . . so long as the state proceeding satisfies the requires of fairness outlined in

2   [*United States v. Utah Constr. & Mining Co,* 384 U.S. 394, 422, 16 L. Ed. 2d 642, 86 S. Ct. 1545

3   (1966)]." *Guild Wineries and Distilleries v. Whitehall Co.* 853 F.2d 755, 758 (9th Cir 1988). *Utah*

4   *Construction*, announced three fairness requirements: (1) that the administrative body act in a

5   judicial capacity; (2) that the administrative body resolve disputed issues of fact; and (3) that the

6   parties have an adequate opportunity to litigate the issues. 384 U.S. at 422. The DETR audit

7   findings relied upon by Mr. Platt for his argument that he is not a partner, do not qualify under the

8   *Utah Constr.* standard for preclusive effect, because there was never any administrative hearing at

9   which the parties had the opportunity to litigate the issue, the administrative body did not act in a

10  judicial capacity through this audit, and because the administrative body did not hear any evidence

11  and thus could not have resolved any disputed issue of fact. As there was never any hearing before

12  an administrative hearing officer in order to arrive at any factual findings, the Court disagrees that

13  the DETR audit findings have any preclusive effect on this Court, and further finds that the basis of

14  the audit was not looking at the factual evidence presented in this case. (*See* Exhibits "E-1" and

15  "X"); (Transcripts 0868-77).

16
### MR. PLATT DIVERTED $31,815.00 OF LEGAL FEES TO HIMSELF FROM RENAISSANCE ACADEMY AND HID HIS ACTIVITY FROM THE FIRM
17

18      56.     From 2012 to 2015, while still an associate at the Firm, Mr. Platt provided legal

19  services to a charter school known as Renaissance Academy (the "Academy"), after the school was

20  closed. As wind-up trustee, Mr. Platt was given the ability to write and sign Academy checks.

21  (Transcripts 0901-04); (Platt's 04/09/2019 Deposition at 77:2-8).

22      57.     Mr. Platt informed the Managing Partners of the Firm that he was providing legal

23  services to the Academy on a pro bono basis (not receiving fees but instead providing free legal

24  services as a public service). (Transcripts 0540, 0796, 0905, 0944, 1147). Mr. Platt never received

25  any authorization from the Firm to bill the Academy, outside of the Firm, for his legal services and

26  keep the money for himself. (Transcripts 0538, 0915, 1268-73).

27      58.     Providing wind-up services to dissolving entities is a legal service the Firm regularly

28  provided to its clients, and Mr. Platt was aware of this. (Transcripts 0995-96).

59.     Mr. Platt has argued that acting as the wind-up trustee for the Academy was not providing "legal services". However, Mr. Platt himself repeatedly stated the work he performed for the Academy was providing "legal services". (*See* Platt's 04/09/2019 Deposition at 76-77); (Transcripts 0907-09).

60.     Rather than bill his legal work for the Academy through the Firm, Mr. Platt collected fees for his legal services outside of the Firm by using his position on the Academy's board and as wind-up trustee to pay himself legal fees. (*See* Exhibit "3").

61.     In April of 2018, the Firm learned for the first time, (during a conversation between Managing Partner Mr. Whitaker and limited partner, Kent Woods), that Mr. Platt had individually received and kept legal fees for providing legal services to the Academy. (Transcripts 0540-43); (Brian Whitaker Deposition at 123:18-124:7). This led to Mr. Whitaker and Mr. Erickson immediately confronting Mr. Platt about whether he had collected money for legal fees outside the Firm and kept the money. (Transcripts 1271); (Whitaker Deposition at 206:3-14).

62.     At that time, Mr. Platt told Mr. Erickson and Mr. Whitaker that he had only received $2,500.00 in legal fees from the Academy. (Transcripts 541-42); (Whitaker Deposition at 206:3-14). **Mr. Erickson then asked Mr. Platt if he had ever received any other money on the side (outside of the Firm) which he had not disclosed to Mr. Erickson and Mr. Whitaker, to which Mr. Platt responded** *he had never taken any other money outside of the firm other than the $2,500.00 from the Academy*. (***Id.***). This was a misrepresentation, as Mr. Platt had formed a competing law firm and had been diverting clients and fees, totaling more than $134,000.00, away from the Firm to himself for nearly a year at the time of this conversation. (*See* Exhibits "6" and "25").

63.     Later, on April 9, 2019, in deposition and under oath, Mr. Platt changed his story by claiming that the amount he had received from the Academy was no more than $15,000.00. (Transcripts 0544); (Platt's 04/09/2019 Deposition at 78:10-22).

64.     When the checkbook for the Academy was subsequently located it was discovered that the actual amount Mr. Platt received from the Academy for legal services was actually $31,815.00. (*See* Exhibit "3"). Mr. Platt also received additional money from the Academy for

1  expenses, that actually belong to the Firm as well, because Mr. Platt was using the Firm's

2  computers, phones, postage and internet to act as the wind-up trustee for the Academy.  (*Id.*);

3  (Transcripts 545-49, 1273).

4  65.  Platt not only concealed from the Firm the money he had received and fraudulently

5  converted from the Academy, but he also fraudulently concealed this money from the Internal

6  Revenue Service, failing to disclose any income aside from that received as wages from the Firm in

7  the three years in which he was paid by the Academy, 2012, 2013 and 2015.  (*See* W-2 Forms for

8  Mr. Platt at Exhibit "8", and Platt's tax transcripts and returns at Exhibits "9" and "10").  Mr.

9  Platt's fraudulent concealment of this $31,815.00 he had converted from the Firm, demonstrates his

10  knowledge that his conduct was both improper and fraudulent and demonstrates his culpable state

11  of mind in converting this money from the firm.  *See Bullock v. BankChampaign, N.A.*, 569 U.S.

12  267, 269 (2013).

### WHILE WORKING AT THE FIRM, MR. PLATT ESTABLISHED A COMPETING LAW FIRM AND DIVERTED CLIENTS AND FEES FROM THE FIRM

13
14

15  66.  On September 28, 2017, while working at the Firm as a limited partner, Mr. Platt

16  formed L&S Counselors LTD ("L&S"), as a full-service law firm, in direct competition with the

17  Firm.  (*See* Exhibit "6"); (Transcripts 1254-55).

18  67.  Each type of legal services in which Mr. Platt and L&S engaged from September 28,

19  2017 until April 20, 2018 (the date Platt resigned his position at the Firm), was a type of legal

20  service also provided by the Firm.  (Transcripts 0657, 1244-47, 1254-55).

21  68.  Nearly all of the initial L&S clients were existing clients of the Firm or referrals to

22  the Firm which Mr. Platt convinced to move their business to L&S (while Mr. Platt was still

23  working at the Firm), including Tina Sawatzky "Tina Su" (Exhibits "19" and "20"), Rose Cordova

24  (Exhibit "21"), and Farjad Fani aka Matt Johnson (Exhibits "30" and "31"). (Transcripts 0677).

25  Before Mr. Platt convinced Farjad Fani to move as a client to his competing law firm, the Firm had

26  collected more than $211,000.00 in legal fees from Mr. Fani.  (*See* Exhibit "31"); (Transcripts1028-

27  31).  The remaining clients of L&S, prior to Platt's April 20, 2018 resignation from the Firm, were

28  clients that Mr. Platt chose to sign up through L&S rather than through the Firm (most of which

were new Farjad Fani owned entities).  (Transcripts 0651, 1119-20); (Platt's 04/09/2019 Deposition at 139:8-25).

69.     No discussion or vote among the Firm's Managing Partners was ever held regarding allowing Mr. Platt to form and operate a separate law firm directly competing with the Firm, to which Mr. Platt could then divert legal fees and clients of his choosing.  (Transcripts 0527-28, 0538, 0883, 0984-85, 1031).

70.     In fact, neither Mr. Erickson nor Mr. Whitaker knew of the existence of L&S until after Mr. Platt's departure from the Firm.  (Transcripts 0528, 0532, 0988, 1106, 1248, 1279).

71.     Furthermore, not a single employee or attorney at the Firm, including all those who worked closely every day with Mr. Platt, had any knowledge that L&S existed and was being used by Mr. Platt to divert fees and clients to enrich himself at the expense of the Firm, or that Mr. Platt was operating a separate and competing law firm while working at the Firm.  (Transcripts 0629 - 33, 0889-90, 1086, 1137 - 38, 43 [Kathy Jones], 1155-61 [Janet Baker], 1178-82 [Allison Miller]).

72.     Mr. Platt offered testimony that Managing Partner Glen Woods was allegedly aware of the formation of L&S, and that Glen Woods gave Mr. Platt permission during a telephone conversation in August 2017 to set up L&S and divert fees to Mr. Platt as compensation for Mr. Platt setting up an automated corporate governance program that would automatically prepare and send the annual corporate formality documents to clients.  This testimony was objected to by the Firm on the basis that it was hearsay.  The Court has considered this evidence and does not rule on the evidentiary objection because the Court does not consider this testimony to be credible, as set forth in Paragraph 16 of the Conclusions of Law.

73.     Mr. Platt admitted that there is not a single email, memo or anything in writing evidencing this authorization of Glen Woods.  (Transcripts 1256 - 1257, 0528, and 0962).  Mr. Platt also admitted there is no writing that confirms Glen Woods was even aware of L&S.  (*Id.*).  Glen Woods died on April 1, 2018, before the Firm discovered Mr. Platt's fraud, and is not available to challenge Mr. Platt's testimony.

74.     However, Mr. Platt admitted that he never sought or received the approval of the other Managing Partners, Mr. Erickson or Mr. Whitaker, and this was corroborated by the

testimony of Mr. Erickson and Mr. Whitaker.  (Transcripts 1248, 1259-60, 0527-28, 0538, 0883, 0984-85, 1031, 0528, 0532, 0988, 1106, 1279).

75.    Mr. Platt testified that he was aware of NRS 87.090(2), which would not permit Glen Woods to approve Mr. Platt setting up a competing law firm, without the consent of the other Managing Partners because permitting a Firm attorney to set up a competing law firm while continuing to work at the Firm was certainly outside of the ordinary business of the Firm. (Transcript 1244).

76.    This Court finds that Mr. Platt was not authorized to form a competing law firm while he worked at the Firm.  This Court further finds that Mr. Platt fraudulently concealed from the Firm the existence of  his competing law firm and his diversion and conversion of Firm money, clients and business opportunities to his competing law firm.  The Court finds that Mr. Platt's concealment of his actions and his understanding that under NRS 87.090(2) no one partner of the Firm could have ever approved his actions, demonstrates Mr. Platt's culpable state of mind and his knowledge with respect to the improper and fraudulent nature of his actions in converting the Firm's property and business opportunities.  *See Bullock v. BankChampaign, N.A.,* 569 U.S. 267, 269 (2013).

77.    Mr. Platt stated that the authorization of Glen Woods was to pay for the creation of a cost saving database for the Firm which would automate the creation of legal forms for clients. (*See* Exhibit "37").  However, no such database or computerized corporate governance program exists or was ever created by Mr. Platt.  (Transcripts 0919, 0962-63). This is further evidence supporting the Court's findings stated above.

78.    Between September 2017 and April 20, 2018 (the date Mr. Platt resigned from the Firm), Mr. Platt collected a total of $134,920.00 from clients of L&S for legal services, all of which revenue was fraudulently converted from the Firm or was derived from Partnership opportunities converted by Mr. Platt to his personal use and gain.  (Doc. 87 at Page 2, Lines 14 - 20); (Transcripts 0999-1001, 1004-05, 1122-23, 1263-64);  (See Exhibit "25" and Exhibit "37" - Response to IROG No. 10).

/ /

## MR. PLATT USED AND CONVERTED FIRM RESOURCES
## FOR HIS PERSONAL BENEFIT

79.     Mr. Platt used his computer, internet and phones located at the Firm and provided by the Firm to conduct the business of his competing firm, L&S.  (Transcripts 1265-66).  Mr. Platt also used the printers at the Firm to provide services through L&S and used the Firm's legal forms to provide services through L&S.  (Transcripts 1267-68, 0689-92, 0856-57, 1037-38).

80.     During the entirety of Mr. Platt's association with the Firm as an associate and as a limited partner, the Firm paid his malpractice insurance and Mr. Platt never obtained malpractice insurance for himself or his competing firm, L&S, while Mr. Platt was working at the Firm.  (Transcripts 0856-57, 0889).

## MR. PLATT'S DEPARTURE FROM THE FIRM, THE DISCOVERY OF L&S, AND MR.
## PLATT'S EFFORTS TO CONCEAL HIS FRAUDULENT ACTION

81.     In March of 2018, one of the Managing Partners, Glen Woods ("Glen"), became very ill and was hospitalized in Phoenix, Arizona.  It was discovered that Glen was suffering from leukemia and had only weeks to live.  (Transcripts 0597-602, 1038-39).

82.     Glen Woods served as the Trustee on a series of trusts for the Firm's largest client, the McDonald Family.  As the Trustee, Glen had also appointed himself as the Managing Partner on some partnerships owned by the McDonald Trusts, which held many commercial properties worth tens of millions of dollars and which generated significant monthly revenue.  Mr. Erickson was the successor trustee on one of the McDonald Trusts.  Historically, Firm attorneys had provided trustee services to clients on a regular basis.  The fees generated from acting as a trustee for Firm clients was always billed through and collected by the Firm as a Firm business opportunity.  (Transcripts 0601, 0954-55, 1039).

83.     Glen was placed into a medically induced coma on March 17, 2018 and he died on April 1, 2018, without ever having come out of the coma.  Neither Mr. Erickson nor Mr. Whitaker were aware of the seriousness of Glen's condition until after Glen was placed into a coma.  (Id.).

84.     Upon learning of Glen's serious condition and that he was in a coma, the remaining Managing Partners of the Firm (Mr. Whitaker and Mr. Erickson) asked Mr. Platt to provide them with the McDonald Family trust and entity documents which would show who the successors to

1  Glen would be to manage the McDonald Family trusts and assets.  Mr. Platt initially refused to

2  provide the Managing Partner with this information, and eventually was only willing to point the

3  Managing Partners to a large file on the Firm's computer server containing hundreds of documents

4  (requiring them to engage in a time-consuming search to find the requested information).

5  (Transcripts 0603-07, 1040-41).

6         85.    The Managing Partners learned that Mr. Platt had prepared succession documents to

7  be signed by Glen Woods for the McDonald Trusts and related entities to make Kent Woods (Glen

8  Wood's son) the successor to Glen.  (Transcripts 0602-03, 0606, 1041-42, 1283-84).

9         86.    These succession documents were allegedly signed by Glen Woods the day before

10  being placed into a coma, when his capacity was obviously impaired and questionable at best.  At

11  Mr. Platt's direction these same succession documents were then electronically docu-signed with

12  Glen's signature after he was in a coma and were obviously invalid.  (Transcripts 1041-45, 1187-

13  89, 1284-85).

14         87.    These succession documents were then returned from Phoenix, AZ to Mr. Platt at the

15  Firm.  These are the documents Mr. Platt refused to provide to the Firm's Managing Partners along

16  with the actual trust and entity documents which detailed how the succession was to occur.  Mr.

17  Platt then provided these suspect succession documents to third parties including Wells Fargo Bank

18  to be relied upon as if they were valid.  (Transcripts 041-45, 1285).

19         88.    Following Glen's death on April 1, 2018, and as a result of the Managing Partners'

20  investigation into the succession issues related to the McDonald Family trusts and entities, the

21  Managing Partners discovered that for the three years leading up to Glen Wood's death, he (Glen

22  Woods) had been taking trustee's fees equal to $25,000.00 per month from the McDonald Family

23  trusts and entities, and collecting these fees under a separate taxpayer I.D. number in his own name

24  and keeping the money rather than running it through the Firm (even though he billed these same

25  amounts on the Firm's billing program and claimed that the trustee's fees had been collected by the

26  Firm).  (Transcripts 0756-57, 0956-59).

27         89.    Upon discovering this embezzlement by Glen, the Managing Partners confronted

28  Kent Woods (an attorney at the Firm who was Glen's son and the executor of Glen's estate) about

1   this conversion.  In attempting to justify his father's actions, Kent Woods informed the Managing

2   Partners that Mr. Platt had taken money outside the Firm from the Academy and kept it.

3   (Transcripts 0541-42, 0958-59).

4          90.     This led to the Managing Partners confronting Mr. Platt to determine if he had taken

5   money outside of the Firm from the Academy, (described in Paragraphs 61 and 62), and the

6   conversation where Mr. Platt lied and told the Managing Partners that he had never received any

7   money outside the Firm except $2,500.00 from the Academy, even though he knew he had received

8   over $30,000.00 from the Academy and over $130,000.00 through his competing law firm, L&S.

9   This meeting occurred approximately a week to ten days before Mr. Platt resigned from the Firm on

10  April 20, 2018.  (Transcripts 0959-60) (described in ¶¶ 61-62).

11         91.     If L&S, (Mr. Platt's competing law firm), had truly been authorized by the Firm,

12  there would have been no reason for Mr. Platt to lie to the Managing Partners during this meeting.

13  Mr. Platt's actions demonstrate that he was lying to conceal his fraudulent conversion of Firm

14  clients, revenue and business opportunities which he knew had never been authorized by the Firm.

15  At this point, Mr. Platt knew he was at risk of having his conversions, embezzlements and larceny

16  discovered, and he began plans to exit the Firm and conceal his actions.

17         92.     Following this meeting, Mr. Whitaker was uncomfortable with what he had learned

18  about Glen Woods and Mr. Platt, and what the Managing Partners were learning about the

19  succession activities engaged in by Mr. Platt and Kent Woods related to the McDonald Family

20  trusts and entities.  Mr. Whitaker ordered the Firm's Information Technology vendor ("IT Vendor")

21  to make a backup of the Firm's computer server and of the desktop computers in the offices of Mr.

22  Platt, Kent Woods and Glen Woods.  (Transcripts 0608-10).

23         93.     On April 19, 2018, Mr. Platt stayed late at the Firm when nobody else was around to

24  observe him.  At this time he prepared a resignation letter to leave the Firm and he copied the

25  Firm's client lists and forms.  (Transcripts 0607, 0689-92, 1286-87, 1295-96).

26         94.     Early the next morning, on April 20, 2018, many Firm employees begin to panic

27  when documents and files they had been working on could not be located or were disappearing

28  while the work was in progress.  (Transcripts 0608, 0610-11).  Mr. Whitaker contacted the Firm's

IT Vendor who gained remote access to the Firm's server and confirmed that files had been and were being deleted from the Firm's Server. (*Id.*).

95.    Mr. Whitaker then confronted Mr. Platt, who admitted that he had deleted files from the Firm servers, but claimed they were just "personal" files. (Transcripts 1288-90, 1297); (*See* Exhibit "11"). Without informing Mr. Whitaker, or Mr. Erickson who joined by phone, Mr. Platt recorded this conversation. (Transcripts 1339-40). Mr. Platt then gave his letter of resignation to Mr. Whitaker and was escorted from the building. (Transcripts 0611-17, 0542-43).

96.    The Firm then spent $2,093.02 restoring the files and data deleted by Mr. Platt from the Firm's server. (*See* Exhibit "12"). As the Firm worked with its IT Vendor to recover files deleted by Mr. Platt, a process that took many hours over a period of many weeks, the Firm learned about Mr. Platt's illicit activities when it recovered deleted documents referencing an entity called "L&S Counselors" and showing that Mr. Platt had been billing and collecting legal fees outside the Firm. (Transcripts 0626-29). Having never heard of L&S, Mr. Whitaker asked around the Firm to see if anyone knew what L&S was. No employee of the Firm had ever heard of L&S or knew anything about Mr. Platt doing work on the side for clients. (Transcripts 0630-32).

97.    After pulling records from the Nevada Secretary of State for L&S, the Firm learned that Mr. Platt had set up a separate competing law firm while working at the Firm. (Transcripts 0630-32).

98.    The Firm also learned that Mr. Platt had deleted all of his April, 2018 time entries from the Firm's billing program when he deleted files from the Firm server to cover-up his fraudulent activities. Mr. Platt then billed these same clients through L&S, using the same time entries he had deleted from the Firm, but raised the hourly rate by $30.00 per hour. (Transcripts 0626-28, 636-47, 1014-19, 1346-49, 1352).

99.    In addition, the Firm discovered a modification to the retainer agreement posted on its website, listing L&S as an affiliate of the Firm. Mr. Platt was the only attorney at the Firm who had the administrative passwords to alter the Firm's website and apparently made this change to cover his illicit actions. (Transcripts 1045-47).

100.     The Firm also learned that Mr. Platt had changed the Incorporated Terms of Representation Form to identify L&S as an affiliate of the Firm.  The Incorporated Terms of Representation Form is a five page document which contains the boilerplate terms of every engagement letter between the Firm and a client.  The specific terms of the engagement (including the scope of the engagement and the rates the client will pay) are always set forth in a single-page letter signed by the originating partner or attorney.  That attorney's assistant then attaches the boilerplate "Incorporated Terms of Representation Form" to the engagement letter and it is sent out to the client.  (Transcripts 1045-51).  Mr. Platt added the words "L&S Counselors" to Section 8 of the Incorporated Terms of Representation (added two words to a five page, single-spaced form document), but nobody at the Firm was aware of this change or had ever heard of L&S.  (Transcripts 1045-53).

## WEINTRAUB WOODS & PLATT, GATEHOUSE STRATEGIES, AND BOSQUE HOLDINGS

101.     Mr. Platt has argued that it was common practice for the Firm to permit attorneys to take money outside of the Firm through other ventures and has argued that Weintraub Woods & Platt, Gatehouse Strategies and Bosque Holdings prove his argument.  However, Mr. Platt has failed to prove any money was ever taken outside the Firm for these ventures, and these arguments do not justify his theft and fraudulent conversion from the Firm.

### *Weintraub Woods & Platt*

102.     In early 2013, Glen Woods had a discussion with the other Managing Partners about a potential referral source, an attorney from California named Daniel Weintraub ("Weintraub"), that wanted to refer work to the Firm, but also wanted to receive a referral fee based upon a percentage of the money collected in fees by the Firm on each of Weintraub's referrals.  The Managing Partners discussed and agreed that some arrangement would be needed to pay the referral fees without being in violation of the Rules of Professional Conduct (that requires the referral fee be paid for actual work).  Mr. Erickson and Mr. Whitaker agreed to the proposed arrangement as long as the money all ran through the Firm, because all work done for Weintraub's referrals was performed by the Firm, and all money billed to the clients referred by Weintraub were billed

1    through and collected by the Firm.  (Transcripts 0711 - 13, 0730 - 31, 0753, 0917 - 18);

2    (Transcripts 0989 - 91).

3    103.    Glen Woods set up an entity known as Weintraub Woods & Platt, LLP ("WWP") to

4    be used to funnel the referral fees to Weintraub.  The WWP entity showed the partners as

5    Weintraub, Glen Woods and Mr. Platt. (*See* Exhibit "G-2").  Neither Mr. Erickson nor Mr.

6    Whitaker was aware of the WWP form established by Glen Woods to funnel referral fees to Mr.

7    Weintraub.  *(Id.)*  However, consistent with what had been agreed to by the Managing Partners, all

8    work done for Weintraub's referrals was performed by the Firm, and all money billed to the clients

9    referred by Weintraub were billed through and collected by the Firm.  There was never any work

10   performed or money collected outside the Firm related to WWP.  Most importantly, the WWP

11   concept for paying referral fees to Weintraub was discussed and approved by the Managing

12   Partners.  *(Id.)*.

13   ***Gatehouse Strategies***

14   104.    Mr. Whitaker attended a CLE course in which he learned that it was not a good idea

15   to have the Firm, or its attorneys, act as the resident agent for Firm clients.  The better practice was

16   to set up a separate entity to act as the resident agent for Firm clients.  The Firm could continue to

17   bill its clients for preparing all documents necessary to comply with the annual corporate

18   formalities, but would not have a conflict of interest by acting directly as the resident agent.  Mr.

19   Whitaker discussed this concept with the other Managing Partners and it was agreed that the Firm

20   would cause a separate entity to be formed to act as the resident agent for firm clients.  The other

21   Managing Partners did not care what type of entity was formed to act as the resident agent or how

22   that entity would be owned, because all of the fees paid by Firm clients to use that resident agent

23   and to have the annual work done to comply with the corporate formalities, was to always run

24   through the Firm.

25   105.    Glen Woods and Mr. Platt set up Gatehouse Strategies, Ltd. ("Gatehouse") to act as

26   the resident agent for Firm clients.  Gatehouse was owned by Glen Woods, Mr. Platt and the Firm;

27   / /

28   / /

1  however, no money was ever run through Gatehouse.  All money billed and collected for acting as

2  resident agent and for preparing annual corporate governance documents, was run through the Firm.

3  (Transcripts 0784, 0791, 0916)

4  ***Bosque Holdings, LLC***

5       106.    Bosque Holdings, LLC is a series limited liability company established by the

6  Firm's partners to provide a service to any clients that wished to have a limited liability company

7  without disclosing their own names as the manager of the Company.  There has never been any

8  money generated by Bosque Holdings, LLC that did not run through the Firm and it was clearly

9  approved by the Managing Partners.  (Transcripts 0788 - 90, 0916).

10                              **CREDIBILITY OF MR. PLATT**

11       107.    The Court found in many instances that Mr. Platt's testimony was not believable, as

12  evidenced by the following:

13               A.    Mr. Platt told Mr. Whitaker he was representing the Academy on a pro bono

14  basis.  (**This was not true as Mr. Platt was being paid for this work**).  (Paragraphs "56" - "65",

15  *supra*)

16               B.    Mr. Platt filed a false tax return for 2012.  (**This was a lie to the IRS**

17  **because Mr. Platt failed to report $25,065 in income for legal services to the Academy**).

18  (Paragraphs "56" - "65", *supra*).

19               C.    Mr. Platt filed a false tax return for 2013.  (**This was a lie to the IRS**

20  **because Mr. Platt failed to report $5,250.00 in income for legal services to the Academy**).

21  (Paragraphs "56" - "65", *supra*).

22               D.    Mr. Platt filed a false tax return for 2015.  (**This was a lie to the IRS**

23  **because Mr. Platt failed to report $1,500 in income for legal services to the Academy**).

24  (Paragraphs "56" - "65", *supra*).

25               E.    In April 2018, Mr. Platt told Mr. Whitaker and Mr. Erickson that he only

26  received $2,500 from the Academy.  (**This was a lie as Mr. Platt knew he had received $31,815**

27  **for legal services provided to the Academy**).  (Paragraphs "56" - "65", *supra*).

28

F.  In April 2018, Mr. Platt told Mr. Whitaker and Mr. Erickson that the only money he had ever received outside of WEW was the $2,500 he received from the Academy.  (**This was a lie because Mr. Platt knew he had received an additional $134,920 in legal fees through his hidden competing law firm**).  (Paragraphs "56" - "65", *supra*).

G.  In his April 9, 2019 Deposition, Mr. Platt changed his earlier lie by testifying under oath that he had received "at least $10,000 but not much more" from the Academy.  **(This was a lie because Mr. Platt knew he had received three times this much, $31,815)**.  (Platt depo 78:7-18).

H.  In his April 9, 2015 Deposition, Mr. Platt testified under oath that the Academy's checkbook and check register had been turned over to the State of Nevada.  (**This was a lie as the checkbook was never turned over to the State**).   (Platt depo 79:15-20).

I.  On April 20, 2018, after being caught deleting files from the Firm's server, Mr. Platt told Mr. Whitaker that he had only deleted personal records.  (**This was a lie as Mr. Platt deleted client records, billing records and financial records belonging to the Firm and other records to conceal his fraud**).  (Paragraph "94" - "95"*, supra*).

J.  On April 28, 2018, Mr. Platt informed Firm clients that the Firm Partners had begun a dissolution of the Firm to convince them to move their work to him. (**This was a lie as the Firm Partners had made no decision at this time regarding dissolution and did not decide until the end of May**).  (Exhibit "32").

108.  Because Mr. Platt lied to conceal his fraud from the Firm, and committed tax fraud to cover up his actions to avoid his legal obligations, his testimony at trial lacked credibility.

## II.

## CONCLUSIONS OF LAW

**A.  THE FIRM'S ORIGINAL COMPLAINT FOR NONDISCHARGEABILITY SATISFIES THE NINTH CIRCUIT'S PLEADING STANDARDS TO COVER LARCENY AS PART OF THE SECTION 523(a)(4) CLAIM**

1.  The Firm's original Section 523(a)(4) claim satisfies the notice requirements under Ninth Circuit law.  "Notice pleading only requires a plaintiff to allege claims for relief, not causes of action, statutes or legal theories…..[n]otice pleading anticipates that subsequent proceedings will

31

1  refine the disputed facts and issues, including the legal theories." *Alvarez v. Hill*, 518 F.3d 1152,

2  1157 (9th Cir. 2008).  The Firm's original complaint in the ND Action was not required to use the

3  label of "larceny" to have properly pled a claim for nondischargeability under Section 523(a)(4),

4  based upon larceny.  The original complaint needed only to allege what the claim was (non-

5  dischargeability under Section 523(a)(4)) and not the "legal theories" that support that claim.  *Id.* at

6  1157.

7        2.  A complaint is to be liberally construed to determine if adequate notice "of the

8  claim" (not the legal theories supporting the claim) has been provided.

9        Federal Rule of Civil Procedure 8(a)(1)-(2) requires only that a complaint contain "a
      short and plain statement of the claim showing that the pleader is entitled to
10        relief…..Rule 8's concluding admonishment that "[a]ll pleadings shall be so construed
      as to do substantial justice" confirms the **liberality with which we should judge**
11        **whether a complaint gives the defendant sufficient notice**…".

12  *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 839 (9th Cir. 2007) (emphasis added).

13  Ninth Circuit law is clear in providing that only the claim (non-dischargeability under Section 523

14  (a)(4)) was required to be pled, not the underlying legal theory for the claim.  *See Alvarez* at 1157

15  and *Skaff* at 839.

16        3.  The Complaint in the ND Action identifies the "SECOND CLAIM FOR RELIEF"

17  as "Objection to Discharge - 11 U.S.C. § 523(a)(4)."  (ND Action Doc. 1 at page 8).  Paragraph 40

18  of that Second Claim for Relief states: "The Firm repeats and re-alleges the preceding paragraphs as

19  though set forth fully herein and incorporates the same by reference."  *Id.*  As such, the Second

20  Claim for Relief (Nondischargeability Under Section 523(a)(4)) is also based upon Paragraphs 1 -

21  39 of the Complaint, in addition to Paragraphs 41 - 49.  That means, Paragraphs 8-15, 22-28, and

22  33-36 of the ND Complaint, describing Mr. Platt's conversion of money and business opportunities

23  from the Firm and his concealment and deletion of Firm files to cover his fraudulent conversion of

24  the Firm's money and business opportunities, were all included in the Firm's Section 523(a)(4)

25  claim of nondischargeability.  *Id.*

26        4.  The Court's oral denial of the Firm's motion to amend,[10] did not preclude (i) the

27  Firm from asserting Mr. Platt's conversion/larceny as part of its Section 523(a)(4) claim – as all the

28  

---

[10]  Which did preclude the Firm from amending the complaint to add a Section 523(a)(6) claim.

1   facts supporting this claim had already been pled; (ii) the Court from considering the evidence that

2   was submitted in support of the 523(a)(4) claim; or (iii) the Court from considering Ninth Circuit

3   legal authority in support of the Firm's Section 523 (a)(4) claim - *Ormsby v. First American Title*

4   *Co.*, 591 F.3d 1199 (9th Cir. 2009) (conversion under Nevada law qualifies as larceny under the

5   federal standard for Section 523(a)(4)).  Mr. Platt had adequate notice of the Firm's Section

6   523(a)(4) claim, and that conversion/larceny was one basis of that claim.

7   **B.**      **MR. PLATT OWED A FIDUCIARY DUTY TO THE FIRM**

8       5.      Whether as an employee of the Firm, as a Firm partner under Nevada's Uniform

9   Partnership Act (NRS 87.010 *et seq*), or Nevada's Uniform Partnership Act (1997) (NRS 87.4301

10  *et seq*), Mr. Platt owed a duty of loyalty not to compete with or usurp the business opportunities of

11  the Firm.

12      6.      "The elements of common-law agency are present in the relationships between

13  employer and employee, corporation and officer, client and lawyer, and partnership and general

14  partner." *See* Restatement 3d of Agency, § 1.01 (emphasis added).  As the Supreme Court of Utah

15  explained, "[b]ecause of the privilege granted to engage in the practice of law, we impose upon

16  members of our bar a fiduciary duty that encompasses the obligation to not compete with their

17  employer, which we define as any law firm or legal services provider who may employ them in a

18  legal capacity, without the employer's prior knowledge and agreement." *Prince, Yeates &*

19  *Geldzahler v. Young*, 94 P.3d 179, 185 (Utah 2004).

20      7.      Thus, as an employee, Mr. Platt owed a duty to the Firm not to compete with or

21  convert to himself the business opportunity arising through the Academy relationship and the

22  subsequent fees he received for providing legal services to the Academy, all of which belonged to

23  the Firm.  Later, when Mr. Platt became a partner, he continued to misappropriate and convert

24  money and business opportunities to himself and his competing law firm.  As both an employee and

25  as a partner, Mr. Platt was competing with the Firm at which he worked and hiding his actions from

26  the Firm so that the fraud could continue.  Mr. Platt's actions in purposely, wrongfully and

27  fraudulently converting and misappropriating money, property, clients, and business opportunities

28  from the Firm, with clear knowledge that his actions were wrong and had not been approved by the

Firm, with conscious disregard for the harmful consequences of his actions and his deliberate failure to act to avoid such consequences, and then fraudulently concealing his conversion of business opportunities and money (i) while an employee from the Academy, and (ii) while a partner through L&S,  demonstrated his culpable state of mind and knowledge that he was intentionally perpetrating a fraud upon the Firm without excuse or color of right.  This conduct certainly satisfies the "culpable state of mind" requirement of *Bullock v. BankChampaign*, *N.A.*, 569 U.S. 267, 269 (2013), and it also meets the definition of larceny under the federal common law which is the "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." 4 *Collier on Bankruptcy P 523.10[2]* (15th ed. Rev. 2008).  This conduct is also determined by the Court to be fraudulent, malicious and oppressive, for purposes of NRS 42.005.

8.    As a partner, Mr. Platt also owed specific fiduciary duties to the Firm.  A partner "is liable to his partners for any breach of fiduciary obligation."  Restatement 2d of Agency, § 14A.  Partners in a law firm owe fiduciary duties to one another.  This common law duty is codified in the Nevada Uniform Partnership Act at NRS 87.210, which states:

**NRS 87.210 Partner accountable as fiduciary.**

1.  Every partner **must account to the partnership for any benefit and <u>hold as trustee</u> for it any profits derived by the partner without the consent of the other partners from any transaction connected with** the formation, **conduct**, or liquidation of the partnership **or from any use by the partner of its property**.  (Emphasis added)

Similarly, the Nevada Uniform Partnership Act (1997) (which the Court has determined does not apply), codifies the common law duty of partners at NRS 87.4336, which states:

NRS 87.4336 Conduct of partner: General standards.

1.  The only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections 2 and 3.

2.  A partner's duty of loyalty to the partnership and the other partners is limited to the following:

(a)  To account to the partnership and hold as trustee for it any property, profit or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;

(b)  To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an interest adverse to the partnership; and

(c)  To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.  (Emphasis added)

9.    NRS 87.4336 expressly forbids Mr. Platt from "competing with the partnership in the conduct of the partnership's business".  NRS 87.4336(2)(c).  Although the Court has determined the Uniform Partnership Act (1997) doesn't apply to the Firm, this statute was simply codifying the common law, which does apply and which likewise forbids Mr. Platt from competing with the Firm.

> As a general matter, the second Restatement of Agency provides that "unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." Restatement (Second) of Agency § 393 (1958). Furthermore, "the rules as to the duties and liabilities to the principal of agents who are not servants [also] apply to servants." Id. at § 429. While the Restatement does not specifically include "employees" as "agents," it does refer to "servants," a term synonymous with "employees." See Black's Law Dictionary 1372 (7th ed. 1999) (defining "servant" by pointing to the definition of "employee").

*Prince, Yeates & Geldzahler v. Young*, 94 P.3d 179, 184 (Utah 2004).   Yet, this is precisely what Mr. Platt did, he directly competed against the Firm and he misappropriated and fraudulently converted the Firm's clients, money and business opportunities to himself.

10.    Mr. Platt testified that he was aware of and had extensive knowledge of these specific partnership laws.  Mr. Platt is also deemed to have knowledge of this and all other laws which governed his conduct.  *See Smith v. State*, 38 Nev. 477, 481, 151 P. 512, 513 (1915) (reaffirmed in *Sengel v. IGT*, 116 Nev. 565, 573, 2 P.3d 258, 262 (2000)) ("Every one is presumed to know the law, and this presumption is not even rebuttable.").   Yet, Mr. Platt acted with conscious disregard for the rights of the Firm in fraudulently converting the Firm's money, property and business opportunities and subjecting the Firm to an unjust hardship.

11.    Under NRS 87.210, Mr. Platt was required to "account to the partnership" and **hold as trustee for it**:

> "any profits derived by the partner without the consent of the other partners from any transaction connected with the . . . conduct . . . of the partnership or from any use by the partner of its property."

NRS 87.210(a).

12.    Both NRS 87.210 and NRS 87.4336, imposed an actual, express trust upon Mr. Platt for all money and business opportunities he converted from the Firm, regardless of whether this

/ /

1    partnership is treated as being formed in 1995 (when is was originally formed), or in 2007 (when it

2    was completely restated and new partners added that were never part of the original partnership).

3    **C.    MR. PLATT'S ACTIONS CONSTITUTE A CONVERSION UNDER NEVADA LAW**

4          13.    The elements for a claim of conversion under Nevada law are the following:

5          Defendant committed a distinct act of dominion wrongfully exerted over Plaintiff's
            personal property; and the act was in denial of, or inconsistent with, Plaintiff's title or
6          rights therein, or the act was in derogation, exclusion, or defiance of Plaintiff's title or
            rights in the personal property.

7    *See Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 5 P.3d 1043 (2000).  "An act constituting

8    conversion must be an intentional act, but it does not require wrongful intent and is not excused by

9    care, good faith, or lack of knowledge."  *Bader v. Cerri*, 96 Nev. 352, 357 n.1, 609 P.2d 314, 317

10   (1980); *see also Winchell v. Schiff*, 193 P.3d 946 (Nev. 2008).

11         14.    The Ninth Circuit Court of Appeals has stated that under Nevada law:

12         Conversion is defined as "a distinct act of dominion wrongfully exerted over another's
            personal property in denial of, or inconsistent with his title or rights therein or in
13         derogation, exclusion, or defiance of such title or rights.  Additionally, conversion is an
            act of general intent, which does not require wrongful intent and is not excused by care,
14         good faith, or lack of knowledge." *M.C. Multi-Family Development, L.L.C. v. Crestdale
            Assocs., Ltd., 193 P.3d 536, 542-43 (Nev. 2008).*
15

16   *See Ormsby v. First American Title Co.*, 591 F.3d 1199, 1205-1206 (9th Cir. 2009).

17         15.    The Court finds that when Mr. Platt took $31,815.00 in fees from the Academy

18   (Exhibit "3") and took $134,920.00 in fees through L&S (Exhibits "25" and "37"), he fraudulently

19   converted to his own benefit fees, clients and business opportunities belonging to the Firm.  Mr.

20   Platt then fraudulently concealed his actions and conversions from the Firm so that he could

21   continue converting money, property and business opportunities from the Firm.  Mr. Platt's actions

22   constitute fraud and fraudulent conversion under Nevada law resulting in actual damages to the

23   Firm of $166,735.00, plus whatever punitive damages are awarded as a result of this fraud.

24   **D.    AUTHORIZATION OF MR. PLATT'S TAKING MONEY OUTSIDE THE FIRM
         OR STARTING A COMPETING LAW FIRM, WOULD HAVE REQUIRED THE
25       CONSENT OF ALL MANAGING PARTNERS - WHICH NEVER HAPPENED**

26         16.    Mr. Platt's sole defense for his fraudulent actions is his uncorroborated testimony

27   that Glen Woods approved his setting up a competing law firm and diverting Firm clients, revenue

28   and business opportunities to the competing firm.  Considering all the evidence, the Court finds Mr.

Platt's testimony regarding this alleged approval to lack credibility and thus finds no approval was ever given by Glen Woods, on behalf of the Firm, to Mr. Platt to set up a competing law firm or to take money from the Academy outside of the Firm. However, even if the Court accepted this assertion (which the Court does not), this Court finds that as a matter of law Glen Woods had no authority to approve Mr. Platt setting up a competing law firm or taking money for legal services outside of the Firm, without the consent of the other Managing Partners.

17. According to the Partnership Agreement, decisions within the firm were divided into three (3) categories: "Routine Decisions," "Partnership Decisions," and "Extraordinary Decisions." "Routine Decisions" are defined as "those that arise as a matter of course in the conduct of the ordinary, day-to-day business of the Partnership." (*See* Exhibit "1" at § 5.3). "Partnership Decisions" are defined as "those that arise in the course of the business of the Partnership, but that do not necessarily arise daily or even weekly, and that require the exercise of discretion or judgment by the management of the Partnership . . .." *Id.* at § 5.2(b). "Extraordinary Decisions" are defined as "those that affect in profound ways the relationship between the Managing Partners and the Partnership." *Id.* at § 5.2(c). The Managing Partners, acting as a body, were to make all decisions in the management and operation of the Partnership that were Partnership or Extraordinary Decisions and all partners had "the right to participate in the deliberations of the Managing Partners" in making these decisions. *Id.* at § 5.4.

18. Any decision to authorize Mr. Platt's violation of his duty of loyalty to the Firm, permitting him to directly compete with the Firm while still working at the Firm, and permitting him to divert and convert revenue, business opportunities and clients away from the Firm, is certainly not a "Routine Decision" as defined by the Partnership Agreement. Such a decision would certainly fall under the definition of either a "Partnership Decision" or an "Extraordinary Decision", requiring a decision deliberated upon by all Managing Partners. However, not only were Mr. Platt's actions never disclosed to all of the Managing Partners, but there was never any vote by the Managing Partners to allow Mr. Platt to compete with the Firm and divert revenue and clients of his choosing into his own pocket. The testimony of Mr. Whitaker and Mr. Erickson make

/ /

it clear that this decision was never considered or voted upon by the Firm's Managing Partners and is thus invalid. As a result, Mr. Platt was in direct competition with the Firm.

19. Of equal importance is Mr. Platt's admission during trial that he was well aware of the requirements of NRS 87.090(1) & (2) which provide:

> **NRS 87.090 Partner agent of partnership; restrictions on authority**.
>
> 1. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which the partner is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom the partner is dealing has knowledge of the fact that the partner has no such authority.
>
> 2. **An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners**. (Emphasis added).

20. Authorizing a Firm attorney to directly compete against the Firm, while continuing to work at the Firm, is certainly not "carrying on of the business of the partnership in the usual way" and is directly against the stated purpose of the partnership (Exhibit "1" at ¶ 1.4), and thus Glen Woods had no ability to approve Mr. Platt's illicit actions "unless authorized by the other partners", Mr. Whitaker and Mr. Erickson. *See* NRS 87.090(2). No such authorization was ever provided by Mr. Whitaker or Mr. Erickson, and thus, as a matter of law, the Firm never authorized Mr. Platt setting up a competing law firm, taking money outside the Firm, or his conversion of funds, clients and business opportunities. Mr. Platt admitted he never asked either Mr. Erickson or Mr. Whitaker for authorization of his actions and never disclosed to them what he was doing (in fact the evidence demonstrates he did just the opposite in fraudulently concealing his actions from the Managing Partners). Mr. Platt was not authorized to open a competing law firm by the Managing Partners. As such Mr. Platt committed fraud when he converted Firm money, property and business opportunities, and then attempted to conceal it from the Firm.

**E.    MR. PLATT'S CONVERSION UNDER NEVADA LAW EQUALS LARCENY UNDER FEDERAL LAW, WHICH IS EXCEPTED FROM DISCHARGE BY 11 U.S.C. § 523(a)(4)**

21. 11 U.S.C. § 523(a)(4) excepts from discharge, debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The Ninth Circuit has explained that "[c]learly, a debt can be nondischargeable for embezzlement under 523(a)(4) without the existence

of a fiduciary relationship." *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991). Similarly, larceny can be committed without the existence of a fiduciary relationship, as Collier on Bankruptcy explains:

> In section 523(a)(4), the term "while acting in a fiduciary capacity" does not qualify the words "embezzlement" or "larceny." Therefore, any debt resulting from embezzlement or larceny falls within the exception of clause (4).

4 Collier on Bankruptcy P 523.10 (16th ed. 2020).

22.    In *Ormsby v. First American Title Co.*, 591 F.3d 1199, 1205-1206 (9th Cir. 2009), the Ninth Circuit made it clear that a state law conversion claim (under Nevada law) constituted larceny under federal law for purposes of 11 U.S.C. § 523(a)(4). In the *Ormsby* case, Mr. Ormsby had been employed by First American Title Company and had access to their title plant records used to search titles. While working at First American Title, Ormsby copied the title plant records and then went to work for a competing title company where he used the title plant records he had stolen from First American to generate fees for the competing business. The Nevada state court had made findings that Ormsby's actions constituted conversion of First American's property and business opportunities. First American then sought to make Ormsby's state law conversion non-dischargeable under 11 U.S.C. § 523(a)(4) as a larceny. Ormsby argued that state law conversion did not constitute larceny under the federal definition and thus his conversion was dischargeable. 591 F.3d at 1205. The Ninth Circuit held:

> For purposes of section 523(a)(4), a bankruptcy court is not bound by the state law definition of larceny but, rather, may follow federal common law, which defines larceny as a 'felonious taking of another's personal property with intent to convert it or deprive the owner of the same.' 4 Collier on Bankruptcy P 523.10[2].

591 F.3d at 1205.

23.    The Ninth Circuit then went on to explain that the conversion found under Nevada law constituted larceny under the federal standard.

> Based on these facts found by the state court [conversion], Ormsby's conduct constituted larceny within the federal meaning of the terms; accordingly under section 523(a)(4), this debt cannot be discharged.

591 F.3d at 1206. Under the controlling *Ormsby* standard, Mr. Platt's conversion of the Firm's revenue, clients and business opportunities, both as an employee and as a partner, constitutes a larceny that is non-dischargeable under 11 U.S.C. § 523(a)(4).

24.     The controlling Ninth Circuit law announced in *Ormsby* was followed in *All In One Trading, Inc. v. Chaparala (In re Chaparala),* Nos. 2:16-bk-15692-RK, 2:16-ap-01332-RK, 2020 Bankr. LEXIS 2068 (Bankr. C.D. Cal. Aug. 3, 2020).  The *Chaparala* court was confronted with a case where a perfume salesman formed a plan similar to that devised and executed by Mr. Platt.  Like Mr. Platt, the debtor, Chaparala, was employed by his company to provide the exact same services to company customers that his side operation provided to potential customers of the company.  *Id.* at *40-*41.  Like Mr. Platt, Chaparala used firm resources to generate revenue for his side operation.  *Id.*  Like Mr. Platt, Chaparala retained all proceeds from his side business while at the same time taking and accepting his normal salary and hiding his operations from his employer.  *Id.*

25.     The *Chaparala* Court found that "during term of employment, an employer is entitled to its employees' 'undivided loyalty'" (*Id.* at *37) and then went on to hold:.

> The court in *Sequoia Vacuum Systems* further stated that "[e]very agent owes his principal the duty of undivided loyalty [and] [d]uring the course of his agency, he may not undertake or participate in activities adverse to the interests of his principal." *Sequoia Vacuum Systems*, 229 Cal. App. 2d at 287.

*Id*. at *37-*38.

> Section 523(a)(4) of the Bankruptcy Code, 11 U.S.C., excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The term "while acting in a fiduciary capacity" does not qualify the words "embezzlement" or "larceny." 11 U.S.C. § 523(a)(4). Therefore, any debt resulting from embezzlement or larceny falls within the exception of subparagraph (a)(4).

*Id*. at *40.

> The Ninth Circuit has held that "[f]or purposes of section 523(a)(4), a bankruptcy court is not bound by the state law definition of larceny but, rather, may follow federal common law, which defines larceny as a 'felonious taking of another's personal property with intent to convert it or deprive the owner of the same.'" *Ormsby v. First American Title Co of Nevada. (In re Ormsby)*, 591 F.3d 1199, 1205 (9th Cir. 2010).

*Id*. at *40.

> "Chaparala during his employment with All In One formed a competing company in the same line of business as All In One for the purpose of conducting business with All In One's customers and suppliers, which he concealed from All in One."

> "This scheme was to divert business opportunities from All In One."

*Id*. at *40.

> "Chaparala and Kim diverted sales from All In One…" . . . [The] State Court… made a number of findings when it held Chaparala converted All In One's [property]."

*Id.* at *41-*42.

> "The court determines that these issues are relevant to and encompassed within those that a bankruptcy court would consider in determining if Chaparala's actions constituted larceny under 11 U.S.C. § 523(a)(4) as the jury's findings of intentional tortious misconduct establish felonious taking of another's personal property with intent to convert it or deprive the owner of the same."

*Id.* at *43.

26.    Thus, after reviewing a state court judgment finding a conversion under California law (*Id.* at *31) , the *Chaparala* Court, citing *Ormsby*, determined that this state law conversion constituted a larceny under federal law and that the debt was accordingly nondischargeable under 11 U.S.C. § 523(a)(4).

27.    This Court is persuaded by *Chaparala* and the controlling law of *Ormsby* which are similar to the facts of this case.  Because Mr. Platt was at all relevant times either an employee or limited partner of the Firm and was compensated for devoting all of his professional time to the Firm, the Firm had a right to all revenue generated through Mr. Platt providing legal services.  Mr. Platt admitted that he was compensated by the Academy for legal services which he never remitted to the Firm. Likewise, the Firm had the exclusive right to the business opportunities and the compensation derived from such business opportunities and all legal services which Mr. Platt performed through L&S to prospective clients of the Firm.  Mr. Platt's retention and diversion of these business opportunities and funds constituted a "felonious taking of [the Firm]'s personal property with intent to convert it."  *Ormsby*, 591 F.3d at 1205.  It is undisputed that Mr. Platt took these actions willfully and knowingly.  Under the controlling Ninth Circuit law in *Ormsby*, Mr. Platt's state law fraudulent conversion of these funds and business opportunities constitutes a larceny under federal law which is nondischargeable under 11 U.S.C. § 523(a)(4).

28.    In the alternative, Mr. Platt's debts are nondischargeable under 11 U.S.C. § 523(a)(4) as acts of embezzlement.  Colliers on Bankruptcy explains that:

> Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the
>
> consent of the owner, while in larceny the felonious intent must have existed at the time

of the taking.

4 Collier on Bankruptcy § 523.10 (16th 2020).  Ninth Circuit law makes clear that Platt's actions can also be characterized as arising from embezzlement:

> Under federal law, embezzlement in the context of nondischargeability has often been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269, 40 L. Ed. 422, 16 S. Ct. 294 (1885). Embezzlement, thus, requires three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." *In re Hoffman*, 70 Bankr. 155, 162 (Bankr. W.D. Ark. 1986); *In re Schultz*, 46 Bankr. 880, 889 (Bankr. D. Nev. 1985).

*In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991).

29.    Mr. Platt's fraudulent taking and conversion of business opportunities and funds derived therefrom is best characterized as a larceny because those funds always should have been paid directly to the Firm and the business opportunities belonged to the Firm.  However, even should the Court find that it was lawful for Mr. Platt to receive fees from clients, his employment or partnership relationship with the Firm required those fees to be turned over to the Firm.  Mr. Platt was entrusted with the Firm's clients, referral sources, legal forms, internet, phones, staff and other resources, and the Firm's client list, and Mr. Platt used this Firm Property to generate revenue, which was also entrusted to Mr. Platt assuming he would remit it to the Firm.  Mr. Platt's retention and conversion of legal fees which were due to his employer, if not an act of larceny for having inappropriately directed those fees to himself.

30.    As stated in Collier:

> In short, section 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement.

4 Collier on Bankruptcy P 523.10 (16th Ed. 2020).  Mr. Platt knowingly and fraudulently converted and misappropriated money and business opportunities away from the Firm and when he provided legal services to clients that rightfully belonged to the Firm and collected money that therefore belonged to the Firm, he failed to remit this money to the Firm.  Mr. Platts actions constitute a larceny for purposes of Section 523(a)(4), and all damages arising from this larceny are nondischargeable under Section 523(a)(4).  The nondischargeable damages include the money

42

1    received from the Academy ($31,815.00) and the money received through L&S ($134,920.00),

2    together with any additional damages which may be awarded as a result of this fraud when the

3    remainder[11] of the Removed Action is decided.

4    **F.    THE EXPRESS TRUST CREATED BY NRS 87.210 RENDERS THE DAMAGES ARISING FROM MR. PLATT'S ACTIONS, WHILE A PARTNER, NON-DISCHARGEABLE FOR A FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY**

5

6

7    31.    Section 523(a)(4) also excepts from discharge any debt "for fraud or defalcation

8    while acting in a fiduciary capacity...".  "For purposes of section 523(a)(4), the definition of

9    "fiduciary" is narrowly construed, meaning that the applicable nonbankruptcy law that creates a

10   fiduciary relationship must clearly outline the fiduciary duties and identify the trust property." 4

11   Collier on Bankruptcy P 523.10 (16th Ed. 2020).

12   32.    The Ninth Circuit has explained the fiduciary relationship that is non-dischargeable

13   as follows:

14   Because the broad general definition of fiduciary -- a relationship involving confidence, trust, and good faith -- is inapplicable in the dischargeability context, ordinary commercial relationships are excluded from the reach of section 523(a)(4). *In re Schultz*, 46 Bankr. 880, 884 (Bankr. D. Nev. 1985). The trust must have been created before the act of wrongdoing. The debtor must have been a trustee before the wrong and not a trustee *ex maleficio*. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 79 L. Ed. 393, 55 S. Ct. 151 (1934); *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986). **Thus, constructive or implied trusts are excluded, but statutory trusts are not**. *In re Pedrazzini*, 644 F.2d 756, 758 n.2 (9th Cir. 1981). Although the concept of fiduciary capacity is a narrowly defined question of federal law, state law can be consulted to determine when a trust exists. Id. at 758; *Haller*, 780 F.2d at 795-96.
. . .

15

16

17

18

19

20   Furthermore, we reasoned that "if state law makes clear that a partner necessarily is a trustee over partnership assets for all purposes, then that partner is a fiduciary within the narrow meaning of § 523(a)(4)." *Haller*, 780 F.2d at 797. In this case, the Washington statute and case law make clear that Short was a fiduciary within the meaning of section 523(a)(4).

21

22

23   In language identical to the California statute in *Haller*, the Washington statute provides in pertinent part:

24

25   Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation,

26

27

28   _____

[11] This court has decided all issues of fact presented by the Removed Action, leaving only the determination of punitive damages and attorney's fees as part of the conversion claim in the Removed Action, and application of these findings to deciding the remaining claims in the Removed Action.

conduct, or liquidation of the partnership or from any use by him of its property.

*In re Short*, 818 F.2d 693, 695 (9th Cir. 1987).

33.    The Washington statute (cited above), which the Ninth Circuit in *Short* determined created the requisite fiduciary capacity to create a nondischargeable debt, is virtually identical[12] to the Nevada statute (NRS 87.210) which creates Mr. Platt's fiduciary capacity:

> Every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by the partner without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by the partner of its property.

NRS 87.210(1).

34.    Both the Washington statute cited in *Short* and the Nevada statute contain statutory language creating an express trust.  As a partner, Mr. Platt was required to hold as a trustee for the Firm, all benefits derived from all partnership opportunities. While acting as a partner, Mr. Platt committed a fraud while acting in a fiduciary capacity when he misappropriated and converted $134,920.00 in Firm revenue derived from Firm business opportunities and then lied to the Firm to conceal his actions.  This amount of actual damages ($134,920.00), together with whatever punitive damages are awarded for this fraud, constitute a nondischargeable debt under 11 U.S.C. § 523(a)(4).  *See In re Short*, 818 F.2d 693, 695 (9th Cir. 1987), because Mr. Platt was imposed with a statutory, express trusteeship over all money belonging to the Firm.

## G.    THE ORIGINAL JUDGMENT WAS INTENDED TO BE FINAL AND ENFORCEABLE

35.    This Court's Judgment entered August 26, 2021 was intended to be final, enforceable and appealable.  This Court has the authority to render a monetary judgment in a non-dischargeability trial.  *See In re Kennedy,* 108 F.3d 1015, 1017 (9th Cir. 1997) (a bankruptcy court may render a monetary judgment against the Debtor in conjunction with a finding that the debt is non-dischargeable).

/ /

/ /

---

[12] The Nevada statute is identical to the Washington statute with the exception that the word "him" in the Washington statute is replaced with the words "the partner" in the Nevada statute.

36.     This Court has determined a debt is owed by Mr. Platt to the Firm for the damages inflicted upon the Firm through Mr. Platt's fraudulent conversion of money, property and business opportunities from the Firm, and has determined that this debt is non-dischargeable.

37.     This Court has determined that the actual damage portion of this debt is $166,735.00 and has entered a judgment against Mr. Platt in that amount.  This Court then remanded the Removed Action to the State Court to decide the punitive damages and attorney's fee portion of this non-dischargeable debt.

38.     Once the State Court has decided any remaining issues in the Removed Action, which has now been sent back to the State Court, any additional damages awarded as part of the conversion claim will likewise be considered to be non-dischargeable for the reasons stated herein.

39.     If additional damages are awarded to the Firm as part of the conversion claim, a motion can be brought to this Court to amend this Judgment.

## CONCLUSION

For the foregoing reasons, the Court concludes that the debt owed by Mr. Platt in the amount of $166,735.00 together with any additional damages (punitive damages and attorney's fees) in the Removed Action that has been remanded to State Court, are non-dischargeable under 11 U.S.C. § 523(a)(4).  The Court will enter a separate judgment consistent with these findings and conclusions.

DATED this _____ day of _____, 2022.


_____
UNITED STATES BANKRUPTCY JUDGE

Submitted by:

**GERRARD COX LARSEN**

 /s/ Douglas D. Gerrard, Esq.
Douglas D. Gerrard, Esq.
Nevada Bar No. 4613
dgerrard@gerrard-cox.com
Gary C. Milne, Esq.
Nevada Bar No. 3653
gmilne@gerrard-cox.com
2450 Saint Rose Parkway, Suite 200
Henderson, Nevada  89074
*Attorneys for Creditor*,
WOODS & ERICKSON, LLP

45

### ALTERNATIVE METHOD Re: RULE 9021

In accordance with LR 9021, counsel submitting this document certifies that the order accurately reflects the court's ruling and that (check one):

          xx     The court has waived the requirement set forth in LR 9021(b)(1).

         No party appeared at the hearing or filed an objection to the motion.

         I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:


         I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order:


*/s/ Esther K. Medellin*
Esther K. Medellin, An Employee of
GERRARD COX LARSEN

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I am an employee of GERRARD COX LARSEN, and I served a copy

of the **FINDINGS OF FACT AND CONCLUSIONS OF LAW**, by serving all parties in the

manner indicated below: [13]

   a.    Electronically Mailed by CM/ECF System:

         MATTHEW L. JOHNSON on behalf of Defendant ANDREW B. PLATT
         annabelle@mjohnsonlaw.com, mjohnson@mjohnsonlaw.com;
         sue@mjohnsonlaw.com

   b.    This document was (i) deposited in the United States Mail, on the 16th day of
         September, 2022, at Henderson, Nevada addressed to :

         ANDREW B. PLATT
         WAVETRONIX
         1827 W 650 N
         SPRINGVILLE, UTAH 84663

         and (ii) emailed to Andrew B. Platt at notice@plattmosphere.com for him to access

         the cited references by hyperlink. *See,* footnote 13.

                                        /s/ Esther K. Medellin
                                        Esther K. Medellin, An Employee of
                                        GERRARD COX LARSEN

---

[13]  As it does not appear that Mr. Platt is registered to receive e-filings through the Court's CM/ECF system,
the documents cited herein may be viewed at the following link.  https://spaces.hightail.com/space/ViePl4I9CM