Andrew Platt, Pro Se
1827 W 650 N
Springville, Utah 84663
702.534.1560
notice@plattmosphere.com
*Debtor pro se*

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In Re: <br><br> ANDREW B. PLATT and RUTH ANN PLATT, <br><br> Debtor(s) | Case No.: 19-17282-gs <br> Chapter 7 |
| WOODS & ERICKSON, LLP, a Nevada Limited Liability Partnership d/b/a WOODS ERICKSON & WHITAKER LLP, <br><br> Plaintiff(s) <br><br> vs <br><br> ANDREW B. PLATT, an individual, <br><br> Defendant. | Adversary Proceeding: 19-01125-gs <br><br> Hearing Date: December 12, 2022 <br> Time: 1:30 p.m. |

**Reply to Plaintiff's Opposition
to Defendant's Statement of Law as to Issues Raised by the Appellate Panel**

The aim of the Statement of Law [203] was to describe the implications of the eight issues raised by BAP in the Memorandum [BAP 28] vacating and remanding. Defendant may have misunderstood[1] the process and the intent of the Order. The approach taken in Defendant's Statement of Law assumed that there was utility in discussing the Memorandum due to the existence of specific binding instructions from the BAP. However, Plaintiff's 50+ page Opposition [210] discusses the Memorandum on only three or four pages. This suggests that Defendant has mistaken the role of the briefing for which we apologize if that is the case.

---

[1] Feigned humility is a rhetorical trope, but, for example, Defendant believed that there was a fifteen-page limit on briefs, but upon review that limit applied only on appeal. Defendant must admit to being out-matched in litigation technique and this is not sarcasm.

1

Defendant urges the Court to interpret the BAP Memorandum as requiring action in accordance with its contents rather than interpreting it as simply an affirmation of the earlier August 26, 2022 Judgment just with a longer explanation. Defendant agrees that the trial court previously did find against Defendant with the effect described by the Firm on page 52 of its Opposition. But Defendant argues, not only that it did so erroneously, but that the BAP demonstrated legal and factual errors in the trial court's earlier Judgement giving eight matters which the Court must revisit and which thereby reshape the outcome of the case.

Section A holds to the idea that BAP Memorandum is the proper subject of this briefing by replying to the three references in the Opposition to the BAP Memorandum's instructions.

In the event that that was not the correct focus, Section B counters some of the factual issues which the Opposition addressed in lieu of discussing the BAP Memorandum.

**A. The Opposition's three references to the Memorandum demonstrate the Firm is ignoring the BAP's instructions.**

1. Amendment. On pages 33–34 of the Opposition [210], the Firm states that the BAP asked for the Court to "fill in the gaps" of the existing finding and that the BAP did not determine that the trial should have been "restricted to fiduciary duty." It is true that the BAP found the record lacking but it did not order simply for the Judgement to be padded out on remand. The BAP makes two points that should not be swept under the rug: first, that the interpretation of the Complaint was that the recovery sought was in fact based on the fiduciary duty issue: "The complaint, as relevant to this appeal, requests recovery based on alleged breach of fiduciary duty." Memorandum [BAP 28] 2. Second, it stated that the attempt to change the basis for recovery had been denied: that there was an "apparent determination before trial that larceny would not be a basis for nondischargeability." *Id.* 3–4. The explicit issue being that there was a contradiction, "we cannot square this," *Id.* between the pretrial order and the Judgement that issued. It is not enough for the Firm to say that the Judgement was correct and the order

2

wrong. For reasons summarized below, larceny and embezzlement's contradictory elements were not properly at issue at trial. But even if Plaintiff gets the underlying legal issue right, the BAP is explicitly saying that, going into trial, there was an order in place denying amendment such that such and order cannot be squared with Judgment issuing which belied that order. There is a procedural error which cannot be remedied by padding the Judgment.

2. Express trust. As part of the Firm's discussion of *In re Short* on page 48 in which it appears to represent to the Court that the case stands for the opposite principle from the Ninth Circuit's holding[2], there is a second citation to the BAP Memorandum. Here the Firm characterizes references two provisions of separate partnership acts, NRS 89.210 which *is* applicable to the 1995 partnership of Woods Erickson and Maurice LLP and the one which is *not* applicable to the Firm, NRS 87.4336. The Firm seems to dismiss the legal determination that the BAP makes by referring to it as "inexplicable." Opposition [210] 48 fn 19. Platt would argue that the determination is not inexplicable, but quite clearly explained. The BAP interprets NRS 87.4336 to provide that partners of partnerships formed after 2006 could have duties under an express trust but that the NRS 87.210 language, while it uses the word "trust" in statute, is not the type of express trust that creates a federal fiduciary duty. This does not seem to be an inexplicable part of the BAP's Memorandum. The failure to mention NRS 87.210 as creating an express trust is because, the BAP explains, its terms do not create a federal fiduciary duty. As

---

[2] *In re Short* is entirely consistent with *Haller*. The Washington Court held that Washington *case law*—not any provision of the Uniform Partnership Act created a fiduciary duty for managing partners. *In re Short*, 818 F.2d 693, 695 (9th Cir. 1987) (endorsing the law that "if state law makes clear that a partner necessarily is a trustee of partnership assets for all purposes, then that partner is a fiduciary."), Opposition [210] 47. In *Haller*, the Ninth Circuit held that California courts had *created* such a duty as well. *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986) ("California courts, however, have raised the duties of partners beyond those required by the literal wording of [the UPA]"). There are zero similar decisions in Nevada. Thus, the general rule applies. It is true that *Short* found a managing partner had a fiduciary duty and it is true that the opinion cites the Uniform Partnership Act. But the holding is that Washington partners have a federal fiduciary capacity because of Washington case law. The Opposition cites the holding of *Short* on page 47 that *case law* must have created a fiduciary duty, but then represents on page 48 that "the Ninth Circuit in *Short* determined [the Washington statute] was sufficient to establish the requisite fiduciary capacity."

3

made clear in *In re Short* and *Haller* which treat the Uniform Partnership Act language as an *ex maleficio* duty.

Platt respectfully asserts that the mandate from the BAP was not to pad the Judgment, but to rule in accordance with applicable law which it identifies and explains. The BAP makes clear that, even if Platt had been a partner of the type in *In re Short*, who had expansive managerial duties over the partnership's accounting and administration, in Nevada, with a 1995 partnership, there was no express trust. Thus, for Platt, especially as (at most) a limited partner, there is no way to make the leap to fraud or defalcation in a fiduciary capacity in the meaning of 532(a)(4).

3. <u>Gainsaying the BAP</u>. While probably not in reference to the Statement of Law, the Opposition does make a final reference to Memorandum. On page 49, the Opposition asserts "the BAP Memorandum seeks clarification on what these findings mean because Judge Beesley did not provide his reasons for reaching these findings, but the findings actually made are quite clear[.]" Platt would counter that even if the findings were amplified with more detailed reasoning, this would be unavailing because the BAP also held that the actual findings of the Judgement did not align with applicable law.

If Platt understood the Court's briefing instructions and the context of the briefing is to analyze the effect of the BAP determination on the case, it seems unhelpful to assert that the trial court got it right and the appellate panel should be disregarded except for the parties to provide additional reasons for the result the BAP criticized. It should go without saying that the power of 28 USC § 158 providing for the Bankruptcy Appellate Panel to hear appeals from bankruptcy courts requires more than would be appropriate in a motion for rehearing. As the BAP instructed, subsequent proceedings are to take "further action consistent with this memorandum." Memorandum [BAP 28] 7. Subsequent proceedings are governed by the mandates of the BAP. "A district court that has received the mandate of an appellate court cannot vary or examine that

mandate for any purpose other than executing it." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012); *In re Moon*, 642 B.R. 27, 34-35 (Bankr. D. Nev. 2022).

4. <u>A repeat of the Judgment is not possible on remand</u>. The BAP identified eight matters which must govern any subsequent result:

1. The BAP held the nonconsolidation ruling inconsistent with the final ruling on damages. Memorandum [BAP 28] 2, 4.  To correct this error, the Court must conduct additional proceedings after giving proper notice of consolidation, or restrict its ruling to dischargeability.
2. The BAP held that ordering nondischargeability based on larceny cannot be squared with the Court's determination that larceny was not at issue. Memorandum [BAP 28] 3. Just as before, to correct this error, the Court must conduct proceedings allowing additional witnesses on this issue—or confine it decision to fiduciary capacity.
3. The BAP raised concerns about the finality of the order. Memorandum [BAP 28] 3–4. This issue can be addressed by confining the order to dischargeability and allowing the State Court action to resolve the competing claims for damages.
4. The BAP found that the basis for the judgement muddled two different theories: larceny and fiduciary duty. Memorandum [BAP 28] 4–5.  The legal basis given in the Judgement indicates that the trial court did not give appropriate attention to the elements of theories for recovery before it. This casts serious doubt the Judgement such that simply restating the same outcome at greater length will not satisfy the BAP's instructions.
5. The BAP identified flaws with Platt's alleged partnership duties. Memorandum [BAP 28] 5, 6. But when the BAP indicated that there is an unreconcilable question of which partnership Platt could have been admitted to emphasizes that the theory by which Platt allegedly became a partner without having a right to partnership profits flies in the face of Nevada law.

6. The BAP held that fiduciary capacity cannot exist as to the 1995 partnership. Memorandum [BAP 28] 5–6. Without a federal fiduciary duty, Platt must be granted a discharge.

7. The BAP emphasized the state of mind element required for denial of discharge. Memorandum [BAP 28] 6. Platt believes he was permitted to perform side-work and so he cannot have the state of mind that justifies denial of discharge for larceny or embezzlement.

8. The BAP pointed out that there are serious problems with the figures used by the trial court. Memorandum [BAP 28] 5, 6. The error that payment from the Department of Education is clear error where not even the Firm claims Platt was any type of partner at that period. Likewise, the face of the evidence indicates that the figure the Firm cites for damages from Platt's side work is inflated. The errors are so blatant that it demonstrates that the correct standards of analysis were not followed in preparing the judgement.

**B. Dueling facts do not carry the burden of proof**

The Opposition made special assertions regarding the context provided by the Statement of Law, but they are not consistent with the record.

1. <u>Managing Partner status</u>. Mr. Glen Woods was certainly *the* managing partner. The Firm asserts that Platt ignores the fact that "Mr. Erickson and Mr. Whitaker were also Managing Partners at all relevant times." Opposition [210] 18. With respect to the Partnership Agreement, Platt would certainly concede that all three of them were *general* partners and even managing partners with certain managerial powers and attendant duties attach to general partners. But for purposes of who was the driving force behind the firm and the primary decision maker, Mr. Woods was held out as the Managing Partner. As in Exhibit 202-6 at 167–170 discussing Trial Exhibit E6, Mr. Woods is the sole "Managing Partner" as far as how the employees understood

the Firm was managed. The Firm is using titles different[3] from the meaning of the Nevada Partnership Act (and from the Partnership Agreement); in 2014, Mr. Whitaker is listed as a



"Partner" and Platt is identified as a "Junior Partner." This issue of titles different from the Partnership Agreement seems to be an odd fight to pick when the Firm's argument in this case has been that the Court should *not* look at the Partnership Agreement, which Platt did not sign in 2016, but that the Court should look at the way he was held out to the public. The Firm's website nevertheless shows that Platt was referred to in the vernacular as a junior partner just as Glen Woods was referred to as *the* Managing Partner.

2. <u>Reasons for Resignation</u>. The Firm urges the Court to disregard the claim that Platt resigned from the Firm because of threat to withhold wages and that he considered Mr. Whitaker and Mr. Erickson to be acting unethically. Opposition [210] 18. Other than testimony at trial, 202-6 at 115, 202-7 at 46, 202-8 at 22, the Firm is other correct that there is no other evidence of

---

[3] See also [202] Ex. 58 at 2 for the use of partnership titles in a professional corporation.

their conduct on the record—which is exactly the point at issue observed by the BAP with respect to nonconsolidation. There was discovery showing contemporaneous text messages and email between Platt and Mr. Erickson on these points. But because the case had been bifurcated between dischargeability in 01125 and the full claims and counterclaims 01122, the context at Platt's exit were not at issue. The grant of summary judgment as to 523(a)(2) fraud claims and the limited focus on fiduciary capacity made actions that may have taken place months later and whether they were a cover up[4] or self-defense became irrelevant to the proceeding. If the Court now consolidates and orders proceedings to deal with all the claims, the documents can be admitted to provide contemporaneous backing to trial testimony.

    3. <u>Mentioning conversion is not the same as alleging larceny</u>. In light of the BAPs emphasis on state of mind, Memorandum [BAP 28] 6, and its insistence on separating elements of recovery theories, *Id*. 4–5, the BAP clearly did not adopt the Plaintiff's false equivalence. The Opposition suggests that Platt knew that larceny was at issue in the trial, Opposition [210] 20, and that "conversion under Nevada law equals larceny under federal law." Opposition [210] 42.

    The fact that Plaintiff's equivalency argument is based on an obvious misquotation of *Ormsby* should have put an end to that argument. The *Ormsby* opinion even calls out the trial court for that shoddy reasoning. *In re Ormsby*, 591 F.3d 1199, 1206 fn 6 (9th Cir. 2010). The *Ormsby* opinion explicitly stated how the additional element was established calling out the debtor's contemporaneous conduct in connection with the diversion of creditor's property. *Id.* at 1206.

    Likewise, the fact that the Motion to amend to add larceny and embezzlement explicitly stated that these claims were being added by amendment[5] and that the motion was denied, should have been enough. As referenced above, the BAP accordingly determined that the matter before

---

[4] The taking of the property must be grounds of discharge. Subsequent acts are not grounds for denial of discharge.
[5] "[A]mendment is proper to clarify that the basis for the application of that section [523(a)(4)] is embezzlement, larceny and conversion." Motion to Amend [39] lines 27–28.

the trial court was fiduciary capacity: "The complaint, as relevant to this appeal, requests recovery based on alleged breach of fiduciary duty." Memorandum [BAP 28] 2.

It is true that the Complaint [1] mentioned the word conversion and that not all claims must be plead with particularity. But in light of the BAP's comments, the trial court's order denying amendment, and Rule 4007(c), there would have had to be notice from the Court that it was willing to rule on embezzlement and larceny. In its first claim related to (a)(2), the Firm alleged its damages arose from the conversion of Firm resources:



Complaint [1] 7. The bad acts alleged were unrelated to the exit from the Firm and not in *obtaining* the earnings through L&S, the trial court accordingly granted summary judgement on this claim. Order Granting in Part and Denying in Part Amended Motion for Summary Judgment [74].

The other mention of conversion in the Complaint related to the second Claim, this time connected to (a)(4) and specifically states that the alleged conversion was a manner whereby he had breached his fiduciary duty.

9

> 44. Platt further breached his fiduciary duties to the Firm and the other partners within the Firm by competing with the Firm, engaging in self-dealing, concealing information from the Managing Partners of the Firm, retaining and converting revenues that were the rightful property of the Firm, destroying Firm property, using Firm property and resources for his personal gain, engaging in fraudulent behavior that was harmful to the Firm and Firm clients while presenting
>
> Case 19-01125-btb    Doc 1    Entered 12/27/19 14:39:53    Page 9 of 9
>
> himself as an agent and representative of the Firm, and engaging in a conspiracy to defraud the Firm.

*Id.* 8–9. In both the alleged conversion under (a)(2) claim and the claim of breach of a fiduciary duty there are no allegations of specific intent—because defalcation, like conversion, does not require it. The elements of conversion and defalcation each require wrongful acts but do not require specific intent.

| Conversion | Defalcation in a fiduciary capacity |
|---|---|
| (a) Wrongful (b) dominion exerted (c) inconsistent with another's rights in (d) their property (e) regardless of intent.[6] | (a) an express trust existed, (b) the debt arose from a failure to produce funds (c) through improper or reckless conduct (d) where the debtor acted as a fiduciary to the creditor at the time the debt was created[7] |

---

[6] *In re Ormsby*, 591 F.3d 1199, 1205–06 (9th Cir. 2010): Conversion is defined as "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights. Additionally, conversion is an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge." *M.C. Multi-Family Development, L.L.C. v. Crestdale Assocs., Ltd.*, 193 P.3d 536, 542-43 (Nev. 2008).
[7] *In re Quinones*, 537 B.R. 942, 950 (Bankr. N.D. Cal. 2015): A debt is nondischargeable under § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity if "(1) an express trust existed, (2) the debt was caused by

The (a)(4) discussions with the settlement judge focused only on fiduciary duty—because that is all that was at issue. Said another way, reference to conversion in the Complaint cannot have implicitly included embezzlement and larceny because they both include specific intent[8], and here is the point, contradictory intent.

| **Embezzlement** | **Conversion** | **Larceny** |
|---|---|---|
| (a) **fraudulent** appropriation of (b) another's property by one (c) **to whom it had been entrusted**.[9] | (a) Wrongful (b) dominion exerted (c) inconsistent with another's rights in (d) their property (e) regardless of intent.[10] | (a) **Felonious taking** of (b) another's property (c) with intent to convert.[11] |

For embezzlement to be implied, the Firm would have had to admit that Platt was permitted to receive the amounts—that Mr. Woods did give consent to the side work just that Platt then owed

---

fraud or defalcation, and (3) the debtor acted as a fiduciary to the creditor at the time the debt was created." *In re Utnehmer*, 499 B.R. 705, 2013 WL 5573198, *5 (9th Cir. BAP 2013) (quoting *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1459 (9th Cir. 1997)).
*Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-74 (2013): Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty.
*In re Hemmeter*, 242 F.3d 1186, 1191 (9th Cir. 2001): The definition of defalcation includes both the "misappropriation of trust funds or money held in any fiduciary capacity; [and the] failure to properly account for such funds." *Lewis*, 97 F.3d at 1186 (quoting *Black's Law Dictionary* 417 (6th ed. 1990)). . . . However, regardless of the mens rea required, the essence of defalcation in the context of § 523(a)(4) is a failure to produce funds entrusted to a fiduciary.
[8] *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274–275 (2013).
[9] *In re Quinones*, 537 B.R. 942, 950 (Bankr. N.D. Cal. 2015): Section 523(a)(4) excepts from discharge debts for "embezzlement." Federal law controls the definition of embezzlement for purposes of § 523(a)(4). See *In re Wada*, 210 B.R. 572, 575 (9th Cir. BAP 1997). Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 40 L.Ed. 422 (1895). In order to except a debt for embezzlement from discharge the creditor must show: "(1) property rightfully in possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991) (quoting *In re Hoffman*, 70 B.R. 155, 162 (Bankr. W.D. Ark. 1986)) (internal quotations omitted).
[10] Identical to footnote 6.
[11] *In re Quinones*, 537 B.R. 942, 950 (Bankr. N.D. Cal. 2015): Section 523(a)(4) excepts from discharge debts for "larceny." Bankruptcy courts look to the federal common law to define larceny for purposes of § 523(a)(4). *In re Ormsby*, 591 F.3d 1199, 1206 (9th Cir. 2010). Federal common law defines larceny as a "felonious taking of another's personal property with intent to convert it or deprive the owner of the same." See *id.* (quoting 4 *Collier on Bankruptcy* ¶ 523.10[2] (15th ed. rev. 2008)) (internal quotations omitted). "Larceny is distinguished from embezzlement in that the original taking of the property was unlawful." *In re Montes*, 177 B.R. 325, 332 (C.D. Cal. 1994).

the Firm a share. For larceny to be implied, the Firm would have had to allege contemporaneous actions other than those already encompassed in (dischargeable) conversion, such as intercepting checks written to the Firm where the clients thought they were doing business with the Firm.[12] In the context of the order weeks before trial, the contradictory elements of embezzlement and larceny could not be implicit in a claim focused on fiduciary duty.

    4. <u>Platt's conduct shows he was following the approval of the Managing Partner</u>. The Firm has a confusing argument that even though other instances of attorneys' work outside the firm had to be approved by Mr. Woods, in the case of L&S, he lacked the power to approve it, and then even though Mr. Woods' acts as Managing Partner were the subject to the Firm's claim against his estate, Trial Exhibit I1 and J1, it should have double recovery this time from Platt. The most relevant instances of Mr. Woods' unilateral acts were the authorization of John Bulloch to move to Ireland to work for a client instead of billing time through the Firm, 202-3 at 63–64; 202-7 at 42, and the creation of a competing partnership with Platt and a client of the firm, Weintraub Woods and Platt LLLP. It is clear that his partners were not involved in these decisions and that the employees generally, and Platt specifically, understood this.

    The competing law firm of Weintraub Woods and Platt is relevant because it was explicitly the template for L&S. Platt received permission to follow the WWP pattern with a referral unconnected to the Firm and followed that pattern. It was firm policy to discuss matters with Mr. Woods. Platt was not aware of any habit of formal resolutions for the decisions he discussed with Mr. Woods or a tipping point when decisions had to be discussed with anyone else. Mr. Woods had told Platt that he was the majority partner, and Mr. Erickson and Mr. Whitaker both deferred to him. Platt's experience with business law reinforced that the agreement of the partners, in the case of the NRS 87A partnerships which Platt generally formed, provided the governing standards

---

[12] The attorney in question in *Prince, Yeates & Geldzahler v. Young*, 94 P.3d 179 (Utah 2004) did exactly that. Absent such deceit, the firm has the burden to show that attorney-client relations (analogous to doctor-patient relationships) are not property of an employer.

and never saw Mr. Woods mention that he had an agreement which required that he deliberate on any matter when he made a decision. Before Platt and Woods had ever discussed the idea of Platt working with Joffe's clients outside of the Firm, Platt had one client desire to make incentive payments to Platt directly. Trial Exhibit G3. In all these cases, Platt knew that Mr. Woods alone was involved in the decision. While there is no evidence that Platt and Mr. Woods ever discussed the specific provisions of the Firm's partnership agreement, Platt's familiarity with partnerships told him that the partnership agreement governed, and in Platt's experience with management decisions at the firm, it was entirely consistent with Firm policy for Platt to present ideas to the Woods alone.

- Trial Exhibit F3, shows the transfer between L&S' trust account and the Firm's trust account after $29,000 was mistakenly paid from the Firm's account. Miller, the office manager, talked with Platt about the mistake with Platt's trust account and she admitted that she told Mr. Woods about the incident.
- Platt strictly limited the clients in L&S to only Joffe's referrals (before April 2018). After the split from the Firm, many clients including Platt's friends from church immediately followed Platt to L&S. Had Platt asked them before, they would likely have moved without question; but because the deal with the Firm was limited only to Joffe referrals, Platt did not try to move any clients to L&S except per the agreement and even continued to engage new clients (not referred by Joffe) through the Firm throughout that time. Trial Exhibits A1–A5.
- The Firm produced at least three emails threads from 2017 discussing the authorization to conduct business in two firms. Trial Exhibit Y. The story has been consistent: in August 2017, Woods gave permission, whereupon, Platt started telling Joffe and those connected with his referrals about that arrangement and letting them choose.
- As described above, Platt followed the precedent established by WWP because that was the way the agreement was made: WWP, but with Joffe.

13

- Platt and Woods made sure that engagement letters set to clients and the terms on the Firm website included L&S because it was a limited purpose arrangement. Trial Exhibit F2. L&S' engagement letter reference the Firm; the Firm's engagement letter referenced L&S.
- Platt spent hundreds of hours developing an automated governance system. With the number of clients Platt had in L&S at first, such a system would have been more work, not less, and could not have justified the massive effort.

Given the short period of time between the authorization and Woods' death and the small number of clients at issue, this list of corroborating evidence testifies loudly, clearly, and consistently that Platt acted according to the permission he had been given. Far from acting with wrongful intent, Platt acted with constraint and purpose. The fact that Mr. Erickson and Mr. Whitaker were not involved in Firm decision making is not evidence of wrongful intent; that was a matter between them and Mr. Woods—a matter which has been settled in full.

Platt is not proud of the way he acted after Mr. Woods death and repeats his apology to Mr. Whitaker and Mr. Erickson. But as to the amounts earned from the Department of Education and later through L&S, Platt did not commit larceny and did not breach a federal fiduciary duty to the Firm.

**C. Conclusion**

Defendant urges the Court to interpret the BAP Memorandum as requiring action in accordance with its contents rather than interpreting it as simply an affirmation of the Judgment just with a longer explanation. If the Court preserves the scope consistent with its orders (prior to the Judgment), in light of the direction provided by the BAP, the Court has sufficient evidence in the record to deny the Complaint and grant discharge.

Respectfully submitted

Signature:   /s/ Andrew Platt
                Andrew Platt, Pro Se
                1827 W 650 N
                Springville, Utah 84663
                702.534.1560
                notice@plattmosphere.com

**Certificate of Service**

I certify that on 10 November 2022, I electronically filed the foregoing document with the Clerk of the Court for the Bankruptcy Court for the District of Nevada by using the CM/ECF system.

I certify that all parties of record to this appeal either are registered CM/ECF users, or have registered for electronic notice, or have consented in writing to electronic service, and that service will be accomplished through the CM/ECF system.

Signature:     /s/ Andrew Platt